No. 24-7141

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

MEDIA MATTERS FOR AMERICA, *et al.*,
*Plaintiffs-Appellees*,

v.

ANDREW BAILEY,
*Defendant-Appellant.*

Appeal from the United States District Court for the District of
Columbia, Hon. Amit P. Mehta, No. 24-cv-00147

## APPENDIX TO BRIEF FOR APPELLANT
## MISSOURI ATTORNEY GENERAL

**ANDREW BAILEY**
Attorney General of Missouri

**JEREMIAH J. MORGAN**
Deputy Attorney General – Civil

**JOSHUA M. DIVINE**
Solicitor General

**REED C. DEMPSEY**
Deputy Solicitor General

207 W. High St.
Jefferson City, Missouri 65101
Phone: (573) 751-8870
Fax: (573) 751-0774

*Counsel for Appellant-Defendant*
*Attorney General of Missouri*
*Andrew Bailey*

# TABLE OF CONTENTS

R.Doc.1      Complaint                                                App.001

R.Doc.37     Opinion re Motion for TRO and Preliminary   App.047
             Injunction

R.Doc.38     Order re Motion for TRO and Preliminary     App.087
             Injunction

R.Doc.39     Rule 15(D) Motion to Supplement the
             Complaint                                    App.089

R.Doc.39-1   Email re Rule 15(D) Motion                   App.102

R.Doc.39-2   Supplemental Complaint                       App.105

R.Doc.39-3   Attorney General Bailey Notice of Pending
             Investigation                                App.128

R.Doc.39-5   Missouri Civil Investigative Demand          App.133

R.Doc.39-6   Petition for Order to Enforce Civil
             Investigative Demand, *Missouri v. Media
             Matters for America*, No. 24AC-CC02291       App.141

R.Doc.40     Attorney General Paxton Opposition to Rule
             15(D) Motion                                 App.211

R.Doc.44     Order re Rule 15(D) Motion                   App.216

R.Doc.49     Plaintiffs' Motion for TRO and Preliminary
             Injunction                                   App.220

R.Doc.49-2   Supplemental Declaration Eric Hananoki       App.223

R.Doc.49-3   Supplemental Declaration Cynthia Padera      App.231

R.Doc.49-5   Supplemental Declaration of Benjamin
             Dimiero                                      App.238

R.Doc.56-1   Declaration of Steven Reed   App.241

R.Doc.57   Attorney General Bailey' Motion to Dismiss   App.264

R.Doc.63-1   Amended Petition for Order to Enforce Civil Investigative Demand, *Missouri v. Media Matters for America*, No. 24AC-CC02291   App.264

R.Doc.63-2   Second Declaration of Steven Reed   App.281

R.Doc.68   Attorney General Bailey's Response to Notice of Supplemental Authority   App.284

R.Doc.70   Order re Motion for TRO and Preliminary Injunction   App.284

R.Doc.71   Opinion re Motion for TRO and Preliminary Injunction   App.290

R.Doc.74   Attorney General Bailey's Notice of Appeal   App.328

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, P.O. Box 44811, Washington, D.C. 20026; *and*, ERIC HANANOKI, Notice of address to be filed under seal pursuant to LCvR 5.1(c)(1), Plaintiffs, v. WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, P.O. Box 12548, Austin, TX 78711, Defendant. | Civil Action No. 24-cv-147 [CIVIL RIGHTS ACTION] **COMPLAINT** **(Rule 57 Speedy Hearing Request)** |

## INTRODUCTION

1.      This case is a test of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). At the heart of this commitment is the First Amendment's promise that the people and the press may discuss public matters—and criticize powerful people—"without . . . fear of subsequent punishment" from government officials. *Roth v. United States*, 354 U.S. 476, 488 (1957) (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 101–02 (1940)).

2.      Plaintiff Media Matters for America ("Media Matters") is a Washington, D.C. based organization dedicated to comprehensively monitoring, analyzing, and correcting

misinformation in the U.S. media. It employs over 60 reporters, writers, and researchers, who regularly publish news articles, analysis, research, and studies about a variety of issues of great public interest. Among them are Plaintiff Eric Hananoki, Media Matters's Senior Investigative Reporter, who for the past decade has specialized in reporting on extremism—including white nationalism, antisemitism, and Islamophobia—in the public square. For years, Media Matters and Mr. Hananoki have regularly published material that is critical of powerful figures, politicians, and elected officials. Their careful reporting and research work has been extensively cited and discussed by other media outlets—and even government agencies—as they have established themselves as important voices contributing to an ongoing and critical national discussion about extremism in our politics and media.

3.       Over the past year, as part of their long running work and mission, Plaintiffs have frequently reported on a major national news story—the disturbing rise of violent and extremist rhetoric on the popular social media platform X (formerly known as Twitter) since it was purchased by Elon Musk, reportedly the world's richest man, in late 2022. As Media Matters and countless others in the media have reported, as hateful rhetoric has continued to proliferate on the platform (often alongside Musk's own statements appearing to endorse extremist views and conspiracy theories), many advertisers have chosen to leave X. And much of Media Matters's reporting on the subject has come from Hananoki who, for nearly a year now, has been publishing a series of articles specifically about X's apparent inability to protect its advertisers from appearing alongside extremist content—despite X's repeated promises that it would do just that.

4.       This case arises out of an article that Media Matters and Hananoki published in November. That article was published on November 16, 2023, when Musk was in the middle of a veritable media storm resulting from his apparent endorsement on X of a fringe conspiracy theory

2

that postulates that Jewish people have a "hatred against whites" and support "flooding the[]
country" with "hordes of minorities." That article was titled, "*As Musk endorses antisemitic
conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-
Nazi content*," and, in it, Hananoki reported that at the same time Musk appeared to endorse this
antisemitic conspiracy theory, X was permitting the placement of advertisements next to pro-Nazi
content. His article published several examples, such as this image of an advertisement for Oracle
appearing next to an image of Adolf Hitler:



5.      Although the subject of the article—specifically X's consistent failure to protect
advertisers from their advertisements appearing alongside hate speech on the platform—had been
addressed in near-constant media coverage for over a year, Musk appeared to take personal offense
at the November 16 article, and shortly after it was published, tweeted to his 165 million followers
that X would be filing a "thermonuclear" lawsuit against Media Matters and anyone else involved

App.003

with the article. A mere two days later, Musk made good on his threat, filing suit against Media Matters and Hananoki on November 20, 2023. *See X Corp. v. Media Matters for America, et al.*, No. 4:23-cv-1175, 2023 WL 8091661 (N.D. Tex. Nov. 20, 2023). Although Media Matters and Hananoki have no meaningful contacts with Texas, X chose to file this lawsuit in federal district court for the Northern District of Texas, in the face of binding precedent that merely having a website available in a state does not supply jurisdiction.

6.     On the same day that X filed that lawsuit (indeed, within minutes of its filing), Defendant Texas Attorney General Ken Paxton—another prominent public figure about whom Hananoki and Media Matters have reported in the past—announced he was launching an investigation into Media Matters, purportedly under Texas's deceptive trade practices act. *See* Ex. A, *Att'y Gen. Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity*, Texas Att'y Gen.'s Office (Nov. 20, 2023). The press release announcing the investigation was four sentences long and identified no basis for the State of Texas to "investigate" Media Matters, a D.C.-based organization, for purported violation of Texas law. It does, however, repeatedly describe the investigation's target in troubling and nakedly partisan terms, calling Media Matters "a radical anti-free speech organization," and "a radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square." It also admits that the sole bases for the "investigation" are X's own self-serving and unverified allegations about Media Matters's and Hananoki's reporting.

7.     That the "investigation" was pretext to rifle through Media Matters' internal communications and chill the reporting of Media Matters and Hananoki was proved the following day, when Paxton issued a civil investigative demand ("Demand") to Media Matters. The Demand commanding Media Matters to "produce [] documentary material[s] and permit inspection and

copying" of a sweeping array of materials in both Media Matters's and Hananoki's possession, including documents and communications about their research and reporting, their communications with possible sources at X and its advertisers, and other sensitive materials related to Media Matters's operations, including information about the organization's funding. Ex. B, Civil Investigative Demand, Office of the Att'y Gen. (Nov. 21, 2023) at 7. Paxton did not pause for even a moment to consider other public reporting on the same topic, or materials clearly within his office's reach, to determine either whether there was a legitimate substantive or jurisdictional basis for the investigation, before demanding these extraordinarily invasive materials from Media Matters itself. The result has been to immediately and significantly chill Plaintiffs' newsgathering, research, and reporting activities on X or Musk, by asserting an immediate, seemingly unrestrained right to any and all related materials, from now until Paxton determines the investigation is over. Ex. B at 7. And, under Texas procedure, Paxton is entitled to enforce the Demand in Texas state court *at any time*, even though Plaintiffs have no relevant connection to Texas and have been afforded *zero* explanation as to how they may have violated Texas law.

8.     Paxton's retaliatory campaign has had its intended effect: Plaintiffs have not published any articles about how Musk's ownership has triggered a rise in political extremism on X since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment.  Hananoki himself had two articles that were already researched and drafted—including one article that had gone through the entire editing process and was effectively ready for publication—at the time Media Matters received the Demand. But neither was published in the wake of the Demand. The chill on Hananoki's reporting is ongoing—he previously published one or two articles per week prior to receiving the Demand, but has published only two articles *altogether* since then, and none about Musk's handling of

political extremism on X. In the two articles Hananoki was able to publish, he has purposefully avoided commenting on X's content moderation policies, even where plainly relevant to the article.

9. "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Likewise, under the Fourth Amendment, it is "contrary to the first principles of justice to allow a search through [Plaintiffs'] records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). Paxton's retaliatory investigation and Demand are "premised solely upon *legal* activity" and thus "the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco.*" *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) (suppressing civil investigative demand violating Fourth Amendment).

10. In view of Paxton's unlawful harassment and retaliation, Plaintiffs seek immediate declaratory and injunctive relief from this Court—in a jurisdiction where their constitutionally protected activities occur, where Media Matters is incorporated and has its office, where most of Media Matters's reporters and researchers live and work, and where Plaintiffs will be uniquely injured by being compelled to disclose information—to vindicate their fundamental right to gather news and hold the powerful to account. To the same end, Plaintiffs also respectfully request that the Court order a "speedy hearing" of this "declaratory-judgment" action. *See* Fed. R. Civ. P. 57.

## JURISDICTION & VENUE

11. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs' federal constitutional claims arise under the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1988. It has authority to grant Plaintiffs declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers. It also has supplemental

jurisdiction over any state law claims derived from a common nucleus of operative fact. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988).

12.     Subject matter jurisdiction further exists under Article III because Plaintiffs have suffered and will continue to suffer injuries-in-fact; there is a sufficient causal connection between Plaintiffs' injuries and Paxton's actions in pursuing his investigation and Demand, and a favorable decision from this Court granting Plaintiffs relief will redress those injuries. This dispute is ripe because Plaintiffs' rights are being violated already, and Plaintiffs will suffer further imminent invasions of those rights in the absence of relief from this Court. Plaintiffs have actual fear that the Demand will be enforced against them, which has already chilled their speech.

13.     This Court has personal jurisdiction over Defendant Paxton in his official capacity as Attorney General of Texas. The District of Columbia's long-arm statute is effectively congruent with the permissible limits of personal jurisdiction under the Due Process Clause. *See, e.g.*, *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020); *Mouzavires v. Baxter*, 434 A.2d 988, 993 (D.C. Cir. 1981). For constitutional purposes, specific personal jurisdiction exists where (1) the defendant has "purposefully directed" activity at residents of the forum and (2) the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Lewis v. Mutond*, 568 F. Supp. 3d 47, 52 (D.D.C. 2021) (first quoting *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472–73 (1985), and then quoting *Bristol-Myers Squibb v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017)). Even "a single act, so long as it creates [a] 'substantial connection,' is sufficient." *Heller v. Nicholas Appelgate Cap. Mgmt. LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 475, n.18 (1984)).

14.     The Court has at least three related bases to exercise jurisdiction over Paxton consistent with the demands of due process. First, Paxton procured the service of an agent—a

process server—and directed that agent to enter the District of Columbia to serve the Demand upon Media Matters. It is well-settled that "physical entry into the State—either by the defendant in person *or through an agent*" is a "relevant contact" for purposes of personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphasis added); *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018). Second, Paxton's Demand seeks documents from Media Matters that are overwhelmingly located in the District, where Media Matters is headquartered and where Media Matters will have to undertake any effort to comply with the Demand. By demanding such documents, Paxton has unquestionably "directed" activity at Media Matters in D.C. And Plaintiffs' claims unquestionably "arise" from those contacts because three of their claims challenge the statutory and constitutional propriety of Paxton's Demand. *See infra* Counts II–IV. Third, Plaintiffs allege unlawful retaliation in violation of the First Amendment, an intentional tort. *See infra* Count I. In intentional-tort cases, "personal jurisdiction can be based upon: (1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered— and which the defendant knows is likely to be suffered—in the forum state." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 29 (D.D.C. 2017) (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998)), *aff'd,* No. 17-7033, 2018 WL 4440459 (D.C. Cir. July 17, 2018); *see also Calder v. Jones*, 465 U.S. 783, 788–89 (1984)*.* Here, jurisdiction is proper because Paxton has intentionally served a Demand on Media Matters in the District causing a substantial and predictable chill to Media Matters and its reporters, including Hananoki. Indeed, Paxton has conceded the Demand was "directed" at Media Matters in the District of Columbia. *See infra* ¶¶ 76–77 & note 28.

15.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia. Paxton caused his

Demand to be served in the District; Media Matters's compliance or noncompliance therewith will occur in the District; and the substantial chill to Plaintiffs has been suffered, in substantial part, in the District.

## PARTIES

16.     Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting misinformation in the media. Media Matters routinely investigates political extremism on media platforms in the United States and publishes articles and commentary on public figures who endorse or espouse such rhetoric. It has been incorporated under the laws of, and has had its principal place of business in, the District of Columbia since its founding over twenty years ago. Most of its reporters and employees live in and work from the Washington, D.C. metropolitan area, including in Maryland and Virginia, as well as the District itself. Nearly all of Media Matters's executive leadership lives and works in the District of Columbia. Any periodic in-person meetings, trainings, and other convenings are held at Media Matters's office space in the District of Columbia, where it also stores any physical documents.

17.     Plaintiff Eric Hananoki is a Senior Investigative Reporter at Media Matters. Hananoki resides in Maryland, just outside of Washington, D.C. For over a decade, Hananoki's beat for Media Matters has included investigating, researching, and reporting on political extremism in U.S. media, including on social media platforms like X. In his role as Senior Investigative Reporter, Hananoki has written many articles about extremism, white nationalism, and anti-Semitic rhetoric espoused by politicians and public figures. Hananoki's reporting has included numerous articles about social media platform X and its owner, Elon Musk. Hananoki generally researched and wrote his articles, including the November 16 article, from his residence

in Maryland. Although Hananoki primarily works from his Maryland home, he occasionally visits the Media Matters office in Washington, D.C. as part of his job responsibilities.

18.     Defendant Warren Kenneth Paxton, Jr. is the Attorney General of the State of Texas and is sued in his official capacity. The Texas Deceptive Trade Practices Act ("DPTA"), Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*, grants Paxton various powers in his capacity as Attorney General through the consumer protection division of his office. This includes the power to issue a "civil investigative demand requiring" the recipient "to produce [] documentary material[s] and permit inspection and copying." Tex. Bus. & Com. Code Ann. § 17.61(a). Under Texas law, the Attorney General is not required to show any cause or even make a threshold determination that he has jurisdiction to issue a Demand—he may do so if he "believes" the recipient to be in possession of relevant material concerning a possible violation of the DPTA. Tex. Bus. & Com. Code Ann. § 17.61(a). Paxton "may use the documentary material or copies of it as [he] determines necessary" to enforce the DPTA, including before a court. Tex. Bus. & Com. Code Ann. § 17.61(f).

## FACTS

**A.     Media Matters and Hananoki have a long track record of reporting on political extremism, including on social media platforms like X.**

19.     Since its founding in 2004, Media Matters has been dedicated to monitoring and correcting misinformation, including by publishing its own investigatory research and reporting on its website. Media Matters provides its reporters and researchers, including Hananoki, a powerful platform from which to reach the public, often in the form of research and reporting on current events and criticism of powerful public figures and politicians.

20.     Media Matters has over 100 employees—including over 60 reporters, writers, and researchers—most of whom work and reside within the Washington, D.C. metropolitan area where

Media Matters's sole office is located.[1] Media Matters does not have an office, or any other physical presence, in Texas. Media Matters does not transact any business in Texas and thus has never registered in the state. *See* Tex. Bus. Orgs. Ann. Code § 9.002(a). Media Matters is also not registered as a charity organization in Texas and does not have a registered agent in the state.

21.    Hananoki has worked at Media Matters since 2007 and is currently a Senior Investigative Reporter. Previously, Hananoki worked as a Researcher, Senior Researcher, Research Fellow, and Investigative Reporter at Media Matters. In his more than 16 years at the organization, Hananoki has researched and written countless reports and articles, often shedding light on public figures who espouse violent, extreme, or racist views. His articles and reports have been widely cited by a broad array of media outlets, including the Associated Press, CNN, Fox News, Los Angeles Times, MSNBC, New York Post, New York Times, Politico, USA Today, Wall Street Journal, and Washington Post.

22.    His long history of research and reporting has been relied upon by government officials, including under both Democratic and Republican leadership. Under President Trump, the Department of Justice cited Hananoki's research regarding a commentator who promoted and sold a bogus COVID-19 cure.[2] Special Counsel Robert Mueller cited Hananoki's reporting on

---

[1] Media Matters employees may request authorization to work remotely and, upon approval, may choose to do so from any location in the United States. Of Media Matters employees authorized to work remotely, only one employee has provided a residential address in Texas. That employee did not work with Mr. Hananoki on the November 16 article, nor any other of his articles related to X or otherwise, and works in an entirely different department. Nonetheless, since October 2023, that employee has only visited Texas for a short period during the holidays—where they only worked for a single day.

[2] *United States v. My Dr. Suggests LLC*, No. 2:20-CV-00279-DBB (D. Utah Apr. 27, 2020), Plaintiffs' Ex Parte Mot. and Mem. of Law for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dkt. 2, at 13; *id.*, Decl. of Virginia Keys, Dkt. 2-1, ¶¶ 7, 28–29.

Roger Stone in his report on Russian interference in the 2016 presidential election,[3] as did a bipartisan U.S. Senate Select Committee on Intelligence report regarding the same.[4] Numerous political organizations, including the National Republican Congressional Committee, have at various times withdrawn support for political candidates after Hananoki reported on racist or extremist rhetoric from those candidates.[5]

23.     Attorney General Paxton himself has previously relied on Hananoki's work. In 2020, Hananoki uncovered "tweets filled with racist rhetoric, violent threats and coronavirus conspiracy theories" from an Assistant Attorney General in Paxton's office.[6] Paxton's office fired the employee in the wake of Hananoki's reporting.[7]

24.     As part of his work at Media Matters, Hananoki has been reporting on X—and before that, Twitter—for years. His coverage of X has increased over the past year due to a marked

---

[3] Both reports cited a Media Matters article that included a video that Hananoki found and produced. *See* Report on the Investigation into Russian Interference in the 2016 Presidential Election, Volume I of II, Special Counsel Robert S. Mueller, III, March 2019, at 57 n.233, available at https://www.justice.gov/storage/report_volume1.pdf.

[4] Select Committee on Intelligence, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 5: Counterintelligence Threats and Vulnerabilities, at 246 n.1638, https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf.

[5] *See, e.g.*, Jonathan D. Salant, "*House Republicans withdraw support of N.J. candidate after report says he shared racist screed*," NJ.com (July 10, 2018), https://www.nj.com/politics/2018/07/house_republicans_withdraw_support_of_nj_candidate.html (noting that NRCC chair "Stivers reacted to a report by the liberal watchdog group Media Matters about [the candidate] linking to the article that ran on a white supremacist website.").

[6] Eric Hananoki, "*A Texas assistant attorney general is a Qanon conspiracy theorist who tweets out violent threats and bigoted remarks*," Media Matters for America (Sept. 3, 2020), https://www.mediamatters.org/twitter/texas-assistant-attorney-general-nick-moutos-qanon-conspiracy-theorist-who-tweets-out.

[7] Trinady Joslin, "*Assistant Texas attorney general loses job after report surfaces racist tweets*," The Texas Tribune (Sept. 3, 2020), https://www.texastribune.org/2020/09/03/nick-moutos-texas-attorney-general; *see also* Taylor Goldenstein, "*Records: Texas assistant AG who lost job over tweets was fired, had been warned about social media*," Houston Chronicle (Sept. 11, 2020),

---

increase in extremist rhetoric on the platform since Musk took ownership, a disturbing trend widely reported on in the media, including by outlets other than Media Matters.

**B.    Elon Musk purchases X and cuts back its content-moderation infrastructure.**

25.    On October 27, 2022, Elon Musk completed his purchase of the social media platform then known as Twitter. Musk subsequently renamed the social media platform "X," though it continues to operate at its traditional twitter.com web address. Both before and after acquiring ownership of X, Musk frequently referred to the platform as a "digital town square" or "de facto town square" for public discussion.[8]

26.    Almost immediately after his takeover, Musk began laying off key executives and content moderators at X responsible for removing hate speech and other violent rhetoric.[9] Indeed, within his first few months of ownership, Musk laid off approximately 80 percent of the company's staff, including its former CEO, general counsel, policy chief, and head of trust and safety.[10] He downsized or eliminated critical areas of the company responsible for overseeing policy, trust and safety, communications, and ethical AI, among others.[11] These deep workforce cuts raised

---

https://www.houstonchronicle.com/politics/texas/article/texas-assistant-ag-social-media-posts-fired-warned-15558487.php.

[8] Douglas Yeung, "*The 'Digital Town Square' Problem*," TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

[9] *See* Brian Fung & Clare Duffy, "*How a single year of Elon Musk turned Twitter into a husk of its former self*," CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*]; *see also* "*Musk fires outsourced content moderators who track abuse on Twitter*," MoneyWatch, CBS News (Nov. 14, 2022), https://www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/.

[10] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[11] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Rohan Goswami, "*X CEO Linda Yaccarino explains reason for getting rid of Twitter name*," CNBC (Aug. 10, 2023), https://www.cnbc.com/2023/08/10/x-corp-ceo-linda-yaccarino-says-she-has-autonomy-under-elon-musk.html.

App.013

questions among U.S. lawmakers and regulators about the social media platform's ability to safely respond to security and privacy threats, misinformation, and hate speech—matters of significant public concern in view of Musk's claim that the platform should serve as a digital town square.[12] Lawmakers similarly expressed concern that, in the wake of Musk's ownership, the platform had ceased to comply with two consent decrees it had entered into with the Federal Trade Commission concerning safeguards for personal data and privacy.[13]

27.     Musk also eliminated existing products and policies—many of which served to protect users from misinformation and violent content—under the auspices of promoting "free speech."[14] He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists who tracked his private air travel.[15]

28.     Unsurprisingly, after the elimination of 80 percent of X's staff and the dismantling of much of X's content moderation infrastructure, extremist and racist rhetoric surged on X in the wake of Musk's takeover. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" in the wake of Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately

---

[12] Brian Fung, "*First on CNN: US senators question Twitter's privacy compliance under Elon Musk*," CNN (June 5, 2023), https://www.cnn.com/2023/06/05/tech/twitter-compliance-musk-senators/index.html; *see also* Brian Fung, "*Elon Musk should be forced to testify on X's 'chaotic environment,' US regulator tells court*," CNN (Sept. 12, 2023), https://www.cnn.com/2023/09/12/tech/elon-musk-testify-privacy-probe/index.html.

[13] *See* Makena Kelly, "*Republicans defend Elon Musk in FTC's Twitter probe*," The Verge (July 14, 2023), https://www.theverge.com/2023/7/14/23794363/elon-musk-twitter-ftc-lina-khan-republicans; *see also* Cat Zakrzewski, "*Musk may have violated FTC privacy order, new court filing shows*," The Washington Post (Sept. 12, 2023), https://www.washingtonpost.com/technology/2023/09/12/elon-musk-consent-order-ftc/.

[14] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[15] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

14

following the shift of ownership to Musk."[16] Similarly, within the first week of his ownership, use of the word "Jew" increased fivefold, with tweets that were antisemitic receiving the most engagement.[17] Academic researchers in the School of Communication and Media at Montclair State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform."[18]

29.    Less than two months after Musk's takeover, the New York Times reported the following about the rising hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."

- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."

- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."[19]

30.    A broad array of media outlets extensively reported on this disturbing trend in Musk's self-described "digital town square."

31.    This spike in hateful rhetoric on X caught the attention of the platform's advertisers, many of whom promptly ceased advertising on the platform in the months after Musk took over.

---

[16] Rashawn Ray and Joy Anyanwu, "*Why is Elon Musk's Twitter takeover increasing hate speech?*," Brookings (Nov. 23, 2022), https://www.brookings.edu/articles/why-is-elon-musks-twitter-takeover-increasing-hate-speech/.

[17] *Id.*

[18] "*Hate Speech Spikes on Twitter After Elon Musk Acquires the Platform*," Montclair State University, (Nov. 1, 2022) https://www.montclair.edu/school-of-communication-and-media/wp-content/uploads/sites/20/2022/11/Montclair-State-SCM-Study-Increases-in-Twitter-Hate-Speech-After-Elon-Musks-Acquisition.pdf.

[19] Sheera Frenkel and Kate Conger, "*Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*," N.Y. Times (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[20]

32. The pullback of the company's largest advertisers led to precipitous drops in its revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load," while in September, he reported that advertising revenue in the U.S. was "still down 60%."[21]

33. More alarming still to X's advertisers was the fact that, after Musk's steep downsizing of company staff, the flood of hateful and violent rhetoric on the platform began appearing increasingly often alongside their advertising, creating a false association between their brands and vile hate speech. X's inability to control the appearance of extremist and violent rhetoric alongside its advertisers precipitated a broader exodus of advertisers from the platform.

34. Indeed, the media writ large has, for over a year, consistently reported on X and Musk's failure to protect advertisers from having their brands appear next to extremist, hateful, and violent rhetoric. Some examples include:

1. **Reuters**, "*Advertisers react to Twitter's new ownership*" (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/.

2. **The Washington Post**, "*Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk*," Faiz Siddiqui (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

---

[20] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk/?sh=1ade964b2a19.

[21] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

3. **ARS Technica**, "*Twitter running major brands' ads with extremist tweets— until they get flagged*," Ashley Belanger (Dec. 7, 2022), https://arstechnica.com/tech-policy/2022/12/amazon-among-brands-whose-ads-appeared-in-white-nationalist-twitter-feeds/.

4. **The Verge**, "*Twitter advertisers aren't happy with ads appearing on pages of white nationalists*," Jon Porter (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists.

5. **Center for Countering Digital Hate**, "*Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts*," (Feb. 9, 2023), https://counterhate.com/wp-content/uploads/2023/02/Toxic-Twitter_FINAL.pdf.

6. **The Washington Post**, "*Extremist influencers are generating millions for Twitter, report says*," Taylor Lorenz (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/.

7. **The Kansas City Star**, "*Mizzou ad appears on racist X page as social media site faces concerned advertisers*," Jonathan Shorman (Mar. 15, 2023), https://www.kansascity.com/news/politics-government/article280309284.html.

8. **Business Insider**, "*Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda*," Katherine Tangalakis-Lippert (June 18, 2023), https://www.businessinsider.com/disney-microsoft-nba-twitter-ads-next-to-neo-nazi-propaganda-2023-6.

9. **The N.Y. Post**, "*Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report*," Shannon Thaler (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

35.     None of these articles cited or otherwise indicated that they relied on research or reporting performed by Media Matters or Hananoki.

**C.     Hananoki and Media Matters investigate and report on the surge of extremist rhetoric on X, including alongside advertisements.**

36.     As part of its long-running mission to document and report extremist political rhetoric in media, Media Matters began investigating, researching, and reporting on the rise in

political extremism and bigotry on X after Musk's changes to the platform. Hananoki, as a Senior

Investigative Reporter whose beat included political extremism, was often assigned this work.

37.     From February 10, 2023 to November 17, 2023, Media Matters published at least

fourteen articles about the juxtaposition of advertisements alongside hateful content on the X

platform. Eleven of these articles were researched and written by Hananoki. They include:

1.  "**Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers**," Media Matters for America (Feb. 10, 2023), https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

2.  "**Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers**," Media Matters for America (June 8, 2023), https://www.mediamatters.org/twitter/linda-yaccarino-just-started-twitters-new-ceo-elon-musk-already-destroyed-platform.

3.  "**Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group**," Media Matters for America (June 22, 2023), https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

4.  "**Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account**," Media Matters for America (July 27, 2023), https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

5.  "**Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool**," Media Matters for America (Aug. 8, 2023), https://www.mediamatters.org/twitter/advertisers-beware-elon-musk-and-linda-yaccarino-are-trying-lure-you-back-rebranding.

6.  "**X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands**," Media Matters for America (Aug. 11, 2023), https://www.mediamatters.org/twitter/x-corp-ceo-yaccarinos-interview-cnbc-should-alarm-major-advertising-brands.

7.  "**Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account**," Media Matters for America (Aug. 16, 2023), https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

8. "**X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11**," Media Matters for America (Sept. 11, 2023), https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

9. "**X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates**," Media Matters for America (Sept. 12, 2023), https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

10. "**X is placing ads for the NFL on prominent white nationalist accounts**," Media Matters for America (Sept. 27, 2023), https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

11. "**X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts**," Media Matters for America (Oct. 12, 2023), https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

12. "**Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing**," Eric Hananoki, Media Matters for America (Nov. 13, 2023), https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

13. "**As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content**," Media Matters for America (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

14. "**X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags**," Media Matters for America (Nov. 17, 2023), https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

38. Media Matters's research and reporting echoed what was being reported widely elsewhere—that the platform was continuing to permit the placement of advertisements alongside extremist content. Hananoki and Media Matters thus joined in ongoing national conversations about an important news story—the surge of hateful and violent rhetoric in America's supposed "digital town square."

19

App.019

39.    Hananoki's research and reporting sometimes looked specifically at what advertisements X's increasingly extremist user base might see on the platform. Following ordinary journalistic investigative practices, Hananoki used an existing X research account controlled by Media Matters to follow white supremacist content and gauge the advertising that X's computer algorithm would automatically generate in response. His research confirmed that the platform's system was continuing to permit advertisements next to violent and fringe content.

40.    Hananoki published some of his findings, along with a handful of examples, in his November 16 article. That article also reported on Musk's apparent endorsement of a widespread antisemitic conspiracy theory—that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities"—which drew widespread condemnation and was extensively covered in the media.[22] Hananoki's article included screenshots of six advertisements from major corporate entities appearing with at least nine posts from X users. For example, below are images of an advertisement for Oracle appearing with a quote from Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi Party, which were included in his article:

---

[22] *See, e.g.*, David Goldman, "*Elon Musk agrees with antisemitic X post that claims Jews 'push hatred' against White people*," CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/15/media/elon-musk-antisemitism-white-people/index.html.



41.    Hananoki did not say in his article that X, or anyone associated with X, was intentionally placing advertisements next to such violent or fringe content. He simply reported truthfully that the platform permitted the placements of advertisements from some of the nation's biggest advertisers next to posts that touted Hitler or the Nazi party—which the platform's algorithm obviously did, as the examples he cited showed.

42.    Hananoki researched, factchecked, and drafted the November 16 article in accordance with Media Matters's policies and standards, using similar methods to those he has used throughout his long career in journalism, and mirroring common journalistic practices.

21

**D.** **Attorney General Paxton retaliates against Media Matters and Hananoki for their coverage of extremist rhetoric on X.**

43.    Despite the robust and ongoing reporting by Media Matters and other news outlets about X's extremist content, Musk apparently took personal offense only at Hananoki's November 16 article discussing Musk's endorsement of an antisemitic conspiracy theory.

44.    Just two days after the article was published, Musk promised to file "a thermonuclear lawsuit against Media Matters." *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. The post received hundreds of thousands of likes and comments, and tens of thousands of reposts. *Id.*



45.    Musk attached a message to the post referencing Hananoki's November 16 article and accusing Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content. *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. Musk made no mention of the year-long parade of reports and documentation illustrating this endemic problem with the architecture of the X platform.

46.    Various media and political figures—many of whom have been the subjects of Media Matters reporting over the years—leapt to Musk's defense and urged retaliation against Media Matters. For example, on November 19, former adviser to President Donald Trump Stephen Miller, discussing Media Matters's article, declared, "There are 2 dozen+ conservative state Attorneys General," seemingly urging states to investigate Plaintiffs for their article. *See* @StephenM, X.com (Nov. 19, 2023, 11:48 AM ET), https://perma.cc/9E6L-FJGY.

47.     Responding directly to Miller's call for retaliation, Missouri Attorney General Andrew Bailey announced that his "team [was] looking into" Plaintiffs' article. @AGAndrewBailey, X.com (Nov. 19, 2023, 4:46 PM ET), https://perma.cc/J463-656K.



48.     On November 20, 2023, Attorney General Paxton joined the fray, announcing via press release that he was launching an investigation into Media Matters. Ex. A. The four-sentence press release asserted that the Attorney General would "vigorously enforce" the Texas Business Organizations Code and the Deceptive Trade Practices Act but failed to explain how Media Matters—a D.C.-based non-profit media watchdog—or Hananoki—a Maryland-based reporter— were believed to have violated those laws directed at consumer protection in the carrying on of a trade or business. *Id.* Instead of providing any substantive basis that could justify the "investigation," Paxton's press release disparaged Media Matters as a "radical anti-free speech organization," and as a "radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]" *Id.*

49.     Paxton doubled down on his public attacks of Media Matters in subsequent interviews. In an interview with Charlie Kirk—a frequent subject of Media Matters's reporting[23]— on the Charlie Kirk Show, Paxton discussed his investigation into Media Matters, asserting that his office could "take away [Media Matters's] ability to do business in Texas[,]" and "go after"

---

[23] *See* "Charlie Kirk," Media Matters for America, https://www.mediamatters.org/charlie-kirk.

Media Matters for large amounts of money—to which Kirk replied, "I love it."[24]

50.     In a subsequent interview, activist Benny Johnson framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping . . . [a] 'thermonuclear' lawsuit on Media Matters." *See* Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. He asked Paxton if he "encourage[d] other Republican attorney generals to do this" and stated "we're so thankful that somebody is just standing up and doing something. Where are the rest of the Republican AGs? . . . Why are they so quiet on issues like this?" *See* Ex. C; *see also* @bennyjohnson, X.com (Nov. 28, 2023, 12:36 PM ET), https://perma.cc/JA55-6A8G.



51.     Paxton responded by encouraging other state attorneys general to investigate Media Matters, saying: "You know, that's a good question . . . I would encourage them to look at this. They may have just become aware of it. I mean it's a relatively new issue so hopefully over the

---

[24] RealAmericasVoice, "*'We have the right as the state of Texas to go after those damages.' - AG Ken Paxton*," Rumble (Nov. 21, 2023), https://rumble.com/v3x3aim-we-have-the-right-as-the-state-of-texas-to-go-after-those-damages.-ag-ken-p.html.

next couple of weeks, you'll see other attorney generals [sic] look at this." Ex. C. Paxton neither

disputed nor qualified Johnson's framing. *Id*. Paxton later admitted in another interview that he

only even became aware of Media Matters's alleged conduct through Musk's litigation, rather than

any independent investigation or work by his office.[25]

52.     On November 21, 2023, the day after Paxton announced his investigation, the office

of the Attorney General of Texas issued the Demand, which references and requests a broad swath

of documents related to Hananoki's November 16 article. Ex. B at 7. Plaintiffs first received the

Demand on November 22 via FedEx delivery at Media Matters's Washington, D.C. office. Paxton

later dispatched a process server, who attempted to serve the Demand on Media Matters at its

office in the District of Columbia on November 30, 2023. The Demand was subsequently served

on Media Matters's District of Columbia-based outside counsel at their Washington, D.C. office,

on December 1, 2023. The Demand has a return date of December 12, 2023. *Id.* at 1.

53.     Paxton's Demand, like his press release, provides no explanation for how Media

Matters or Hananoki could have violated Texas's Deceptive Trade Practices Act, nor any

explanation for how Paxton could exercise the State's coercive power over them. *See generally*

Ex. A; Ex. B. To date, Paxton has provided no explanation at all for how Plaintiffs may have

violated Texas law, or are plausibly subject to Texas's jurisdiction, and has continued to point to

Musk's allegations as the sole basis of his investigation.

54.     The overbroad Demand requests that Media Matters produce "all documents related

to internal and external communications relating to the article titled '*As Musk endorses antisemitic*

---

[25] *See also* Newsmax, "*Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity,'*"
Rumble (Nov. 21, 2023), available at https://rumble.com/v3x4olk-texas-a.g.-ken-paxton-probes-
media-matters-for-fraudulent-activity.html. *See id.* at 2:12 ("So we learned about this actually
through the actual lawsuit that Elon Musk filed and then the reporting of it.").

App.025

*conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*' by Eric Hananoki." Ex. B at 7. The Demand also requests documents sufficient to identify Media Matters's organizational structure; sources of income originating in Texas; operational expenditures in Texas; current and past X accounts, including those used to obtain the screenshots contained in the November 16 article; and direct and indirect sources of funding for operations involving X research and publications. *Id.*

55.    Paxton's Demand also requests that Media Matters produce—on an ongoing basis—all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X; all internal and external communications regarding the November 16 article; external communications with employees and representatives of X, from November 1, 2023 to November 21, 2023; and external communications with ten corporate entities, from November 1, 2023 to November 21, 2023. *Id.* It is, in effect, an ongoing demand for virtually any materials Media Matters and Hananoki might generate as a result of future coverage of X and Musk.

56.    On December 12, as requested in the Demand, Media Matters responded to the Attorney General's Office, setting forth why it believed Paxton's conduct to be unlawful and raising objections to the Demand. Paxton's office responded on December 29. Paxton's letter confirms he intends to enforce the Demand without any showing of jurisdiction or cause. Texas law, he claims, grants him "broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation" and requires him to provide his targets with only "the general subject matter of the investigation." Plaintiffs' rights in responding are constricted because "a CID issued by [Paxton] is not limited by the Texas Rules of Civil Procedure." Paxton reserves his "right to pursue appropriate legal action to enforce" the Demand

and asserts that Plaintiffs' only option to "resist the Attorney General's investigation" is "to establish that there were zero permissible justifications" for it. The letter requested an answer by January 4, at which point counsel for Media Matters responded to Paxton's December 29 correspondence to reassert all objections to the Demand, and reiterate that Defendant's office is without jurisdiction to conduct the investigation of Media Matters, and that Defendant's investigation constitutes unlawful retaliation in violation of the First Amendment.

**E.    Attorney General Paxton chilled, and continues to chill, Media Matters's and Hananoki's speech and reporting.**

57.    Paxton's investigation and Demand have chilled Media Matters's and Hananoki's speech and press activities. It has further resulted in a slew of threats against Media Matters and its staff. Hananoki has been harassed and has received hateful messages, requiring him to increase his home and personal security. Media Matters has been forced to retain an outside security firm to protect its employees in response.

58.    Hananoki's research and writing have been severely impaired and disrupted by Paxton's baseless investigation. Prior to Paxton's Demand, Hananoki published approximately one or two articles per week; in the eight weeks since Paxton issued the Demand, Hananoki has published only two articles altogether, or roughly one per month. Draft articles he intended to publish about extremism on X were cut for fear of generating documents that would be subject to Paxton's Demand and further retaliation from Paxton. In fact, since Paxton launched his investigation, Hananoki has not published any stories about the rise of extremist rhetoric in the wake of Musk's ownership after consistently doing so for months.

59.    Hananoki's diminished reporting output is not for lack of story ideas. Since Paxton's investigation began, Hananoki has continued generating potential story ideas regarding extremist content on X but has not pursued them for fear of retaliation. This includes coverage of

App.027

the reinstatement of Alex Jones, a prominent conspiracy theorist, to the X platform by Musk, and the use of an Alex Jones-related hashtag alongside advertising; antisemitic hashtags targeting Jewish people appearing alongside advertising; and advertising appearing on the X account of Stew Peters, a white nationalist internet personality who has promoted violence, as well as antisemitism, racism, and homophobia. Hananoki fears that reporting on these topics will draw further retaliation towards himself, his employer, and his colleagues. These story ideas are well within Hananoki's long-running beat, yet he was nonetheless chilled from reporting on these topics, at least one of which received extensive national coverage in other publications.[26] Even where Hananoki has been able to publish work, he has self-censored on the topic related to X's content-moderation policies, limiting the scope of his articles. For example, on January 2, 2024, he published an article describing former General Mike Flynn's appearance on Alex Jones's show but omitted any discussion of Jones's recent reinstatement on X—a plainly relevant aspect of the story.

60.    Hananoki's chill is further compounded by the fear that any materials he generated in preparing such stories will end up in Paxton's hands, which calls for the ongoing production of any and all internal communications even touching upon Musk's purchase of X or X's CEO Linda Yaccarino, who has frequently made claims (undermined by Plaintiffs' reporting) that X provides

---

[26] Clare Duffy, *'The people have spoken': Elon Musk restores the X account of conspiracy theorist Alex Jones after poll*, CNN (Dec. 10, 2023), https://www.cnn.com/2023/12/09/business/alex-jones-restored-x-elon-musk-poll/index.html; Danielle Wallace, *Elon Musk reinstates Alex Jones on X*, Fox News (Dec. 10, 2023), https://www.foxnews.com/media/elon-musk-reinstates-alex-jones-x; Kate Conger, *Elon Musk Brings Conspiracy Theorist Alex Jones Back to X*, N.Y. Times (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/technology/elon-musk-alex-jones-twitter-x.html.

App.028

a safe platform for advertisers.[27] This same concern has even hampered Hananoki's ability to communicate internally with his editor—who is based in Washington, D.C.—for fear that their communications about story ideas will be turned over to the attorney general of a state with absolutely no connection to Hananoki's work.

61.     Prior to the Demand, Hananoki regularly posted commentary on X regarding his work, responded to other journalists' posts, and communicated with other journalists. Since Paxton issued the Demand, however, he no longer actively engages in such communications.

62.     As a direct result of Paxton's intrusive Demand, many other Media Matters reporters, writers, and researchers—many of whom live and work in the District of Columbia and surrounding suburbs—have also pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation, fearful of being ensnared in Paxton's investigation, generating documents subject to Paxton's Demand, or publishing articles that would provoke additional legal action. These reporters and researchers are also aware that Media Matters's editorial team has been required to hold back stories about X and Musk due to these concerns. The Demand has effectively tied Media Matters's hands in reporting on these issues, even while it has received an outpouring of tips from people who continue to see extremist and violent content placed next to advertisements on X. Media Matters has not yet acted on these tips, afraid that under Paxton's Demand it could be compelled to turn over any work performed in response.

---

[27] *See, e.g.*, *Twitter-turned-X CEO Linda Yaccarino focuses on winning back big brands on Elon Musk's platform*, AP (Aug. 10, 2023), https://apnews.com/article/twitter-x-corp-ceo-linda-yaccarino-elon-musk-0131c61ac296955d424fd057f6b0196d; Jonathan Vanian, *Read Linda Yaccarino's message to X employees about Elon Musk's controversial DealBook interview*, CNBC (Nov. 30, 2023), https://www.cnbc.com/2023/11/30/read-linda-yaccarinos-message-to-x-employees-about-musk-interview.html.

App.029

63.     Media Matters's executive and editorial team have also been forced to become more involved in the organization's publishing decisions since Attorney General Paxton launched his investigation to protect the organization against further retaliation. This has significantly slowed down Media Matters's publication process, as the organization must carefully assess whether a new article or report could impact existing legal proceedings or spark new ones.

64.     Media Matters's associations with other groups have also been impaired by Attorney General Paxton's investigation. Groups that previously worked closely with Media Matters have reevaluated doing so, afraid that communications may be turned over to the Attorney General or spark investigations into their own publications. And Media Matters employees are self-censoring when anything related to X comes up in communications with such groups, curtailing engagement with partner organizations out of concern over potential exposure. For example, Media Matters has refrained from actively participating in discussions as part of its membership in coalitions focused on issues of hate speech on X while the Demand remains pending. Media Matters's external affairs staff have also paused sharing research regarding X and its content moderation policies with longstanding partners, refraining even from directing partners to content it has *already published* about X, for fear that any conversations or aid may lead to further retaliation against Media Matters or its partners.

65.     Paxton's investigation has also caused Media Matters's department directors to hit pause on similar reporting on content moderation and advertisement placement issues for at least one other social media platform, besides X, out of fear such reporting will lead to further retribution.

66.     Attorney General Paxton's overbroad Demand—which on its face demands associational and journalistic materials protected from disclosure by the First Amendment—

App.030

further harms Plaintiffs. Complying with the Demand would require Plaintiffs to turn over sensitive documents and communications, including materials Hananoki prepared to write his November 16 article, in addition to sensitive operational information about Media Matters's employees, donors, funding, expenditures, and confidential sources. With this Demand looming over them, Plaintiffs have been chilled from publishing, and in some cases generating, new research and investigatory work product that could be subject to compelled disclosure.

67.     The scope of the Demand extends far beyond any document requests Plaintiffs may receive in X's civil suit—should that matter proceed past the pleading stage and reach discovery. Whereas X's civil suit is focused exclusively on Plaintiffs' *past* coverage of X and Musk— specifically the November 16 and 17 articles written by Hananoki—Paxton's Demand requires ongoing production of materials pertaining to *future* articles that Plaintiffs may wish to prepare, chilling their speech indefinitely. Even if X's suit reaches discovery (and given X's choice of jurisdiction and binding precedent in that jurisdiction holding a lack of jurisdiction in a similar case, it very well may not), Plaintiffs can avail themselves of the full protections of the Federal Rules of Civil Procedure which, among other protections, limit document production to "nonprivileged matter[s]" that are "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). But according to Paxton, the Texas Civil Rules of Civil Procedure do not apply to his Demand—in other words, he may demand documents regardless of relevance, overbreadth, and proportionality.

68.     The onerous Demand is backed by the threat that, if Plaintiffs do not comply, Paxton is entitled to sue Plaintiffs in a Texas court to enforce the Demand. *See* Tex. Bus. & Com. Code Ann. § 17.62(b) (authorizing the Office of the Attorney General to "file . . . a petition for an order of the court for enforcement of" a Civil Investigative Demand under Section 17.61). Such a

31

tribunal would be a foreign court to both Media Matters and Hananoki, who have no relevant contacts with Texas and who understandably fear having their constitutional rights adjudicated in jurisdictions with which they have no connection.

69.     Media Matters is not registered as a foreign corporation in Texas and does not "transact business" in Texas. Tex. Bus. Orgs. Code Ann § 9.002(a). It does not have a registered agent in Texas. Media Matters performs no "business practices" in Texas, Tex. Bus. & Com. Code Ann. § 17.44(a), and conducts no "trade" or "commerce" in Texas, Tex. Bus. & Com. Code Ann. §§ 17.45(6), .46(a). And, as explained, Hananoki's reporting that is the focus of Paxton's investigation occurred exclusively in Maryland and involved no contact with Texas. That Plaintiffs may be dragged to court in an unknown, unfamiliar, and untouched venue in Texas at the option of Attorney General Paxton further chills their speech.

70.     The Deceptive Trade Practices Act arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)–(f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

71.     Paxton's own past words resolve any possible doubt about the uniquely injurious effects of his Demand that will be felt by Plaintiffs Hananoki and Media Matters. In 2016, alongside several other state attorneys general, Paxton filed an amicus brief excoriating Massachusetts for using its own deceptive trade practices law to serve a similar civil investigative demand on Exxon Mobil—which, notably, is involved in trade practices—regarding claims it misled consumers about the impact of its energy products on climate change. Ex. D, Brief of Amici

Curiae, *Exxon Mobil Corp. v. Healey*, No. 4:16-CV-00469-K (N.D. Tex. Sept. 8, 2016), ECF No.

63-2. Paxton, at that time, wrote:

> "The[] [First Amendment] protections afforded by the Constitution . . . [are]
> threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air.
> Thus, not only is Massachusetts attempting to silence Exxon through the issuance
> and threat of compelling a response to the CID, this very action harms everyone[.]"

*Id.* at 6. He added that "[t]he authority attorneys general have to investigate fraud does not allow

them to encroach on the constitutional freedom of others to engage in an ongoing public . . .

debate." *Id.* at 3.

**F.     Plaintiffs sued Paxton to protect their First Amendment rights.**

72.     Plaintiffs filed suit against Paxton on December 12, 2023—the return date for the

Demand. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 1.

Plaintiffs filed suit in Maryland because that is where Hananoki lives, works, and wrote the articles

giving rise to Paxton's unlawful investigation. The Demand—which targets Hananoki's work and

communications—sought documents created and stored at Hananoki's home in Maryland.

73.     Plaintiffs also moved for a preliminary injunction and temporary restraining order

the same day, seeking to enjoin further enforcement of the Demand. *Media Matters for America

v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF Nos. 2, 20. Plaintiffs' motion—refiled on

December 14, 2023 after completing service on Paxton—was fully briefed on January 2, 2024.

Paxton's response offered little defense on the merits, but raised ripeness, personal jurisdiction,

and venue objections.

74.     The District Court of Maryland (Xinis, J.) held a hearing on the motion on January

8. The court indicated that if it reached the question, it would likely find that Plaintiffs' claims are

ripe, explaining at the outset it believed Plaintiffs had "jumped the broom on subject matter

jurisdiction" and had "pled enough for this [matter] to be ripe constitutionally."

75.    The court expressed concern, however, about whether Maryland had personal jurisdiction over Paxton. The court's concern was rooted specifically in whether Paxton had awareness of Hananoki's connections to Maryland, coupled with the fact that the Demand had been formally served on Media Matters in Washington, D.C.

76.    The court expressed little doubt, however, that the District of Columbia had specific jurisdiction over Paxton. It repeatedly stressed that Paxton had "served [the Demand] in D.C." and had "directed [his] investigation to Media Matters in D.C." The court even understood Paxton's "pleadings" to have "referenced that there is personal jurisdiction in D.C."[28]

77.    The court's reading of Paxton's pleadings was well-founded—his opposition to Plaintiffs' motion stressed that his "conduct was not in any sense 'aimed' at Maryland—indeed, [the] CID was issued to, and served in, the District of Columbia, where Media Matters resides." *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, at 16. And counsel for Paxton made the same point at oral argument, explaining "the civil investigation demand[] *was directed as [sic] Media Matters, which is a . . . District of Columbia corporation.*"

78.    The court did not rule on Plaintiffs' motion, or Paxton's personal jurisdiction argument, but indicated that if the parties "want a resolution that is fast and fair to both sides," they "would move it to D.C." either through "an agreement from both sides that personal jurisdiction exists in D.C." or through briefing a transfer motion. The court advised Paxton's counsel that, beyond transfer, Plaintiffs could simply "dismiss this case and refile immediately in D.C." and Paxton's counsel agreed Plaintiffs "could do that." Despite the court's offer and

---

[28] Although Paxton's prior briefing argues the District of Columbia is not the "proper venue" for this proceeding and that he is "not subject to personal jurisdiction there," he has also argued that Media Matters "could have instead sued in its home—the District of Columbia, where undersigned counsel, and other attorneys in OAG, are barred." *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, at 18 n.5, 24.

Plaintiffs' willingness to transfer the matter to this District, Paxton's counsel demurred and insisted the issue "need[ed] to be briefed."

79.     Accordingly, without ruling on the pending motion, the court set a briefing schedule for Paxton's motion to dismiss, through which it would further evaluate the issue of jurisdiction and, upon finding jurisdiction, evaluate the merits of Plaintiffs' motion. It advised Plaintiffs that if "in the interim" they "would just prefer to file it in D.C.," then they "can do that."

80.     While Plaintiffs continue to believe Maryland has specific jurisdiction over Paxton, and that the District of Maryland is an appropriate venue for this case, given the urgency of the relief needed, they agree with Judge Xinis's conclusion that the "fast and fair" way to resolve this dispute is by moving this matter to the District of Columbia, which also has specific jurisdiction over Paxton, where venue is also appropriate, and where both Paxton and Judge Xinis appeared to agree that jurisdiction and venue more clearly lies. Plaintiffs therefore filed a notice of voluntary dismissal of their action in the District of Maryland and have promptly refiled their complaint in this District.

## CLAIMS FOR RELIEF

## COUNT I

**First Amendment Retaliation in Violation of Plaintiffs' Rights Under the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

81.     Plaintiffs incorporate paragraphs one through 80 above as if set forth fully herein.

82.     Attorney General Paxton violated, and continues to violate, Plaintiffs' First Amendment rights by launching an investigation and serving a burdensome Demand in retaliation for Plaintiffs' speech, press, and associational activities. Paxton's use of the power of his office is discouraging and will continue to discourage Plaintiffs from engaging in news coverage. The chill imposed by his retaliatory actions injures Plaintiffs' ability to investigate and publish news stories

and further chills their ability to participate in a robust public discussion around political extremism on the X platform. Absent relief from this Court, that chill will continue so long as Paxton's investigation and Demand are—in Paxton's own words—"hanging in the air." Ex. D at 6.

83.     "[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

84.     The D.C. Circuit has long recognized First Amendment retaliation claims as "actionable because 'retaliatory actions may tend to chill individuals' exercise of constitutional rights.'" *Crawford-El v. Britton*, 93 F.3d 813, 846 (D.C. Cir. 1996) (Henderson, J., concurring) (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)); *see also Perry v. Sindermann,* 408 U.S. 593, 597 (1972). That cause of action for First Amendment retaliation arises under 42 U.S.C. § 1983, which "has long [been] interpreted . . . to permit suits against officials in their individual capacities" for constitutional violations. *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). To prevail on their retaliation claim, Plaintiffs must show: "(1) [they] engaged in conduct protected under the First Amendment; (2) [Paxton] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiffs satisfy each element.

85.     *First*, Plaintiffs' investigative, newsgathering, and reporting activities are "legally protected interest[s]" under the First Amendment. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (recognizing right of local news website operator to "gather news"); *see also*

36

*Flynt v. Rumsfeld*, 180 F. Supp. 2d 174, 175 (D.D.C. 2002) (explaining that "under the First Amendment the press is guaranteed a right to gather and report news"). Media Matters provides journalistic research and investigative reporting on a variety of matters and figures of public importance. Hananoki is a senior investigative reporter who for over a decade has published journalism about political extremism online, including on platforms like X. The "First Amendment applies in full force" to this newsgathering and commentary, and further "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue. *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974)); *cf. Nat'l Org. For Women, N.Y.C Chapter v. F.C.C.*, 555 F.2d 1002, 1010 (D.C. Cir. 1977) (explaining that "[t]he exercise of such editorial discretion, especially in connection with news reporting, sharply implicates First Amendment values"). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who investigate and write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. 254); *see also Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up); *Farah v. Esquire Mag.*, 736 F.3d 528, 539 (D.C. Cir. 2013) (similar).

86.     *Second*, Paxton has taken action adverse to Plaintiffs' protected activity in response to news coverage. His investigation and intrusive Demand have already chilled Plaintiffs' speech and reporting activities and will continue to do so absent relief. Paxton's retaliatory conduct would "deter a person of ordinary firmness in [Plaintiffs'] position from speaking again." *Aref*, 833 F.3d at 258, particularly given the suite of tools Texas law provides Paxton to further punish, harass, and restrain Plaintiffs' constitutionally protected conduct. *See, e.g.*, Tex. Bus. & Com. Code Ann.

§§ 17.47, .60, .62. This chill is exacerbated by the fear Plaintiffs will be forced to defend their constitutional rights in a jurisdiction with which they have no meaningful connection.

87.     *Third*, there is no serious dispute that Paxton's investigation and Demand are causally linked to Plaintiffs' coverage of X and Musk. Attorney General Paxton has publicly admitted as much. He announced his investigation into Plaintiffs on November 20, 2023, the same day that X filed a frivolous lawsuit against Plaintiffs for the very same coverage Paxton seeks to punish. Paxton issued his retaliatory Demand only a day after announcing his investigation. Since then, Paxton has encouraged other state Attorneys General to take retaliatory action against Plaintiffs under their own state consumer laws—regardless of any connection Plaintiffs have with those states. The material sought by Attorney General Paxton's Demand further confirms the causal connection, as it singles out documents and communications related to the November 16 article, as well as X and its officers.

88.     Paxton's retaliatory campaign against Media Matters has injured Plaintiffs and will continue to do so absent relief from this Court. This harm will be redressed by an order declaring Paxton's conduct to be unlawful and enjoining him from further investigating Plaintiffs or enforcing his Demand. Such relief is appropriate under Section 1983. *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004); *Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010).

## COUNT II

**Violation of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

89.     Plaintiffs incorporate paragraphs one through 88 above as if set forth fully herein.

90.     Attorney General Paxton's issuance of the overbroad and retaliatory Demand further violates Plaintiffs' First and Fourth Amendment rights by unreasonably requiring them to

App.038

turn over sensitive and privileged materials, including those that impinge upon their association with other organizations.

91.     The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). The First Amendment provides Plaintiffs a privilege against disclosure of materials that would chill their constitutional rights. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). Where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas,* 379 U.S. 476, 485 (1965)) (emphasis added).

92.     Defendant Paxton has shown no such "scrupulous exactitude" in his Demand. Without any showing of cause or jurisdiction, Paxton has demanded that Plaintiffs produce a broad set of documents that implicate their core First Amendment rights.

93.     The Demand seeks, for example, swathes of documents related to Plaintiffs' donors, funding sources, expenditures, and employees, all of which are protected from compelled disclosure under the First Amendment. *E.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

94.     Relatedly, the Demand seeks various kinds of "external communications" that would expose Plaintiffs' associations and collaborations with other groups, including on efforts like ongoing coalitions that include prominent civil rights organizations as well as technology experts and research organizations focused on the challenges of content moderation on X. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental

App.039

action." *NAACP*, 357 U.S. at 462. Compelled disclosure of such associational materials must meet "exacting scrutiny." *Bonta*, 141 S. Ct. at 2383.

95.    The Demand further requires that Plaintiffs surrender internal communications and files regarding news articles, as well as communications with employees at X and its advertisers, again with no showing of cause. Paxton may not "rummage at large in newspaper files or [] intrude into or to deter normal editorial and publication decisions" under the First Amendment. *Zurcher*, 436 U.S. at 566; *see also Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012). Such "[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion).

96.    It provides no meaningful relief to Plaintiffs that Paxton is only authorized to enforce his Demand through a petition to Texas's courts. *See* Tex. Bus. & Com. Code Ann. § 17.62(b). Texas courts plainly lack personal jurisdiction over Plaintiffs, who should not be forced to subject themselves to foreign tribunals to defend their constitutionally protected rights.

97.    Plaintiff Media Matters is incorporated under the laws of, and has its principal place of business in, the District of Columbia. Plaintiff Eric Hananoki is domiciled in Maryland. Texas courts lack general jurisdiction over Plaintiffs. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).

98.    Plaintiffs have not purposefully availed themselves of the privilege of conducting activities in Texas, nor would any cause of action stemming from the Demand arise out of or relate to such purposeful contacts, if they existed. Texas courts lack specific jurisdiction to enforce the Demand against Plaintiffs. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–18 (5th Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022);

App.040

*Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 140 (4th Cir. 2020); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349–50 (D.C. Cir. 2000); *cf. Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 513, (D.C. Cir. 2002) (holding that website interacting and "entering into contracts with residents of a foreign jurisdiction" subject to personal jurisdiction (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997))).

99.     With the Demand's return date now past, Plaintiffs are now faced with the ongoing prospect of either surrendering constitutionally protected materials in violation of their First and Fourth Amendment rights to comply with the Demand, or risk subjecting themselves to state-level proceedings in foreign courts that plainly lack jurisdiction over them should they continue to resist the Demand. That is no true choice at all.

100.    This ongoing violation of Plaintiffs' First and Fourth Amendment rights will be remedied by prompt injunctive relief from this Court setting aside the Demand.

## COUNT III

**Violation of Plaintiffs' Due Process Rights Under the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)**

101.    Plaintiffs incorporate paragraphs one through 100 above as if set forth fully herein.

102.    The guarantee of due process in the Fourteenth Amendment "recognizes and protects an individual liberty interest" from being subjected to legal process in a jurisdiction with which a person has no contact, unless they willingly consent to such process. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

103.    For a state to exercise personal jurisdiction over a party in a manner consistent with due process, the party must have "'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Mere "foreseeability of causing *injury* in another State" is not a "'sufficient benchmark'

41

for exercising personal jurisdiction." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). "Instead, 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

104.    Here, Defendant Paxton has purported to subject Plaintiffs to legal process under Texas law—and has the power to force Plaintiffs into Texas court to defend against enforcement of his Demand—despite Plaintiffs' having no minimum contacts with Texas and not being subject to either general or specific personal jurisdiction in that state. Plaintiffs do not avail themselves of Texas law and had no reason to ever foresee being subject to Texas's deceptive trade practices act. Media Matters's mere "operation of a website accessible in [Texas] is insufficient to satisfy the minimum-contacts requirement of the personal-jurisdiction inquiry" under the Due Process clause. *Fidrych*, 952 F.3d at 140.

105.    Plaintiffs are injured by the ongoing imposition of Texas law on them by Defendant Paxton despite his clear lack of jurisdiction to do so, and will be further injured if Paxton hauls Plaintiffs into Texas state court to defend their constitutional rights in a jurisdiction with which they have no relevant contacts.

## COUNT IV

**Violation of Plaintiffs' Rights Under the District of Columbia's and Maryland's Reporters' Shield Laws**

106.    Plaintiffs incorporate paragraphs one through 105 above as if set forth fully herein.

107.    Attorney General Paxton's Demand violates Plaintiffs' rights under the District of Columbia's and Maryland's shield laws by seeking to compel disclosure of statutorily protected,

confidential sources. D.C. Code §§ 16-4702, 4703; Md. Cts. & Jud. Proc. Code Ann. § 9-112(b), (c).

108.    The D.C. shield law provides absolute protection against compelled disclosure of sources, D.C. Code § 16-4703(b), and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed, *id.* § 16-4702. *See also Grunseth v. Marriott Corp*., 868 F. Supp. 333, 336 (D.D.C. 1994). The shield law protects media organizations and their employees acting within the scope of a contract in any "news gathering or news disseminating capacity." D.C. Code § 16-4702.

109.    Maryland's shield provides materially equivalent protections. *See* Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3), (c)(2).

110.    To overcome even the qualified privilege for non-source information, both statutes provide that parties seeking news or information must establish by clear and convincing evidence that (1) the news or information is relevant to a significant legal issue before a party that has a power to issue a subpoena; (2) the news or information could not, with due diligence, be obtained by any alternative means; and (3) there is an overriding public interest in the disclosure. Still, courts have quashed subpoenas that seek information from news media, even when all three prongs of the qualified privilege apply. *See, e.g.*, *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1–*2 (Md. Cir. Ct. Apr. 20, 1994); *Grunseth*, 868 F. Supp. at 336.

111.    Attorney General Paxton's Demand is consequently infirm because its overbreadth will require that Plaintiffs turn over constitutionally protected sources. The Demand asks for any and all materials related to external *and internal* communications regarding Plaintiffs' November 16 article, as well as external communications between Plaintiffs and employees and

App.043

representatives of X from November 1, 2023, to November 21, 2023. What is more, the Demand seeks numerous documents regarding Plaintiffs' organizational structure, as well as the specific X accounts used to obtain the screenshots contained in the November 16 article. In essence, the Demand functions as a boundless inquiry into Plaintiffs' organization and news gathering capacity—precisely the kind of pernicious subpoena that these shield laws were designed to combat.

112.   Attorney General Paxton's Demand not only seeks privileged material in violation of Plaintiff's First Amendment rights, but also chills Plaintiff's news gathering capacity. An order setting aside the Demand is the only legal mechanism to ensure that plaintiff's rights—protected by the Constitution and promulgated by state statute—are secure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask for the following relief:

113.   Declare Paxton's Demand constitutes a First Amendment retaliatory action in violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution.

114.   Declare that Paxton's Demand violates Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution.

115.   Declare that courts in the State of Texas cannot exercise personal jurisdiction over Plaintiffs in any imminent action to enforce the Demand.[29]

---

[29] It is neither unusual nor unprecedented for courts to determine whether other courts in other circuits have jurisdiction. *See, e.g.*, *Clark v. Busey*, 959 F.2d 808, 812 (9th Cir. 1992) ("Transfer is improper where the transferee court lacks jurisdiction and thus could not have originally heard the suit."); *Grondal v. United States*, 513 F. Supp. 3d 1262, 1275 (E.D. Wash. 2021); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 965 F. Supp. 2d 612, 620 (E.D. Pa. 2013) ("Ohio's long-arm statute does not confer jurisdiction"). *See also* 28 U.S.C. § 1404(a) ("a district court may transfer any civil action to any other district or division where it might have been brought"); *id.* § 1631 ("the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed").

116.    Temporarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand in violation of Plaintiffs' constitutional rights.

117.    Permanently and preliminarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand or further investigating Plaintiffs in violation of their constitutional rights, as well as to the extent enforcement would require the disclosure of information protected by the Maryland and D.C. shield laws.

118.     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

119.    Grant Plaintiffs any and all other relief as the Court deems just and proper.

Dated: January 17, 2024

Respectfully submitted,
*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Jacob D. Shelly* (DC 90010127)
Elena A. Rodriguez Armenta* (DC 90018798)
Daniela Lorenzo*[+]
Omeed Alerasool* (DC 90006578)
Samuel T. Ward-Packard* (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

App.045

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed (DC 500630)
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

\*_Pro hac vice_ application forthcoming
[+]Admission to D.C. bar pending swearing in

_Counsel for Plaintiffs Media Matters for America and Eric Hananoki_

App.046

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                )
**MEDIA MATTERS FOR AMERICA, et al.,**  )
                                                )
**Plaintiffs,**                               )
                                                )
**v.**                                         )          **Civil No. 24-cv-147 (APM)**
                                                )
**WARREN KENNETH PAXTON,**           )
*Attorney General of the State of Texas*,   )
                                                )
**Defendant.**                              )
_____)

## <u>MEMORANDUM OPINION</u>

### I.    INTRODUCTION

On November 16, 2023, Plaintiff Media Matters for America, Inc. ("Media Matters"), a District of Columbia-based media company, published an online article written by one of its long-time journalists, Plaintiff Eric Hananoki, which reported that advertisements for major corporations were appearing next to extremist content on X.com, the social media platform formerly known as Twitter ("November 16 Article").  The story depicted multiple images of the advertisements and posts at issue.  The article showed images of Adolph Hitler alongside advertisements from Apple, Oracle, and IBM, and white nationalist tweets next to advertisements from Xfinity and Bravo.  X's new owner, Elon Musk, responded that the November 16 Article was a "fraudulent attack on [the] company," and he promised to file "a thermonuclear lawsuit against Media Matters[.]"

Days later, the Attorney General for the State of Texas, Defendant Warren Kenneth Paxton, announced that he was opening an investigation into whether Media Matters' reporting about X had violated Texas' Deceptive Trade Practices Act ("DTPA").  According to a press release,

Defendant "was extremely troubled" by allegations that Media Matters had "fraudulently manipulated data on X.com" in its reporting.  Defendant then issued a Civil Investigative Demand ("CID"), which sought from Media Matters a host of records, including its internal and external communications about Musk's purchase of X; the company's CEO, Linda Yaccarino; and the November 16th Article.  It also sought records about the company's sources of income and expenditures in Texas.  Defendant hired a process server who successfully served the CID on Media Matters in the District of Columbia.

Plaintiffs are before this court seeking an order that preliminarily enjoins Defendant from enforcing the CID.  Their primary claim is that Defendant has retaliated against them for exercising their First Amendment rights, which caused substantial chilling effects such as self-censorship and other disruptions of their journalistic endeavors.  For his part, Defendant urges the court to reject the requested relief on various grounds: (1) lack of personal jurisdiction, (2) failure to pursue an adequate legal remedy in Texas state court, (3) improper venue, (4) failure to demonstrate a likelihood of success on the merits, and (5) absence of irreparable harm.

As explained below, the court finds that Defendant is subject to personal jurisdiction in this court, and Plaintiffs have satisfied each of the preliminary injunction factors.  The court therefore grants Plaintiffs' motion for preliminary relief.

## II.     BACKGROUND

### A.     Factual Background

#### 1.     Media Matters and Eric Hananoki

Plaintiff Media Matters is a non-profit research and information center that monitors and reports on misinformation and political extremism in the U.S. media landscape.  Compl., ECF No. 1, ¶ 2 [hereinafter Compl.].  Media Matters is incorporated in Washington, D.C.  Pls.'

Mot. for TRO & Prelim. Inj., ECF No. 4 [hereinafter Pls.' Mot.], Decl. of Cynthia Padera in Supp. of Pls.' Mot., Ex. 2, ECF No. 4-2, ¶ 7 [hereinafter Padera Decl.].  Its principal place of business and office space are in the District, as are its hard-copy records.  Padera Decl. ¶ 9.  Media Matters has no meaningful ties to the State of Texas.  Padera Decl. ¶¶ 10–14.

Plaintiff Eric Hananoki is a senior investigative reporter who has worked at Media Matters since 2007.  Pls.' Mot., Decl. of Eric Hananoki in Supp. of Pls.' Mot., Ex. 3, ECF No. 4-3, ¶ 2 [hereinafter Hananoki Decl.].  Hananoki resides in Maryland and works remotely from there, although he occasionally visits Media Matters' D.C. office.  *Id.* ¶ 3.  For more than a decade, Hananoki's work "has focused on documenting extremism—including white nationalism, antisemitism, and Islamophobia."  *Id.* ¶ 4.  As part of his reporting, Hananoki has covered the social media platform X.  *Id.* ¶ 9.  None of that work has involved speaking with Texas residents or businesses, and he has never traveled to Texas for business purposes.  *Id.* ¶ 21.

2. *Media Matters Publishes the November 16 Article about X*

In 2022, Elon Musk acquired X.  In the wake of the ownership change, Hananoki observed a "sustained and significant surge" in extremist content on the platform.  *Id.* ¶ 10.  He reported, in nearly a dozen articles, that corporate advertisements on X were appearing alongside extremist content.  *Id.* ¶ 12 (listing articles).  Other media outlets published similar stories.  *Id.* ¶¶ 10, 13; Pls.' Mem. in Supp. of Pls.' Mot., ECF No. 4-1 [hereinafter Pls.' Mem.], at 6 (listing news stories).

One of Hananoki's articles gave rise to the present controversy.  On November 16, 2023, Media Matters published on its website an article written by Hananoki titled, "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" ("November 16 Article").  Hananoki Decl. ¶ 12.[1]  The story included

---

[1] Article available at https://perma.cc/HHX2-AT2N (last visited on April 12, 2024).

multiple images of antisemitic tweets, in some cases depicting Hitler, next to advertisements by the companies identified in the article's title.  *Id.* ¶ 15.  The story also noted that the night before Musk had "endorsed the pernicious antisemitic conspiracy that Jewish people are supporting 'hordes of minorities' who are 'flooding' into the country to replace white people."  *Id.* ¶ 14.

Musk responded to the article swiftly and aggressively.  On November 18, 2023, he posted on his X account that "X will be filing a thermonuclear lawsuit" against Media Matters and others "who colluded in this fraudulent attack on our company."  *Id.* ¶ 16.  Then, on November 20, 2023, X filed suit against Media Matters and Hananoki, citing the November 16 Article and one other. *Id.* ¶ 18.

### 3. *Defendant Launches an Investigation of Media Matters' Reporting on X*

Defendant Kenneth Paxton is the Attorney General for the State of Texas.  Texas has adopted a modified version of the Uniform Unfair and Deceptive Trade Practices Act, which prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]" Tex. Bus. & Com. Code § 17.46(a).  Deceptive trade practices include "disparaging the goods, services, or business of another by false or misleading representation of facts[.]"  *Id.* § 17.46(b)(8).  The DTPA authorizes the Consumer Protection Division of the Office of Attorney General to enforce the statute.  *See id.* § 17.61(a).

On November 20, 2023, the same day that X filed suit, Defendant issued a press release announcing that he was opening an investigation of Media Matters "for potential fraudulent activity" in violation of the DTPA.  Pls.' Mot., Ex. 5, Decl. of Aria C. Branch in Supp. of Pls.' Mot. [hereinafter Branch Decl.], Ex. B, ECF No. 4-5, at 13.[2]  The press release explained that Defendant "was extremely troubled by the allegations that Media Matters, a radical anti-free

---

[2] Page number references to the exhibits attached to the Branch Declaration are those generated by CM/ECF.

speech organization, fraudulently manipulated data on X.com (formerly known as Twitter)." *Id.* The press release quotes Defendant describing Media Matters as a "radical left-wing organization who would like nothing more than to limit freedom by reducing participation in the public square." *Id.*

Defendant talked to the press about the investigation. He told Newsmax that his office had learned about the controversy from Musk's lawsuit and press accounts. Pls.' Mem. at 10 n.6. Defendant said on CNBC that he had initiated the investigation because of the "information" that Media Matters had reported about X. Branch Decl., Ex. D, at 25. On a podcast called "The Benny Show," Defendant "encouraged" Attorneys General of both political parties to look into Media Matters' reporting, though he observed that Democratic Attorneys General "probably won't but they should because they should care about free speech as much as we do." *Id.*, Ex. C, at 17.[3] And, on another podcast a week later, Defendant described Media Matters as a "left-wing organization" and stated he was "pretty sure that they had put hit pieces out on [him]." Hananoki Decl. ¶ 25 (citing Tudor Dixon Podcast, Dec. 1, 2023).

> 4.    *Defendant Serves a Civil Investigative Demand on Media Matters*

The DTPA grants the Attorney General various tools to investigate violations of the Act. Among them are issuing a CID "requiring [a] person to produce [] documentary material and permit [its] inspection and copying." Tex. Bus. & Com. Code § 17.61(a). The statue permits service of the CID on out-of-state persons either by "delivering a duly executed copy of the demand to the principal place of business in the state of the person to be served" or, "if the person has no place of business in th[e] state," by "mailing by registered mail or certified mail a duly executed

---

[3] At least one Attorney General has followed Defendant's lead. On March 25, 2024, Missouri Attorney General Andrew Bailey announced that he was serving a "virtually identical" CID on Media Matters and filing a petition to enforce it in Missouri state court. Pls.' Notice of Mo. Att'y Gen. CID & Pet., ECF No. 36.

copy of the demand addressed to the person to be served . . . to his principal office or place of business."  *Id.* § 17.61(d)(2), (3).  The CID's recipient may petition to "modify or set aside the demand, stating good cause," in "the district court in the county where the parties reside, or a district court of Travis County."  *Id.* § 17.61(g).

The day after announcing his investigation, Defendant issued a CID, seeking a broad array of records from Media Matters.  Branch Decl., Ex. A, at 5.  The CID directed the company to produce records relating to the following:

- an employee organizational chart;

- sources of income originating in Texas;

- operational expenditures in Texas;

- internal and external communications regarding Musk's purchase of X;

- internal and external communications regarding the CEO of X, Linda Yaccarino;

- current and past X accounts under ownership or control of Media Matters;

- internal and external communications regarding the November 16 Article;

- the X accounts that Media Matters used to obtain the screenshot images used in the November 16 Article;

- the accounts, profiles, and members followed by Media Matters' X accounts referenced in November 16 Article;

- external communications with employees and representatives of X from November 1, 2023, to November 21, 2023;

- external communications with Apple, IBM, Bravo, and the various other companies identified in the November 16 Article; and,

- direct and indirect sources of funding for all Media Matters operations involving X research or publications.

*Id.* at 11.  The CID set a return date of December 12, 2023.  *Id.* at 5.  It further instructed that Media Matters could produce responsive records directly to the designated Assistant Attorney General, "[i]n lieu of producing the originals for inspection and copying at your principal place of business[.]"  *Id.*  And it directed Media Matters to contact the designated Assistant Attorney General "to discuss the logistics of producing the requested documents to the [Consumer Protection] Division."  *Id.*

Media Matters received the CID on November 22, 2023, via FedEx delivery at its office in the District.  Compl. ¶ 52.  Defendant also dispatched a process server who, on November 30, 2023, attempted to serve the CID upon Media Matters at its office.  *Id.*  The agent ultimately delivered the CID to Media Matters' outside counsel, the Elias Law Group, at their D.C. office on December 1, 2023.  Branch Decl. ¶ 4.

Media Matters responded on December 12, 2023, with objections to the CID and put Defendant on notice that it would seek preliminary injunctive relief in federal court in Maryland. Branch Decl., Ex. E, at 33–35.  Media Matters asserted that Defendant lacked jurisdiction to issue and enforce the CID, the CID violated the First Amendment, and the CID's scope was overly burdensome and broad.  *Id.*  Defendant responded on December 29, 2023.  He wrote that he had "broad discretion" in determining the breadth and relevance of materials sought in a pre-litigation investigatory demand.  Branch Decl., Ex. F, at 38–39.  He said that Media Matters would need "to establish that there were zero permissible justifications for the investigation" in order to "resist the Attorney General's investigation," and that Media Matters could seek relief in Texas state court under the DTPA.  *Id.*

### B.    Procedural Background

Plaintiffs initially brought suit for injunctive relief against Defendant, in his official capacity, in the U.S. District Court for the District of Maryland on December 12, 2023.  *Media Matters for Am. v. Paxton*, No. 8:23-cv-3363 (PJX) (D. Md.), ECF Nos. 1–2.  That court held a hearing on January 8, 2024, which focused primarily on whether it could exercise personal jurisdiction over Defendant.  The court's comments suggested that it believed that personal jurisdiction in the District of Columbia might be less controverted, prompting Plaintiffs to voluntarily dismiss that action and refile suit here on January 17, 2024.  Pls.' Mem. at 19–20; Compl.

Plaintiffs assert four claims.  The first three are under 42 U.S.C. § 1983 for (1) retaliation in violation of the First Amendment (Count I); (2) an overbroad CID in violation of the First and Fourth Amendments (Count II); and (3) unlawful service of the CID in violation of the Due Process Clause (Count III).  Compl. at 35–42.  Plaintiffs' fourth cause of action is for violations of the D.C. and Maryland reporters' shield laws.  *Id.* at 42–44.  Plaintiffs also sought both a temporary restraining order and a preliminary injunction.  Pls.' Mot.  Defendant agreed that he would not seek to enforce the CID until the court ruled on the preliminary injunction motion, thereby mooting Plaintiffs' request for temporary relief.  Resp. to Order of the Ct., ECF No. 11; Minute Order, Jan. 23, 2024.

The parties' dispute centers primarily on whether the court can exercise personal jurisdiction over Defendant and whether Plaintiffs' suit is premature.  Pls.' Mem. at 21–23; Def.'s Opp'n to Pls.' Mot., ECF No. 26 [hereinafter Def.'s Opp'n], at 11–19; Pls.' Reply in Supp. of Pls.' Mot., ECF No. 28 [hereinafter Pls.' Reply], at 2–15.  As to the first issue, Defendant filed a sur-reply brief at the court's direction.  Minute Order, Feb. 7, 2024; Def.'s Sur-Reply to Pls.' Reply,

ECF No. 30 [hereinafter Def.'s Sur-Reply].  The court held a hearing on February 15, 2024.  Hr'g Tr., ECF No. 33.  At the court's request, the parties then submitted supplemental briefing on the discrete question of whether Defendant is a "person" for purposes of the D.C. long-arm statute. Def.'s Suppl. Briefing on *Ex Parte Young*, ECF No. 34 [hereinafter Def.'s Suppl. Br.]; Pls.' Suppl. Br. in Supp. of Pls.' Mot., ECF No. 35 [hereinafter Pls.' Suppl. Br.].

## III.    LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks and citations omitted).  A court may grant the "extraordinary remedy . . . [only] upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

The preliminary injunction factors are well established: plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest."  *Id.* at 20 (citations omitted).  Courts in this jurisdiction evaluate these factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (citation omitted). *Winter*, however, sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors regardless. *See Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that the D.C. Circuit "has not yet decided whether *Winter* . . . is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").

Here, application of the sliding scale makes no difference because the court finds that Plaintiffs have met their burden even under a more stringent application of the traditional four-factor test.  *See infra* Part IV.

## IV.   DISCUSSION

### A.     Personal Jurisdiction

The first factor—success on the merits—includes demonstrating a likelihood of successfully establishing jurisdiction.  *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913–14 (D.C. Cir. 2015).   The court thus begins with Defendant's personal jurisdictional challenge.  *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510–14 (D.C. Cir. 2018) (holding that the court must determine whether it has personal jurisdiction over the defendant before reaching the merits).

To determine whether the court has personal jurisdiction over a non-resident, it engages in a two-part inquiry: "A court must first examine whether jurisdiction is applicable under the state's long-arm statute and then determine whether a finding of jurisdiction satisfies the constitutional requirements of due process."  *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).

### 1.     Whether Defendant Is a "Person" under the D.C. Long-Arm Statute

The court starts with a threshold question regarding the applicability of the D.C. long-arm statute.  In his sur-reply brief, Defendant argued for the first time that, because he is sued in his official capacity, he should be treated as the State of Texas for jurisdictional purposes and that, because the D.C. Circuit has held that a State is not a "person" under the District's long-arm statute, the court cannot exercise specific jurisdiction over him.  Def.'s Sur-Reply at 2–3.

That argument was far from well-developed.  Defendant made it in a single sentence with one accompanying citation.  *See id.* (citing *United States v. Ferrara*, 54 F.3d 825, 831–32 (D.C. Cir. 1995)).  Plaintiffs urge the court to treat the argument as forfeited.  Pls.' Suppl. Br. at 9–10. The court declines to do so.  Given the threshold importance of the issue, and because the parties later fully briefed it at the court's request, the court will address the contention.  *See Smith v. United States*, No. 19-cv-324-BAH, 2022 WL 425059, at *33 (D.D.C. Feb. 11, 2022).

Defendant's argument rests on the D.C. Circuit's decision in *United States v. Ferrara*, 54 F.3d at 825.  In *Ferrara*, the United States brought suit in this court against the Chief Counsel of the Disciplinary Board of the New Mexico Supreme Court in her official capacity, seeking to enjoin her from taking disciplinary action against an Assistant United States Attorney barred in New Mexico.  *Id.* at 827–28.  The D.C. Circuit first held that personal jurisdiction over Ferrara was lacking under the "transacting business" prong of the long-arm statue, D.C. Code § 13-423(a)(1), whose reach is co-extensive with the Due Process Clause, because Ferrara lacked the requisite "minimum contacts" with the forum.  *Id.* at 828–31.

The court also rejected the United States' alternative argument—the one relevant here— that "due process considerations [were] inappropriate in this instance" because (1) a State is not a "person" under the Due Process Clause and (2) because Ferrara was sued in her official capacity, she should be treated as if she were the State of New Mexico for due process purposes, making constitutional considerations "not relevant to the question of jurisdiction[.]"  *Id.* at 831.  The D.C. Circuit avoided "determinin[g] whether a State official sued in his official capacity should be treated as if he were a State for jurisdictional purposes because the United States could not have established jurisdiction over the State of New Mexico in the District of Columbia regardless of whether due process considerations are relevant to the inquiry."  *Id.*  The court so concluded

App.057

because it determined that a State is not a "person" within the meaning of the D.C. long-arm statute. *Id.* at 831–832.  That conclusion hinged on the Supreme Court's articulation of the principle in *Will v. Michigan Department of State Police* that "in common usage, the term 'person' does not include the sovereign, and statutes employing the word are ordinarily construed to exclude it[.]" *Id.* at 831. (quoting 491 U.S. 58, 64 (1989)).  The court in *Ferrara* also looked to the statutory definition of "person," which did not "clearly indicate" that a "person" included a State.  *See id.* at 832 (quoting and citing D.C. Code § 13-421).

Defendant reads *Ferrara* to mean that the court lacks jurisdiction over him.  He argues that, because he is sued in his official capacity, he should be treated as if he were the State of Texas, and therefore he is not a "person" under the long-arm statute.  Def.'s Suppl. Br. at 3.  Plaintiffs, on the other hand, contend that *Ferrara* explicitly declined to answer the question presented here. Pls.' Suppl. Br. at 8.  They maintain that the definition of "person" encompasses Defendant under the *Ex Parte Young* legal fiction, which permits suits against a state official when the relief sought is to enjoin a constitutional violation.  *See Id*. at 8–9.  That fiction permits litigants to avoid the Eleventh Amendment's sovereign immunity bar.  *See Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008).  Applied here, Plaintiffs contend, the doctrine renders Defendant a "person" for purposes of the long-arm statute as well.  *See generally* Pls.' Suppl. Br.

The court agrees with Plaintiffs that *Ferrara* does not squarely address the question presented here, and other courts in this District have recognized the same.  *See West v. Holder*, 60 F. Supp. 3d 190, 196 (D.D.C. 2014), *aff'd sub nom. West v. Lynch*, 845 F.3d 1228 (D.C. Cir. 2017) (explaining that "[i]t is an open question in this circuit whether, under the D.C. long-arm statute, a court may exercise personal jurisdiction over an official sued under *Ex Parte Young*" and declining to answer the question); *Trump v. Comm. on Ways & Means, U.S. House of*

App.058

*Representatives*, 415 F. Supp. 3d 98, 106 (D.D.C. 2019) (noting same open question).  The court therefore must answer the question whether Defendant should be considered a "person" for purposes of the D.C. long-arm statute.

The court begins, as it must, with the statutory text.  As relevant here, a "person" under the long-arm statute includes "an individual . . . whether or not a citizen or domiciliary of the District of Columbia[.]"  D.C. Code § 13-421.  That text does not resolve whether a state official sued in their official capacity is an "individual," but historical context provides guidance.

The Supreme Court decided *Ex Parte Young* in 1908.  *See* 209 U.S. 123.  The Court in *Young* held that, "[i]f the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of the Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct."  209 U.S. 123, 159–60 (1908).  In other words, when a plaintiff seeks to enjoin an official defendant from acting unconstitutionally, such suit is "brought against the defendant not as a representative of the state but to restrain him individually from, as it is alleged, wrongfully subjecting plaintiff to such unauthorized prosecutions."  *Ex Parte La Prade*, 289 U.S. 444, 455 (1933).

When Congress enacted the D.C. long-arm statute in 1970, it would have understood that the term "person" included official-capacity defendants in suits involving injunctive relief. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010) (stating that courts must "assume that, when Congress enacts statutes, it is aware of relevant judicial precedent").  In *Will*, the Supreme addressed whether States and state officials acting in their official capacity are "persons" under § 1983.  491 U.S. at 60.  In holding that they were not, the Court explained, "in common usage, the term "person" ordinarily does not include the sovereign, and statutes employing the word are

ordinarily construed to exclude it." 491 U.S. at 58. The Court, however, recognized an exception for suits brought against "a state official in his or her official capacity, when sued for injunctive relief." 491 U.S. at 71 n.10. Such cases "would be [against] a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)). That distinction "would not have been foreign to the 19th-century Congress that enacted § 1983," the Court wrote, because it was "commonplace in sovereign immunity doctrine." *Id.* Thus, the Court in *Will* imported the longstanding *Ex Parte Young* fiction into its reading of § 1983. *See id.* If the post-Civil War Congress that enacted § 1983 would have understood the term "person" to include state officials sued for injunctive relief, the Congress that enacted the D.C. long-arm provision nearly a century later would have as well.

And so too would have the D.C. Circuit 25 years later in *Ferrara*. It relied on the "common usage" of the term "person," as articulated in *Will*, to interpret the D.C. long-arm statute not to reach States. *Ferrara*, 54 F.3d at 831 (citing *Will*, 491 U.S. at 64). It stands to reason that, if confronted with the question today, the D.C. Circuit would read the term "person" to include suits against an official-capacity defendant for injunctive relief, just as the Court did in *Will*.

As Plaintiffs point out, a contrary reading would upend years of settled jurisdictional understanding and significantly constrain plaintiffs' ability to sue federal officials for injunctive relief in this District Court. For instance, the term "person" also appears in the D.C. Code's general jurisdiction provision. D.C. Code § 13-422. If Defendant were correct, non-resident federal officials who maintain their primary place of business in the District would not be "persons" because they would be treated as the United States, which is not specifically enumerated as a "person" in § 13-421. Yet, it has long been understood that the court can exercise jurisdiction over

14

such federal officials under the District's general jurisdiction statute.  *See Cameron v. Thornburgh*, 983 F.2d 253, 258 n.4 (D.C. Cir. 1993) (recognizing that the court had personal jurisdiction over the Director of the Bureau of Prisons under § 13-422 because his "office was located in the District"); *cf. Pollack v. Hogan*, 703 F.3d 117, 120–21 (D.C. Cir. 2012) (recognizing that sovereign immunity does not bar suits brought against federal officials for injunctive relief when the official is accused of acting beyond constitutional or statutory authority).

The same is true of a non-resident WMATA official, despite WMATA enjoying the same sovereign immunity as a State.  In *Hedgepeth ex rel. Hedgepeth v. WMATA*, the D.C. Circuit rejected the WMATA general manager's assertion that he was not a "person" for purposes of § 1983 when sued only for injunctive relief because "official-capacity actions for prospective relief are not treated as actions against the State."  386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004) (quoting *Will*, 491 U.S. at 71 n.10).  Likewise, this court has exercised jurisdiction over federal officials acting under color of D.C. law under the same rationale.  *See Roy v. Fulwood*, No. 09-cv-463-HHK, 2010 WL 610275, at *2 (D.D.C. Feb. 22, 2010) (exercising "long-arm personal jurisdiction" over the Chairman of the U.S. Parole Commission "with respect to his duties under the D.C. Revitalization Act") (citing *Fletcher v. District of Columbia*, 481 F. Supp. 2d 156, 169–71 (D.D.C. 2007).

When construing a statute, the court must read it to "avoid absurd results."  *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998).  The court must steer clear of outcomes that are both "contrary to common sense" and "absurd when considered in the particular statutory context."  *Id.*  Defendant's reading of the term "person" would produce "absurd results."  Congress could not have intended to foreclose this District Court from hearing the types of cases described in the preceding paragraph, when for decades prior to 1970 the Supreme Court had recognized that

15

"official-capacity actions for prospective relief are not treated as actions against the State." *Will*, 491 U.S. at 71 n.10.  The court will not read District of Columbia law in a way that would cast doubt on decades of federal court practice and jurisdictional reach.

Defendant maintains that Plaintiffs' suit cannot be construed as anything other than one against the State of Texas because of the "*effect* of the relief sought[.]"  Def.'s Suppl. Br. at 2 (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 256 (2011)).  He notes that the injunctive relief requested seeks to bind not only him but also "his officers, agents, servants, and employees," thus making this a "suit that is functionally against the State."  *Id.*  But the Court in *Ex Parte Young* said otherwise.  It explained that "the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity."  209 U.S. at 159.  "It is simply an illegal act upon the part of a state official . . . . The state has no power to impart to him any immunity from responsibility to the supreme authority of the United States."  *Id.* at 159–60 (citation omitted).  Put differently, when a federal court restrains a state official from pursuing an unconstitutional act, it is not proscribing state action, but the unlawful conduct of a person stripped of his official protections.  Thus, the fact that an injunction here would reach not only Defendant but also his agents and employees does not make this a suit against the State of Texas.

Defendant also resorts to statutory construction, asserting that the *expressio unius est exclusio alterius* ("the expression of one thing is the exclusion of the other") and *noscitur a sociis* ("it is known by its associates") canons apply to the definition of "person" to exclude a "statewide official," like the Texas Attorney General.  Def.'s Suppl. Br. at 3–4.  These canons, however, are of no help here.  The former is context-specific and applies only when circumstances support a "sensible inference that the term left out must have been meant to be excluded." *See Chevron*

16

App.062

*U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 81 (2002).  And the latter "requires some context cues indicating that the statutory text should be limited by its company," and "especially holds that words grouped in a list should be given related meanings." *United States v. Fischer*, 64 F.4th 329, 346 (D.C. Cir.), *cert. granted*, 144 S. Ct. 537 (2023) (internal quotation marks and citation omitted).  The definition of "person" does not support a "sensible inference" of exclusion or contain any "context cues" of limitation. *See* D.C. Code § 13-421.

Finally, Defendant contends that reading "person" to reach him in this case "would at least raise serious federalism problems under the Constitution."  Def.'s Suppl. Br. at 4.  He notes that there are few cases of State Attorneys General being sued in out-of-state federal courts, and only one found the exercise of jurisdiction to be appropriate. *See id.* at 5 (citing *Def. Distrib. v. Grewal*, 971 F.3d 485 (5th Cir. 2020)).  The court is sensitive to the federalism matters implicated here and does not take lightly the notion of enjoining a State Attorney General.  But *Ex Parte Young* struck the federalism balance in favor of enforcing constitutional rights in federal court against state officials.  As a panel of the Fifth Circuit observed (albeit in dicta):

> If the *Ex Parte Young* exception applies, sovereign immunity is unavailable—the official is an individual, not the State, so a sister-State court's exercising personal jurisdiction does not offend state sovereignty, even if the challenged conduct was enforcement of a state statute. This anomaly comes from the *Ex Parte Young* "fiction," not the sister State's personal-jurisdiction statute.

*Bulkley & Assocs., L.L.C. v. Dep't of Indus. Rels., Div. of Occupational Safety & Health of the State of Cal.*, 1 F.4th 346, 355 n.2 (5th Cir. 2021).[4]  In other words, treating a foreign state official as a "person" under a long-arm statute poses no federalism problem because under *Ex Parte Young*

---

[4] This passage from *Bulkley* was a direct response to dicta in an earlier Fifth Circuit case, *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476 (5th Cir. 2008), suggesting that "the Texas [long-arm] statute offers no obvious rationale for including nonresident individuals sued solely in their official capacity under *Ex Parte Young*." *Id.* at 482–83.

App.063

a federal court's exercise of jurisdiction over a state official does not infringe upon that state's sovereignty.[5]

### 2. Grounds for Exercising Personal Jurisdiction

Having determined that Defendant is a "person" in this suit for purposes of the D.C. long-arm statute, the court now turns to the specific jurisdictional grounds asserted by Plaintiffs.  The D.C. long-arm statute provides, in relevant part, that "a District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's":

> (1) transacting any business in the District of Columbia; . . .

> (3) causing tortious injury in the District of Columbia by causing an act or omission in the District of Columbia;

> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he [i] regularly does or solicits business, [ii] engages in any other persistent course of conduct, or [iii] derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. Code. § 13-423(a).  "Section (a)(1)'s 'transacting any business' clause generally has been interpreted to be coextensive with the Constitution's due process requirements[.]"  *GTE New Media*, 199 F.3d at 1347.  Section (a)(3), on the other hand, "is a precise and intentionally restricted tort section which stops short of the outer limits of due process."  *Forras v. Rauf*, 812 F.3d 1102, 1107 (D.C. Cir. 2016) (cleaned up).  Section (a)(4) likewise "stop[s] short of the outer limit of the constitutional space."  *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987).

---

[5] Although rare, more than one court has found personal jurisdiction over a State Attorney General who projects himself into an outside forum.  *See Grewal*, 971 F.3d 491–96; *El Paso Water Utils.-Pub. Serv. Bd. v. Kenney*, No. EP-22-cv-460-DB, 2023 WL 4612549, at *5 (W.D. Tex. July 18, 2023); *Twitter, Inc. v. Paxton*, No. 21-cv-01644-MMC, 2021 WL 1893140, at *2–3 (N.D. Cal. May 11, 2021) (finding personal jurisdiction over Defendant in analogous case involving CID served on a California corporation); *but cf. Wercinski*, 513 F.3d at 482–487 (declining to exercise personal jurisdiction over a State Attorney General that did no more than mail a cease-and-desist letter to a Texas real estate agency about its marketing activities in the Attorney General's own state); *Bulkley & Assocs.*, 1 F.4th at 352–55 (same).

Plaintiffs claim to have established personal jurisdiction under subsections (a)(1), (a)(3), and (a)(4).  Pls.' Reply at 2.  The court agrees as to subsections (a)(1) and (a)(3) and thus does not reach subsection (a)(4).

a.   The "transacting business" prong

1.   *Minimum contacts analysis*

Because the "transacting business" prong has been interpreted to reach the fullest extent permitted by the Due Process Clause, the statutory and constitutional analyses "merge[s] into a single inquiry."  *Ferrara*, 54 F.3d at 828.  Due process is satisfied if there are "minimum contacts" between the defendant and the forum such that the defendant "should reasonably anticipate being haled into court there[.]"  *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013) (quoting *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 287, 297 (1980)).  "Such minimum contacts must show that 'the defendant purposefully avail[ed] [him]self of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'"  *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).  "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with notions of 'fair play and substantial justice.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320, (1945)).[6]

First, the court finds that Defendant invoked the benefits and protections of the District's laws when he "caused" service of the CID in the District of Columbia "through a professional

---

[6] To satisfy subsection (a)(1), the "claim of relief" also must "aris[e] from" the person's transacting of business in the District.  D.C. Code § 13-423(b).  The D.C. Court of Appeals has interpreted the "arise from" language of § 13-423(b) "flexibly and synonymously with 'relate to' or having a 'substantial connection' with[.]'"  *Shoppers Food Warehouse*

App.065

process service." Def.'s Opp'n, Decl. of Ass't Att'y Gen. Levi Fuller, Ex. 1, ECF No. 26-1, ¶ 3 [hereinafter Fuller Decl.]. Courts have found that the hiring of a process server creates an agency relationship between the attorney and process server, and that relationship establishes the attorney's presence in the jurisdiction to satisfy the "minimum contacts" requirement. *See Schleit v. Warren*, 693 F. Supp. 416, 419–20 (E.D. Va. 1988) (so holding under Virginia law); *Balsly v. W. Michigan Debt Collections, Inc.*, No. 11-cv-642-DJN, 2012 WL 628490, at *5–7 (E.D. Va. Feb. 27, 2012) (same); *Hamilton, Miller, Hudson & Fayne Travel Corp. v. Hori*, 520 F. Supp. 67, 70 (E.D. Mich. 1981) (so holding under Michigan law). Courts also have held that a person who arranges for personal delivery of process in a State "purposely avail[s] themselves of the privilege of serving process in [the State]." *Hori*, 520 F. Supp. at 70. As one court has put it: "it [is] reasonable to conclude that a lawyer who knowingly serves abusive process in a jurisdiction . . . is 'purposely avail[ing] himself of the privilege of conducting activities within the forum State.'" *Schleit*, 693 F. Supp. at 422–23 (quoting *Luke v. Dalow Indus., Inc.*, 566 F. Supp. 1470, 1472 (E.D. Va. 1983)). Defendant's hiring of a process server in the District of Columbia to effect service on Media Matters therefore created the requisite jurisdictional contacts with the District. *See Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982) ("Generally an agency relationship results when one person authorizes another to act on his behalf subject to his control, and the other consents to do so.") (citations omitted).

Second, Defendant reasonably should have anticipated being haled into court here because the CID established a future course of dealing with a D.C. resident. *Cf. Burger King*, 471 U.S. at 478 (eschewing "mechanical tests" to determine whether an agreement with a forum resident

---

*v. Moreno*, 746 A.2d 320, 335 (D.C. 2000). Defendant does not make any argument about § 13-423(b). But even if he had, Plaintiffs' suit plainly "relates to" or has a "substantial connection" with Defendant's hiring of a process server to personally serve the CID on Media Matters in the District.

creates the requisite contacts and looking instead at the contract terms and the parties' actual dealings).  Defendant knew that the CID would require negotiations with Media Matters' counsel, who is based in the District.  Branch Decl., Ex. F, at 38–40.  If Media Matters ultimately agreed to produce records, it could have elected to have Defendant's representatives come to the District to inspect and copy those records.  *See* Tex. Bus. & Com. Code § 17.61(e).  If the investigation continued beyond the CID, Defendant might have sought to interview Media Matters leadership or employees, with such interviews possibly occurring in the District.  And perhaps Defendant would have tried to compel sworn testimony.  *Id.* § 17.60(2) (authorizing the Attorney General to "examine under oath any person in connection with this alleged violation").  By targeting a D.C.-based entity for investigation and demanding records from it, Defendant committed himself to a potentially long course of dealing in the District.  In such circumstances, Defendant should have reasonably foreseen that he would be called into court here.[7]

Third, asserting jurisdiction here is reasonable "in the context of our federal system of government."  *World-Wide Volkswagen*, 444 U.S. at 293 (quoting *Int'l Shoe*, 326 U.S. at 317).  The Fifth Circuit's decision in *Grewal* provides a close analogy to this case.  There, the Fifth Circuit concluded that Texas state courts had personal jurisdiction over the Attorney General of New Jersey, who had sent a Texas-based business, which published "materials related to the 3D printing of firearms," a letter "threatening action if [it] published its files."  *Grewal*, 971 F.3d at 488–89, 497.  The court found that the letter created sufficient minimum contacts with the State of Texas because the Attorney General not only sought not merely to enforce New Jersey law but "halt [the company's] activity nationwide, including activity that had no connection to New Jersey

---

[7] Defendant's service of the CID is analogous to a subpoena served under Federal Rule of Civil Procedure 45, which permits the subpoena's recipient to quash or modify the subpoena in the federal district court where it resides.  *See* Fed. R. Civ. P. 45(d)(3).  Like a party that issues a Rule 45 subpoena to an out-of-state person, Defendant should have reasonably expected to appear in Media Matter's home forum.

property or residents." *Bulkley & Assocs.*, 1 F.4th at 353–54 (citing *Grewal*, 971 F.3d at 492). The court reasoned that "Grewal's letter had a chilling effect on the exercise of [the plaintiffs'] First Amendment rights . . . .   That chilling effect, in turn, caused [the plaintiffs] to cease publication and reduced Texans' access to materials the plaintiffs seek to publish . . . .  In this sense, Grewal created contacts with Texas and not just the plaintiffs."  *Grewal*, 971 F.3d at 495 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).

That same rationale applies here.  Defendant promised to "vigorously enforce" the Texas DTPA against Media Matters for "fraudulent acts" with no apparent connection to Texas.   Branch Decl., Ex. B at 13.  His issuance of the CID had the effect of chilling Plaintiffs' expressive activities nationwide, which deprived D.C. residents access to Plaintiffs' reporting.   The national implications of Defendant's actions were compounded by his calling upon other Attorneys General to investigate Media Matters. *See id.*, Ex. C, at 17.  Thus, like the New Jersey Attorney General in *Grewal*, Defendant "projected himself across state lines and asserted a pseudo-national executive authority" that makes exercising jurisdiction over him reasonable and does not offend principles of federalism. *Grewal*, 971 F.3d at 493.

## 2.    *Defendant's contentions*

Defendant offers three main arguments as to why the "transacting business" prong is inapplicable, but none is persuasive.  First, he argues that "transacting business" requires some "'commercial or business-related activity' directed towards D.C. persons."  Def.'s Sur-Reply at 1 (quoting *Capel v. Capel*, 272 F. Supp. 3d 33, 39 (D.D.C. 2017)).  He concedes that "negotiating or performing contracts" counts, *id.* (quoting *Trump*, 415 F. Supp. 3d 107), but declares without citation that "hiring a process server does not qualify." *id.*

"It is now well-settled that the 'transacting any business' provision embraces those contractual activities of a nonresident defendant which cause a consequence here." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (citation omitted). Defendant's hiring of a process server to hand-deliver the CID did "cause a consequence here": it legally obligated Media Matters to produce records to Defendant absent court intervention. Tex. Bus. & Com. Code § 17.61(h). Such effect is not "too remote or too trivial to be regarded as a consequence" of Defendant's contractual activity. *Cf. Cockrell v. Cumberland Corp.*, 458 A.2d 716, 718 (D.C. 1983) (holding that the plaintiff's "writing of a check on a District of Columbia bank" did not suffice to invoke § 13-423(a)(1)).

In any event, Defendant cites no appellate authority from the D.C. Circuit or the D.C. Court of Appeals for the proposition that only strictly commercial activity qualifies as "transacting business." And persuasive authority from Maryland that pre-dates enactment of the D.C. long-arm statute rejects Defendant's narrow reading. *See Mouzavires*, 434 A.2d at 991 (observing that "Congress intended to vest courts of the District with jurisdictional reach identical to that in effect in Maryland[.]"). In 1967, Maryland's highest court held that a non-profit had sufficient contacts with the state when it regularly employed an agent to inspect a racing track to certify it according to the organization's standards. *Novack v. Nat'l Hot Rod Ass'n*, 231 A.2d 22, 23 (Md. 1967). In so holding, the court observed that "acts done within a State which will support in personam jurisdiction as transacting 'any business' are not necessarily limited to acts which are a part of commerce or of transactions for profit, but include acts which constitute a purposeful activity within the State." *Id.* (quoting *Van Wagenberg v. Van Wagenberg*, 215 A.2d 812, 821 (Md. 1966)). The D.C. Circuit has since cited favorably to *Novack*. *See Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 n.7 (D.C. Cir. 1981); *id.* at 932–33 (Wright, J., concurring) (citing *Novack* for

the proposition that "identical Maryland provision covers purposeful activity within the state even if the acts are neither part of commerce nor for profit").   Thus, the sole relevant appellate authorities interpreting the "transacting any business" prong have rejected the rigid commercial–non-commercial distinction Defendant proposes.   *See id.* (Wright, J., concurring) (opining that Interpol's activities in the District of Columbia constituted "transacting any business").

Second, Defendant notes that he lacks "a continuing corporate presence" in the District. Def.'s Sur-Reply at 1–2 (citing *AMAF Int'l Corp. v. Ralston Purina Co.*, 428 A.2d 849, 851 (D.C. 1981).  But an ongoing course of conduct is not necessary to satisfy § 13-423(a)(1).  *See Jackson v. Loews Wash. Cinemas, Inc.*, 944 A.2d 1088, 1093 (D.C. 2008).  Even "'a single act may be sufficient to constitute transacting business,' so long as the contact is 'voluntary and deliberate, rather than fortuitous.'"  *Id.* at 1093 (quoting *Mouzavires*, 434 A.2d at 992, 995).  Defendant's single act of hiring a process server to conduct his business in the District was "voluntary and deliberate."  Fuller Decl. ¶ 3.

Finally, citing the D.C. Circuit's decision in *Thompson Hine LLP v. Taieb*, Defendant argues that "simply retaining a process server to serve papers on a D.C. plaintiff is insufficient to establish personal jurisdiction."  Def.'s Sur-Reply at 4–5 (citing 734 F.3d 1187, 1194 (D.C. Cir. 2013)).[8]  In *Thompson Hine*, the D.C. Circuit held that a non-resident who hired a law firm with a D.C. office, and whose lawyers in the District worked on the matter, without more, had not done business in the District.  734 F.3d at 1191–95.  The court so held because of the "quality and nature" of the non-resident client's activities.  That is, he never purposely availed himself of the privilege of conducting activities in the District.  *Id.* at 1193–94.  To buttress this conclusion, the

---

[8] Defendant makes this argument in connection with his discussion of subsection (a)(3), but *Thompson Hine* has nothing to do with that subsection.  It is a "transacting business" case.  *Thompson Hine*, 734 F.3d at 1189.  So, the court addresses the argument here, where it belongs.

court quoted from the D.C. Court of Appeals' opinion in *Environmental Research International, Inc. v. Lockwood*: "The mere fact that a nonresident has retained the professional services of a District of Columbia firm, thereby setting into motion the resident party's own activities within the jurisdiction, does not constitute an invocation by the nonresident of the benefits and protections of the District's laws."  *Id.* (quoting 355 A.2d 808, 812 (D.C. 1976)).  Defendant bases his argument on his quote.  Def.'s Sur-Reply at 5.

*Thompson Hine* is inapposite, however.  In *Thompson Hine*, the non-resident client signed the retainer agreement outside the District, the engagement related to a matter in Oregon, and nothing in the retainer required the firm to perform work or receive payment in the District.  734 F.3d at 1192.  Further, the Oregon matter was supervised by Atlanta-based lawyers and the record contained no communications between the client and D.C.-based counsel.  *Id.*  Here, by contrast, Defendant contracted with the process server to carry out a specific task in the District of Columbia directed at a District resident and, presumably, directed the server's fee here.  That action was purposefully aimed at the District, and the work contracted for had a direct nexus to this forum, unlike the retainer agreement for legal services in *Thompson Hine*.  Defendant's business here was more than the "mere" retention of professional services.[9]

b.    Causing tortious injury by an act in the District

The court also finds that it can exercise jurisdiction over Defendant under subsection (a)(3) of the long-arm statute, which reaches a non-resident who "caus[es] tortious injury in the District of Columbia by an act or omission in the District of Columbia[.]"  D.C. Code § 13-423(a)(3).  Application of that provision is, in a sense, straightforward: Defendant's service of process,

---

[9] In passing, Defendant cites *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987), to confusingly argue that claims alleging tortious injury "do not fit [the transacting business] description."  Def.'s Sur-Reply at 2.  But the "transacting business" prong requires no showing of injury in the District of Columbia, whether tortious or otherwise.  And, even if it did, as will be discussed, Media Matters has made such showing.

through an agent, was an act in the District of Columbia that injured Plaintiffs' constitutionally protected interests.  And, although subsection (a)(3) falls short of the outer perimeter of the Due Process Clause, in the tort context, "minimum contacts exist where a defendant takes 'intentional and allegedly tortious[] actions' 'expressly aimed' at a jurisdiction," *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020) (quoting *Calder*, 465 U.S. at 789), and the effects of those actions in the District of Columbia are not "some 'fortuitous' or 'unilateral' choice of the plaintiff's," *id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)).  That is precisely the circumstance here, as Defendant's intentional service of the CID is the act that caused chilling effects in the District.  *Cf. Ferrara*, 54 F.3d at 829–30 (holding that *Calder* did not apply where the action arose from the attorney's "preexisting relationship" as a member of the New Mexico Bar).

Still, Defendant contends that he committed no act in the District of Columbia.  Def.'s Opp'n at 13–15.  That is not correct.  The process server's in-forum acts are imputed to him as his "agent."  D.C. Code § 13-423(a); *see also Walden*, 571 U.S. at 285.  For that reason, Defendant's reliance on cases involving limited telephonic or electronic communications with a District resident or the mere mailing of matters into the District is misplaced.  Def.'s Opp'n at 14 (citing *Slate v. Kamau*, No. 20-cv-3732 (BAH), 2021 WL 3472438, at * 6 (D.D.C. Aug. 6, 2021) (holding that such mailing is not an "act . . . in the District of Columbia" for purposes of subsection (a)(3)); *Dyson v. Dutok Ragen Homes & Invests.*, No. 21-cv-2280 (APM), 2022 WL 1294484, at *4 (D.D.C. Apr. 27, 2022) (holding that "one text message, a single email, and two phones calls" initiated from outside the District were not acts "in the District")).

The better analogy, as Plaintiffs submit, is to those cases holding that subsection (a)(3) is satisfied when abusive service of process causes injury within the forum.  Pls.' Reply at 6–7.  The

App.072

Fourth Circuit, for instance, has held that "if an out-of-state defendant causes abusive process to be served upon an in-state plaintiff, and the plaintiff subsequently sues the defendant in plaintiff's state . . . , personal jurisdiction exists over the out-of-state defendant." *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1067 (4th Cir. 1982).  Numerous district courts have held the same.  *See, e.g.*, *Guest v. Provident Funding Assocs.*, No. 12-cv-224, 2013 WL 1003524 (WHR), at *4 (S.D. Ohio March 13, 2013); *MHA Fin. Corp. v. Varenko Invs. Ltd.*, 583 F. Supp. 2d 173, 178 (D. Mass. 2008); *Schleit*, 693 F. Supp. at 420–22; *Balsly*, 2012 WL 628490, at *6; *Hori*, 520 F. Supp. at 70.

Defendant resists the force of these authorities on the grounds that, in those cases, "the service itself was tortious because the claim in question was service of *abusive* process," whereas "the CID functioned as an ***official act*** of a state law enforcement officer as part of an investigation."  Def.'s Sur-Reply at 4 (emphasis in original).  The court finds that factual distinction unpersuasive.  In both cases, it is the act of service that caused the alleged injury, whether ordinary tortious injury in the abuse-of-process cases or a constitutional one as alleged here.  The fact that service here is an official act is not dispositive.  It gave rise to Plaintiffs' claims and, under *Ex Parte Young*, Defendant enjoys no immunity for the act.

Next, Defendant cites *Forras v. Rauf*, 812 F.3d 1102 (D.C. Cir. 2016), for the proposition that under subsection (a)(3) the injury cannot be part of the tort "because such a theory would obliterate subsection (3)'s careful distinction between 'injury' and 'act.'"  Def.'s Opp'n at 14 (quoting 812 F.3d at 1107).  That principle has no application here.  It arises only in the context of defamation or libel actions in which the alleged tortious act takes place outside the District, and the plaintiff claims that an act took place in the District because of a subsequent publication here.  *Forras*, 812 F.3d at 1107.  In such circumstances, subsection (a)(3) is inapplicable because the

tortious act and injury are one and the same.  *See id.*  That simply is not the case here, where there is an identifiable act (physically serving the CID on Media Matters) that is separate from the claimed injury (chilling of First Amendment rights).

### B.  No "Justiciable Injury"

Having determined that Plaintiffs are likely to be successful in establishing personal jurisdiction, the court turns to the remaining threshold issues.

Defendant contends that "Media Matters has suffered no judicially cognizable injury." Def.'s Opp'n at 19.  Defendant's argument is based on the Supreme Court's opinion in *Reisman v. Caplin*, 375 U.S. 440 (1964), which, he says, stands for the proposition that "an agency's non-self-executing request for documents is not reviewable until the agency tries to enforce it," Def.'s Opp'n at 19 (arguing that "*Reisman* is now widely understood as having 'announced a rule strongly disfavoring any pre-enforcement review of investigative subpoenas'") (quoting *Belle Fourche Pipeline Co. v. United States*, 751 F.2d 332, 334 (10th Cir. 1984)).  He thus contends that *Reisman* forecloses Media Matters from "seek[ing] pre-enforcement review of the CID in federal court." Def.'s Opp'n at 20.  In the same section of his brief, Defendant quotes from the Ninth Circuit's decision in *Twitter, Inc. v. Paxton*, 56 F.4th 1170 (9th Cir. 2022), a similar case in which Twitter moved in federal court in California to oppose a CID that Defendant had served on it.  The Ninth Circuit wrote there that "Twitter has not suffered an Article III injury because the CID is not self-enforcing."  Def.'s Opp'n at 20 (quoting *Twitter*, 56 F.4th at 1176).  For that same reason, Defendant argues, "Media Matters has suffered [no] cognizable injury."  *Id.*

Defendant's argument conflates two distinct concepts: an adequate remedy at law and Article III standing.  The first is an equitable principle, and the latter a constitutional one.  *Reisman* concerns the adequacy of an alternative remedy and has nothing to do with justiciability.  *Twitter*,

28

by contrast, is about standing and has nothing to do with the adequacy of an alternative remedy. In any event, both arguments are wrong.

1.     *Alternative Adequate Remedy at Law*

In *Reisman*, attorneys for two taxpayers sued the Internal Revenue Service ("IRS") Commissioner and an accounting firm that had been working on their client's financial records. *See* 375 U.S. at 440.  The IRS had issued summonses to the accounting firm calling for the accountants to provide testimony and to produce reports, correspondence, and other materials relating to the taxpayers.  *Id.* at 441–42.  Their attorneys moved to enjoin the summonses, arguing that "the enforced production of" the requested papers was "an unlawful appropriation of [their] work product and trial preparation as well as an unreasonable seizure[.]"  *Id.* at 442.  The Court concluded that the "comprehensive procedure of the [IRS] Code, which provides full opportunity for review," either before an administrative hearing officer or a district court, provided adequate remedies that did not warrant judicial interference where the IRS had done no more than issue the summonses.  *Id.* at 450.  The Court would later make clear that *Reisman* had nothing to do with justiciability requirements.  In *Donaldson v. United States*, the Court said that it had held in *Reisman* "that the petitioner-attorneys possessed an *adequate remedy at law* and that the complaint, therefore, was subject to dismissal."  400 U.S. 517, 539 (1971) (emphasis added).

Thus, properly framed, Defendant's argument is as follows: *Reisman* compels dismissal both because his office has not sought to enforce the subpoena and because the Texas Code provides an adequate remedy, permitting Plaintiffs to file an action to modify or set aside the CID in state court in Travis County, Texas.  Def.'s Opp'n at 19–20 (citing Tex. Bus. & Com. Code § 17.61(g)).

*Reisman* is inapplicable for two reasons.  First, the sole alternative remedy identified here is judicial relief in a foreign forum.  According to Defendant, Media Matters, which is a D.C. resident, would have to go to Texas state court to obtain relief.  *See id.*  Defendant has not cited any authority holding that an exclusive remedy in foreign state court is an adequate remedy at law.  In *Reisman*, the remedy that the Court found to be sufficient involved review before an administrative hearing officer and, if the Commissioner moved to enforce the summons, before a district court "for the district *within which the person so summoned resides or is found*[.]"  375 U.S. at 447 n.7 (emphasis added).  The Texas Code contains no equivalent remedies for a non-resident challenging a CID.

Second, "[t]his case is different from *Reisman* because it involves the First Amendment, under which a chilling effect on speech can itself be the harm."  *Twitter*, 56 F.4th at 1178.  "The key to the holding in *Reisman*," the Ninth Circuit explained in *Twitter*, "was that there had not yet been an injury: The Court held that the remedy specified by Congress (to challenge the document request) 'suffer[ed] no constitutional invalidity."  *Id.* (quoting *Reisman*, 375 U.S. at 450).  Not so here.  As will be discussed below, Plaintiffs' constitutional injury—the chilling effect on their First Amendment rights—has occurred and is ongoing.  Plaintiffs cannot "avoid that alleged injury by challenging the document request" in Texas state court.  *Id.* at 1179.  *Reisman* thus does not compel denying injunctive relief.

### 2.    *Cognizable Injury*

Defendant says this case is identical to *Twitter*.  Def.'s Opp'n at 20.  As in that case, Defendant argues, Plaintiffs have suffered no injury because the CID is not self-enforcing and, to the extent they claim a First Amendment injury, any such injury is "self-inflicted[.]"  *Id.* at 21

(quoting *Twitter*, 56 F.4th at 1176) (internal quotation marks omitted).  Defendant is wrong on both counts.

Where, as here, a plaintiff brings a claim of First Amendment retaliation, "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression."  *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021), *cert. denied*, 142 S. Ct. 2737 (2022) (quoting *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013)) (internal quotation marks omitted); *see also Twitter*, 56 F.4th at 1174 (citing *Edgar*, 2 F.4th at 310); *Cooksey*, 721 F.3d at 236 (finding justiciable injury where a state official informed plaintiff that she had "statutory authority" to seek an injunction against him if he did not edit his diet-advice website and plaintiff alleged "speech-chilling uncertainty about the legality of private conversations and correspondence").  The chill must be "objectively reasonable."  *Edgar*, 2 F.4th at 310 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)).

Through sworn affidavits, Plaintiffs have demonstrated the profound chilling impact that the CID has had on its news operations and journalistic mission.  Media Matters' Editor-in-Chief, Benjamin Dimiero, declares that the CID has "dramatically changed [his] team's editorial processes[.]"  Pls.' Mot., Decl. of Benjamin Dimiero in Supp. of Pls.' Mot., Ex. 4, ECF No. 4-4, ¶ 16 [hereinafter Dimiero Decl.].  Dimiero describes a "new culture of fear" amongst Media Matters staff about research and reporting.  *Id.*  For example, he avers that the editorial team and leadership now engage in "greater internal scrutiny and risk calculation" when approaching stories that they otherwise would have published after their normal vetting process, such as stories about media coverage of the Defendant's anti-abortion actions in Texas.  *Id.*  Dimiero further states that other stories, such as one concerning content moderation decisions made by X, "may go unreported on

App.077

entirely." *Id.* "There is," he says, "a general sense among our team and organization that we must tread very lightly[] and be careful not to cross lines that would jeopardize our work or our employees' safety . . . because of concern that certain reporting could make us a target for further retaliation." *Id.*

According to Dimiero, since Defendant announced the investigation, "Media Matters's editorial leaders have pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation." *Id.* ¶ 17. Absent the CID, Media Matters would have coordinated follow up research and reporting on Hananoki's November 16 Article, as well as the one that appeared the next day. *Id.* ¶ 18. Media Matters, for instance, "received several tips from people who have seen advertisements for prominent brands placed alongside extremist content," but has limited the scope of its reporting on the subject "for fear of additional retaliation." *Id.* Furthermore, Media Matters otherwise would have published at least two additional articles on the topics of Hananoki's reporting, but his team withheld them due to concerns of further legal action. *Id.* ¶ 19. Writers have expressed concerns that their investigations could serve as the basis for retaliatory legal action and that their work product might be subject to investigative demands. *Id.* ¶ 22; *see also* Padera Decl. ¶¶ 23–24 (same). Media Matters' leadership and editorial team have since assumed a more significant role in publishing decisions, which "has significantly slowed down [their] editorial and publication process." Dimiero Decl. ¶ 21. Media Matters has been taking these steps out of fear of retaliation, not out of legitimate concerns about fairness or accuracy. *Id.* ¶ 16.

The CID also has adversely impacted Hananoki. According to Hananoki, the CID has forced him to curtail his investigation and coverage of X out of fear of harassment, threats, and retaliation. Hananoki Decl. ¶ 29. His editors explicitly have told him that, because of the

App.078

investigation, Media Matters will not publish work that he already has prepared regarding Musk and extremism on X. *Id.* ¶ 30. That includes two pieces concerning X's placement of advertising alongside antisemitic, pro-Nazi accounts. *Id.* ¶ 31. And though he has generated story ideas on related topics, he has "self-censored," *id.* ¶ 34, and "not pursued them due to the fear of further legal retaliation," *id.* ¶ 32. According to Hananoki, the CID also has impeded his relationship with his editor and others at Media Matters, because of concern that their internal communications regarding story ideas could be subject to the CID. *Id.* ¶¶ 33, 35. As a result, Hananoki's reporting has appeared less frequently online. Media Matters used to publish Hananoki's work approximately once or twice a week. Dimiero Decl. ¶ 20. Between the CID's issuance on November 22, 2023, and mid-January 2024, Media Matters had published only two of his articles. *Id.*

Defendant has not challenged these concrete and particularized declarations, and they are what distinguish this case from *Twitter*. Whereas Twitter's complaint and declarations "[did] not quite show chilled speech," Plaintiffs here have offered ample evidence of the chilling effects of the investigation and CID. *Cf.* 56 F.4th at 1175. Moreover, the "self-inflicted" injuries the Ninth Circuit said were insufficient to establish standing were not about self-censorship, but about the "financial costs and diverted employee time" that Twitter expended to produce some records "voluntarily[.]" *Id.* at 1176. And the Ninth Circuit said that Twitter had "not suffered an Article III injury because the CID is not self-enforcing" in order to make the point that in the posture of that case, Twitter's claimed injuries were speculative and "may never occur." *Id.* Here, however, Plaintiffs have offered ample evidence of injury, so the fact that the CID is not self-enforcing is of no moment.

App.079

The other cases to which Defendant cites are similarly inapposite.  In *Google v. Hood*, the Mississippi Attorney General issued an administrative subpoena, seeking information on Google's platforms, advertising practices, and efforts to police illegal content.  822 F.3d 212, 218–19 (5th Cir. 2016).  Google filed suit, seeking a preliminary injunction and alleging that the Attorney General's investigation violated Google's immunity under the Communications Decency Act and its Fourth and First Amendment rights.  *Id.* at 219–20.  Addressing the First Amendment claim, the Fifth Circuit observed: "A preliminary injunction is not appropriate [] unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  *Id.* at 227–28 (internal quotation marks omitted).  The Fifth Circuit did not have before it, as here, self-censorship and other chilling effects experienced by a media organization and journalist.  *See id.* at 228; *see also Twitter*, 56 F.4th at 1178 n.3 (explaining that the *Google v. Hood* "court did not recognize that Google could have suffered injury in the form of objectively reasonable chilling of its speech or another legally cognizable harm from the CID").

For this same reason, this case does not present the concern expressed by Judge Wilkey in *Reporters Committee for Freedom of Press*, and relied on by Defendant, that "[a]ny person can establish the existence of a First Amendment right and of an investigative technique that could possibly be employed in bad faith as to violate that right."  Def.'s Opp'n at 1 (quoting 593 F.2d 1030, 1070 (D.C. Cir. 1978)).  The "person" here is a press organization and a journalist, and they have presented the "real and imminent prospect" of harm that Judge Wilkey demanded.  *Reps. Comm. for Freedom of Press*, 593 F.2d at 1070.

Finally, *Laird v. Tatum*, 408 U.S. 1 (1972), offers Defendant no help.  *See* Def.'s Opp'n at 21.  There, the plaintiffs claimed that an Army data-gathering system chilled their First Amendment rights.  *Laird*, 408 U.S. at 13.  The Court rejected this claim because it amounted to

a "disagree[ment] with the judgments made by the Executive Branch," and they had presented only an amorphous "subjective 'chill'" and not "a claim of specific present objective harm or a threat of specific future harm." *Id.* at 13–14.  Those are not the facts here.

Accordingly, there is no Article III impediment to the court hearing this case, and Plaintiffs are not required to turn to a state court in Texas for relief.

### C.    Venue

Defendant makes a half-hearted argument that venue is not proper in the District.  Def.'s Opp'n at 21–22.  Venue is proper here because a "substantial part of the events . . . giving rise to the claim," 28 U.S.C. § 1391(b)(2), occurred here: physical service of the CID on Media Matters and the chilling effect that ensued, *see Twitter, Inc. v. Paxton*, No. 21-cv-01644 (MMC), 2021 WL 1893140, at *2 (N.D. Cal. May 11, 2021) (same).

### D.    Likelihood of Success on the Merits

The court now turns to Plaintiffs' likelihood of success on the merits.  Although Plaintiffs argue that they have established a likelihood of success on all of their claims, Pls.' Mem. at 23–40, the court only addresses one: First Amendment retaliation.  To prevail on that claim, a plaintiff must show that (1) they engaged in conduct protected under the First Amendment; (2) "the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against him." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).  On this record, Plaintiffs have proven each of these elements.

*Protected Conduct.*  Plaintiffs' reporting on matters of public concern are core First Amendment activities.  *See N.Y. Times v. Sullivan*, 376 U.S. 254, 269 (1971) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment

35

App.081

has long been settled by our decisions."); *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up).

Defendant nevertheless contends that, because Hananoki's articles were "deliberately designed" to mislead, they are not "constitutionally protected."  Def.'s Opp'n at 23.  Oddly, he cites to a Lanham Act case and a Federal Trade Commission Act case for that proposition, which have no application here.  *Id.* (citing *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250 (D.D.C. 1997); *Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000)).

*Objective Deterrence.*  Defendant's investigation of Media Matters is "retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again[.]" *Aref*, 833 F.3d at 258.  Defendant makes no contrary argument, Def.'s Opp'n at 23, so the court treats as conceded the sufficiency of Plaintiffs' proof as to this element, *see Day v. D.C. Dep't of Consumer & Regul. Affs.*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."); *see also Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

Still, the court explains why Plaintiffs prevail regardless.  "[T]he threat of invoking legal sanctions" is sufficient to deter protected speech.  *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).  So, too, is the "threat of administrative and judicial intrusion into newsgathering and editorial process" that arises from official process and its possible enforcement.  *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) (internal quotation marks omitted).  The Texas Code authorizes the Attorney General to seek restraint of future conduct and the imposition of civil penalties of up to $10,000 per violation in a Texas state court if he has "reason to believe"

Plaintiffs violated the DTPA.  Tex. Bus. & Com. Code § 17.47(a), (c).  He also can seek to have Plaintiffs held in contempt in Texas state court for not complying with the CID.  *Id.* § 17.62(c).  These potential punitive consequences, as well as possible judicial intervention to enforce the CID, make Plaintiffs' claim of chilled expression objectively reasonable.

There is more.  "The compelled production of a reporter's resource materials can constitute a significant intrusion . . . [that] may substantially undercut the public policy in favor of the free flow of information to the public[.]"  *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980).  The CID seeks such records.  It demands "internal and external communications . . . regarding Elon Musk's purchase of X," X's CEO "Linda Yaccarino," and Hananoki's November 16 Article, as well as external communications with "employees and representatives of X" and the various companies that were the subject of the November 16 Article for a three-week period.  Branch Decl., Ex. A, at 11.  The compelled disclosure of such "research materials poses a serious threat to the vitality of the newsgathering process."  *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995).  And, of course, Plaintiffs' actual self-censorship in response to the announced investigation and the CID "provides some evidence of the tendency of [Defendant's] conduct to chill First Amendment activity."  *Hartley v. Wilfert*, 918 F. Supp. 2d 45, 54 (D.D.C. 2013) (quoting *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005)).  The court need not repeat that uncontested evidence here.

*Causation.*  To establish causal link, "[i]t is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury.  Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).  Defendant's initial press release establishes that Defendant opened an investigation of

App.083

Media Matters in response to its protected media activities.  Branch Decl., Ex. B, at 13.  Also, Defendant's description of Media Matters as a "radical anti-free speech" and "radical left-wing organization" and his encouraging of other Attorneys General to look into Media Matters' reporting is evidence of retaliatory intent.  *See supra* Section II.A.3.

Defendant has not responded to Plaintiffs' causation evidence.  *See* Def.'s Opp'n at 22–23. Notably, he has not submitted a sworn declaration that explains his reasons for opening the investigation.  By remaining silent, he has conceded the requisite causal link.  *See Day*, 191 F. Supp. 2d at 159.

### E.  Irreparable Harm

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks omitted).  "A preliminary injunction is not appropriate, however, unless the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought."  *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (cleaned up).  In *National Employees Treasury Union*, the D.C. Circuit rejected a request for injunctive relief where nothing in the record evinced that the plaintiffs would have "cease[d] speaking or writing before the district court resolve[d] their constitutional challenges."  *Id.* at 1255.  There is no such absence of evidence here.  As discussed above, the investigation and the CID have caused Plaintiffs to self-censor when making research and publication decisions, adversely affected the relationships between editors and reporters, and restricted communications with sources and journalists.  Plaintiffs have amply "demonstrate[d]

some likelihood of a chilling effect on their rights" to justify preliminary injunctive relief. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 301 (D.C. Cir. 2006).

Defendant asserts that Plaintiffs' claimed harm is not irreparable because it is "self-inflicted," as they have not taken the "opportunity to avail themselves of a regulatory scheme [under the DTPA] to avoid the very harm for which they seek injunctive relief[.]"  Def.'s Opp'n at 24 (quoting *Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012)).  But that argument fails to recognize that Plaintiffs are *already* suffering First Amendment harm in the form of chilled protected activities.  Plaintiffs' "constitutional injury has already occurred; there is no way for it to avoid that alleged injury by challenging the document request" in Texas state court. *Twitter*, 56 F.4th at 1179.  Only injunctive relief will "prevent the [ongoing] deprivation of free speech rights."  *Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 (quoting *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349–50 (2d Cir. 2003)).

Defendant also contends that it is "factually untrue" that Media Matters has had its expression chilled, citing television appearances by Media Matters' President, in which he has defended the organization's reporting and "doubled down" on the accuracy of the X images contained the November 16 Article.  Def.'s Opp'n at 24; Fuller Decl., Exs. E & F, at 24–39.  But this argument asks too much of Plaintiffs.  They "need not show that the government action led them to stop speaking 'altogether,'" only that it would be "likely to deter a person of ordinary firmness from the exercise of First Amendment rights."  *Edgar*, 2 F.4th at 310 (quoting *Benham* 635 F.3d at 135).  Therefore, the fact that Media Matters' President has publicly defended its work does not mean that Plaintiffs have not suffered irreparable harm.

### F.    Balance of Equities and the Public Interest

The balance of equities and the public interest favor Plaintiffs.[10]  Defendant has not identified any resulting harms to his interests if the court imposes an injunction.  Def.'s Opp'n at 25.  And "there is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation[.]"  *Pursuing Am.'s Greatness*, 831 F.3d at 511. Defendant does not argue otherwise.  Def.'s Opp'n at 25.  The court thus finds that the final two *Winter* factors support awarding injunctive relief.

## V.    CONCLUSION

For the foregoing reasons, the court grants Plaintiffs' motion for a preliminary injunction, ECF No. 4.  The Order accompanying this Memorandum Opinion sets forth the terms of the injunction. Fed. R. Civ. P. 65(d).

Additionally, because Defendant has moved to dismiss on the very same grounds that he has opposed injunctive relief, Def.'s Mot. to Dismiss, ECF No. 31, that motion is denied.

Dated:  April 12, 2024

_____
Amit P. Mehta
United States District Judge

---

[10] The court does not presume here that Defendant's interest and the public interest are one and same, *cf. Pursuing Am.'s Greatness*, 831 F.3d at 511, as federalism considerations may create some daylight between the two factors.

App.086

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>WARREN KENNETH PAXTON, JR., in his official capacity as Attorney General of the State of Texas,<br><br>    Defendant. | Civil Action No. 24-cv-147 |

## PRELIMINARY INJUNCTION ORDER

On January 18, 2024, Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki filed a motion for preliminary injunctive relief against Defendant Warren Kenneth Paxton, Jr., the Attorney General for the State of Texas, ECF No. 4.  After considering the parties' arguments and evidence submitted, and for the reasons stated in the accompanying Memorandum Opinion, ECF No. 37, the court grants the motion and enters the following Preliminary Injunction Order.  It is hereby:

**ORDERED** that Warren Kenneth Paxton, Jr., Attorney General of the State of Texas, together with his agents and employees within the Office of the Attorney General (collectively "Defendant Paxton"), is enjoined from enforcing the Civil Investigative Demand served on Media Matters on December 1, 2023; and, it is further

**ORDERED** that Defendant Paxton is enjoined from issuing any additional Demands, or taking steps purporting to mandate any action on behalf of Plaintiffs (including Media Matters' officers, employees and agents), in furtherance of the investigation of Media Matters announced by Defendant Paxton on November 20, 2023.

This order shall remain in effect until a final judgment is entered in this matter, unless this Order is earlier dissolved by this court or by an appellate court.

2024.04.12
17:53:05 -04'00'

_____
Amit P. Mehta
United States District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-147-APM |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| Defendant. | |

**PLAINTIFFS' RULE 15(D) MOTION TO SUPPLEMENT THE COMPLAINT**

## INTRODUCTION

Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki filed this suit in January 2024 against Texas Attorney General Paxton to enjoin his retaliatory and unlawful enforcement of his November 21, 2023, civil investigative demand ("Texas Demand"). Since then, Missouri Attorney General Andrew Bailey has followed in Paxton's footsteps and served Media Matters with, by his own admission, a "virtually identical" civil investigative demand ("Missouri Demand" or "Demand"). The Missouri Demand, like its Texas predecessor, unlawfully retaliates against Media Matters for its reporting on a matter of profound public concern—extremism on one of the nation's largest social media platforms—and is irreparably harming Plaintiffs' exercise of their First Amendment rights. Bailey has already gone even further than Paxton. In a rush to punish and harass Plaintiffs, Bailey preemptively sued Media Matters in Missouri to enforce his baseless Demand before Media Matters had even received it, illustrating the bad faith nature of his conduct. In correspondence with Plaintiffs, Bailey has made clear that this Court's recent preliminary injunction ruling will not deter him from plowing ahead with his meritless, harassing, and retaliatory investigation, even though the Missouri Demand is materially the same as the Texas Demand this Court just days ago enjoined Paxton from enforcing. Plaintiffs therefore seek leave to assert the same set of claims, and seek the same scope of relief, against Bailey that they have already asserted against Paxton. For the reasons set forth in the Court's recent preliminary injunction ruling, Plaintiffs are likely to prevail on such claims.

Leave to supplement the complaint is appropriate under Rule 15(d). That rule is "used to set forth new facts that update the original pleading" and "to include new parties where subsequent events have made it necessary to do so." *Thorp v. District of Columbia*, 325 F.R.D. 510, 513 (D.D.C. 2018) (quoting *United States v. Hicks*, 283 F.3d 380, 386 (D.C. Cir. 2002)). Bailey's intervening choice to replicate Paxton's unconstitutional and retaliatory behavior has made it

1

necessary to add him to this suit in order to afford Plaintiffs complete relief. And while Paxton has indicated that he opposes the instant motion, he failed to identify *any* prejudice that he will suffer from supplementation. Nor could he—the supplemental allegations do not add claims against him and instead simply update Plaintiffs' original complaint to reflect Bailey's intervening conduct. That lack of prejudice is dispositive because, under Rule 15, it is *Paxton's* burden to demonstrate why leave to supplement should not be granted, a showing he cannot possibly make here. For those reasons, and the reasons below, Plaintiffs amply satisfy Rule 15(d)'s liberal and generous standard favoring such supplementation.

## BACKGROUND

On November 20, 2023—just a few minutes after Elon Musk filed a threatened "thermonuclear" lawsuit against Media Matters—Texas Attorney General Ken Paxton announced that he was investigating Media Matters for purported violations of Texas's business and trade practices laws. Paxton issued a civil investigative demand—the Texas Demand—against Media Matters the following day. After first filing suit in Maryland, Plaintiffs Media Matters and Eric Hananoki filed suit in this Court on January 17, 2024, and moved for preliminary relief the next day. *See* ECF Nos. 1, 4. As the complaint and motion explained, Paxton's conduct constituted unlawful retaliation against Media Matters and Hananoki for protected First Amendment speech, chilling and irreparably harming Plaintiffs' exercise of their speech, press, and associational rights. The Court granted Plaintiffs a preliminary injunction on April 12, 2024. *See* ECF Nos. 37, 38. The Court's order enjoins Paxton from enforcing the Texas Demand and from issuing any other demands in furtherance of his investigation into Media Matters. *See* ECF No. 38.

While Plaintiffs' dispute with Paxton unfolded, Missouri Attorney General Andrew Bailey also took steps to retaliate against Media Matters and Hananoki. Bailey announced on November 19, 2023, that his office was "looking into this matter," referring to Elon Musk's allegations against

App.091

Media Matters. *See* Compl. ¶ 47, ECF No. 1. On December 11, 2023, Bailey issued a "Notice of Pending Investigation" to Media Matters, demanding that it preserve documents relevant to a forthcoming investigation. *See* ECF No. 36 at 1. The Notice was sent to a generic email inbox at Media Matters (action@mediamatters.org) but was never formally served on the organization. *Id.* Media Matters and Hananoki filed suit against Paxton in the District of Maryland the day after Bailey issued his Notice. *Id.* at 1–2; *see also* Compl. ¶¶ 72–80.

On March 25, 2024—over two months after Plaintiffs filed this action against Paxton—Bailey announced that he was serving a civil investigative demand—the Missouri Demand—on Media Matters. *See* ECF No. 36-1 at 1. The Missouri Demand is, in Bailey's own words, "virtually identical" to the Texas Demand. ECF No. 36 at 1. Media Matters was first alerted to the Missouri Demand on March 25 when a reporter asked for comment on Bailey's actions, but Media Matters did not actually receive the as-served Demand until April 1, just two weeks before the Demand's April 15 return date. *Id.* at 2. Media Matters responded to the Missouri Demand on that date with a letter setting forth various objections, including that Bailey's conduct constituted unlawful retaliation against Plaintiffs' exercise of their First Amendment rights. *See* Ex. 8, Letter from Aria C. Branch to Jeremiah J. Morgan (Apr. 15, 2024) The letter noted that this Court had recently enjoined Paxton from enforcing his "virtually identical" Texas Demand, and therefore asked that Bailey withdraw the Missouri Demand. *Id.* The letter explained that, unless Bailey agreed to withdraw the Missouri Demand, Plaintiffs would supplement the complaint in this action to add him as a Defendant and seek similar relief as against Paxton. *Id.* Bailey responded to that letter on April 17, doubling down on his baseless and unlawful investigation and making clear that he would continue to pursue the Missouri Demand regardless of this Court's preliminary injunction ruling. *See* Ex. 9, Email from Jeremiah Morgan to Samuel Ward-Packard (Apr. 17, 2024 5:04 PM).

App.092

Despite the Missouri Demand's April 15 return date, Bailey moved to enforce the demand immediately—nearly three weeks before the return date and before Media Matters even *received* the as-served Missouri Demand—by filing a petition to enforce in Missouri state court. *See* ECF No. 36-2 ("Petition"). Bailey attempted to justify this rush to court by accusing Media Matters of having a "sordid history of refusing to cooperate with investigations."[1] ECF No. 36-1 at 3. His only factual support for this charge was Media Matters's refusal to cooperate with the Texas Demand, which this Court enjoined Paxton from enforcing just days ago. *See* ECF No. 36 at 2. Bailey served the Petition on Media Matters at its Washington, DC headquarters on March 28, 2024. *Id.* Media Matters must respond to the Petition by April 29. *Id.*

## LEGAL STANDARD

Under Rule 15(d), "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). "Rule 15(d) is used to set forth new facts that update the original pleading" and "to include new parties where subsequent events have made it necessary to do so." *Thorp*, 325 F.R.D. at 513 (D.D.C. 2018) (quoting *Hicks*, 283 F.3d at 386). "The court has broad discretion in determining whether to allow supplemental pleadings in the interests of judicial economy and convenience." *Jones v. Bernanke*, 685 F. Supp. 2d 31, 35 (D.D.C. 2010). Motions to supplement under Rule 15(d) are "are subject to the same standard" as motions to amend the complaint pursuant to Rule 15(a)(2). *Wildearth Guardians v. Kempthorne*, 592 F. Supp. 2d 18, 23 (D.D.C. 2008); *see also Schonzeit v. Bernhardt*, No. CV 18-3052 (JEB), 2020 WL 6701318, at *2 (D.D.C. Nov. 13, 2020) (collecting cases).

---

[1] Mo. Att'y Gen., *Attorney General Bailey Files Suit Against Media Matters for Refusal to Cooperate with Investigation*, https://ago.mo.gov/attorney-general-bailey-files-suit-against-media-matters-for-refusal-to-cooperate-with-investigation/ (last accessed April 18, 2024).

Rule 15(a)(2), in turn, reflects a "generous standard" favoring supplementation and amendment. *Harris v. Sec'y, U.S. Dep't of Veterans Affs.*, 126 F.3d 339, 344 (D.C. Cir. 1997); *see also Hill v. U.S. Dep't of Def.*, 70 F.Supp.3d 17, 19 (D.D.C. 2014) (explaining "it is common ground that Rule 15 embodies a generally favorable policy towards amendments" (quoting *Davis v. Liberty Mut. Ins. Co.*, 871 F.2d 1134, 1136–37 (D.C. Cir. 1989)). Under Rule 15(a)(2), a "court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court has emphasized that this liberal "mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Id.* Notably, under Rule 15, "[i]t is the opposing party's burden to demonstrate why leave should not be granted." *Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 12 (D.D.C. 2017) (citing *LaPrade v. Abramson*, 1:97–cv–10, 2006 WL 3469532, at *3 (D.D.C. Nov. 29, 2006)).

## DISCUSSION

Plaintiffs' motion to supplement their complaint under Rule 15(d) should be granted because "doing so will promote the economic and speedy disposition of the entire controversy." *Hall v. CIA*, 437 F.3d 94, 101 (D.C. Cir. 2006) (quoting 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1504, at 186-87 (2d ed. 1990)). Plaintiffs' challenge to the Texas Demand and the nearly identical Missouri Demand raise common questions of law and fact that are best resolved as part of a single action. This Court has already made significant legal and factual findings with respect to Plaintiffs' challenge to the Texas Demand, and it would make little sense for Plaintiffs to file a parallel challenge against Attorney General Bailey that would potentially lead to conflicting findings of law or fact. *See, e.g.*, ECF No. 37 at 22 (finding issuance

5

of Texas Demand "had the effect of chilling Plaintiffs' expressive activities nationwide" and "deprived D.C. residents [of] access to Plaintiffs' reporting"). "Rule 15(d) exists precisely for this type of situation—to allow the full conflict between the parties to be resolved in a single case, rather than requiring [Plaintiffs] to file a second, distinct set of claims regarding the later [civil investigative demand]." *Sunless, Inc. v. Selby Holdings, LLC*, No. 3:20-CV-00930, 2021 WL 3513871, at *5 (M.D. Tenn. Aug. 10, 2021); *cf. ACLU of Miss., Inc. v. Finch*, 638 F.2d 1336, 1347 (5th Cir. 1981) (finding Rule 15(d) "particularly apt" for adding defendants in case "seeking prospective relief against public officers"). Permitting supplementation will therefore "promote as complete an adjudication of the dispute between the parties as is possible" by ensuring that factually and legally related disputes are resolved within a single action. 6A Charles Alan Wright & Arther R. Miller, *Federal Practice & Procedure* § 1504 (3d ed. 2023) (explaining purpose of Rule 15(d)).

Rule 15(d) is also the proper mechanism for adding a new defendant necessary to afford a plaintiff complete relief based on intervening events. "Rule 15(d) . . . plainly permits supplemental amendments to cover events happening after suit, and it follows, of course, that persons participating in these new events may be added if necessary." *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 227 (1964). As the D.C. Circuit has explained, Rule 15(d) permits a party to "supplement his complaint" to "include allegation[s] of recent incidents, [seek] joinder of additional parties and, of course, present[] . . . legal contentions." *Gomez v. Wilson*, 477 F.2d 411, 417 (D.C. Cir. 1973); *see also Competitive Enter. Inst. v. McCarthy*, No. CV 21-1238 (CKK), 2021 WL 9937858, at *2 (D.D.C. Oct. 7, 2021) (similar); *accord* Wright & Miller *supra*, § 1504 & n.9 (explaining Rule 15(d) permits a plaintiff to "supplement their original pleadings to include

new parties" where "events make it necessary to do so") (collecting cases). Here, adding Bailey as a Defendant is necessary to afford Plaintiffs complete relief.

Supplementation is further appropriate because Bailey's conduct indisputably arises out of the same set of facts that gave rise to the original complaint against Paxton. Like Paxton, Bailey acted in response to calls for conservative state Attorneys General to retaliate against Media Matters for its reporting on antisemitism and extremism on X. *See* Compl. ¶¶ 46–48; *see also* ECF No. 36 (altering Court to Bailey's issuance of Missouri Demand). Bailey himself stated in an interview that he "coordinated with Texas" in preparing the Missouri Demand based on the "similar investigation" Paxton launched.[2] And by his own admission, the Missouri Demand is "virtually identical" to the Texas Demand that first gave rise to this suit, copying many of its demands word-for-word. "[L]eave to file a supplemental pleading should be freely permitted when the supplemental facts connect it to the original pleading." *Aftergood v. CIA.*, 225 F. Supp. 2d 27, 30 (D.D.C. 2002) (quoting *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 66 (2d Cir. 1995)); *accord Griffin*, 377 U.S. at 226 (finding it proper for plaintiffs to supplement their complaint to add defendants based on "new transactions" that arose "as a part of a continued, persistent" course of conduct described in original pleading). While Plaintiffs anticipate that Paxton will argue that the Missouri Demand constitutes a distinct "transaction" from the Texas Demand, there is no serious dispute that Plaintiffs' "proposed supplemental allegations relate directly to the subject matter of [their] current operative pleading." *Competitive Enter. Inst.*, 2021 WL 9937858, at *3 (granting leave to supplement).

---

[2] Tim Jones & Chris Arps Show, *MO A.G. Andrew Bailey: Missouri Doesn't Have Sanctuary Cities*, NewsTalkSTL at 5:32–58 (Dec. 12, 2023), https://omny.fm/shows/newstalk-stl/mo-a-g-andrew-bailey-missouri-doesnt-have-sanctuar.

App.096

In his brief email indicating opposition to this motion, Paxton claimed without further explanation that "no 'question of law or fact common to' Attorney General Paxton and Attorney General Bailey is live within the meaning of Rule 20(a)(2)." Ex. 1, E-Mail from Reuben Blum to Chris Dodge (Apr. 18, 2024 5:26 PM). That cryptic assertion is puzzling for several reasons. First, as explained, Rule 15(d) independently supplies a basis for adding a defendant to the case based on intervening events. *See supra* at 6-7; *see also Gomez*, 477 F.2d at 417; *Competitive Enter. Inst.*, 2021 WL 9937858, at *2. Second, there are self-evidently numerous common questions of law and fact presented by Bailey's issuance of a *nearly-identical Demand* to Media Matters within the District of Columbia, which is precisely why Plaintiffs seek to assert *identical* claims against him.

Finally, Plaintiffs' motion should be granted because it is timely and the existing Defendant—Paxton—will suffer no prejudice as a result. This case remains in its early stages: Defendant Paxton has not yet answered Plaintiffs' original complaint, and no case schedule has been set. Moreover, Plaintiffs' proposed supplemental pleading has little to do with Paxton—it adds no new claims against him and simply "bring[s] the case up to date" by describing Bailey's intervening acts. Wright & Miller *supra*, § 1504. Indeed, when asked for his position on this motion, Paxton did not even dispute Plaintiffs' representation that he would suffer no prejudice from supplementation. *See* Ex. 1.

There is also no trace here of the sort of "apparent or declared reason[s]" that might weigh against Rule 15's liberal policy favoring supplementation and amendment. *Foman*, 371 U.S. at 182. *First*, there has been no undue delay. Plaintiffs seek leave to supplement less than a month after they first learned of Bailey's Demand and enforcement petition, less than three weeks after receiving the Demand itself, and just one day after Bailey refused Plaintiffs' request to withdraw the Demand. *See, e.g.*, *El-Shifa Pharm. Indus. Co. v. United States*, No. CV 01-731 (RWR), 2005

WL 8160733, at *1–2 (D.D.C. Sept. 22, 2005) (finding no undue delay where supplemental pleading was filed four months after intervening event); *Competitive Enter. Inst.*, 2021 WL 9937858, at *3 (finding no undue delay where supplementation occurred "just weeks" after intervening event); *United States ex rel. Davis v. District of Columbia*, 265 F.R.D. 1, 2 (D.D.C. 2010) (finding no undue delay where motion to amend was filed six weeks after learning of factual development in deposition).

*Second*, Plaintiffs do not seek to supplement their complaint in bad faith or out of dilatory motive—they have moved promptly in response to plainly relevant factual developments outside of their control. *E.g.*, *Risteen v. Youth For Understanding, Inc.*, 245 F. Supp. 2d 1, 4–5 (D.D.C. 2002) (finding no undue delay or dilatory motive where plaintiff "moved to amend his complaint roughly five weeks after he learned" of factual development); *Kas v. Fin. Gen. Bankshares, Inc.*, 105 F.R.D. 453, 458 (D.D.C. 1984) (finding no bad faith where plaintiff amended complaint to add facts that "could not have been included in the complaint or first amended complaint"). In fact, Plaintiffs sought to avoid the need to supplement by requesting that Bailey withdraw his Demand in light of this Court's preliminary injunction order against Paxton. Plaintiffs seek leave of Court only because Bailey has refused, leaving them no choice but to seek relief against him.

*Third*, there is no prejudice to the existing Defendant—Paxton. As explained, "there is no scheduling order in place setting a discovery cutoff, a pretrial conference, or a trial date," reinforcing that "there would be no prejudice to [Paxton] if the [supplementation] is permitted." *Risteen*, 245 F. Supp. 2d at 4–5 (finding no prejudice under Rule 15(a)(2) where "action is in an early stage"). Moreover, the supplemental pleading adds no new claims against Paxton and does not significantly "alter the original allegations made against" him, meaning the "proposed supplemental allegations will not inhibit" Paxton's ability to litigate his positions. *Competitive*

*Enter. Inst.*, 2021 WL 9937858, at *4. Instead, as to Paxton, the supplemental pleading only concerns "auxiliary facts [] requiring no need for [Paxton] to research and brief new legal claims or factual defenses." *El-Shifa Pharm. Indus.*, 2005 WL 8160733, at *2 (finding "no prejudice to the defendant").[3] His email opposing this motion identifies no prejudice whatsoever and, accordingly, Paxton cannot carry his "burden of demonstrating why leave [to supplement] should not be granted." *LaPrade*, 2006 WL 3469532, at *3; *see also* Ex. 1.

## CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs leave to file their proposed supplemental complaint under Rule 15(d).

Dated: April 18, 2024

Respectfully submitted,

*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elizabeth C. Frost (DC 1007632)
Christopher D. Dodge (DC 90011587)
Jacob D. Shelly (DC 90010127)
Elena A. Rodriguez Armenta (DC 90018798)
Daniela Lorenzo (DC 90022335)
Omeed Alerasool (DC 90006578)
Samuel T. Ward-Packard (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law

---

[3] The remaining two considerations prescribed in *Foman*—"repeated failures to cure deficiencies by amendments previously allowed" and "futility of amendment," 371 U.S. at 182—have no bearing here. For one, Plaintiffs do not seek to amend their complaint, but rather to supplement it based on intervening events. Further, Plaintiffs seek to supplement in response to a factual development beyond their control, not because of any deficiency in their original pleading. And their supplemental pleadings are plainly not futile. Amended pleadings are futile when "the proposed claim would not survive a motion to dismiss," *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996). Plaintiffs here do not seek to add new claims and their original claims have already survived Paxton's motion to dismiss. *See* ECF No. 37 at 40.

cdodge@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law
Abha Khanna*
1700 Seventh Ave, Suite 2100
Seattle, WA 98101
T : (206) 656-0177
akhanna@elias.law


**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com

Amer S. Ahmed (DC 500630)
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com

**Admitted *pro hac vice*

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

**CERTIFICATE OF SERVICE**

I hereby certify that this document will be served on the Defendant in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Aria C. Branch*
Aria C. Branch

App.101

# Exhibit 1

| | |
|---|---|
| **From:** | Reuben Blum |
| **To:** | Chris Dodge |
| **Cc:** | Abha Khanna; Aria Branch; Chris Lavorato; Gene Schaerr; Kenneth Klukowski; Michelle Elliott |
| **Subject:** | RE: MMFA/Paxton, Case No. 1:24-cv-147 (DDC) - motion to supplement complaint |
| **Date:** | Thursday, April 18, 2024 5:26:04 PM |

Thank you, Counsel,

We are opposed to a 15(d) supplementation adding Missouri Attorney General Bailey.

A supplemental complaint against Attorney General Bailey does not arise out of a related "transaction or occurrence," and so it is not properly part of this case. Additionally, no "question of law or fact common to" Attorney General Paxton and Attorney General Bailey is live within the meaning of Rule 20(a)(2).

Best regards,
Reuben

---

**From:** Chris Dodge <cdodge@elias.law>
**Sent:** Thursday, April 18, 2024 12:13 AM
**To:** Chris Lavorato <Chris.Lavorato@oag.texas.gov>; Reuben Blum <Reuben.Blum@oag.texas.gov>; Gene Schaerr <gschaerr@schaerr-jaffe.com>; Kenneth Klukowski <kklukowski@schaerr-jaffe.com>
**Cc:** Abha Khanna <akhanna@elias.law>; Aria Branch <abranch@elias.law>
**Subject:** MMFA/Paxton, Case No. 1:24-cv-147 (DDC) - motion to supplement complaint

Counsel,

As you are aware, Missouri Attorney General Andrew Bailey recently served a CID on Media Matters that is substantially the same as the one already at issue in this litigation. *See* ECF No. 36. In view of this development, Plaintiffs intend to move under Rule 15(d) to file a supplemental complaint providing allegations against AG Bailey and adding him as a defendant. The amendments will not add any claims as to AG Paxton and will not involve any substantial modification of the factual allegations directed towards him.

Amendment is appropriate under Rule 15(d), as Attorney General Bailey's issuance of the Missouri CID is an "event that happened after the date of the pleading to be supplemented" and is relevant to the subject matter original pleading. Plaintiffs' proposed amendment will cause no prejudice to AG Paxton, as it will not add claims against him. Plaintiffs have also not acted with any undue delay, as they only received the as-served Missouri CID on April 1, and unofficially learned of it just a few days prior to that. Moreover, AG Bailey only confirmed a short time ago that he intends to proceed with his CID despite the Court's recent preliminary injunction decision.

Please let us know whether you consent to this supplementation. We respectfully request a response by no later than close of business today (April 18).

Best,
Chris

App.103

**Christopher D. Dodge**
**Counsel**
Elias Law Group LLP
250 Massachusetts Ave NW
Washington, DC 20001
202-987-4928
cdodge@elias.law

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA,<br>P.O. Box 44811,<br>Washington, D.C. 20026;<br><br>*and*<br><br>ERIC HANANOKI,<br>Notice of address filed under seal pursuant to<br>LCvR 5.1(c)(1),<br><br>       Plaintiffs,<br><br>  v.<br><br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br>P.O. Box 12548,<br>Austin, TX 78711,<br><br>*and*<br><br>ANDREW BAILEY, in his official capacity as Attorney General of the State of Missouri,<br>P.O. Box 899,<br>Jefferson City, MO 65102,<br><br>       Defendants. | Civil Action No. 24-cv-147-APM<br><br>[CIVIL RIGHTS ACTION]<br><br><br><br>**[PROPOSED]**<br>**SUPPLEMENTAL COMPLAINT** |

**INTRODUCTION**

1.    Plaintiffs Media Matters for America and Mr. Eric Hananoki filed the operative Complaint in this action on January 17, 2024. ECF No. 1.

2.    The Complaint named Texas Attorney General Ken Paxton, in his official capacity, as the sole defendant, and pleaded four counts against him. Count I alleges that Paxton's issuance

of a civil investigative demand (the "Texas Demand") to Media Matters is unlawful retaliation in violation of Plaintiffs' First and Fourteenth Amendments rights. Count II alleges that the Texas Demand seeks sensitive and privileged documents and communications without adequate justification, in violation of Plaintiffs' First, Fourth, and Fourteenth Amendment rights. Count III alleges that the Texas Demand violates Plaintiffs' Fourteenth Amendment rights to due process by improperly subjecting them to Texas's jurisdiction and laws. Count IV alleges that Paxton's Demand violates Plaintiffs' rights to protect their confidential source information from disclosure under the District of Columbia and Maryland shield laws.

3.      Pursuant to Federal Rule of Civil Procedure 15(d), Plaintiffs file this Supplemental Complaint for the purpose of setting forth occurrences and events "that happened after the date of the pleading to be supplemented." Specifically, the Missouri Attorney General's Office issued a civil investigative demand (the "Missouri Demand") to Media Matters on March 25, 2024. That same day, before Media Matters had even received the Missouri Demand at its office in D.C., the Missouri Attorney General also filed a petition to enforce the Demand in Cole County, Missouri, Circuit Court. The Missouri Attorney General hired a process server to serve Media Matters with that enforcement petition at its office in D.C. on March 28, 2024.

4.      In this Supplemental Complaint, Plaintiffs add Missouri Attorney General Andrew Bailey as a Defendant and plead the same four causes of action against Bailey that Plaintiffs' original Complaint pleaded against Paxton.

**SUPPLEMENTAL PARTY**

5.      Defendant Andrew Bailey is the Attorney General of the State of Missouri and is sued in his official capacity. Missouri law grants Bailey certain limited powers related to the issuance of civil investigative demands. *See, e.g.*, Mo. Rev. Stat. § 407.040 (Merchandising Practices Act); *id.* § 407.472 (Charitable Organizations and Solicitations Act). In particular, the

App.107

Attorney General may issue a civil investigative demand  "[w]hen it appears to the attorney general that a person has engaged in or is engaging in any method, act, use, practice or solicitation declared to be unlawful" under the Merchandising Practices Act. *Id.* § 407.040. As in Texas, the Missouri Attorney General is not required by statute to show probable cause or establish jurisdiction before issuing a civil investigative demand. Rather, state law authorizes him to do so, among other reasons, whenever he "believes it to be in the public interest that an investigation should be made." *Id.*

## JURISDICTION OVER SUPPLEMENTAL CLAIMS AND PARTY

6.      The grounds for the Court's subject matter jurisdiction over the claims pleaded below are the same as the grounds set forth in the original Complaint. *See* Compl. ¶¶ 11–12, ECF No. 1.

7.      This Court may exercise personal jurisdiction over Bailey in his official capacity as Attorney General of Missouri. Bailey, like Paxton, dispatched a process server into the District of Columbia to serve his enforcement petition at Media Matters's Washington, D.C. headquarters. He also effectuated service of the Missouri Demand in this District by mailing the Demand to Media Matters in the District. By engaging in these activities, Bailey has committed a tort in the District. Bailey has otherwise directed activity in the District by seeking to conduct an ongoing investigation into documents located here. Bailey has thereby availed himself of the District and subjected himself to the jurisdiction of its laws and courts.

8.      Bailey is a "person" for purposes of D.C. Code § 13-421 because he is a state officer sued for prospective injunctive relief under *Ex parte Young*.

9.      This Court has statutory long-arm jurisdiction over Bailey under D.C. Code § 13-423(a)(1), (3) and (4). Bailey has transacted business in the District by mailing his Demand into the District, seeking documents here, and employing and directing a process server to serve Media

Matters in the District with a Petition to enforce the Demand in Missouri state court. Bailey has caused tortious injury to Plaintiffs in the District through those actions taken in the District. Even if Bailey had not taken actions in the District to cause tortious injury to Plaintiffs, he is otherwise engaged in a persistent course of conduct in the District—and its courts—in his capacity as Missouri Attorney General.

<strong>SUPPLEMENTAL ALLEGATIONS</strong>

10.     As alleged in the Complaint, ¶ 47, Bailey announced on November 19, 2023, that his "team [was] looking into" Plaintiffs' coverage of Musk and extremism on X. @AGAndrewBailey, X.com (Nov. 19, 2023, 4:46 PM ET), https://perma.cc/J463-656K.



11.     Bailey subsequently issued a "Notice of Pending Investigation" on December 11, 2023, demanding that Media Matters preserve certain documents. Ex. 3, Notice of Pending Investigation, Mo. Att'y Gen. (Dec. 11, 2023). But Bailey never formally served that Notice, instead electing only to email it to the generic email inbox "action@mediamatters.org." His press release announcing the Notice provided no explanation as to what possible basis he had for investigating or exercising jurisdiction over Media Matters, yet nonetheless slandered the organization as a group of "progressive tyrants." Ex. 4, *Attorney General Bailey Notifies Media Matters of Pending Investigation*, Mo. Att'y Gen. (Dec. 11, 2023).

4

App.109

12.     Plaintiffs filed the Complaint on January 17, 2024. ECF No. 1. Because Bailey had not issued any formal demand or initiated any formal process against Media Matters at that juncture, Plaintiffs did not name Bailey as a Defendant at that time.

13.     On January 18, 2024, one day after filing the Complaint, Plaintiffs moved for a temporary restraining order and preliminary injunction against Paxton. ECF No. 4. After Paxton confirmed that his office would take no steps to enforce the Texas Demand while the preliminary injunction motion was pending, ECF No. 11, the Court entered a Minute Order on January 23 denying the request for a TRO as moot.

14.     The Court held a hearing on the preliminary injunction motion on February 15, and thereafter ordered supplemental briefing on whether Paxton, when sued in his official capacity, is a "person" within the meaning of the District of Columbia's personal jurisdiction statute, D.C. Code § 13-421.

15.     On April 12, 2024, this Court granted a preliminary injunction against Paxton preventing him from taking any steps to enforce the Texas Demand or issue further demands. ECF Nos. 37, 38. In doing so, the Court made various factual determinations, including that Paxton's issuance of the Texas Demand "had the effect of chilling Plaintiffs' expressive activities nationwide" and "deprived D.C. residents [of] access to Plaintiffs' reporting." Mem. Op. at 22, ECF No. 37.

16.     On March 25, 2024, months after this lawsuit was filed but before the preliminary injunction motion against Paxton was resolved, Attorney General Bailey copied Paxton's playbook by issuing a Civil Investigative Demand of his own.

17.     Bailey's Demand, like Paxton's, seeks to rifle through Media Matters's most sensitive internal documents—donor records, internal correspondence, and journalistic source

5

App.110

material—in retaliation for Media Matters's reporting about X. Ex. 5, Civil Investigative Demand, Mo. Att'y Gen. (Mar. 25, 2024). Among other things, it seeks names, home addresses, and donation amounts for Missouri-based donors to Media Matters; internal communications about sources and uses of donated funds; internal communications about strategy; and confidential source information related to Mr. Hananoki's reporting. The Missouri Demand is, like the Texas Demand, incredibly broad in scope; for instance, it seeks several categories of documents without imposing any temporal limits on the requested production.

18.     The Missouri Demand is materially very similar to the Texas Demand, and in many respects is a word-for-word copy. Indeed, Bailey has described the Missouri Demand as "virtually identical" to the Texas Demand. Ex. 6 ¶ 20, Petition for Order to Enforce Civil Investigative Demand, *Missouri ex rel. Bailey v. Media Matters for Am.*, No. 24AC-CC02291 (Cole Cnty. Cir Ct. Mar. 25, 2024). For instance, the Texas Demand sought "all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023." Compl. Ex. B at 7, ECF No. 1-4. The Missouri Demand similarly seeks "[a]ll communications with Apple, International Business Machine Corporation, Bravo Television Network, NBCUniversal, Oracle Corporation, Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, or Sony Group Corporation from November 1, 2023, to March 25, 2024." Ex. 5 at 5.

19.     Substantial evidence indicates that Bailey issued the Missouri Demand to harass and retaliate against Plaintiffs, rather than for any good-faith investigative reason. For example,

although more than three months passed between Bailey's Notice of Pending Investigation and his issuance of the Missouri Demand, Bailey apparently expended little investigative effort in that time. Neither the Missouri Demand nor the Petition seeking to enforce it identifies *any* new facts regarding Media Matters. Both documents simply regurgitate the vague and groundless accusations leveled at Media Matters in the Notice.

20.     Similarly, Bailey's press release announcing the escalation in harassment was short on facts and long on invective. Among other things, it characterized Media Matters as a "political activist organization," described its reporting on X as "an "attempt to destroy X, because they [sic] cannot control it," and described its reporters as "radical 'progressives'" and "'progressive' activists masquerading as news outlets [sic]."  Ex. 7, *Attorney General Bailey Files Suit Against Media Matters for Refusal to Cooperate with Investigation*, Mo. Att'y Gen. (Mar. 25, 2024).

21.     Although Hananoki himself has not previously reported on Bailey, Bailey has, like Paxton, been subject to critical reporting from Media Matters.[1] Bailey's Demand, much like Paxton's, reeks of opportunistic retaliation.

22.     The Missouri Demand has a return date of April 15, 2024. Ex. 5 at 5.

23.     Media Matters received the demand by certified mail on April 1, 2024.

24.     Remarkably, Bailey filed an enforcement petition against Media Matters in Missouri state court on March 25—the same day he issued the Missouri Demand and a full *week* before Media Matters had even received the Demand in D.C. *See* Ex. 6. That Petition, citing this case, claims an immediate enforcement action is appropriate because Media Matters has resisted

---

[1] *E.g.*, Payton Armstrong, *On Salem Media, Jenna Ellis and Missouri Attorney General Andrew Bailey push states to ban health care for trans people*, Media Matters for Am. (Aug. 31, 2023). https://www.mediamatters.org/salem-media-group/salem-media-jenna-ellis-and-missouri-attorney-general-andrew-bailey-push-states.

Paxton's Demand. *Id.* ¶ 20. On Bailey's view, because Media Matters chose to vigorously defend its constitutional rights against Paxton rather than capitulate to his bullying, Bailey is free to disregard the basic dictates of due process—and Missouri state law—by enforcing a Demand without even serving it. This rush to court further illustrates that Bailey issued the Missouri Demand chiefly to harass and punish Media Matters, rather than for any bona fide investigatory purpose.

25.     Bailey served the Petition by dispatching a process server to Media Matters's D.C. office on March 28, 2024.

26.     Although Bailey's Demand purports merely to be investigating Media Matters, the Petition goes much further, affirmatively alleging that Media Matters "has used fraud to solicit donations from Missourians." Ex. 6 at 2. But the Petition provides zero factual support for that inflammatory suggestion, asserting only that Bailey "has reason to believe" that Media Matters has somehow violated Missouri law. *Id.* ¶ 22. The Petition also describes Media Matters and its employees as "radical 'progressives" who are "attempt[ing] to destroy X, because they cannot control it," and as "activists masquerading as [a] news outlet[]."*Id.* at 2.

27.     Moreover, the Petition makes clear that Bailey intends to rely solely upon his authority under the Merchandising Practices Act as a basis for issuing and enforcing the Demand. Ex. 6 ¶¶ 13–14, 16, 22–24; *see also* Ex. 7 (accusing Media Matters of acting in direct violation of the Missouri Merchandising Practices Act). But the Missouri Supreme Court has made clear that the Act applies only to "the protection of consumers who are the actual buyers in a sale." *Ports Petroleum Co. of Ohio v. Nixon*, 37 S.W.3d 237, 241 (Mo. 2001). Media Matters makes no "sales" and has no "actual buyers" in Missouri or elsewhere. Bailey's choice to employ authority under a law that, on its face, has no possible application to Media Matters further demonstrates that his

conduct is not for any real investigative purpose, but instead simply to harass and retaliate against Media Matters.

28.     On April 15, 2024, the return date for the Missouri Demand, Media Matters replied to the Demand in a letter objecting to it in full. Ex. 8, Letter from Aria C. Branch to Jeremiah J. Morgan (April 15, 2024). In that letter, Media Matters informed Bailey of this Court's grant of a preliminary injunction against Paxton and requested that Bailey withdraw the Missouri Demand. *Id.* at 2.

29.     Bailey refused to withdraw the Missouri Demand in an email sent by one of his deputies on April 17, 2024. Ex. 9, Email from Jeremiah Morgan to Samuel Ward-Packard (Apr. 17, 2024, 5:04 PM). That email failed to explain the basis for Bailey's purported jurisdiction over Media Matters, nor did it acknowledge—let alone distinguish—this Court's preliminary injunction against Paxton's "virtually identical" Demand. *Id.* The only thing made clear by the email is that Bailey intends to proceed with his investigation and enforcement of the Missouri Demand regardless of this Court's preliminary injunction order against Paxton.

30.     Also on April 17, Bailey filed a Notice informing the Cole County, Missouri, Circuit Court of Media Matters's response to the Missouri Demand. Ex. 10, Notice of Filing Response to Civil Investigative Demand, *Missouri ex rel. Bailey v. Media Matters for Am.*, No. 24AC-CC02291 (Cole Cnty. Cir Ct. Apr. 17, 2024). That Notice asserted, improbably, that the Cole County Circuit Court had jurisdiction over Media Matters and was a proper venue because of the Missouri Attorney General's issuance of a letter in 2007 *exempting* Media Matters from any obligation to register as a charity in Missouri. *Id.* ¶ 5.

31.     The Missouri Demand and Petition have magnified and compounded the acute chill Plaintiffs suffered as a consequence of the Texas Demand. The Missouri Demand, unlike the Texas

Demand, is the subject of a pending enforcement action. It therefore represents a significant escalation: Moving to enforce creates an imminent possibility that Plaintiffs may be coerced into granting Bailey access to Plaintiffs' most sensitive papers.

32.    Bailey's enforcement action is also in a foreign venue with which neither Media Matters nor Hananoki has any ties.

33.    Media Matters is not registered as a foreign corporation in Missouri because it does not "transact business" in Missouri. Mo. Rev. Stat. § 351.572. Nor does it have a registered agent in Missouri. Further, Media Matters is not engaged in "the sale or advertisement of any merchandise in trade or commerce" in Missouri. *Id.* § 407.020. Nor is it targeting any "solicitation of any funds for any charitable purpose" at Missouri. *Id.*; *see also id.* § 407.453. Indeed, it is not even registered as a charity in Missouri because nearly two decades ago the Missouri Attorney General's Office itself concluded Media Matters was exempt from registration. Ex. 11, Letter from Rhonda Johnson to Megan B. Allen (July 12, 2007). Media Matters has never employed anyone in Missouri and has no physical presence in the state.

34.     Hananoki's reporting occurred entirely within Maryland and involved no contact with Missouri.

35.    Despite these readily ascertainable facts, Bailey's Petition seeking to enforce the Missouri Demand flatly asserts without support that "Media Matters transacts business in this county [*i.e.*, Cole County, Bailey's home jurisdiction]." Ex. 6 ¶ 5.

36.    Bailey's actions are particularly troubling in light of this Court's recent preliminary injunction ruling, which enjoined Paxton from further enforcing the Texas Demand. *See* ECF Nos. 37, 38. Bailey and Paxton are coordinating with one another. Bailey himself admitted as much in an interview on a St. Louis radio program: "Yeah, certainly we've coordinated with Texas. Texas

has launched a similar investigation and we're in talks with other states as well. This is a new front in the war, in the fight for free speech."[2] And Paxton expressly encouraged other Attorneys General to follow his lead, *see* Compl. ¶ 51, ECF No. 1, which Bailey has now done. It is thus no surprise that Bailey's Demand is virtually identical to Paxton's, effectively picking up Paxton's baton now that the Texas Demand is enjoined.

37.     Whether Bailey obtains access to Plaintiffs' papers or Paxton does makes no practical difference to Plaintiffs—the retaliation will have been accomplished either way.

**SUPPLMENTAL CLAIMS FOR RELIEF**

**COUNT V**
**(Against Bailey)**

**First Amendment Retaliation in Violation of Plaintiffs' Rights Under the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

38.     Plaintiffs incorporate all paragraphs above and in the original Complaint as if fully set forth in this paragraph.

39.     Bailey has violated, and continues to violate, Plaintiffs' First Amendment rights by launching an investigation and serving a burdensome Demand in retaliation for Plaintiffs' speech, press, and associational activities. Bailey's use of the power of his office is discouraging and will continue to discourage Plaintiffs from engaging in news coverage. The chill imposed by his retaliatory actions injures Plaintiffs' ability to investigate and publish news stories and further chills their ability to participate in a robust public discussion around political extremism on the X platform. And because Bailey has moved to enforce his lawless Demand, the chill is even more

---

[2] Tim Jones & Chris Arps Show, *MO A.G. Andrew Bailey: Missouri Doesn't Have Sanctuary Cities*, NewsTalkSTL at 5:32–58 (Dec. 12, 2023), https://omny.fm/shows/newstalk-stl/mo-a-g-andrew-bailey-missouri-doesnt-have-sanctuar.

acute, and the retaliatory effect even graver, than that caused by Paxton's Demand. Absent relief from this Court, that chill will continue.

40.     "[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

41.     The D.C. Circuit has long recognized First Amendment retaliation claims as "actionable precisely 'because retaliatory actions may tend to chill individuals' exercise of constitutional rights.'" *Crawford-El v. Britton*, 93 F.3d 813, 846 (D.C. Cir. 1996) (Henderson, J., concurring) (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)); *see also Perry v. Sindermann,* 408 U.S. 593, 597 (1972). That cause of action for First Amendment retaliation arises under 42 U.S.C. § 1983, which "has long [been] interpreted . . . to permit suits against officials in their individual capacities" for constitutional violations. *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). To prevail on their retaliation claim, Plaintiffs must show: "(1) [they] engaged in conduct protected under the First Amendment; (2) [Bailey] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (quotation marks omitted). Plaintiffs satisfy each element.

42.     *First*, Plaintiffs' investigative, newsgathering, and reporting activities are "legally protected interest[s]" under the First Amendment. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (recognizing right of local news website operator to "gather news"); *see also*

*Flynt v. Rumsfeld*, 180 F. Supp. 2d 174, 175 (D.D.C. 2002) (explaining that "under the First Amendment the press is guaranteed a right to gather and report news"). Media Matters provides journalistic research and investigative reporting on a variety of matters and figures of public importance. Hananoki is a senior investigative reporter who for over a decade has published journalism about political extremism online, including on platforms like X. The "First Amendment applies in full force" to this newsgathering and commentary, and further "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue. *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)); *cf. Nat'l Org. For Women v. Fed. Commc'n Comm'n*, 555 F.2d 1002, 1010 (D.C. Cir. 1977) (explaining that "[t]he exercise of such editorial discretion, especially in connection with news reporting, sharply implicates First Amendment values"). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who investigate and write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)); *see also Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up); *Farah v. Esquire Mag.*, 736 F.3d 528, 539 (D.C. Cir. 2013) (similar).

43.     *Second*, Bailey has taken action adverse to Plaintiffs' protected activity in response to news coverage. His investigation, intrusive Demand, and Petition to enforce that Demand have already chilled Plaintiffs' speech and reporting activities and will continue to do so absent relief. Bailey's retaliatory conduct would "deter a person of ordinary firmness in [Plaintiffs'] position from speaking again." *Aref*, 833 F.3d at 258. This chill is exacerbated by the fear Plaintiffs will be

forced to defend their constitutional rights in a jurisdiction with which they have no meaningful connection.

44.     *Third*, there is no serious dispute that Bailey's investigation and Demand are causally linked to Plaintiffs' coverage of X and Musk. Bailey has publicly admitted as much. He announced his intention to investigate Plaintiffs on November 19, 2023, in direct response to a suggestion that conservative Attorneys General launch investigations into Media Matters based on its reporting on X in the preceding days. The material sought by Bailey's Demand further confirms the causal connection, as it singles out documents and communications related to Hananoki's November 16 article, as well as X and its officers. Indeed, the Missouri Demand is a near–carbon copy of the Texas Demand.

45.     Bailey's retaliatory campaign against Media Matters has injured Plaintiffs and will continue to do so absent relief from this Court. This harm will be redressed by an order declaring Bailey's conduct to be unlawful and enjoining him from further investigating Plaintiffs or enforcing his Demand. Such relief is appropriate under Section 1983. *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004); *Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010).

### COUNT VI
### (Against Bailey)

**Violation of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

46.     Plaintiffs incorporate all paragraphs above and in the original Complaint as if fully set forth in this paragraph.

47.     Bailey's issuance of the overbroad and retaliatory Demand further violates Plaintiffs' First and Fourth Amendment rights by unreasonably requiring them to turn over

14

App.119

sensitive and privileged materials, including those that impinge upon their association with other organizations.

48.     The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). The First Amendment provides Plaintiffs a privilege against disclosure of materials that would chill their constitutional rights. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010). Where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas,* 379 U.S. 476, 485 (1965)) (emphasis added).

49.     Bailey has shown no such "scrupulous exactitude" in his Demand. Without any showing of cause or jurisdiction, Bailey has demanded that Plaintiffs produce a broad set of documents that implicate their core First Amendment rights. Indeed, Bailey seeks even broader information about Media Matters's donors than does Paxton.

50.     The Missouri Demand seeks, for example, swathes of documents related to Plaintiffs' donors, funding sources, expenditures, and employees, all of which are protected from compelled disclosure under the First Amendment. *E.g.*, *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

51.     Relatedly, the Missouri Demand seeks various kinds of "external communications" that would expose Plaintiffs' associations and collaborations with other groups, including on efforts like ongoing coalitions that include prominent civil rights organizations as well as technology experts and research organizations focused on the challenges of content moderation on X. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in

15

advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP*, 357 U.S. at 462. Compelled disclosure of such associational materials must meet "exacting scrutiny." *Bonta*, 141 S. Ct. at 2383.

52.     The Missouri Demand further requires that Plaintiffs surrender internal communications and files regarding news articles, as well as communications with employees at X and its advertisers, again with no showing of cause. Bailey may not "rummage at large in newspaper files or [] intrude into or to deter normal editorial and publication decisions" under the First Amendment. *Zurcher*, 436 U.S. at 566; *see also Lacey v. Maricopa County*, 693 F.3d 896, 917 (9th Cir. 2012). Such "[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion).

53.     It provides no meaningful relief to Plaintiffs that Bailey is authorized to enforce his Demand only through a petition in Missouri state court. *See* Mo. Rev. Stat. § 407.090. Missouri courts plainly lack personal jurisdiction over Plaintiffs, who should not be forced to subject themselves to foreign tribunals to defend their constitutionally protected rights. And Bailey has already exercised his authority to enforce the Missouri Demand in state court.

54.     Plaintiff Media Matters is incorporated under the laws of, and has its principal place of business in, the District of Columbia. Plaintiff Eric Hananoki is domiciled in Maryland. Missouri courts lack general jurisdiction over Plaintiffs. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359–60 (2021).

55.     Plaintiffs have not purposefully availed themselves of the privilege of conducting activities in Missouri, nor would any cause of action stemming from the Demand arise out of or relate to such purposeful contacts, if they existed. Missouri courts lack specific jurisdiction to

App.121

enforce the Demands against Plaintiffs. *See Johnson v. Arden*, 614 F.3d 785, 796 (8th Cir. 2010); *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–18 (5th Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022); *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 140 (4th Cir. 2020); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349–50 (D.C. Cir. 2000).

56. With an action to enforce the Missouri Demand ongoing, Plaintiffs are faced with the ongoing prospect of either surrendering constitutionally protected materials in violation of their First and Fourth Amendment rights or subjecting themselves to proceedings in a foreign court that plainly lacks jurisdiction over them. That is no true choice at all.

57. This ongoing violation of Plaintiffs' First and Fourth Amendment rights will be remedied by prompt injunctive relief from this Court setting aside the Demand.

## COUNT VII
## (Against Bailey)

**Violation of Plaintiffs' Due Process Rights Under the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)**

58. Plaintiffs incorporate all paragraphs above and in the original Complaint as if fully set forth in this paragraph.

59. The guarantee of due process in the Fourteenth Amendment "recognizes and protects an individual liberty interest" from being subjected to legal process in a jurisdiction with which a person has no contact, unless they willingly consent to such process. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

60. For a state to exercise personal jurisdiction over a party in a manner consistent with due process, the party must have "'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Mere "foreseeability of causing *injury* in another State" is not a "'sufficient benchmark'

for exercising personal jurisdiction." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). "Instead, 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

61. Here, Bailey has sought to subject Plaintiffs to legal process under Missouri law— and has already hailed Plaintiff Media Matters into Missouri state court in an attempt to enforce his Demand—despite Plaintiffs' having no minimum contacts with Missouri and not being subject to either general or specific personal jurisdiction in that state. Plaintiffs do not avail themselves of Missouri law and had no reason to ever foresee being subject to Missouri's Charitable Organizations and Solicitations Law. Media Matters's mere "operation of a website accessible in [Missouri] is insufficient to satisfy the minimum-contacts requirement of the personal-jurisdiction inquiry" under the Due Process clause. *Fidrych*, 952 F.3d at 140.

62. Plaintiffs are injured by the ongoing imposition of Missouri law on them by Bailey despite his clear lack of jurisdiction to do so. Bailey's hailing of them into Cole County court, his home jurisdiction, is a plain violation of fundamental due process principles. And—compounding the due-process injury—Bailey filed his enforcement action *before Media Matters had even received the Demand*.

**COUNT VIII**
**(Against Bailey)**

**Violation of Plaintiffs' Rights Under the District of Columbia's and Maryland's Reporters' Shield Laws**

63. Plaintiffs incorporate all paragraphs above and in the original Complaint as if fully set forth in this paragraph.

App.123

64.     Bailey's Demand violates Plaintiffs' rights under the District of Columbia's and Maryland's shield laws by seeking to compel disclosure of statutorily protected, confidential sources. D.C. Code §§ 16-4702, 4703; Md. Cts. & Jud. Proc. Code Ann. § 9-112(b), (c).

65.     The D.C. shield law provides absolute protection against compelled disclosure of sources, D.C. Code § 16-4703(b), and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed, *id.* § 16-4702. *See also Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994). The shield law protects media organizations and their employees acting within the scope of a contract in any "news gathering or news disseminating capacity." D.C. Code § 16-4702.

66.     Maryland's shield law provides materially equivalent protections. *See* Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(1), (c)(2).

67.     To overcome even the qualified privilege for non-source information, both statutes provide that parties seeking news or information must establish by clear and convincing evidence that (1) the news or information is relevant to a significant legal issue before a party that has a power to issue a subpoena; (2) the news or information could not, with due diligence, be obtained by any alternative means; and (3) there is an overriding public interest in the disclosure. Still, courts have quashed subpoenas that seek information from news media, even when all three prongs of the qualified privilege apply. *See, e.g.*, *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1–*2 (Md. Cir. Ct. Apr. 20, 1994); *Grunseth*, 868 F. Supp. at 336.

68.     Bailey's Demand is consequently infirm because its overbreadth will require that Plaintiffs turn over constitutionally protected sources. The Demand asks for any and all documents related to Plaintiffs' November 16 article—including internal documents—as well as external

communications between Plaintiffs and others. What is more, the Demand seeks documents regarding Plaintiffs' organizational structure, as well as the specific X accounts used to obtain the screenshots contained in the November 16 article. In essence, the Demand functions as a boundless inquiry into Plaintiffs' organization and news gathering capacity—precisely the kind of pernicious subpoena that these shield laws were designed to combat.

69.     Bailey's Demand not only seeks privileged material in violation of Plaintiff's First Amendment rights, but also chills Plaintiffs' news gathering capacity. An order setting aside the Demand is the only legal mechanism to ensure that Plaintiffs' rights—protected by the Constitution and by state statute—are secure.

### SUPPLEMENTAL PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask for the following supplemental relief:

70.     Declare that Bailey's Demand and Petition constitute a First Amendment retaliatory action in violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution.

71.     Declare that Bailey's Demand and Petition violate Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution.

72.     Declare as a matter of law that courts in the State of Missouri cannot exercise personal jurisdiction over Plaintiffs in any imminent action to enforce the Demand, including that prematurely filed by Bailey.

73.     Declare that Bailey's Demand seeks disclosure of information protected by the Maryland and D.C. shield laws.

74.     Preliminarily enjoin Bailey, his officers, agents, servants, and employees from taking any further action to enforce the Missouri Demand or further investigating Plaintiffs in violation of their constitutional rights.

75.     Permanently enjoin Bailey, his officers, agents, servants, and employees from taking any further to enforce the Missouri Demand or further investigating Plaintiffs in violation of their constitutional rights.

76.      Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

77.     Grant Plaintiffs any and all other relief that the Court deems just and proper.

Dated: April 18, 2024                                Respectfully submitted,

                                                     */s/ Aria C. Branch*

                                                     **ELIAS LAW GROUP LLP**
                                                     Aria C. Branch (DC 1014541)
                                                     Elizabeth C. Frost (DC 1007632)
                                                     Christopher D. Dodge (DC 90011587)
                                                     Jacob D. Shelly (DC 90010127)
                                                     Elena A. Rodriguez Armenta (DC 90018798)
                                                     Daniela Lorenzo (DC 90022335)
                                                     Omeed Alerasool (DC 90006578)
                                                     Samuel T. Ward-Packard (DC 90005484)
                                                     250 Massachusetts Ave. NW, Suite 400
                                                     Washington, DC 20001
                                                     T: (202) 968-4652
                                                     abranch@elias.law
                                                     efrost@elias.law
                                                     cdodge@elias.law
                                                     jshelly@elias.law
                                                     erodriguezarmenta@elias.law
                                                     dlorenzo@elias.law
                                                     oalerasool@elias.law
                                                     swardpackard@elias.law

                                                     Abha Khanna*
                                                     1700 Seventh Ave, Suite 2100
                                                     Seattle, WA 98101
                                                     T : (206) 656-0177
                                                     akhanna@elias.law

App.126

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com

Amer S. Ahmed (DC 500630)
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com

*Admitted *pro hac vice*

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

App.127

# Exhibit 3



ATTORNEY GENERAL OF MISSOURI

ANDREW BAILEY

December 11, 2023

Angelo Carusone
President and CEO
Media Matters for America
PO Box 44811
Washington, DC 20026
*Via email to:* action@medimatters.org

 Re: Notice of Pending Investigation

Dear Mr. Carusone,

 This letter serves as a formal document hold notice under federal and Missouri law. The Missouri Attorney General's Office has opened an investigation into Media Matters for America ("Media Matters") regarding your firm's potentially unlawful business practices.

 As you are no doubt aware, a federal lawsuit has been filed against Media Matters, raising serious allegations that your firm falsely and deceptively manipulated the algorithm on X (formerly known as Twitter) through coordinated, inauthentic behavior and that you did so in an attempt to defame the organization and cause advertisers to pull their support from the platform, thus harming free speech. The lawsuit alleges that you lied to the public, falsely suggesting that fringe, extremist content regularly appears next to content from corporate advertisers when in fact the opposite is true. At the same time, you appear to have used this coordinated, inauthentic activity to solicit charitable donations from consumers across the country.

 I have reason to believe that your firm's alleged actions may have violated Missouri consumer protection laws, including laws that prohibit nonprofit entities from soliciting funds under false pretenses. *E.g.*, Mo. Rev. Stat. § 407.020.1. I am especially concerned that Media Matters' actions, if proven true, have hampered free speech by targeting an expressly pro free speech social media platform in an attempt

**Supreme Court Building**
207 W. High Street
P.O. Box 899
Jefferson City, MO 65102
Phone: (573) 751-3321
Fax: (573) 751-0774
www.ago.mo.gov

App.129

to cause it financial harm while defrauding Missourians in the process.

You are thus hereby instructed to <u>preserve all records that may relate to</u> your alleged effort to engage in coordinated, inauthentic behavior on social media platforms in order to generate false statements that were used to solicit charitable contributions under false pretenses.  You are instructed in particular to preserve all records that may relate to your webpage, which expressly solicits funds, at the following  URL:  [https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle](https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle).  Records you must preserve include but are not limited to:

- • Internal communications regarding your strategy to target advertisers on X, formerly known as Twitter, and your efforts to manipulate those advertisers into pulling their ads from the platform.
- • Communications with third parties regarding your strategy to target advertisers on X, formerly known as Twitter, and your efforts to manipulate those advertisers into pulling their ads from the platform.
- • Communications with IBM, Lions Gate Entertainment, Apple, Disney, Warner Brothers Discovery, Paramount Gold, NBCUniversal, Comcast, Sony, Ubisoft and Wal-Mart regarding your strategy to target advertisers on X, formerly known as Twitter, and your efforts to manipulate those advertisers into pulling their ads from the platform.
- • Internal communications regarding your policies, strategies or operations related to generating stories or content intended to "cancel," "deplatform," "demonetize," or otherwise interfere with businesses or organizations located in Missouri, or utilized by Missouri residents.
- • Communications and documents related to soliciting charitable funds from residents of Missouri in relation to the webpage at the URL stated above.

Your obligation to preserve evidence extends to documents kept in any form, both physical and electronic. This includes letters, emails, instant messages, text messages, drafts, informal files, desk files, handwritten notes, faxes, memoranda, forms, calendar entries, address book entries, and voicemails.  Your obligation applies to both hardcopy documents and electronic ones, including those kept on computers, laptops, tablets, smartphones, and any other electronic device, including both work and personal devices, personal email accounts and personal computers and tablets. Please ensure that all employees and contractors of Media Matters are aware of their obligations to preserve evidence in this case.

2

You and your staff are further instructed to <u>cease any protocol for the automatic deletion of emails or backup files</u> on your computer systems.  Please forward a copy of this letter to Media Matters IT managers and instruct them to suspend any such protocols.

Be advised that any failure to preserve documents of probative value to this case, even if inadvertent, will constitute spoliation of evidence and may result in a finding of contempt from the court or in sanctions.

Your cooperation in this matter is appreciated.  Please feel free to contact me with any questions or concerns.

Respectfully,

ANDREW BAILEY
Missouri Attorney General

3

App.131

# Exhibit 5



## ATTORNEY GENERAL OF MISSOURI

ANDREW BAILEY
ATTORNEY GENERAL

### JEFFERSON CITY
65102

P.O. Box 899
(573) 751-3321

*In the Matter of:*

**Media Matters for America**

**CID NO. 24-10**
**Date:** March 25, 2024

## INVESTIGATIVE DEMAND

### THE ATTORNEY GENERAL TO:

**Served:** *U.S. Postal Service*
*Certified Mail*

**Media Matters for America**
**PO Box 44811**
**Washington, DC 20026**

The Attorney General of the State of Missouri believes it to be in the public interest that an investigation be made to ascertain whether **Media Matters for America (Subject)** has engaged in or is engaging in practices declared unlawful by § 407.020, RSMo.

The investigation will inquire into the activities of **Subject** in connection with the solicitation of funds for a charitable purpose, or the sale or advertisement of merchandise, §§ 407.020, 407.453, RSMo.

The Attorney General has reason to believe that the **Subject** has used deception, fraud, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material fact in connection with the soliciting of funds for a charitable purpose or the sale or advertisement of merchandise in or from the State of Missouri, § 407.020, RSMo. Independently, the Attorney General also believes it to be in the public interest to investigate whether such acts have occurred.

The Attorney General believes you have information, documentary material or physical evidence relevant to the above-mentioned conduct.

## DEFINITIONS

As used in this Demand, the following terms have the meanings described below:

**"Communication"** means any expression, statement, conveyance, or dissemination of any words, thoughts, statements, ideas, or information regardless of form, format, or kind.  "Communication" includes but is not limited to oral or written communications of any kind, such as telephone conversations, discussions, meetings, notes, letters, agreements, emails or other electronic communications, facsimiles, and other forms of written or oral exchange that are recorded in any way, including video recordings, audio recordings, written notes, or otherwise.  Any "Communication" that also falls within the definition of "Document" shall constitute both a Document and a Communication for purposes of this civil investigative demand.

**"Document"** means all written, printed, typed, and recorded matter of every kind and description, originals and copies, and all attachments and appendices thereto.  Without limiting the foregoing, "documents" include all agreements, contracts, correspondence and other communications including notes, memoranda and marginal notations, records, reports, books, manuals, instructions, statistical data and data compilations, drafts, charts, graphs and tables, bills, statements and invoices, advertising, surveys, transcripts, microfilm and microfiche, electronic records that can be reproduced in paper form, recordings, film, tapes, photographs, electronic mail and Web pages, and all other computer-generated, computer-stored, or electronically-stored matter, however and by whomever produced, prepared, reproduced, disseminated, or made.

**"Identify"**, when used with respect to a **person or entity**, means information sufficient to allow employees of the Attorney General to ascertain the name, address, telephone number, and if not a natural person, the contact person of the entity or facility to be identified, as well as the relationship of that person or entity to you.

**"Identifying"**, when used with respect to a **fact or event**, means information sufficient to allow employees of the Attorney General to ascertain the fact or event with reasonable particularity, and to identify each person believed to have knowledge with respect to the fact or event and each document that refers or relates to the fact or event.

2

App.134

**"Relating to"**, "**related to**", "**relate to**" means to be relevant in any way to the subject matter in question, including without limitation all information that directly or indirectly contains, records, reflects, summarizes, evaluates, refers to, is pertinent to, indicates, comments upon, or discusses the subject matter; or that states the background of, or was the basis for, or that records, evaluates, comments, was referred to, relied upon, utilized, generated, transmitted, or received in arriving at any conclusion, opinion, estimate, position, decision, belief, policy, practice, course of business, course of conduct, procedure, or assertion concerning the subject matter.

**"You"**, including your, means Media Matters for America, subsidiaries, partnerships, or any other entities related to Media Matters for America.

<u>DEMAND FOR INFORMATION</u>

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material and information that may be in your possession, custody or control, and permit the inspection and copying thereof:

1. A list or information identifying any and all donations of funds from donors located in the state of Missouri from January 01, 2023 through March 25, 2024.

   The list of donations should include, but is not limited to:
   - Identity of each individual or organization who donated funds;
   - Address of each individual or organization who donated funds;
   - Total amount spent per donation;
   - Date and time of each donation;
   - Payment method for each donation;
   - Identity of financial institution where funds were sent;
   - Contracts and/or agreements governing or related to each donation;

For each Demand for Information, you shall type the Demand and type your corresponding response. If you do not know the answer to a Demand for Information, you shall identify in your response the individual or business entity that has the answer to the Demand for Information. The document on

3

App.135

which you type each Demand and your corresponding response shall be executed by you before a Notary Public.

## DEMAND FOR DOCUMENTS

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material that may be in your possession, custody or control, and permit the inspection and copying thereof:

2. All promotional or marketing information provided by you from January 1, 2023 to March 25, 2024 to any individual or organization for the purpose of soliciting donations.

3. All documents or communications showing how solicited donations were used.

4. All communications or materials relating to any policy, strategy or operation related to generating stories or content intended to cancel, deplatform, demonetize, or otherwise interfere with businesses located in Missouri, or utilized by Missouri residents.

5. All communications, internal and external, regarding your strategy to pressure advertisers into pulling advertisements from the social media platform, X (formerly Twitter).

6. Documents sufficient to identify your employee organizational chart.

7. Documents sufficient to identify all your operational expenses in the state of Missouri.

8. All documents discussing Elon Musk's purchase of X (formerly Twitter).

9. All documents related to the article, or to the events described in the article, by Eric Hananoki entitled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM,Oracle, and Xfinity next to pro-Nazi content."

App.136

10.   All documents sufficient to identify X accounts owned, controlled, or authorized by you used to obtain the images in the article referenced in paragraph 9.

11.   All documents sufficient to identify all X accounts followed by the X accounts identified in response to paragraph 10.

12.   All communications with Apple, International Business Machine Corporation, Bravo Television Network, NBCUniversal, Oracle Corporation, Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, or Sony Group Corporation from November 1, 2023, to March 25, 2024.

## NOTICE OF DEMAND FOR RETENTION OF RECORDS

You are hereby notified that all records, including communications, documents and things, relating to the above requests and the matters that are the subject of these requests for information are to be preserved during the pendency of this investigation.  This includes, but is not limited to, all related customer records, including recordings made of customers, all related correspondence and other communications with third parties, all related documents and things received from third parties, and all internal documents and things.

## COMPLIANCE

You may comply with this Investigative Demand by producing copies of the requested documents and information by regular mail or overnight delivery to **Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102.** The requested copies of documents and information should be received by the Office of the Attorney General **by 10:00 a.m. (Central) on April 15, 2024** and be accompanied by the attached Business Records Affidavit and Certification of Compliance.

You are advised that the Attorney General will not grant an extension of time or modification of the terms of the Demand except for good cause pursuant to the terms of Section 407.070, RSMo.  Your prompt response and provision of the requested information is requested.

App.137

Your attention is respectfully called to the provisions of Section 407.080, RSMo, which makes certain acts done with the intent to avoid, evade or prevent compliance in whole or in part with any Investigative Demand served hereunder a Class A misdemeanor, which is punishable by a fine not to exceed $1,000.00 for individuals and $5,000.00 for corporations, or by imprisonment for a term of not more than one year, or both a fine and imprisonment.

Please direct all questions regarding this Investigative Demand to Jeremiah Morgan at 573-751-1800 or by e-mail to: Jeremiah.Morgan@ago.mo.gov.

Respectfully Submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, #50387
Deputy Attorney General – Civil Litigation
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870; Fax: (573) 751-0774
Jeremiah.Morgan@ago.mo.gov

App.138

STATE OF _____     )
                                 ) SS.
COUNTY OF _____      )

## BUSINESS RECORDS AFFIDAVIT AND CERTIFICATE OF COMPLIANCE

     Before me, the undersigned authority, personally appeared _____, who, being by me duly sworn, deposed as follows:

     My name is _____, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

     I am the custodian of the records of _____. Attached hereto are _____ pages of records from _____. These _____ pages of records are kept by _____ in the regular course of business, and it was the regular course of business of_____ for an employee or representative of_____ with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, opinion or diagnosis. The records attached hereto are the original or exact duplicate of the original.

     I further certify that all documents and information required by Civil Investigative Demand No. 24-10 which is in the possession, custody, control, or knowledge of, _____ has been submitted to the Missouri Attorney General as directed herein.

_____
     Affiant

Sworn to before me this ____ day of_____, 2024.

_____
Notary Public
Commission Expires:

App.139

# Exhibit 6

**24AC-CC02291**

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

IN THE CIRCUIT COURT OF COLE COUNTY
STATE OF MISSOURI

| | |
|---|---|
| STATE OF MISSOURI, ex rel. ANDREW BAILEY, ATTORNEY GENERAL, | ) ) ) ) |
| Petitioner, | ) ) |
| v. | ) Case No. ) ) Division: |
| MEDIA MATTERS FOR AMERICA, | ) ) |
| Serve Registered Agent At: Angelo Carusone 800 Maine Avenue SW Suite 500 Washington, DC  20024 | ) ) ) ) ) ) |
| Respondent. | ) |

## PETITION FOR ORDER TO ENFORCE
## <u>CIVIL INVESTIGATIVE DEMAND</u>

The State of Missouri, by and through Attorney General Andrew Bailey,

petitions the Court pursuant to Missouri Revised Statutes section 407.090, to

enforce its Civil Investigative Demand directed to Media Matters for America

(hereinafter "Media Matters"), and upon information and belief states in

support as follows:[1]

### INTRODUCTION

Media Matters, a self-styled not-for-profit "progressive research and

---

[1] All statutory citations are to RSMo 2016 unless otherwise noted.

App.141

information center," envisions itself monitoring, analyzing, and correcting "conservative misinformation" in the U.S. media. In fact, this description falls far short of reality for this political activist organization. Instead, rather than passively "monitoring," Media Matters has used fraud to solicit donations from Missourians in order to trick advertisers into removing their advertisements from X, formerly Twitter, one of the last platforms dedicated to free speech in America.

Media Matters has pursued an activist agenda in its attempt to destroy X, because they cannot control it. And because they cannot control it, or the free speech platform it provides to Missourians to express their own viewpoints in the public square, the radical "progressives" at Media Matters have resorted to fraud to, as Benjamin Franklin once said, mark X "for the odium of the public, as an enemy to the liberty of the press." Missourians will not be manipulated by "progressive" activists masquerading as news outlets, and they will not be defrauded in the process.

Based on serious allegations of false and deceptive behavior, the Attorney General's Office has issued a Civil Investigative Demand ("CID"), as authorized by Missouri Law, to Media Matters to investigate possible violations of the Missouri Merchandising Practices Act. Because Media Matters has refused such efforts in other states and made clear that it will refuse any such efforts, the Attorney General seeks an order from the Court,

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

pursuant to section 407.090, compelling Media Matters to comply with the CID within 20 days.

## PARTIES

1.     Andrew Bailey is the Attorney General of the State of Missouri and files this petition in his official capacity pursuant to chapter 407 and section 27.060 of the Missouri Revised Statutes, as well as the authority granted to the Attorney General at common law.

2.     Respondent Media Matters is incorporated under the laws of, and has its principal place of business in the District of Columbia, and engages in media activity as well as fundraising throughout the United States, including in Missouri. Specifically, Media Matters engages in internet and email solicitations, phone solicitations, and in-person solicitations for fundraising–listing Missouri in its public financial disclosures as a state in which it "is registered or licensed to solicit contributions or has been notified it is exempt from registration."

## JURISDICTION

3.     This Court has subject matter and personal jurisdiction over this action under the Missouri Constitution Article. V, § 14 and section 506.500.

## VENUE

4.     This Court has authority over this action pursuant to section 407.090, which allows the Attorney General to file in the trial court of general

App.143

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

jurisdiction of a county or judicial district in which such person resides, is found, or transacts business, and serve upon such person a petition for an order of such court for the enforcement of such CID.

5.   Media Matters transacts business in this county.

## MISSOURI MERCHANDISING PRACTICES ACT

6.   Section 407.020 of the Missouri Merchandising Practices Act ("MMPA") provides in pertinent part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose, as defined in section 407.453, in or from the state of Missouri, is declared to be an unlawful practice… Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement, or solicitation.

7.   The words in the statute are "unrestricted, all-encompassing and exceedingly broad." *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. banc 2001). "[T]he literal words cover every practice imaginable and every unfairness to whatever degree." *Id.*

8.   "Person" is defined as "any natural person or his legal representative, partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation, trust, business entity or

4

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof." § 407.010(5).

9.     "Merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, or services." § 407.010(4).

10.     "Trade" or "commerce" is defined as the "advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated. The terms 'trade' and 'commerce' include any trade or commerce directly or indirectly affecting the people of this state." § 407.010(7).

11.     Respondent Media Matters has engaged in trade or commerce within the meaning of section 407.010.

12.     Pursuant to section 407.145, the Attorney General has promulgated rules explaining and defining terms in sections 407.010-407.145 of the Merchandising Practices Act. The rules relevant to the Merchandising Practices Act allegations herein include the provisions of 15 CSR 60.

13.     Section 407.040 provides in pertinent part:

> When it appears to the attorney general that a person has engaged in or is engaging in any method, act, use, practice or solicitation declared to be unlawful by this chapter or when he believes it to be in the public interest that an investigation should be made to ascertain whether a

5

person in fact has engaged in or is engaging in any such method, act, use, practice or solicitation, he may execute in writing and cause to be served upon any person who is believed to have information, documentary material, or physical evidence relevant to the alleged or suspected violation, a civil investigative demand requiring such person to appear and testify, or to produce relevant documentary material or physical evidence or examination, at such reasonable time and place as may be stated in the civil investigative demand, concerning the advertisement, sale or offering for sale of any goods or services or the conduct of any trade or commerce or the conduct of any solicitation that is the subject matter of the investigation. Service of any civil investigative demand, notice, or subpoena may be made by any person authorized by law to serve process or by any duly authorized employee of the attorney general.

14.    Section 407.070 provides in pertinent part:

At any time before the return date specified in a civil investigative demand issued under section 407.040, or within twenty days after the civil investigative demand has been served, whichever period is shorter, a petition to extend the return date for, or to modify or set aside the civil investigative demand, stating good cause, may be filed in the circuit court of the county where the parties reside or in the circuit court of Cole County.

**ALLEGATIONS OF FACT**

15.    On March 25, 2024, the Office of the Missouri Attorney General served upon Media Matters, through its Registered Agent, Angelo Carusone, 800 Maine Avenue SW, Suite 500, Washington DC, 20024, Civil Investigative Demand Number ("Investigative Demand") CID No. 24-10. A true and accurate copy of the Investigative Demand is attached hereto as Exhibit 1 and

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

incorporated herein. A true and accurate copy of proof of service is attached hereto as Exhibit 2 and incorporated herein.

16.     Pursuant to section 407.040, Investigative Demand No. CID No. 24-10 identified the statute of the suspected violation and the general subject matter of the investigation.

17.     Specifically, Investigative Demand CID No. 24-10 requests information relevant to whether Media Matters has engaged in or is engaging in any merchandising practices declared to be unlawful by section 407.020 with regard to Media Matters' fraudulent manipulation of data on X.com (formerly known as Twitter).

18.     The return date to produce all requested documentation and information and submit the Certification of Compliance to the Attorney General's Office is no later than 10:00 a.m. April 15, 2024.

19.     Media Matters has expressed its intent not to comply with CIDs like this one.

20.     For example, the State of Texas served on Media Matters a virtually identical civil investigative demand in December of 2023, which Media Matters refused to comply with and instead filed a lawsuit to block compliance and disclosure of information and materials. *See* Exhibit 3 (Texas CID); Exhibit 4 (Media Matters complaint); *see generally Media Matters for*

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

*America, et al. v. Paxton*, 1:24-cv-00147-APM (United States District Court for the District of Columbia).

### COUNT I-REQUEST FOR ORDER ENFORCING INVESTIGATIVE DEMAND

21.   Petitioner incorporates all of the allegations contained in Paragraphs 1 through 20 above.

22.   The Attorney General has reason to believe that Media Matters has engaged in methods, acts, uses, or practices that violate chapter 407, and that it is in the public's interest that an investigation should be made. *See* § 407.040.1.

23.   Investigative Demand CID No. 24-10 meets all of the statutory requirements of section 407.040.2.

24.   The CID does not run afoul of the statutory prohibitions of section 407.040.3, RSMo, or of the Missouri or U.S. Constitutions.

25.   Media Matters has failed or will fail to comply with the Investigative Demand CID No. 24-10, as it has expressed that it will not comply with similar investigative demands.

26.   Accordingly, Petitioner is entitled to an order pursuant to section 407.090 requiring Media Matters to produce responses to Investigative Demand CID No. 24-10.

WHEREFORE, Petitioner State of Missouri ex rel. Attorney General Andrew Bailey, prays this Court for an Order enforcing the Civil Investigative

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Demand, and ordering Media Matters to produce complete responses to Civil Investigative Demand No. 24-10 within twenty (20) days of the entry of its Order.

Respectfully submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, MO 50387
Deputy Attorney General – Civil
Jeremiah.Morgan@ago.mo.gov
Steven Reed, MO 40616
Chief Counsel – Consumer Protection
Steven.Reed@ago.mo.gov
Kathryn Monroe, MO 76022
Assistant Attorney General
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800; Fax: (573) 751-0774

ATTORNEYS FOR PETITIONER

## ATTORNEY GENERAL OF MISSOURI

### JEFFERSON CITY

ANDREW BAILEY
ATTORNEY GENERAL

65102

P.O. Box 899
(573) 751-3321

*In the Matter of:*

**Media Matters for America**

CID NO. 24-10
**Date:** March 25, 2024

### INVESTIGATIVE DEMAND

**THE ATTORNEY GENERAL TO:**

**Media Matters for America**
PO Box 44811
Washington, DC 20026

**Served:** *U.S. Postal Service*
*Certified Mail*

The Attorney General of the State of Missouri believes it to be in the public interest that an investigation be made to ascertain whether **Media Matters for America (Subject)** has engaged in or is engaging in practices declared unlawful by § 407.020, RSMo.

The investigation will inquire into the activities of **Subject** in connection with the solicitation of funds for a charitable purpose, or the sale or advertisement of merchandise, §§ 407.020, 407.453, RSMo.

The Attorney General has reason to believe that the **Subject** has used deception, fraud, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material fact in connection with the soliciting of funds for a charitable purpose or the sale or advertisement of merchandise in or from the State of Missouri, § 407.020, RSMo. Independently, the Attorney General also believes it to be in the public interest to investigate whether such acts have occurred.

The Attorney General believes you have information, documentary material or physical evidence relevant to the above-mentioned conduct.

App.150

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

## DEFINITIONS

As used in this Demand, the following terms have the meanings described below:

**"Communication"** means any expression, statement, conveyance, or dissemination of any words, thoughts, statements, ideas, or information regardless of form, format, or kind.  "Communication" includes but is not limited to oral or written communications of any kind, such as telephone conversations, discussions, meetings, notes, letters, agreements, emails or other electronic communications, facsimiles, and other forms of written or oral exchange that are recorded in any way, including video recordings, audio recordings, written notes, or otherwise.  Any "Communication" that also falls within the definition of "Document" shall constitute both a Document and a Communication for purposes of this civil investigative demand.

**"Document"** means all written, printed, typed, and recorded matter of every kind and description, originals and copies, and all attachments and appendices thereto.  Without limiting the foregoing, "documents" include all agreements, contracts, correspondence and other communications including notes, memoranda and marginal notations, records, reports, books, manuals, instructions, statistical data and data compilations, drafts, charts, graphs and tables, bills, statements and invoices, advertising, surveys, transcripts, microfilm and microfiche, electronic records that can be reproduced in paper form, recordings, film, tapes, photographs, electronic mail and Web pages, and all other computer-generated, computer-stored, or electronically-stored matter, however and by whomever produced, prepared, reproduced, disseminated, or made.

**"Identify"**, when used with respect to a **person or entity**, means information sufficient to allow employees of the Attorney General to ascertain the name, address, telephone number, and if not a natural person, the contact person of the entity or facility to be identified, as well as the relationship of that person or entity to you.

**"Identifying"**, when used with respect to a **fact or event**, means information sufficient to allow employees of the Attorney General to ascertain the fact or event with reasonable particularity, and to identify each person believed to have knowledge with respect to the fact or event and each document that refers or relates to the fact or event.

"**Relating to**", "**related to**", "**relate to**" means to be relevant in any way to the subject matter in question, including without limitation all information that directly or indirectly contains, records, reflects, summarizes, evaluates, refers to, is pertinent to, indicates, comments upon, or discusses the subject matter; or that states the background of, or was the basis for, or that records, evaluates, comments, was referred to, relied upon, utilized, generated, transmitted, or received in arriving at any conclusion, opinion, estimate, position, decision, belief, policy, practice, course of business, course of conduct, procedure, or assertion concerning the subject matter.

"**You**", including your, means Media Matters for America, subsidiaries, partnerships, or any other entities related to Media Matters for America.

## DEMAND FOR INFORMATION

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material and information that may be in your possession, custody or control, and permit the inspection and copying thereof:

1. A list or information identifying any and all donations of funds from donors located in the state of Missouri from January 01, 2023 through March 25, 2024.

   The list of donations should include, but is not limited to:
   - Identity of each individual or organization who donated funds;
   - Address of each individual or organization who donated funds;
   - Total amount spent per donation;
   - Date and time of each donation;
   - Payment method for each donation;
   - Identity of financial institution where funds were sent;
   - Contracts and/or agreements governing or related to each donation;

For each Demand for Information, you shall type the Demand and type your corresponding response. If you do not know the answer to a Demand for Information, you shall identify in your response the individual or business entity that has the answer to the Demand for Information. The document on

App.152

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

which you type each Demand and your corresponding response shall be executed by you before a Notary Public.

## DEMAND FOR DOCUMENTS

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material that may be in your possession, custody or control, and permit the inspection and copying thereof:

2. All promotional or marketing information provided by you from January 1, 2023 to March 25, 2024 to any individual or organization for the purpose of soliciting donations.

3. All documents or communications showing how solicited donations were used.

4. All communications or materials relating to any policy, strategy or operation related to generating stories or content intended to cancel, deplatform, demonetize, or otherwise interfere with businesses located in Missouri, or utilized by Missouri residents.

5. All communications, internal and external, regarding your strategy to pressure advertisers into pulling advertisements from the social media platform, X (formerly Twitter).

6. Documents sufficient to identify your employee organizational chart.

7. Documents sufficient to identify all your operational expenses in the state of Missouri.

8. All documents discussing Elon Musk's purchase of X (formerly Twitter).

9. All documents related to the article, or to the events described in the article, by Eric Hananoki entitled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM,Oracle, and Xfinity next to pro-Nazi content."

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

10. All documents sufficient to identify X accounts owned, controlled, or authorized by you used to obtain the images in the article referenced in paragraph 9.

11. All documents sufficient to identify all X accounts followed by the X accounts identified in response to paragraph 10.

12. All communications with Apple, International Business Machine Corporation, Bravo Television Network, NBCUniversal, Oracle Corporation, Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, or Sony Group Corporation from November 1, 2023, to March 25, 2024.

## NOTICE OF DEMAND FOR RETENTION OF RECORDS

You are hereby notified that all records, including communications, documents and things, relating to the above requests and the matters that are the subject of these requests for information are to be preserved during the pendency of this investigation.  This includes, but is not limited to, all related customer records, including recordings made of customers, all related correspondence and other communications with third parties, all related documents and things received from third parties, and all internal documents and things.

## COMPLIANCE

You may comply with this Investigative Demand by producing copies of the requested documents and information by regular mail or overnight delivery to **Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102.** The requested copies of documents and information should be received by the Office of the Attorney General **by 10:00 a.m. (Central) on April 15, 2024** and be accompanied by the attached Business Records Affidavit and Certification of Compliance.

You are advised that the Attorney General will not grant an extension of time or modification of the terms of the Demand except for good cause pursuant to the terms of Section 407.070, RSMo.  Your prompt response and provision of the requested information is requested.

Your attention is respectfully called to the provisions of Section 407.080, RSMo, which makes certain acts done with the intent to avoid, evade or prevent compliance in whole or in part with any Investigative Demand served hereunder a Class A misdemeanor, which is punishable by a fine not to exceed $1,000.00 for individuals and $5,000.00 for corporations, or by imprisonment for a term of not more than one year, or both a fine and imprisonment.

Please direct all questions regarding this Investigative Demand to Jeremiah Morgan at 573-751-1800 or by e-mail to: Jeremiah.Morgan@ago.mo.gov.

Respectfully Submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, #50387
Deputy Attorney General – Civil Litigation
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870; Fax: (573) 751-0774
Jeremiah.Morgan@ago.mo.gov

6

App.155

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

STATE OF _____   )
                             ) SS.
COUNTY OF _____    )

## BUSINESS RECORDS AFFIDAVIT AND CERTIFICATE OF COMPLIANCE

Before me, the undersigned authority, personally appeared _____, who, being by me duly sworn, deposed as follows:

My name is _____, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of _____. Attached hereto are _____ pages of records from _____. These _____ pages of records are kept by _____ in the regular course of business, and it was the regular course of business of_____ for an employee or representative of_____ with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, opinion or diagnosis. The records attached hereto are the original or exact duplicate of the original.

I further certify that all documents and information required by Civil Investigative Demand No. 24-10 which is in the possession, custody, control, or knowledge of, _____ has been submitted to the Missouri Attorney General as directed herein.

_____
Affiant

Sworn to before me this _____ day of_____, 2024.

_____
Notary Public
Commission Expires:

7

App.156

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®.*

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery  $

Postage
$

Total

$

Media Matters for America
P.O Box 44811
Washington, DC 20026

**24AC-CC02291**
Exhibit 3

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION

# CIVIL INVESTIGATIVE DEMAND

**To:** **Media Matters for America**        *via FedEx 7741 8756 3037*
                                     **Return Date: December 12, 2023**

**c/o**  **Angelo Carusone**
       **800 Maine Ave SW, Suite 500**
       **Washington, DC 20024**

Pursuant to this office's specific authority under § 17.61 of the Texas Deceptive Trade Practices –
Consumer Protection Act, §§ 17.41-.63, Texas Business and Commerce Code ("DTPA"), Media Matters
for America ("Media Matters") is hereby directed to produce the items listed in **"Exhibit A"** attached
hereto.

You are to make available the documentary material described in **"Exhibit A"** to the undersigned
Assistant Attorney General, or other authorized agent(s) identified by the Consumer Protection Division
("Division"), by the "Return Date" indicated above for inspection and copying. In lieu of producing the
originals for inspection and copying at your principal place of business, you may deliver true copies of
the requested documents to the Assistant Attorney General or Authorized Agent below at the Office of
the Attorney General, 300 W 15th St, Austin, TX, 78701. **Contact one of the persons listed below upon
receipt to discuss the logistics of producing the requested documents to the Division.**

The Division believes that Media Matters for America is in possession, custody, or control of documentary
material relevant to the subject matter of an investigation of possible violations of §§ 17.46(a) and (b) of
the DTPA, related to false, misleading, and/or deceptive practices in the State of Texas.

> **TAKE NOTICE THAT pursuant to section 17.62, Texas Business and Commerce Code, any
> person who attempts to avoid, evade, or prevent compliance, in whole or in part, with this
> directive by removing, concealing, withholding, destroying, mutilating, altering, or by any other
> means falsifying any documentary material may be guilty of a misdemeanor and on conviction
> is punishable by a fine of not more than $5,000.00 or by confinement in the county jail for not
> more than one year, or both.**

ISSUED THIS 21st day of November, 2023.

/s Levi Fuller                          **Authorized Agent**
Levi Fuller                             Ryan Hanlan
Assistant Attorney General              Investigator
(512) 936-1308                          (512) 936-3354

## Instructions

1. **Read These Instructions/Definitions.** Read these instructions and definitions carefully.

2. **Duty to Preserve Documents**. All documents and/or other data which relate to the subject matter or requests of this Civil Investigative Demand must be preserved. *Any ongoing, scheduled or other process of document or data destruction involving such documents or data must cease even if it is your normal or routine course of business for you to delete or destroy such documents or data and even if you believe such documents or data are protected from discovery by privilege or otherwise.* Failure to preserve such documents or data may result in legal action and may be regarded as spoliation of evidence under applicable law.

3. **Relevant Dates**. Unless otherwise noted, the requests in this Civil Investigative Demand require production of documents for each year from January 1, 2022 to the final date of your production of responsive documents, herein called "the relevant time period."

4. **Custody and Control.** In responding to this Civil Investigative Demand, you are required to produce not only all requested documents in your physical possession, but also all requested documents within your custody and control, including those within the possession of persons reasonably available to you or under your direction or control.

5. **Identification of Documents not in Custody or Control.** If any responsive document was, but no longer is, in your possession, custody or control, produce a description of each such document. The description shall include the following:

   a. The name of each author, sender, creator, and initiator of such document;

   b. the name of each recipient, addressee, or party for whom such document was intended;

   c. the date the document was created;

   d. the date(s) the document was in use;

   e. a detailed description of the content of the document;

   f. the reason it is no longer in your possession, custody or control; and

   g. the document's present whereabouts.

   If the document is no longer in existence, in addition to providing the information indicated above, state on whose instructions the document was destroyed or otherwise disposed of, and the date and manner of the destruction or disposal.

6. **Privileged Documents**. If any responsive document is withheld, in whole or in part, under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document or partial document that you have withheld:

   a. the document's control numbers;

   b. all authors of the document;

   c. all addressees of the document;

   d. all recipients of the document or of any copies of the document, to the extent not included among the document's addressees;

   e.   the date of the document;

   f.   a description of the subject matter of the document sufficient to determine the applicability of the privilege;

   g.   the nature or type of the privilege that is being asserted for the document (e.g., "attorney-client privilege");

   h.   the specification(s) of the Demand to which the document is responsive;

   i.   the document control number(s) of any attachments to the document, regardless of whether any privilege is being asserted for such attachment(s); and

   j.   whether the document has been produced in redacted form, and if so, the range of the control numbers for the document.

7. **Trade Secrets.** It is your responsibility to clearly designate which, if any, of the requested documents contain trade secrets, in accordance with Section 17.61(f) of the Texas Business and Commerce Code.

8. **Consult Before Producing Documents.** Before processing or making copies of hard copy documents or electronically stored information in response to this Civil Investigative Demand, consult with the designated representative(s) of the Office of the Attorney General, ("OAG") identified above and reach agreement on the format and method of production.

   Likewise, before producing any *original* documents, consult with one of the designated representatives of the OAG identified above to obtain approval. If you produce original documents, the OAG cannot guarantee their return.

9. **You May Produce Copies.** Subject to the consultation requirement noted above, you may submit photocopies (with color photocopies where necessary to interpret the document) in lieu of original hard-copy documents, provided that such copies are accompanied by an affidavit of an officer of Media Matters for America stating that the copies are true, correct, and complete copies of the original documents, and (if appropriate) were generated and maintained in the ordinary course of your business, and provided that where the original contains colored text or images, a color copy must be provided.

10. **Non-identical Copies to be Produced.** Identical copies of responsive documents need not be produced. However, any copy of a document that differs in any manner, including but not limited to the presence of handwritten notations, different senders or recipients, etc. must be produced.

11. **No Redaction**. All materials or documents produced in response to this Civil Investigative Demand shall be produced, except as deemed privileged, in complete unabridged, unedited and unredacted form, even if portions may contain information not explicitly requested, or might include interim or final editions of a document.

12. **Documents to be Bates Numbered.** Mark each page or electronic medium (e.g., disk, tape, or CD) with individual or corporate identification and eight-digit consecutive document control numbers (e.g., DOE-12345678; CORP-12345678). Hardcopy bound pamphlets or books may be marked with a single identification and control number. Documents as to which privilege is asserted are to also receive identification and control numbers.

   If your production will be more than one box or piece of electronic media, number each box or electronic media, as well as the total number of boxes/media (e.g., box 1 of 13) and mark each with the name(s) of the person(s) whose files are contained therein, the requests(s) to which they are responsive, and the document control numbers contained therein.

Civil Investigative Demand                                                                                        3
Media Matters for America

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

13. **Document Organization**. *Each document and other tangible thing produced shall be clearly designated as to which request, and each sub-part of a request, that it satisfies. The documents produced shall be identified and segregated to correspond with the number and subsection of the request.*

14. **Production of Electronic Documents.** Unless otherwise agreed to in writing by the designated OAG representative, electronically stored information shall be produced in electronic form. Before you prepare documents or information for production in electronic form in order to comply with this Civil Investigative Demand (for example, before you attempt to process electronically stored information or image hard copy documents), you must consult with the designated representative(s) of the OAG identified above and reach agreement regarding the format and method of production.

15. **Questions.** Questions concerning this Civil Investigative Demand should be directed to Assistant Attorney General Levi Fuller at (512) 936-1308.

# Definitions

1. **"You," "your," "the business," "Media Matters for America,"** or **"Media Matters"** means Media Matters for America, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above. The terms "subsidiary," "affiliate," and "joint venture" refer to any firm in which there is total or partial ownership (25 percent or more) or control between the company and any other person or entity.

2. **"X," "X Corp.," "Twitter,"** or **"Twitter, Inc."** means X, their past and present officers, employees, agents and representatives, parents and predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and includes all persons and entities acting or purporting to act under the guidance or on behalf of any of the above.

3. **"Document"** means the original and all non-identical copies (whether different from the original because of notes, underlining, attachments, or otherwise) of all computer files, and all written, printed, graphic or recorded material of every kind, regardless of authorship. It includes communications in words, symbols, pictures, photographs, sounds, films, and tapes, as well as electronically stored information, computer files, together with all codes and/or programming instructions and other materials necessary to understand and use such systems. The term "computer files" includes information stored in or accessible through computers or other information retrieval systems and includes but is not limited to drafts of documents, metadata, embedded, hidden and other bibliographic or historical data describing or relating to documents created, revised, or distributed on computer systems, as well as spreadsheets and their underlying cell formulae and other codes. Thus, you should produce documents that exist in machine-readable form, including documents stored in personal computers, portable computers, workstations, minicomputers, phones, pagers, personal data/digital assistants, archival voice storage systems, group and collaborative tools, electronic messaging devices, mainframes, servers, backup disks and tapes, archive disks and tapes, and other forms of offline storage, whether on or off your premises. This definition covers electronic mail messages ("e-mail"), text messages, voice mail, and all other documents in the possession of you and/or your directors, officers, managers, or employees, whether located at their home or office, whether on work or personal devices. Notice: Unless otherwise specified, the term "document" excludes bills of lading, invoices in non-electronic form, customs declarations, purchase orders, and other similar documents of a purely transactional nature.

4. **"Communication"** means any exchange or transmission of words or ideas to another person or an entity, including without limitation conversations, discussions, letters, memoranda, meetings, notes, speeches, or other transfer of information, whether written, oral, or by any other means, whether direct or indirect, formal or informal, and includes any document which abstracts, digests, transcribes or records any such communication. This definition extends to and encompasses electronic communications on internal chat platforms such as Slack, Microsoft Teams, Google Chat, and other similar messaging platforms.

5. **"Entity"** means legal or business entity of any kind and includes, without limitation, corporations, partnerships, joint ventures, associations, governmental bodies, and trusts.

6. **"Evidencing"** means having any tendency to make the existence of any fact related to the request more probable than it would be without the evidence.

7. **"Identify"** means

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

   a.  Regarding an individual, to identify that individual's:

      i.  name;

      ii.  current or last known telephone numbers at business and home; and

      iii.  current or last known business and home addresses.

   b.  Regarding a person other than an individual, to identify:

      i.  its full name;

      ii.  the nature of its organization;

      iii.  the address and telephone number of its principal offices and, if applicable, the state in which it is incorporated; and

      iv.  its principal line of business or activity.

   c.  Regarding any other tangible thing, to identify:

      i.  what it is, giving a reasonably detailed description thereof;

      ii.  when, where, and how it was made, if applicable;

      iii.  who made it, if applicable; and

      iv.  its current custodian or the person that had last known possession, custody, or control thereof.

8.  **"Including"** means including, but not limited to.

9.  **"Person"** includes you and means any entity or natural person.

10. **"Relate," "related,"** and **"relating"** mean being in any way legally, logically, or factually connected with the subject matter of the request at issue.

11. The words **"and"** and **"or"** shall be construed either conjunctively or disjunctively as required by the context to bring within the scope of the request, any document(s) that might be deemed outside its scope by another construction.

12. Unless the context otherwise clearly indicates, words used in the singular include the plural, the plural includes the singular, and the neuter gender includes the masculine and the feminine.

App.163

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

# EXHIBIT A: DOCUMENTS TO BE PRODUCED

1. Produce documents sufficient to identify Media Matters for America's employee organizational chart.

2. Produce documents sufficient to identify all of Media Matters for America's sources of income originating in the State of Texas.

3. Produce documents sufficient to identify all of Media Matters for America's operational expenditures in the State of Texas.

4. Produce all documents related to internal and external communications by Media Matters for America regarding Elon Musk's purchase of X during the relevant time period.

5. Produce all documents related to internal and external communications by Media Matters for America regarding Linda Yaccarino during the relevant time period.

6. Produce documents sufficient to identify all current and past X accounts under the ownership, control, or operating at the behest of Media Matters for America.

7. Produce all documents related to internal and external communications relating to the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

8. Produce documents sufficient to identify all of Media Matters for America's owned, controlled, or authorized X accounts that were used to obtain, produce, or otherwise acquire the screenshot images contained in the article titled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content" by Eric Hananoki.

9. Produce documents sufficient to identify all X accounts, profiles, and members followed by the X accounts identified in response to Demand Number 8, above.

10. Produce all of Media Matters for America's external communications with employees and representatives of X from November 1, 2023 to November 21, 2023.

11. Produce all of Media Matters for America's external communications with Apple Inc., International Business Machine Corporation (IBM), Bravo television network, NBCUniversal, Oracle Corporation, and Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, and Sony Group Corporation from November 1, 2023 to November 21, 2023.

12. Produce documents sufficient to identify all direct and indirect sources of funding for all Media Matters for America operations involving X research or publications.

24AC-CC02291

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA,
P.O. Box 44811,
Washington, D.C. 20026;

*and*,

ERIC HANANOKI,
Notice of address to be filed under seal
pursuant to LCvR 5.1(c)(1),

              Plaintiffs,

    v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,
P.O. Box 12548,
Austin, TX 78711,

              Defendant.

Civil Action No. 24-cv-147

[CIVIL RIGHTS ACTION]

**COMPLAINT**

**(Rule 57 Speedy Hearing Request)**

## INTRODUCTION

1.     This case is a test of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). At the heart of this commitment is the First Amendment's promise that the people and the press may discuss public matters—and criticize powerful people—"without . . . fear of subsequent punishment" from government officials. *Roth v. United States*, 354 U.S. 476, 488 (1957) (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 101–02 (1940)).

2.     Plaintiff Media Matters for America ("Media Matters") is a Washington, D.C. based organization dedicated to comprehensively monitoring, analyzing, and correcting

misinformation in the U.S. media. It employs over 60 reporters, writers, and researchers, who regularly publish news articles, analysis, research, and studies about a variety of issues of great public interest. Among them are Plaintiff Eric Hananoki, Media Matters's Senior Investigative Reporter, who for the past decade has specialized in reporting on extremism—including white nationalism, antisemitism, and Islamophobia—in the public square. For years, Media Matters and Mr. Hananoki have regularly published material that is critical of powerful figures, politicians, and elected officials. Their careful reporting and research work has been extensively cited and discussed by other media outlets—and even government agencies—as they have established themselves as important voices contributing to an ongoing and critical national discussion about extremism in our politics and media.

3.      Over the past year, as part of their long running work and mission, Plaintiffs have frequently reported on a major national news story—the disturbing rise of violent and extremist rhetoric on the popular social media platform X (formerly known as Twitter) since it was purchased by Elon Musk, reportedly the world's richest man, in late 2022. As Media Matters and countless others in the media have reported, as hateful rhetoric has continued to proliferate on the platform (often alongside Musk's own statements appearing to endorse extremist views and conspiracy theories), many advertisers have chosen to leave X. And much of Media Matters's reporting on the subject has come from Hananoki who, for nearly a year now, has been publishing a series of articles specifically about X's apparent inability to protect its advertisers from appearing alongside extremist content—despite X's repeated promises that it would do just that.

4.      This case arises out of an article that Media Matters and Hananoki published in November. That article was published on November 16, 2023, when Musk was in the middle of a veritable media storm resulting from his apparent endorsement on X of a fringe conspiracy theory

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

that postulates that Jewish people have a "hatred against whites" and support "flooding the[]
country" with "hordes of minorities." That article was titled, "*As Musk endorses antisemitic
conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-
Nazi content*," and, in it, Hananoki reported that at the same time Musk appeared to endorse this
antisemitic conspiracy theory, X was permitting the placement of advertisements next to pro-Nazi
content. His article published several examples, such as this image of an advertisement for Oracle
appearing next to an image of Adolf Hitler:



    5.    Although the subject of the article—specifically X's consistent failure to protect
advertisers from their advertisements appearing alongside hate speech on the platform—had been
addressed in near-constant media coverage for over a year, Musk appeared to take personal offense
at the November 16 article, and shortly after it was published, tweeted to his 165 million followers
that X would be filing a "thermonuclear" lawsuit against Media Matters and anyone else involved

with the article. A mere two days later, Musk made good on his threat, filing suit against Media

Matters and Hananoki on November 20, 2023. *See X Corp. v. Media Matters for America, et al.*,

No. 4:23-cv-1175, 2023 WL 8091661 (N.D. Tex. Nov. 20, 2023). Although Media Matters and

Hananoki have no meaningful contacts with Texas, X chose to file this lawsuit in federal district

court for the Northern District of Texas, in the face of binding precedent that merely having a

website available in a state does not supply jurisdiction.

6. On the same day that X filed that lawsuit (indeed, within minutes of its filing),

Defendant Texas Attorney General Ken Paxton—another prominent public figure about whom

Hananoki and Media Matters have reported in the past—announced he was launching an

investigation into Media Matters, purportedly under Texas's deceptive trade practices act. *See*

Ex. A, *Att'y Gen. Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent*

*Activity*, Texas Att'y Gen.'s Office (Nov. 20, 2023). The press release announcing the

investigation was four sentences long and identified no basis for the State of Texas to "investigate"

Media Matters, a D.C.-based organization, for purported violation of Texas law. It does, however,

repeatedly describe the investigation's target in troubling and nakedly partisan terms, calling

Media Matters "a radical anti-free speech organization," and "a radical left-wing organization[]

who would like nothing more than to limit freedom by reducing participation in the public square."

It also admits that the sole bases for the "investigation" are X's own self-serving and unverified

allegations about Media Matters's and Hananoki's reporting.

7. That the "investigation" was pretext to rifle through Media Matters' internal

communications and chill the reporting of Media Matters and Hananoki was proved the following

day, when Paxton issued a civil investigative demand ("Demand") to Media Matters. The Demand

commanding Media Matters to "produce [] documentary material[s] and permit inspection and

copying" of a sweeping array of materials in both Media Matters's and Hananoki's possession, including documents and communications about their research and reporting, their communications with possible sources at X and its advertisers, and other sensitive materials related to Media Matters's operations, including information about the organization's funding. Ex. B, Civil Investigative Demand, Office of the Att'y Gen. (Nov. 21, 2023) at 7. Paxton did not pause for even a moment to consider other public reporting on the same topic, or materials clearly within his office's reach, to determine either whether there was a legitimate substantive or jurisdictional basis for the investigation, before demanding these extraordinarily invasive materials from Media Matters itself. The result has been to immediately and significantly chill Plaintiffs' newsgathering, research, and reporting activities on X or Musk, by asserting an immediate, seemingly unrestrained right to any and all related materials, from now until Paxton determines the investigation is over. Ex. B at 7. And, under Texas procedure, Paxton is entitled to enforce the Demand in Texas state court *at any time*, even though Plaintiffs have no relevant connection to Texas and have been afforded *zero* explanation as to how they may have violated Texas law.

8.      Paxton's retaliatory campaign has had its intended effect: Plaintiffs have not published any articles about how Musk's ownership has triggered a rise in political extremism on X since Paxton announced his investigation—despite a flood of tips identifying extremist content on the platform—for fear of further retaliation and harassment.  Hananoki himself had two articles that were already researched and drafted—including one article that had gone through the entire editing process and was effectively ready for publication—at the time Media Matters received the Demand. But neither was published in the wake of the Demand. The chill on Hananoki's reporting is ongoing—he previously published one or two articles per week prior to receiving the Demand, but has published only two articles *altogether* since then, and none about Musk's handling of

5

political extremism on X. In the two articles Hananoki was able to publish, he has purposefully avoided commenting on X's content moderation policies, even where plainly relevant to the article.

9.  "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). Likewise, under the Fourth Amendment, it is "contrary to the first principles of justice to allow a search through [Plaintiffs'] records, relevant or irrelevant, in the hope that something will turn up." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924) (Holmes, J.). Paxton's retaliatory investigation and Demand are "premised solely upon *legal* activity" and thus "the very type of 'fishing expeditions' that were the target of Justice Holmes's assault in *American Tobacco.*" *Major League Baseball v. Crist*, 331 F.3d 1177, 1187 (11th Cir. 2003) (suppressing civil investigative demand violating Fourth Amendment).

10. In view of Paxton's unlawful harassment and retaliation, Plaintiffs seek immediate declaratory and injunctive relief from this Court—in a jurisdiction where their constitutionally protected activities occur, where Media Matters is incorporated and has its office, where most of Media Matters's reporters and researchers live and work, and where Plaintiffs will be uniquely injured by being compelled to disclose information—to vindicate their fundamental right to gather news and hold the powerful to account. To the same end, Plaintiffs also respectfully request that the Court order a "speedy hearing" of this "declaratory-judgment" action. *See* Fed. R. Civ. P. 57.

### JURISDICTION & VENUE

11. This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiffs' federal constitutional claims arise under the First, Fourth, and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983, 1988. It has authority to grant Plaintiffs declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers. It also has supplemental

App.170

jurisdiction over any state law claims derived from a common nucleus of operative fact. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988).

12. Subject matter jurisdiction further exists under Article III because Plaintiffs have suffered and will continue to suffer injuries-in-fact; there is a sufficient causal connection between Plaintiffs' injuries and Paxton's actions in pursuing his investigation and Demand, and a favorable decision from this Court granting Plaintiffs relief will redress those injuries. This dispute is ripe because Plaintiffs' rights are being violated already, and Plaintiffs will suffer further imminent invasions of those rights in the absence of relief from this Court. Plaintiffs have actual fear that the Demand will be enforced against them, which has already chilled their speech.

13. This Court has personal jurisdiction over Defendant Paxton in his official capacity as Attorney General of Texas. The District of Columbia's long-arm statute is effectively congruent with the permissible limits of personal jurisdiction under the Due Process Clause. *See, e.g.*, *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 44 (D.C. Cir. 2020); *Mouzavires v. Baxter*, 434 A.2d 988, 993 (D.C. Cir. 1981). For constitutional purposes, specific personal jurisdiction exists where (1) the defendant has "purposefully directed" activity at residents of the forum and (2) the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Lewis v. Mutond*, 568 F. Supp. 3d 47, 52 (D.D.C. 2021) (first quoting *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 472–73 (1985), and then quoting *Bristol-Myers Squibb v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017)). Even "a single act, so long as it creates [a] 'substantial connection,' is sufficient." *Heller v. Nicholas Appelgate Cap. Mgmt. LLC*, 498 F. Supp. 2d 100, 109–10 (D.D.C. 2007) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 475, n.18 (1984)).

14. The Court has at least three related bases to exercise jurisdiction over Paxton consistent with the demands of due process. First, Paxton procured the service of an agent—a

process server—and directed that agent to enter the District of Columbia to serve the Demand upon Media Matters. It is well-settled that "physical entry into the State—either by the defendant in person *or through an agent*" is a "relevant contact" for purposes of personal jurisdiction. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphasis added); *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 113 (D.D.C. 2018). Second, Paxton's Demand seeks documents from Media Matters that are overwhelmingly located in the District, where Media Matters is headquartered and where Media Matters will have to undertake any effort to comply with the Demand. By demanding such documents, Paxton has unquestionably "directed" activity at Media Matters in D.C. And Plaintiffs' claims unquestionably "arise" from those contacts because three of their claims challenge the statutory and constitutional propriety of Paxton's Demand. *See infra* Counts II–IV. Third, Plaintiffs allege unlawful retaliation in violation of the First Amendment, an intentional tort. *See infra* Count I. In intentional-tort cases, "personal jurisdiction can be based upon: (1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered— and which the defendant knows is likely to be suffered—in the forum state." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 29 (D.D.C. 2017) (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998)), *aff'd,* No. 17-7033, 2018 WL 4440459 (D.C. Cir. July 17, 2018); *see also Calder v. Jones*, 465 U.S. 783, 788–89 (1984). Here, jurisdiction is proper because Paxton has intentionally served a Demand on Media Matters in the District causing a substantial and predictable chill to Media Matters and its reporters, including Hananoki. Indeed, Paxton has conceded the Demand was "directed" at Media Matters in the District of Columbia. *See infra* ¶¶ 76–77 & note 28.

15.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia. Paxton caused his

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Demand to be served in the District; Media Matters's compliance or noncompliance therewith will occur in the District; and the substantial chill to Plaintiffs has been suffered, in substantial part, in the District.

## PARTIES

16.     Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting misinformation in the media. Media Matters routinely investigates political extremism on media platforms in the United States and publishes articles and commentary on public figures who endorse or espouse such rhetoric. It has been incorporated under the laws of, and has had its principal place of business in, the District of Columbia since its founding over twenty years ago. Most of its reporters and employees live in and work from the Washington, D.C. metropolitan area, including in Maryland and Virginia, as well as the District itself. Nearly all of Media Matters's executive leadership lives and works in the District of Columbia. Any periodic in-person meetings, trainings, and other convenings are held at Media Matters's office space in the District of Columbia, where it also stores any physical documents.

17.     Plaintiff Eric Hananoki is a Senior Investigative Reporter at Media Matters. Hananoki resides in Maryland, just outside of Washington, D.C. For over a decade, Hananoki's beat for Media Matters has included investigating, researching, and reporting on political extremism in U.S. media, including on social media platforms like X. In his role as Senior Investigative Reporter, Hananoki has written many articles about extremism, white nationalism, and anti-Semitic rhetoric espoused by politicians and public figures. Hananoki's reporting has included numerous articles about social media platform X and its owner, Elon Musk. Hananoki generally researched and wrote his articles, including the November 16 article, from his residence

in Maryland. Although Hananoki primarily works from his Maryland home, he occasionally visits the Media Matters office in Washington, D.C. as part of his job responsibilities.

18.     Defendant Warren Kenneth Paxton, Jr. is the Attorney General of the State of Texas and is sued in his official capacity. The Texas Deceptive Trade Practices Act ("DPTA"), Tex. Bus. & Com. Code Ann. § 17.41, *et seq.*, grants Paxton various powers in his capacity as Attorney General through the consumer protection division of his office. This includes the power to issue a "civil investigative demand requiring" the recipient "to produce [] documentary material[s] and permit inspection and copying." Tex. Bus. & Com. Code Ann. § 17.61(a). Under Texas law, the Attorney General is not required to show any cause or even make a threshold determination that he has jurisdiction to issue a Demand—he may do so if he "believes" the recipient to be in possession of relevant material concerning a possible violation of the DPTA. Tex. Bus. & Com. Code Ann. § 17.61(a). Paxton "may use the documentary material or copies of it as [he] determines necessary" to enforce the DPTA, including before a court. Tex. Bus. & Com. Code Ann. § 17.61(f).

**FACTS**

**A.     Media Matters and Hananoki have a long track record of reporting on political extremism, including on social media platforms like X.**

19.     Since its founding in 2004, Media Matters has been dedicated to monitoring and correcting misinformation, including by publishing its own investigatory research and reporting on its website. Media Matters provides its reporters and researchers, including Hananoki, a powerful platform from which to reach the public, often in the form of research and reporting on current events and criticism of powerful public figures and politicians.

20.     Media Matters has over 100 employees—including over 60 reporters, writers, and researchers—most of whom work and reside within the Washington, D.C. metropolitan area where

10

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Media Matters's sole office is located.[1] Media Matters does not have an office, or any other physical presence, in Texas. Media Matters does not transact any business in Texas and thus has never registered in the state. *See* Tex. Bus. Orgs. Ann. Code § 9.002(a). Media Matters is also not registered as a charity organization in Texas and does not have a registered agent in the state.

21. Hananoki has worked at Media Matters since 2007 and is currently a Senior Investigative Reporter. Previously, Hananoki worked as a Researcher, Senior Researcher, Research Fellow, and Investigative Reporter at Media Matters. In his more than 16 years at the organization, Hananoki has researched and written countless reports and articles, often shedding light on public figures who espouse violent, extreme, or racist views. His articles and reports have been widely cited by a broad array of media outlets, including the Associated Press, CNN, Fox News, Los Angeles Times, MSNBC, New York Post, New York Times, Politico, USA Today, Wall Street Journal, and Washington Post.

22. His long history of research and reporting has been relied upon by government officials, including under both Democratic and Republican leadership. Under President Trump, the Department of Justice cited Hananoki's research regarding a commentator who promoted and sold a bogus COVID-19 cure.[2] Special Counsel Robert Mueller cited Hananoki's reporting on

---

[1] Media Matters employees may request authorization to work remotely and, upon approval, may choose to do so from any location in the United States. Of Media Matters employees authorized to work remotely, only one employee has provided a residential address in Texas. That employee did not work with Mr. Hananoki on the November 16 article, nor any other of his articles related to X or otherwise, and works in an entirely different department. Nonetheless, since October 2023, that employee has only visited Texas for a short period during the holidays—where they only worked for a single day.

[2] *United States v. My Dr. Suggests LLC*, No. 2:20-CV-00279-DBB (D. Utah Apr. 27, 2020), Plaintiffs' Ex Parte Mot. and Mem. of Law for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, Dkt. 2, at 13; *id.*, Decl. of Virginia Keys, Dkt. 2-1, ¶¶ 7, 28–29.

Roger Stone in his report on Russian interference in the 2016 presidential election,[3] as did a bipartisan U.S. Senate Select Committee on Intelligence report regarding the same.[4] Numerous political organizations, including the National Republican Congressional Committee, have at various times withdrawn support for political candidates after Hananoki reported on racist or extremist rhetoric from those candidates.[5]

23.     Attorney General Paxton himself has previously relied on Hananoki's work. In 2020, Hananoki uncovered "tweets filled with racist rhetoric, violent threats and coronavirus conspiracy theories" from an Assistant Attorney General in Paxton's office.[6] Paxton's office fired the employee in the wake of Hananoki's reporting.[7]

24.     As part of his work at Media Matters, Hananoki has been reporting on X—and before that, Twitter—for years. His coverage of X has increased over the past year due to a marked

---

[3] Both reports cited a Media Matters article that included a video that Hananoki found and produced. *See* Report on the Investigation into Russian Interference in the 2016 Presidential Election, Volume I of II, Special Counsel Robert S. Mueller, III, March 2019, at 57 n.233, available at https://www.justice.gov/storage/report_volume1.pdf.

[4] Select Committee on Intelligence, Russian Active Measures Campaigns and Interference in the 2016 U.S. Election, Volume 5: Counterintelligence Threats and Vulnerabilities, at 246 n.1638, https://www.intelligence.senate.gov/sites/default/files/documents/report_volume5.pdf.

[5] *See, e.g.*, Jonathan D. Salant, "*House Republicans withdraw support of N.J. candidate after report says he shared racist screed*," NJ.com (July 10, 2018), https://www.nj.com/politics/2018/07/house_republicans_withdraw_support_of_nj_candidate.html (noting that NRCC chair "Stivers reacted to a report by the liberal watchdog group Media Matters about [the candidate] linking to the article that ran on a white supremacist website.").

[6] Eric Hananoki, "*A Texas assistant attorney general is a Qanon conspiracy theorist who tweets out violent threats and bigoted remarks*," Media Matters for America (Sept. 3, 2020), https://www.mediamatters.org/twitter/texas-assistant-attorney-general-nick-moutos-qanon-conspiracy-theorist-who-tweets-out.

[7] Trinady Joslin, "*Assistant Texas attorney general loses job after report surfaces racist tweets*," The Texas Tribune (Sept. 3, 2020), https://www.texastribune.org/2020/09/03/nick-moutos-texas-attorney-general; *see also* Taylor Goldenstein, "*Records: Texas assistant AG who lost job over tweets was fired, had been warned about social media*," Houston Chronicle (Sept. 11, 2020),

---

increase in extremist rhetoric on the platform since Musk took ownership, a disturbing trend widely reported on in the media, including by outlets other than Media Matters.

**B. Elon Musk purchases X and cuts back its content-moderation infrastructure.**

25.     On October 27, 2022, Elon Musk completed his purchase of the social media platform then known as Twitter. Musk subsequently renamed the social media platform "X," though it continues to operate at its traditional twitter.com web address. Both before and after acquiring ownership of X, Musk frequently referred to the platform as a "digital town square" or "de facto town square" for public discussion.[8]

26.     Almost immediately after his takeover, Musk began laying off key executives and content moderators at X responsible for removing hate speech and other violent rhetoric.[9] Indeed, within his first few months of ownership, Musk laid off approximately 80 percent of the company's staff, including its former CEO, general counsel, policy chief, and head of trust and safety.[10] He downsized or eliminated critical areas of the company responsible for overseeing policy, trust and safety, communications, and ethical AI, among others.[11] These deep workforce cuts raised

---

https://www.houstonchronicle.com/politics/texas/article/texas-assistant-ag-social-media-posts-fired-warned-15558487.php.

[8] Douglas Yeung, "*The 'Digital Town Square' Problem*," TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

[9] *See* Brian Fung & Clare Duffy, "*How a single year of Elon Musk turned Twitter into a husk of its former self*," CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html [hereinafter *A single year of Elon Musk turned Twitter into a husk*]; *see also* "*Musk fires outsourced content moderators who track abuse on Twitter*," MoneyWatch, CBS News (Nov. 14, 2022), https://www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/.

[10] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[11] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Rohan Goswami, "*X CEO Linda Yaccarino explains reason for getting rid of Twitter name*," CNBC (Aug. 10, 2023), https://www.cnbc.com/2023/08/10/x-corp-ceo-linda-yaccarino-says-she-has-autonomy-under-elon-musk.html.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

questions among U.S. lawmakers and regulators about the social media platform's ability to safely respond to security and privacy threats, misinformation, and hate speech—matters of significant public concern in view of Musk's claim that the platform should serve as a digital town square.[12] Lawmakers similarly expressed concern that, in the wake of Musk's ownership, the platform had ceased to comply with two consent decrees it had entered into with the Federal Trade Commission concerning safeguards for personal data and privacy.[13]

27.      Musk also eliminated existing products and policies—many of which served to protect users from misinformation and violent content—under the auspices of promoting "free speech."[14] He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists who tracked his private air travel.[15]

28.      Unsurprisingly, after the elimination of 80 percent of X's staff and the dismantling of much of X's content moderation infrastructure, extremist and racist rhetoric surged on X in the wake of Musk's takeover. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" in the wake of Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately

---

[12] Brian Fung, "*First on CNN: US senators question Twitter's privacy compliance under Elon Musk*," CNN (June 5, 2023), https://www.cnn.com/2023/06/05/tech/twitter-compliance-musk-senators/index.html; *see also* Brian Fung, "*Elon Musk should be forced to testify on X's 'chaotic environment,' US regulator tells court*," CNN (Sept. 12, 2023), https://www.cnn.com/2023/09/12/tech/elon-musk-testify-privacy-probe/index.html.

[13] *See* Makena Kelly, "*Republicans defend Elon Musk in FTC's Twitter probe*," The Verge (July 14, 2023), https://www.theverge.com/2023/7/14/23794363/elon-musk-twitter-ftc-lina-khan-republicans; *see also* Cat Zakrzewski, "*Musk may have violated FTC privacy order, new court filing shows*," The Washington Post (Sept. 12, 2023), https://www.washingtonpost.com/technology/2023/09/12/elon-musk-consent-order-ftc/.

[14] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

[15] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

following the shift of ownership to Musk."[16] Similarly, within the first week of his ownership, use of the word "Jew" increased fivefold, with tweets that were antisemitic receiving the most engagement.[17] Academic researchers in the School of Communication and Media at Montclair State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform."[18]

29.     Less than two months after Musk's takeover, the New York Times reported the following about the rising hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."

- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."

- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."[19]

30.     A broad array of media outlets extensively reported on this disturbing trend in Musk's self-described "digital town square."

31.     This spike in hateful rhetoric on X caught the attention of the platform's advertisers, many of whom promptly ceased advertising on the platform in the months after Musk took over.

---

[16] Rashawn Ray and Joy Anyanwu, "*Why is Elon Musk's Twitter takeover increasing hate speech?,*" Brookings (Nov. 23, 2022), https://www.brookings.edu/articles/why-is-elon-musks-twitter-takeover-increasing-hate-speech/.

[17] *Id.*

[18] "*Hate Speech Spikes on Twitter After Elon Musk Acquires the Platform,*" Montclair State University, (Nov. 1, 2022) https://www.montclair.edu/school-of-communication-and-media/wp-content/uploads/sites/20/2022/11/Montclair-State-SCM-Study-Increases-in-Twitter-Hate-Speech-After-Elon-Musks-Acquisition.pdf.

[19] Sheera Frenkel and Kate Conger, "*Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find,*" N.Y. Times (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[20]

32. The pullback of the company's largest advertisers led to precipitous drops in its revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load," while in September, he reported that advertising revenue in the U.S. was "still down 60%."[21]

33. More alarming still to X's advertisers was the fact that, after Musk's steep downsizing of company staff, the flood of hateful and violent rhetoric on the platform began appearing increasingly often alongside their advertising, creating a false association between their brands and vile hate speech. X's inability to control the appearance of extremist and violent rhetoric alongside its advertisers precipitated a broader exodus of advertisers from the platform.

34. Indeed, the media writ large has, for over a year, consistently reported on X and Musk's failure to protect advertisers from having their brands appear next to extremist, hateful, and violent rhetoric. Some examples include:

1. **Reuters**, "*Advertisers react to Twitter's new ownership*" (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/.

2. **The Washington Post**, "*Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk,*" Faiz Siddiqui (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

---

[20] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9; *see also* Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk/?sh=1ade964b2a19.

[21] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 9.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

3. **ARS Technica**, "*Twitter running major brands' ads with extremist tweets—until they get flagged*," Ashley Belanger (Dec. 7, 2022), https://arstechnica.com/tech-policy/2022/12/amazon-among-brands-whose-ads-appeared-in-white-nationalist-twitter-feeds/.

4. **The Verge**, "*Twitter advertisers aren't happy with ads appearing on pages of white nationalists*," Jon Porter (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists.

5. **Center for Countering Digital Hate**, "*Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts*," (Feb. 9, 2023), https://counterhate.com/wp-content/uploads/2023/02/Toxic-Twitter_FINAL.pdf.

6. **The Washington Post**, "*Extremist influencers are generating millions for Twitter, report says*," Taylor Lorenz (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/.

7. **The Kansas City Star**, "*Mizzou ad appears on racist X page as social media site faces concerned advertisers*," Jonathan Shorman (Mar. 15, 2023), https://www.kansascity.com/news/politics-government/article280309284.html.

8. **Business Insider**, "*Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda*," Katherine Tangalakis-Lippert (June 18, 2023), https://www.businessinsider.com/disney-microsoft-nba-twitter-ads-next-to-neo-nazi-propaganda-2023-6.

9. **The N.Y. Post**, "*Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report*," Shannon Thaler (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

35. None of these articles cited or otherwise indicated that they relied on research or reporting performed by Media Matters or Hananoki.

**C. Hananoki and Media Matters investigate and report on the surge of extremist rhetoric on X, including alongside advertisements.**

36. As part of its long-running mission to document and report extremist political rhetoric in media, Media Matters began investigating, researching, and reporting on the rise in

political extremism and bigotry on X after Musk's changes to the platform. Hananoki, as a Senior Investigative Reporter whose beat included political extremism, was often assigned this work.

37. From February 10, 2023 to November 17, 2023, Media Matters published at least fourteen articles about the juxtaposition of advertisements alongside hateful content on the X platform. Eleven of these articles were researched and written by Hananoki. They include:

1. "**Under Elon Musk, Twitter is running corporate ads alongside tweets from Holocaust deniers**," Media Matters for America (Feb. 10, 2023), https://www.mediamatters.org/twitter/under-elon-musk-twitter-running-corporate-ads-alongside-tweets-holocaust-deniers.

2. "**Linda Yaccarino just started as Twitter's new CEO, but Elon Musk already destroyed the platform for advertisers**," Media Matters for America (June 8, 2023), https://www.mediamatters.org/twitter/linda-yaccarino-just-started-twitters-new-ceo-elon-musk-already-destroyed-platform.

3. "**Dish, Samsung, Wall Street Journal, and others are advertising on the Twitter account of a leading white nationalist group**," Media Matters for America (June 22, 2023), https://www.mediamatters.org/twitter/dish-samsung-wall-street-journal-and-others-are-advertising-twitter-account-leading-white.

4. "**Update: Twitter placed ads for USA Today, National Women's Soccer League, and other major brands on a terrorism-linked neo-Nazi account**," Media Matters for America (July 27, 2023), https://www.mediamatters.org/twitter/twitter-placed-ads-usa-today-national-womens-soccer-league-and-other-major-brands-terrorism.

5. "**Advertisers beware: Elon Musk and Linda Yaccarino are trying to lure you back by rebranding Twitter, but it's still a toxic cesspool**," Media Matters for America (Aug. 8, 2023), https://www.mediamatters.org/twitter/advertisers-beware-elon-musk-and-linda-yaccarino-are-trying-lure-you-back-rebranding.

6. "**X Corp. CEO Yaccarino's interview on CNBC should alarm major advertising brands**," Media Matters for America (Aug. 11, 2023), https://www.mediamatters.org/twitter/x-corp-ceo-yaccarinos-interview-cnbc-should-alarm-major-advertising-brands.

7. "**Update: Under Linda Yaccarino, X is placing ads for major brands on a verified pro-Hitler account**," Media Matters for America (Aug. 16, 2023), https://www.mediamatters.org/twitter/update-under-linda-yaccarino-x-placing-ads-major-brands-verified-pro-hitler-account.

18

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

8.  "**X is placing ads for brands like the NFL and MLB next to unhinged conspiracy theories about Jewish people and 9/11**," Media Matters for America (Sept. 11, 2023), https://www.mediamatters.org/twitter/x-placing-ads-brands-nfl-and-mlb-next-unhinged-conspiracy-theories-about-jewish-people-and.

9.  "**X is placing major ads on a heavily followed antisemitic account that endorses killing politicians and LGBTQ advocates**," Media Matters for America (Sept. 12, 2023), https://www.mediamatters.org/twitter/x-placing-major-ads-heavily-followed-antisemitic-account-endorses-killing-politicians-and.

10. "**X is placing ads for the NFL on prominent white nationalist accounts**," Media Matters for America (Sept. 27, 2023), https://www.mediamatters.org/white-nationalism/x-placing-ads-nfl-prominent-white-nationalist-accounts.

11. "**X is placing ads for MLB, the NFL, and the Pittsburgh Steelers on antisemitic and Holocaust denial accounts**," Media Matters for America (Oct. 12, 2023), https://www.mediamatters.org/twitter/x-placing-ads-mlb-nfl-and-pittsburgh-steelers-antisemitic-and-holocaust-denial-accounts.

12. "**Pro-Hitler and Holocaust denier account: X has paid me $3,000 in ad revenue sharing**," Eric Hananoki, Media Matters for America (Nov. 13, 2023), https://www.mediamatters.org/twitter/pro-hitler-and-holocaust-denier-account-x-has-paid-me-3000-ad-revenue-sharing.

13. "**As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content**," Media Matters for America (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

14. "**X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags**," Media Matters for America (Nov. 17, 2023), https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

38.  Media Matters's research and reporting echoed what was being reported widely elsewhere—that the platform was continuing to permit the placement of advertisements alongside extremist content. Hananoki and Media Matters thus joined in ongoing national conversations about an important news story—the surge of hateful and violent rhetoric in America's supposed "digital town square."

19

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

39.    Hananoki's research and reporting sometimes looked specifically at what advertisements X's increasingly extremist user base might see on the platform. Following ordinary journalistic investigative practices, Hananoki used an existing X research account controlled by Media Matters to follow white supremacist content and gauge the advertising that X's computer algorithm would automatically generate in response. His research confirmed that the platform's system was continuing to permit advertisements next to violent and fringe content.

40.    Hananoki published some of his findings, along with a handful of examples, in his November 16 article. That article also reported on Musk's apparent endorsement of a widespread antisemitic conspiracy theory—that Jewish people are seeking to promote "hatred against whites" and are seeking to "flood[] the[] country" with "hordes of minorities"—which drew widespread condemnation and was extensively covered in the media.[22] Hananoki's article included screenshots of six advertisements from major corporate entities appearing with at least nine posts from X users. For example, below are images of an advertisement for Oracle appearing with a quote from Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi Party, which were included in his article:

---

[22] *See, e.g.*, David Goldman, "*Elon Musk agrees with antisemitic X post that claims Jews 'push hatred' against White people*," CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/15/media/elon-musk-antisemitism-white-people/index.html.

App.184

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM



41.    Hananoki did not say in his article that X, or anyone associated with X, was intentionally placing advertisements next to such violent or fringe content. He simply reported truthfully that the platform permitted the placements of advertisements from some of the nation's biggest advertisers next to posts that touted Hitler or the Nazi party—which the platform's algorithm obviously did, as the examples he cited showed.

42.    Hananoki researched, factchecked, and drafted the November 16 article in accordance with Media Matters's policies and standards, using similar methods to those he has used throughout his long career in journalism, and mirroring common journalistic practices.

**D.** **Attorney General Paxton retaliates against Media Matters and Hananoki for their coverage of extremist rhetoric on X.**

43. Despite the robust and ongoing reporting by Media Matters and other news outlets about X's extremist content, Musk apparently took personal offense only at Hananoki's November 16 article discussing Musk's endorsement of an antisemitic conspiracy theory.

44. Just two days after the article was published, Musk promised to file "a thermonuclear lawsuit against Media Matters." *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. The post received hundreds of thousands of likes and comments, and tens of thousands of reposts. *Id.*



45. Musk attached a message to the post referencing Hananoki's November 16 article and accusing Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content. *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM ET), https://perma.cc/X4HN-PLJ4. Musk made no mention of the year-long parade of reports and documentation illustrating this endemic problem with the architecture of the X platform.

46. Various media and political figures—many of whom have been the subjects of Media Matters reporting over the years—leapt to Musk's defense and urged retaliation against Media Matters. For example, on November 19, former adviser to President Donald Trump Stephen Miller, discussing Media Matters's article, declared, "There are 2 dozen+ conservative state Attorneys General," seemingly urging states to investigate Plaintiffs for their article. *See* @StephenM, X.com (Nov. 19, 2023, 11:48 AM ET), https://perma.cc/9E6L-FJGY.

22

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

47.    Responding directly to Miller's call for retaliation, Missouri Attorney General Andrew Bailey announced that his "team [was] looking into" Plaintiffs' article. @AGAndrewBailey, X.com (Nov. 19, 2023, 4:46 PM ET), https://perma.cc/J463-656K.



48.    On November 20, 2023, Attorney General Paxton joined the fray, announcing via press release that he was launching an investigation into Media Matters. Ex. A. The four-sentence press release asserted that the Attorney General would "vigorously enforce" the Texas Business Organizations Code and the Deceptive Trade Practices Act but failed to explain how Media Matters—a D.C.-based non-profit media watchdog—or Hananoki—a Maryland-based reporter— were believed to have violated those laws directed at consumer protection in the carrying on of a trade or business. *Id.* Instead of providing any substantive basis that could justify the "investigation," Paxton's press release disparaged Media Matters as "a radical anti-free speech organization," and as a "radical left-wing organization[] who would like nothing more than to limit freedom by reducing participation in the public square[.]" *Id.*

49.    Paxton doubled down on his public attacks of Media Matters in subsequent interviews. In an interview with Charlie Kirk—a frequent subject of Media Matters's reporting[23]— on the Charlie Kirk Show, Paxton discussed his investigation into Media Matters, asserting that his office could "take away [Media Matters's] ability to do business in Texas[,]" and "go after"

---

[23] *See* "Charlie Kirk," Media Matters for America, https://www.mediamatters.org/charlie-kirk.

Media Matters for large amounts of money—to which Kirk replied, "I love it."[24]

50.    In a subsequent interview, activist Benny Johnson framed Paxton's investigation as "devastating" to Media Matters and "com[ing] in concert with Elon Musk dropping . . . [a] 'thermonuclear' lawsuit on Media Matters." *See* Ex. C, Nov. 28, 2023 "The Benny Show" Certified Tr. He asked Paxton if he "encourage[d] other Republican attorney generals to do this" and stated "we're so thankful that somebody is just standing up and doing something. Where are the rest of the Republican AGs? . . . Why are they so quiet on issues like this?" *See* Ex. C; *see also* @bennyjohnson, X.com (Nov. 28, 2023, 12:36 PM ET), https://perma.cc/JA55-6A8G.



51.    Paxton responded by encouraging other state attorneys general to investigate Media Matters, saying: "You know, that's a good question . . . I would encourage them to look at this. They may have just become aware of it. I mean it's a relatively new issue so hopefully over the

---

[24] RealAmericasVoice, "*'We have the right as the state of Texas to go after those damages.' - AG Ken Paxton*," Rumble (Nov. 21, 2023), https://rumble.com/v3x3aim-we-have-the-right-as-the-state-of-texas-to-go-after-those.-damages.-ag-ken-p.html.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

next couple of weeks, you'll see other attorney generals [sic] look at this." Ex. C. Paxton neither disputed nor qualified Johnson's framing. *Id*. Paxton later admitted in another interview that he only even became aware of Media Matters's alleged conduct through Musk's litigation, rather than any independent investigation or work by his office.[25]

52.     On November 21, 2023, the day after Paxton announced his investigation, the office of the Attorney General of Texas issued the Demand, which references and requests a broad swath of documents related to Hananoki's November 16 article. Ex. B at 7. Plaintiffs first received the Demand on November 22 via FedEx delivery at Media Matters's Washington, D.C. office. Paxton later dispatched a process server, who attempted to serve the Demand on Media Matters at its office in the District of Columbia on November 30, 2023. The Demand was subsequently served on Media Matters's District of Columbia-based outside counsel at their Washington, D.C. office, on December 1, 2023. The Demand has a return date of December 12, 2023. *Id.* at 1.

53.     Paxton's Demand, like his press release, provides no explanation for how Media Matters or Hananoki could have violated Texas's Deceptive Trade Practices Act, nor any explanation for how Paxton could exercise the State's coercive power over them. *See generally* Ex. A; Ex. B. To date, Paxton has provided no explanation at all for how Plaintiffs may have violated Texas law, or are plausibly subject to Texas's jurisdiction, and has continued to point to Musk's allegations as the sole basis of his investigation.

54.     The overbroad Demand requests that Media Matters produce "all documents related to internal and external communications relating to the article titled '*As Musk endorses antisemitic*

---

[25] *See also* Newsmax, "*Texas A.G. Ken Paxton probes Media Matters for 'Fraudulent Activity,'*" Rumble (Nov. 21, 2023), available at https://rumble.com/v3x4olk-texas-a.g.-ken-paxton-probes-media-matters-for-fraudulent-activity.html. *See id.* at 2:12 ("So we learned about this actually through the actual lawsuit that Elon Musk filed and then the reporting of it.").

*conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*' by Eric Hananoki." Ex. B at 7. The Demand also requests documents sufficient to identify Media Matters's organizational structure; sources of income originating in Texas; operational expenditures in Texas; current and past X accounts, including those used to obtain the screenshots contained in the November 16 article; and direct and indirect sources of funding for operations involving X research and publications. *Id.*

55.    Paxton's Demand also requests that Media Matters produce—on an ongoing basis—all documents related to its internal and external communications, from as far back as January 1, 2022, regarding X CEO Linda Yaccarino and Musk's purchase of X; all internal and external communications regarding the November 16 article; external communications with employees and representatives of X, from November 1, 2023 to November 21, 2023; and external communications with ten corporate entities, from November 1, 2023 to November 21, 2023. *Id.* It is, in effect, an ongoing demand for virtually any materials Media Matters and Hananoki might generate as a result of future coverage of X and Musk.

56.    On December 12, as requested in the Demand, Media Matters responded to the Attorney General's Office, setting forth why it believed Paxton's conduct to be unlawful and raising objections to the Demand. Paxton's office responded on December 29. Paxton's letter confirms he intends to enforce the Demand without any showing of jurisdiction or cause. Texas law, he claims, grants him "broad discretion in the overall breadth and relevance of the materials that may be sought in the course of a pre-suit investigation" and requires him to provide his targets with only "the general subject matter of the investigation." Plaintiffs' rights in responding are constricted because "a CID issued by [Paxton] is not limited by the Texas Rules of Civil Procedure." Paxton reserves his "right to pursue appropriate legal action to enforce" the Demand

App.190

and asserts that Plaintiffs' only option to "resist the Attorney General's investigation" is "to establish that there were zero permissible justifications" for it. The letter requested an answer by January 4, at which point counsel for Media Matters responded to Paxton's December 29 correspondence to reassert all objections to the Demand, and reiterate that Defendant's office is without jurisdiction to conduct the investigation of Media Matters, and that Defendant's investigation constitutes unlawful retaliation in violation of the First Amendment.

**E.      Attorney General Paxton chilled, and continues to chill, Media Matters's and Hananoki's speech and reporting.**

57.      Paxton's investigation and Demand have chilled Media Matters's and Hananoki's speech and press activities. It has further resulted in a slew of threats against Media Matters and its staff. Hananoki has been harassed and has received hateful messages, requiring him to increase his home and personal security. Media Matters has been forced to retain an outside security firm to protect its employees in response.

58.      Hananoki's research and writing have been severely impaired and disrupted by Paxton's baseless investigation. Prior to Paxton's Demand, Hananoki published approximately one or two articles per week; in the eight weeks since Paxton issued the Demand, Hananoki has published only two articles altogether, or roughly one per month. Draft articles he intended to publish about extremism on X were cut for fear of generating documents that would be subject to Paxton's Demand and further retaliation from Paxton. In fact, since Paxton launched his investigation, Hananoki has not published any stories about the rise of extremist rhetoric in the wake of Musk's ownership after consistently doing so for months.

59.      Hananoki's diminished reporting output is not for lack of story ideas. Since Paxton's investigation began, Hananoki has continued generating potential story ideas regarding extremist content on X but has not pursued them for fear of retaliation. This includes coverage of

App.191

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

the reinstatement of Alex Jones, a prominent conspiracy theorist, to the X platform by Musk, and the use of an Alex Jones-related hashtag alongside advertising; antisemitic hashtags targeting Jewish people appearing alongside advertising; and advertising appearing on the X account of Stew Peters, a white nationalist internet personality who has promoted violence, as well as antisemitism, racism, and homophobia. Hananoki fears that reporting on these topics will draw further retaliation towards himself, his employer, and his colleagues. These story ideas are well within Hananoki's long-running beat, yet he was nonetheless chilled from reporting on these topics, at least one of which received extensive national coverage in other publications.[26] Even where Hananoki has been able to publish work, he has self-censored on the topic related to X's content-moderation policies, limiting the scope of his articles. For example, on January 2, 2024, he published an article describing former General Mike Flynn's appearance on Alex Jones's show but omitted any discussion of Jones's recent reinstatement on X—a plainly relevant aspect of the story.

60.  Hananoki's chill is further compounded by the fear that any materials he generated in preparing such stories will end up in Paxton's hands, which calls for the ongoing production of any and all internal communications even touching upon Musk's purchase of X or X's CEO Linda Yaccarino, who has frequently made claims (undermined by Plaintiffs' reporting) that X provides

---

[26] Clare Duffy, *'The people have spoken': Elon Musk restores the X account of conspiracy theorist Alex Jones after poll*, CNN (Dec. 10, 2023), https://www.cnn.com/2023/12/09/business/alex-jones-restored-x-elon-musk-poll/index.html; Danielle Wallace, *Elon Musk reinstates Alex Jones on X*, Fox News (Dec. 10, 2023), https://www.foxnews.com/media/elon-musk-reinstates-alex-jones-x; Kate Conger, *Elon Musk Brings Conspiracy Theorist Alex Jones Back to X*, N.Y. Times (Dec. 9, 2023), https://www.nytimes.com/2023/12/09/technology/elon-musk-alex-jones-twitter-x.html.

a safe platform for advertisers.[27] This same concern has even hampered Hananoki's ability to communicate internally with his editor—who is based in Washington, D.C.—for fear that their communications about story ideas will be turned over to the attorney general of a state with absolutely no connection to Hananoki's work.

61.     Prior to the Demand, Hananoki regularly posted commentary on X regarding his work, responded to other journalists' posts, and communicated with other journalists. Since Paxton issued the Demand, however, he no longer actively engages in such communications.

62.     As a direct result of Paxton's intrusive Demand, many other Media Matters reporters, writers, and researchers—many of whom live and work in the District of Columbia and surrounding suburbs—have also pared back reporting and publishing, particularly on any topics that could be perceived as relating to the Paxton investigation, fearful of being ensnared in Paxton's investigation, generating documents subject to Paxton's Demand, or publishing articles that would provoke additional legal action. These reporters and researchers are also aware that Media Matters's editorial team has been required to hold back stories about X and Musk due to these concerns. The Demand has effectively tied Media Matters's hands in reporting on these issues, even while it has received an outpouring of tips from people who continue to see extremist and violent content placed next to advertisements on X. Media Matters has not yet acted on these tips, afraid that under Paxton's Demand it could be compelled to turn over any work performed in response.

---

[27] *See, e.g.*, *Twitter-turned-X CEO Linda Yaccarino focuses on winning back big brands on Elon Musk's platform*, AP (Aug. 10, 2023), https://apnews.com/article/twitter-x-corp-ceo-linda-yaccarino-elon-musk-0131c61ac296955d424fd057f6b0196d; Jonathan Vanian, *Read Linda Yaccarino's message to X employees about Elon Musk's controversial DealBook interview*, CNBC (Nov. 30, 2023), https://www.cnbc.com/2023/11/30/read-linda-yaccarinos-message-to-x-employees-about-musk-interview.html.

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

63.     Media Matters's executive and editorial team have also been forced to become more involved in the organization's publishing decisions since Attorney General Paxton launched his investigation to protect the organization against further retaliation. This has significantly slowed down Media Matters's publication process, as the organization must carefully assess whether a new article or report could impact existing legal proceedings or spark new ones.

64.     Media Matters's associations with other groups have also been impaired by Attorney General Paxton's investigation. Groups that previously worked closely with Media Matters have reevaluated doing so, afraid that communications may be turned over to the Attorney General or spark investigations into their own publications. And Media Matters employees are self-censoring when anything related to X comes up in communications with such groups, curtailing engagement with partner organizations out of concern over potential exposure. For example, Media Matters has refrained from actively participating in discussions as part of its membership in coalitions focused on issues of hate speech on X while the Demand remains pending. Media Matters's external affairs staff have also paused sharing research regarding X and its content moderation policies with longstanding partners, refraining even from directing partners to content it has *already published* about X, for fear that any conversations or aid may lead to further retaliation against Media Matters or its partners.

65.     Paxton's investigation has also caused Media Matters's department directors to hit pause on similar reporting on content moderation and advertisement placement issues for at least one other social media platform, besides X, out of fear such reporting will lead to further retribution.

66.     Attorney General Paxton's overbroad Demand—which on its face demands associational and journalistic materials protected from disclosure by the First Amendment—

App.194

further harms Plaintiffs. Complying with the Demand would require Plaintiffs to turn over sensitive documents and communications, including materials Hananoki prepared to write his November 16 article, in addition to sensitive operational information about Media Matters's employees, donors, funding, expenditures, and confidential sources. With this Demand looming over them, Plaintiffs have been chilled from publishing, and in some cases generating, new research and investigatory work product that could be subject to compelled disclosure.

67. The scope of the Demand extends far beyond any document requests Plaintiffs may receive in X's civil suit—should that matter proceed past the pleading stage and reach discovery. Whereas X's civil suit is focused exclusively on Plaintiffs' *past* coverage of X and Musk—specifically the November 16 and 17 articles written by Hananoki—Paxton's Demand requires ongoing production of materials pertaining to *future* articles that Plaintiffs may wish to prepare, chilling their speech indefinitely. Even if X's suit reaches discovery (and given X's choice of jurisdiction and binding precedent in that jurisdiction holding a lack of jurisdiction in a similar case, it very well may not), Plaintiffs can avail themselves of the full protections of the Federal Rules of Civil Procedure which, among other protections, limit document production to "nonprivileged matter[s]" that are "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). But according to Paxton, the Texas Civil Rules of Civil Procedure do not apply to his Demand—in other words, he may demand documents regardless of relevance, overbreadth, and proportionality.

68. The onerous Demand is backed by the threat that, if Plaintiffs do not comply, Paxton is entitled to sue Plaintiffs in a Texas court to enforce the Demand. *See* Tex. Bus. & Com. Code Ann. § 17.62(b) (authorizing the Office of the Attorney General to "file . . . a petition for an order of the court for enforcement of" a Civil Investigative Demand under Section 17.61). Such a

App.195

tribunal would be a foreign court to both Media Matters and Hananoki, who have no relevant contacts with Texas and who understandably fear having their constitutional rights adjudicated in jurisdictions with which they have no connection.

69.     Media Matters is not registered as a foreign corporation in Texas and does not "transact business" in Texas. Tex. Bus. Orgs. Code Ann § 9.002(a). It does not have a registered agent in Texas. Media Matters performs no "business practices" in Texas, Tex. Bus. & Com. Code Ann. § 17.44(a), and conducts no "trade" or "commerce" in Texas, Tex. Bus. & Com. Code Ann. §§ 17.45(6), .46(a). And, as explained, Hananoki's reporting that is the focus of Paxton's investigation occurred exclusively in Maryland and involved no contact with Texas. That Plaintiffs may be dragged to court in an unknown, unfamiliar, and untouched venue in Texas at the option of Attorney General Paxton further chills their speech.

70.     The Deceptive Trade Practices Act arms Paxton with a host of other powers with which to retaliate against Plaintiffs, including restraining orders, civil penalties, and sanctions. *See, e.g.*, Tex. Bus. & Com. Code Ann. §§ 17.47(a)–(b) (authorizing OAG to "bring an action in the name of the state" for injunctive relief), (c)–(d) (authorizing OAG to seek damages and restitution), (e)–(f) (authorizing OAG to seek monetary civil penalties for violations of injunctions).

71.     Paxton's own past words resolve any possible doubt about the uniquely injurious effects of his Demand that will be felt by Plaintiffs Hananoki and Media Matters. In 2016, alongside several other state attorneys general, Paxton filed an amicus brief excoriating Massachusetts for using its own deceptive trade practices law to serve a similar civil investigative demand on Exxon Mobil—which, notably, is involved in trade practices—regarding claims it misled consumers about the impact of its energy products on climate change. Ex. D, Brief of Amici

32

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

Curiae, *Exxon Mobil Corp. v. Healey*, No. 4:16-CV-00469-K (N.D. Tex. Sept. 8, 2016), ECF No.

63-2. Paxton, at that time, wrote:

> "The[] [First Amendment] protections afforded by the Constitution . . . . [are]
> threatened by the chill of subpoenas, like Massachusetts's CID, hanging in the air.
> Thus, not only is Massachusetts attempting to silence Exxon through the issuance
> and threat of compelling a response to the CID, this very action harms everyone[.]"

*Id.* at 6. He added that "[t]he authority attorneys general have to investigate fraud does not allow

them to encroach on the constitutional freedom of others to engage in an ongoing public . . .

debate." *Id.* at 3.

**F.  Plaintiffs sued Paxton to protect their First Amendment rights.**

72.     Plaintiffs filed suit against Paxton on December 12, 2023—the return date for the

Demand. *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 1.

Plaintiffs filed suit in Maryland because that is where Hananoki lives, works, and wrote the articles

giving rise to Paxton's unlawful investigation. The Demand—which targets Hananoki's work and

communications—sought documents created and stored at Hananoki's home in Maryland.

73.     Plaintiffs also moved for a preliminary injunction and temporary restraining order

the same day, seeking to enjoin further enforcement of the Demand. *Media Matters for America

v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF Nos. 2, 20. Plaintiffs' motion—refiled on

December 14, 2023 after completing service on Paxton—was fully briefed on January 2, 2024.

Paxton's response offered little defense on the merits, but raised ripeness, personal jurisdiction,

and venue objections.

74.     The District Court of Maryland (Xinis, J.) held a hearing on the motion on January

8. The court indicated that if it reached the question, it would likely find that Plaintiffs' claims are

ripe, explaining at the outset it believed Plaintiffs had "jumped the broom on subject matter

jurisdiction" and had "pled enough for this [matter] to be ripe constitutionally."

33

75. The court expressed concern, however, about whether Maryland had personal jurisdiction over Paxton. The court's concern was rooted specifically in whether Paxton had awareness of Hananoki's connections to Maryland, coupled with the fact that the Demand had been formally served on Media Matters in Washington, D.C.

76. The court expressed little doubt, however, that the District of Columbia had specific jurisdiction over Paxton. It repeatedly stressed that Paxton had "served [the Demand] in D.C." and had "directed [his] investigation to Media Matters in D.C." The court even understood Paxton's "pleadings" to have "referenced that there is personal jurisdiction in D.C."[28]

77. The court's reading of Paxton's pleadings was well-founded—his opposition to Plaintiffs' motion stressed that his "conduct was not in any sense 'aimed' at Maryland—indeed, [the] CID was issued to, and served in, the District of Columbia, where Media Matters resides." *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, at 16. And counsel for Paxton made the same point at oral argument, explaining "the civil investigation demand[] *was directed as [sic] Media Matters, which is a . . . District of Columbia corporation.*"

78. The court did not rule on Plaintiffs' motion, or Paxton's personal jurisdiction argument, but indicated that if the parties "want a resolution that is fast and fair to both sides," they "would move it to D.C." either through "an agreement from both sides that personal jurisdiction exists in D.C." or through briefing a transfer motion. The court advised Paxton's counsel that, beyond transfer, Plaintiffs could simply "dismiss this case and refile immediately in D.C." and Paxton's counsel agreed Plaintiffs "could do that." Despite the court's offer and

---

[28] Although Paxton's prior briefing argues the District of Columbia is not the "proper venue" for this proceeding and that he is "not subject to personal jurisdiction there," he has also argued that Media Matters "could have instead sued in its home—the District of Columbia, where undersigned counsel, and other attorneys in OAG, are barred." *Media Matters for America v. Paxton*, No. 8:23-cv-03363-PX (D. Md.), ECF No. 33, at 18 n.5, 24.

34

Plaintiffs' willingness to transfer the matter to this District, Paxton's counsel demurred and insisted the issue "need[ed] to be briefed."

79.     Accordingly, without ruling on the pending motion, the court set a briefing schedule for Paxton's motion to dismiss, through which it would further evaluate the issue of jurisdiction and, upon finding jurisdiction, evaluate the merits of Plaintiffs' motion. It advised Plaintiffs that if "in the interim" they "would just prefer to file it in D.C.," then they "can do that."

80.     While Plaintiffs continue to believe Maryland has specific jurisdiction over Paxton, and that the District of Maryland is an appropriate venue for this case, given the urgency of the relief needed, they agree with Judge Xinis's conclusion that the "fast and fair" way to resolve this dispute is by moving this matter to the District of Columbia, which also has specific jurisdiction over Paxton, where venue is also appropriate, and where both Paxton and Judge Xinis appeared to agree that jurisdiction and venue more clearly lies. Plaintiffs therefore filed a notice of voluntary dismissal of their action in the District of Maryland and have promptly refiled their complaint in this District.

## CLAIMS FOR RELIEF

### COUNT I

**First Amendment Retaliation in Violation of Plaintiffs' Rights Under the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

81.     Plaintiffs incorporate paragraphs one through 80 above as if set forth fully herein.

82.     Attorney General Paxton violated, and continues to violate, Plaintiffs' First Amendment rights by launching an investigation and serving a burdensome Demand in retaliation for Plaintiffs' speech, press, and associational activities. Paxton's use of the power of his office is discouraging and will continue to discourage Plaintiffs from engaging in news coverage. The chill imposed by his retaliatory actions injures Plaintiffs' ability to investigate and publish news stories

35

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

and further chills their ability to participate in a robust public discussion around political extremism on the X platform. Absent relief from this Court, that chill will continue so long as Paxton's investigation and Demand are—in Paxton's own words—"hanging in the air." Ex. D at 6.

83.    "[T]he law is settled that . . . the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000).

84.    The D.C. Circuit has long recognized First Amendment retaliation claims as "actionable because 'retaliatory actions may tend to chill individuals' exercise of constitutional rights.'" *Crawford-El v. Britton*, 93 F.3d 813, 846 (D.C. Cir. 1996) (Henderson, J., concurring) (quoting *ACLU of Md., Inc. v. Wicomico County*, 999 F.2d 780, 785 (4th Cir. 1993)); *see also Perry v. Sindermann,* 408 U.S. 593, 597 (1972). That cause of action for First Amendment retaliation arises under 42 U.S.C. § 1983, which "has long [been] interpreted . . . to permit suits against officials in their individual capacities" for constitutional violations. *Tanzin v. Tanvir*, 592 U.S. 43, 48 (2020). To prevail on their retaliation claim, Plaintiffs must show: "(1) [they] engaged in conduct protected under the First Amendment; (2) [Paxton] took some retaliatory action sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action." *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016). Plaintiffs satisfy each element.

85.    *First*, Plaintiffs' investigative, newsgathering, and reporting activities are "legally protected interest[s]" under the First Amendment. *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 227 (4th Cir. 2019) (recognizing right of local news website operator to "gather news"); *see also*

App.200

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

*Flynt v. Rumsfeld*, 180 F. Supp. 2d 174, 175 (D.D.C. 2002) (explaining that "under the First Amendment the press is guaranteed a right to gather and report news"). Media Matters provides journalistic research and investigative reporting on a variety of matters and figures of public importance. Hananoki is a senior investigative reporter who for over a decade has published journalism about political extremism online, including on platforms like X. The "First Amendment applies in full force" to this newsgathering and commentary, and further "protect[s] a news outlet's editorial perspective [and] the way its beat reporters cover a given" public issue. *Washington Post v. McManus*, 944 F.3d 506, 518 (4th Cir. 2019) (quoting *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974)); *cf. Nat'l Org. For Women, N.Y.C Chapter v. F.C.C.*, 555 F.2d 1002, 1010 (D.C. Cir. 1977) (explaining that "[t]he exercise of such editorial discretion, especially in connection with news reporting, sharply implicates First Amendment values"). Indeed, "the constitutional protection of the press reaches its apogee" where, as here, Plaintiffs are members of the press who investigate and write about "a public figure" or "on a matter of public concern." *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *New York Times Co.*, 376 U.S. 254); *see also Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) ("Speech on matters of public concern is at the heart of the First Amendment's protection.") (cleaned up); *Farah v. Esquire Mag.*, 736 F.3d 528, 539 (D.C. Cir. 2013) (similar).

86. *Second*, Paxton has taken action adverse to Plaintiffs' protected activity in response to news coverage. His investigation and intrusive Demand have already chilled Plaintiffs' speech and reporting activities and will continue to do so absent relief. Paxton's retaliatory conduct would "deter a person of ordinary firmness in [Plaintiffs'] position from speaking again." *Aref*, 833 F.3d at 258, particularly given the suite of tools Texas law provides Paxton to further punish, harass, and restrain Plaintiffs' constitutionally protected conduct. *See, e.g.*, Tex. Bus. & Com. Code Ann.

§§ 17.47, .60, .62. This chill is exacerbated by the fear Plaintiffs will be forced to defend their constitutional rights in a jurisdiction with which they have no meaningful connection.

87. *Third*, there is no serious dispute that Paxton's investigation and Demand are causally linked to Plaintiffs' coverage of X and Musk. Attorney General Paxton has publicly admitted as much. He announced his investigation into Plaintiffs on November 20, 2023, the same day that X filed a frivolous lawsuit against Plaintiffs for the very same coverage Paxton seeks to punish. Paxton issued his retaliatory Demand only a day after announcing his investigation. Since then, Paxton has encouraged other state Attorneys General to take retaliatory action against Plaintiffs under their own state consumer laws—regardless of any connection Plaintiffs have with those states. The material sought by Attorney General Paxton's Demand further confirms the causal connection, as it singles out documents and communications related to the November 16 article, as well as X and its officers.

88. Paxton's retaliatory campaign against Media Matters has injured Plaintiffs and will continue to do so absent relief from this Court. This harm will be redressed by an order declaring Paxton's conduct to be unlawful and enjoining him from further investigating Plaintiffs or enforcing his Demand. Such relief is appropriate under Section 1983. *Hedgepeth ex rel. Hedgepeth v. Washington Metro. Area Transit Auth.*, 386 F.3d 1148, 1152 n.3 (D.C. Cir. 2004); *Anderson v. Reilly*, 691 F. Supp. 2d 89, 92 (D.D.C. 2010).

## COUNT II

**Violation of Plaintiffs' Rights Under the First, Fourth, and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983)**

89. Plaintiffs incorporate paragraphs one through 88 above as if set forth fully herein.

90. Attorney General Paxton's issuance of the overbroad and retaliatory Demand further violates Plaintiffs' First and Fourth Amendment rights by unreasonably requiring them to

App.202

turn over sensitive and privileged materials, including those that impinge upon their association with other organizations.

91. The Fourth Amendment limits the scope of administrative subpoenas. *See Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 208–11 (1946). The First Amendment provides Plaintiffs a privilege against disclosure of materials that would chill their constitutional rights. *See Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2009). Where "the materials sought to be seized" by an administrative subpoena even "*may* be protected by the First Amendment," the requirements of the Fourth Amendment are applied with "scrupulous exactitude." *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (citing *Stanford v. Texas,* 379 U.S. 476, 485 (1965)) (emphasis added).

92. Defendant Paxton has shown no such "scrupulous exactitude" in his Demand. Without any showing of cause or jurisdiction, Paxton has demanded that Plaintiffs produce a broad set of documents that implicate their core First Amendment rights.

93. The Demand seeks, for example, swathes of documents related to Plaintiffs' donors, funding sources, expenditures, and employees, all of which are protected from compelled disclosure under the First Amendment. *E.g.*, *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021); *NAACP v. Alabama*, 357 U.S. 449, 462 (1958).

94. Relatedly, the Demand seeks various kinds of "external communications" that would expose Plaintiffs' associations and collaborations with other groups, including on efforts like ongoing coalitions that include prominent civil rights organizations as well as technology experts and research organizations focused on the challenges of content moderation on X. "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental

action." *NAACP*, 357 U.S. at 462. Compelled disclosure of such associational materials must meet "exacting scrutiny." *Bonta*, 141 S. Ct. at 2383.

95. The Demand further requires that Plaintiffs surrender internal communications and files regarding news articles, as well as communications with employees at X and its advertisers, again with no showing of cause. Paxton may not "rummage at large in newspaper files or [] intrude into or to deter normal editorial and publication decisions" under the First Amendment. *Zurcher*, 436 U.S. at 566; *see also Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012). Such "[b]road and sweeping state inquiries into these protected areas . . . discourage citizens from exercising rights protected by the Constitution." *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion).

96. It provides no meaningful relief to Plaintiffs that Paxton is only authorized to enforce his Demand through a petition to Texas's courts. *See* Tex. Bus. & Com. Code Ann. § 17.62(b). Texas courts plainly lack personal jurisdiction over Plaintiffs, who should not be forced to subject themselves to foreign tribunals to defend their constitutionally protected rights.

97. Plaintiff Media Matters is incorporated under the laws of, and has its principal place of business in, the District of Columbia. Plaintiff Eric Hananoki is domiciled in Maryland. Texas courts lack general jurisdiction over Plaintiffs. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024–25 (2021).

98. Plaintiffs have not purposefully availed themselves of the privilege of conducting activities in Texas, nor would any cause of action stemming from the Demand arise out of or relate to such purposeful contacts, if they existed. Texas courts lack specific jurisdiction to enforce the Demand against Plaintiffs. *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317–18 (5th Cir. 2021), *reh'g en banc denied*, 32 F.4th 488 (5th Cir. 2022), *cert. denied*, 143 S. Ct. 485 (2022);

40

*Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 140 (4th Cir. 2020); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349–50 (D.C. Cir. 2000); *cf. Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 513, (D.C. Cir. 2002) (holding that website interacting and "entering into contracts with residents of a foreign jurisdiction" subject to personal jurisdiction (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997))).

99.     With the Demand's return date now past, Plaintiffs are now faced with the ongoing prospect of either surrendering constitutionally protected materials in violation of their First and Fourth Amendment rights to comply with the Demand, or risk subjecting themselves to state-level proceedings in foreign courts that plainly lack jurisdiction over them should they continue to resist the Demand. That is no true choice at all.

100.     This ongoing violation of Plaintiffs' First and Fourth Amendment rights will be remedied by prompt injunctive relief from this Court setting aside the Demand.

## COUNT III

### Violation of Plaintiffs' Due Process Rights Under the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983)

101.     Plaintiffs incorporate paragraphs one through 100 above as if set forth fully herein.

102.     The guarantee of due process in the Fourteenth Amendment "recognizes and protects an individual liberty interest" from being subjected to legal process in a jurisdiction with which a person has no contact, unless they willingly consent to such process. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

103.     For a state to exercise personal jurisdiction over a party in a manner consistent with due process, the party must have "'minimum contacts' in the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Mere "foreseeability of causing *injury* in another State" is not a "'sufficient benchmark'

41

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

for exercising personal jurisdiction." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)). "Instead, 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297).

104.    Here, Defendant Paxton has purported to subject Plaintiffs to legal process under Texas law—and has the power to force Plaintiffs into Texas court to defend against enforcement of his Demand—despite Plaintiffs' having no minimum contacts with Texas and not being subject to either general or specific personal jurisdiction in that state. Plaintiffs do not avail themselves of Texas law and had no reason to ever foresee being subject to Texas's deceptive trade practices act. Media Matters's mere "operation of a website accessible in [Texas] is insufficient to satisfy the minimum-contacts requirement of the personal-jurisdiction inquiry" under the Due Process clause. *Fidrych*, 952 F.3d at 140.

105.    Plaintiffs are injured by the ongoing imposition of Texas law on them by Defendant Paxton despite his clear lack of jurisdiction to do so, and will be further injured if Paxton hauls Plaintiffs into Texas state court to defend their constitutional rights in a jurisdiction with which they have no relevant contacts.

**COUNT IV**

**Violation of Plaintiffs' Rights Under the District of Columbia's and Maryland's Reporters' Shield Laws**

106.    Plaintiffs incorporate paragraphs one through 105 above as if set forth fully herein.

107.    Attorney General Paxton's Demand violates Plaintiffs' rights under the District of Columbia's and Maryland's shield laws by seeking to compel disclosure of statutorily protected,

App.206

confidential sources. D.C. Code §§ 16-4702, 4703; Md. Cts. & Jud. Proc. Code Ann. § 9-112(b), (c).

108.    The D.C. shield law provides absolute protection against compelled disclosure of sources, D.C. Code § 16-4703(b), and qualified protection against compelled disclosure of other information, including "any news or information procured . . . in the course of pursuing [] professional activit[ies]," including notes, to the extent such information is not publicly disclosed, *id.* § 16-4702. *See also Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994). The shield law protects media organizations and their employees acting within the scope of a contract in any "news gathering or news disseminating capacity." D.C. Code § 16-4702.

109.    Maryland's shield provides materially equivalent protections. *See* Md. Cts. & Jud. Proc. Code Ann. § 9-112(b)(3), (c)(2).

110.    To overcome even the qualified privilege for non-source information, both statutes provide that parties seeking news or information must establish by clear and convincing evidence that (1) the news or information is relevant to a significant legal issue before a party that has a power to issue a subpoena; (2) the news or information could not, with due diligence, be obtained by any alternative means; and (3) there is an overriding public interest in the disclosure. Still, courts have quashed subpoenas that seek information from news media, even when all three prongs of the qualified privilege apply. *See, e.g.*, *Bice v. Bernstein*, No. 93-CA-22258, 1994 WL 555379, at *1–*2 (Md. Cir. Ct. Apr. 20, 1994); *Grunseth*, 868 F. Supp. at 336.

111.    Attorney General Paxton's Demand is consequently infirm because its overbreadth will require that Plaintiffs turn over constitutionally protected sources. The Demand asks for any and all materials related to external *and internal* communications regarding Plaintiffs' November 16 article, as well as external communications between Plaintiffs and employees and

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

representatives of X from November 1, 2023, to November 21, 2023. What is more, the Demand seeks numerous documents regarding Plaintiffs' organizational structure, as well as the specific X accounts used to obtain the screenshots contained in the November 16 article. In essence, the Demand functions as a boundless inquiry into Plaintiffs' organization and news gathering capacity—precisely the kind of pernicious subpoena that these shield laws were designed to combat.

112.    Attorney General Paxton's Demand not only seeks privileged material in violation of Plaintiff's First Amendment rights, but also chills Plaintiff's news gathering capacity. An order setting aside the Demand is the only legal mechanism to ensure that plaintiff's rights—protected by the Constitution and promulgated by state statute—are secure.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask for the following relief:

113.    Declare Paxton's Demand constitutes a First Amendment retaliatory action in violation of Plaintiffs' rights under the First and Fourteenth Amendments of the U.S. Constitution.

114.    Declare that Paxton's Demand violates Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution.

115.    Declare that courts in the State of Texas cannot exercise personal jurisdiction over Plaintiffs in any imminent action to enforce the Demand.[29]

---

[29] It is neither unusual nor unprecedented for courts to determine whether other courts in other circuits have jurisdiction. *See, e.g.*, *Clark v. Busey*, 959 F.2d 808, 812 (9th Cir. 1992) ("Transfer is improper where the transferee court lacks jurisdiction and thus could not have originally heard the suit."); *Grondal v. United States*, 513 F. Supp. 3d 1262, 1275 (E.D. Wash. 2021); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 965 F. Supp. 2d 612, 620 (E.D. Pa. 2013) ("Ohio's long-arm statute does not confer jurisdiction"). *See also* 28 U.S.C. § 1404(a) ("a district court may transfer any civil action to any other district or division where it might have been brought"); *id.* § 1631 ("the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court . . . in which the action or appeal could have been brought at the time it was filed or noticed").

116.     Temporarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand in violation of Plaintiffs' constitutional rights.

117.     Permanently and preliminarily enjoin Paxton, his officers, agents, servants, and employees from initiating any action to enforce the Demand or further investigating Plaintiffs in violation of their constitutional rights, as well as to the extent enforcement would require the disclosure of information protected by the Maryland and D.C. shield laws.

118.     Award Plaintiffs their costs, expenses, and reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988, and any other applicable law.

119.     Grant Plaintiffs any and all other relief as the Court deems just and proper.

Dated: January 17, 2024

Respectfully submitted,

*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Elisabeth C. Frost (DC 1007632)
Jacob D. Shelly* (DC 90010127)
Elena A. Rodriguez Armenta* (DC 90018798)
Daniela Lorenzo*⁺
Omeed Alerasool* (DC 90006578)
Samuel T. Ward-Packard* (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
efrost@elias.law
jshelly@elias.law
erodriguezarmenta@elias.law
dlorenzo@elias.law
oalerasool@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

App.209

Electronically Filed - COLE CIRCUIT - March 25, 2024 - 11:29 AM

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
Jay P. Srinivasan*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com
Email: jsrinivasan@gibsondunn.com

Amer S. Ahmed (DC 500630)
Anne Champion*
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com
Email: achampion@gibsondunn.com

**Pro hac vice* application forthcoming
⁺Admission to D.C. bar pending swearing in

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

46

App.210

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA, *et al.*,

                Plaintiffs,

    v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,

                Defendant.

Civil Action No. 1:24-cv-147-APM

**DEFENDANT'S OPPOSITION TO PLAINTIFFS'
RULE 15(D) MOTION TO SUPPLEMENT**

## INTRODUCTION

Defendant Ken Paxton, in his official capacity as Attorney General of the State of Texas, respectfully files this Response in Opposition to Plaintiffs' ("Media Matters") Rule 15(d) Motion to Supplement the Complaint ("Motion") adding Missouri Attorney General Andrew Bailey as a defendant. *See* ECF No. 39. Defendant Paxton opposes supplementation because Attorney General Bailey is not a proper party to this case under either Rule 15(d) or Rule 20(a). *See* Fed. R. Civ. P. 15(d); Fed. R. Civ. P. 20(a).

**I.      Supplemental complaints that add claims against unrelated parties prejudice existing defendants.**

Rule 15(d) provides for the filing of supplemental pleadings "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). Similarly, Rule 20(a)(2) provides for joinder of a defendant for claims "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences …." Fed. R. Civ. P. 20.

Courts occasionally permit supplemental pleadings to join additional parties under Rule 15(d). *See Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 227 (1964). Nonetheless, "supplemental, unrelated claims against new defendants are inappropriate …." because "[u]nrelated claims against different defendants belong in different suits …." *Chandler v. James*, 783 F. Supp. 2d 33, 39 (D.D.C. 2011) (quoting *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007)).

Moreover, "prejudice to the opposing party . . . [i]s among the most important reasons to deny leave to amend." *Thorp v. D.C.*, 325 F.R.D. 510, 513 (D.D.C. 2018) (internal quotation marks omitted) (quoting *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010)). And "[p]rejudice may arise when the proposed complaint 'adds new parties or at

least entails more than an alternate claim or a change in the allegations of a complaint.'" *Id.* (quoting *LSSi Data Corp. v. Time Warner Cable, Inc.*, No. 11 Civ. 7780 (PAE), 2012 WL 933078, at *2 (S.D.N.Y. Mar. 20, 2012)).  That is amply true here.

## II. Media Matters' claims against Attorney General Bailey do not arise out of a common transaction or occurrence.

Media Matters' proposed claims against Attorney General Bailey do not arise out of a common transaction or occurrence with Attorney General Paxton. Fed. R. Civ. P. 15(d); Fed. R. Civ. P. 20(a). Despite Media Matters' assertions to the contrary, ECF No. 39 at 8, Attorney General Bailey's conduct does not arise out of the same set of facts that gave rise to the original complaint against Attorney General Paxton. Rather, Texas and Missouri are different sovereign states that independently launched separate investigations into Media Matters for potential violations of each state's consumer protection statutes. *See* Tex. Bus. & Com. Code § 17.46 *et seq.*; Mo. Rev. Stat. § 407.010 *et seq.*

Each Attorney General's office launched an investigation at its own behest and on its own timeline. Indeed, Media Matters only now seeks to supplement its original complaint because Attorney General Bailey issued an investigatory demand to Media Matters *after* Texas had voluntarily agreed not to enforce its own investigation until this Court ruled on Plaintiffs' then-pending motion for preliminary injunctive relief. *Compare* Motion Ex. 5, Missouri Investigative Demand (Mar. 25, 2024), ECF No. 39-5, *with* Def.'s Ltr. to Hon. Amit P. Mehta (Jan. 22, 2024), ECF No. 11. By Media Matters' own admission, "Bailey has already gone even further than Paxton." ECF No. 39 at 2 (noting that Missouri, unlike Texas, filed suit to preemptively enforce its investigative demand).

Thus, the subsequent events giving rise to Media Matters' claims against Attorney General Bailey are wholly unconnected to its claims against Texas. Additionally, supplementation would

App.213

needlessly delay this case by adding issues related to an ongoing Missouri state court proceeding. Attorney General Bailey is currently engaged in proceedings with Media Matters in Missouri state court. *See* Motion Ex. 6, ECF No. 39-6. That case is active and ongoing, as for example, Media Matters applied for a change of judge on April 18, 2024. Defendant's Application for Change of Judge, *Missouri v. Media Matters for America*, Case No. 4AC-CC02291 (Cir. Ct., Cole Cnty., Mo., Apr. 18, 2024). At minimum, adding Attorney General Bailey as a defendant in this case would require this Court to consider the relevance of the existing Missouri proceedings. *Cf. Younger v. Harris*, 401 U.S. 37 (1971). Supplementation would therefore improperly prejudice Attorney General Paxton by adding unrelated claims against a different defendant and delaying this case.

### III. There is no question of law or fact common to Attorney General Bailey and Attorney General Paxton.

Rule 20(a)(2) also permits joinder of a defendant only when "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a). Here, however, there is no question of law or fact common to Attorney General Bailey and Attorney General Paxton because their separate investigations stem from independent investigatory authorities.

Attorneys General Paxton and Bailey have separate investigatory powers, which are derived from laws enacted by legislatures in different states. *See* Tex. Bus. & Com. Code § 17.46 *et seq.*; Mo. Rev. Stat. § 407.010 *et seq.* The Texas and Missouri consumer protection statutes likewise provide different procedural remedies, in their respective state courts, to parties seeking to challenge enforcement actions. *See* Tex. Bus. & Com. Code § 17.61(g); Mo. Rev. Stat. § 407.070. Thus, not only do the Texas and Missouri investigations involve distinct questions of state law, but they are also subject to review by their respective state judiciaries. *See, e.g., Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982) ("Proceedings

App.214

necessary for the vindication of important state policies or for the functioning of the state judicial system also evidence the state's substantial interest in the litigation."). Consequently, Media Matters' claims against Attorney General Bailey do not belong in this case.

For all of the reasons set forth herein, the Court should deny Plaintiffs' motion.

DATED: April 22, 2024

*/s/ Gene C. Schaerr*
GENE C. SCHAERR
  (D.C. Bar No. 416368)
KENNETH A. KLUKOWSKI
  (D.C. Bar No. 1046093)
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, D.C. 20006
gschaerr@schaerr-jaffe.com
kklukowski@schaerr-jaffe.com

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JAMES LLOYD
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

REUBEN W. BLUM*
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-4117
reuben.blum@oag.texas.gov

*Admitted *pro hac vice*

*Attorneys for Defendant Ken Paxton, Attorney General of the State of Texas*

App.215

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MEDIA MATTERS FOR AMERICA, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil No. 24-cv-147 (APM)** |
| ) | |
| **WARREN KENNETH PAXTON,** ) | |
| *Attorney General of the State of Texas,* ) | |
| ) | |
| **Defendant.** ) | |

## ORDER

On April 18, 2024, Plaintiffs Media Matters and Eric Hananoki moved to add Missouri Attorney General Andrew Bailey as a defendant to the present action pursuant to Federal Rule of Civil Procedure 15(d). Pls.' Rule 15(d) Mot. to Suppl. the Compl., ECF No. 39 [hereinafter Pls.' Mot.]. Defendant Warren Kenneth Paxton, the Attorney General of the State of Texas, opposes the request. Def.'s Opp'n to Pls.' Rule 15(d) Mot. to Suppl., ECF No. 40 [hereinafter Def.'s Opp'n]. Having considered the parties' arguments, the court grants Plaintiffs' motion.

### I.

Plaintiffs filed this suit against Defendant in January 2024, seeking to enjoin enforcement of a Civil Investigation Demand ("Texas CID") that Defendant served on Media Matters on November 21, 2023. The CID sought records about the organization's reporting on the placement of prominent companies' advertisements alongside antisemitic content on the social media platform X. *See generally* Compl., ECF No. 1. The court granted Plaintiffs preliminary injunctive relief on April 12, 2024. Mem. Op., ECF No. 37.

App.216

Meanwhile, on November 21, 2023, the day after Defendant announced his investigation, Missouri Attorney General Andrew Bailey made known that he too would be looking into Media Matters' reporting about X.  Pls.' Mot. at 2.  On December 11, 2023, Bailey sent a "Notice of Pending Investigation" to Media Matters' generic email inbox.  *Id.* at 3.  He then publicly announced on March 25, 2024, that he had filed suit in Missouri state court to enforce a CID ("Missouri CID") "virtually identical" to Defendant's, which he purportedly had served on Media Matters.  *Id.* at 3.  Attorney General Bailey in fact had not yet formally served Media Matters.  *Id.* Thereafter, Media Matters asked Attorney General Bailey to withdraw the Missouri CID, but he refused.  *Id.* at 3; Pls.' Mot., Ex. 9, Email from Jeremiah Morgan to Samuel Ward-Packard, ECF No. 39-9.

Plaintiffs now move under Rule 15(d) to add Attorney General Bailey as a defendant to this action.  Pls.' Mot.

## II.

Under Federal Rule of Civil Procedure 15(d), "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."  Fed. R. Civ. P. 15(d).  "[T]he decision to grant leave to supplement a pleading under Rule 15(d) is discretionary and may be granted where it serves the interests of judicial economy and convenience."  *Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 12 (D.D.C. 2017) (citation omitted). Rule 15(d) permits the addition of new defendants "participating in the[] new events," *Griffin v. Cnty. Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218, 227 (1964), but "supplemental, unrelated claims against new defendants are inappropriate," *Chandler v. James*, 783 F. Supp. 2d 33, 39 (D.D.C. 2011).

2

As with a motion to amend under Rule 15(a), leave to supplement "should be freely given[.]" *Willoughby v. Potomac Elec. Power Co.*, 100 F.3d 999, 1003 (D.C. Cir. 1996). The opposing party carries the "burden to demonstrate why leave should not be granted." *Lannan Found.*, 300 F. Supp. at 12.

Also relevant, under Rule 20(a), defendants "may be joined in an action if any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2).

### III.

Defendant argues that adding Attorney General Bailey as a defendant fails to satisfy Rule 20(a)'s requirement that claims filed against joined defendants must "arise out of a common transaction or occurrence." Def.'s Opp'n at 2. He contends that the two inquiries of Media Matters are being conducted by different sovereigns with different sources of investigatory authority and thus are "wholly unconnected." *Id.* at 2. The court disagrees.

According to the proposed amended complaint, Defendant and Attorney General Bailey are "coordinating" their respective investigations of Media Matters. Suppl. Compl. ¶ 36, ECF No. 39-2. Attorney General Bailey apparently admitted as much. On a radio program, he said, "Yeah, certainly we've coordinated with Texas. Texas has launched a similar investigation and we're in talks with other states as well. This is a new front in the war, in the fight for free speech." *Id.* Assuming that allegation is true, the proposed addition of Attorney General Bailey satisfies the "same transaction" requirement of Rule 20(a). It also establishes the basis for Plaintiff to seek joint relief against Defendant and Bailey, as also required by the rule. *Cf. United States v. Mississippi*, 380 U.S. 128, 142–43 (1965) (holding that joinder of various county registrars was

proper where the complaint alleged that "the registrars had acted and were continuing to act as part of a state-wide system designed to enforce the registration laws" in violation of civil rights).

Defendant also contends that allowing supplementation would "needlessly delay this case by adding issues related to an ongoing Missouri state court proceeding." Def.'s Opp'n at 3. But there is little reason to think that the Missouri state court matter will slow this one down, particularly as Defendant has sought interlocutory review of the court's preliminary injunction order and has not yet answered the original complaint. *See* Notice of Interlocutory Appeal, ECF No. 41.

## IV.

Accordingly, Plaintiffs' Motion to Supplement the Complaint, ECF No. 39, is hereby granted. Plaintiffs' Supplemental Complaint, ECF No. 39-2, shall supplement the operative pleading in this matter.

Dated: April 24, 2024

Amit P. Mehta
United States District Judge

App.219

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-147 |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | **(EXPEDITED HEARING REQUESTED)** |
| ANDREW BAILEY, in his official capacity as Attorney General of the State of Missouri, Defendants. | |
| Defendants. | |

### PLAINTIFFS' MOTION FOR TEMPORARY RESTRANING ORDER AND PRELIMINARY INJUNCTION AGAINST BAILEY

Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki move for a temporary restraining order and preliminary injunction against Defendant Andrew Bailey in his official capacity as Attorney General of the State of Missouri. For the reasons stated in the accompanying memorandum in support, during the pendency of this action the Court should restrain and enjoin Bailey, as well as his agents and employees, from:

1. Taking any further steps to enforce the Civil Investigative Demand issued to Media Matters on March 25, 2024, including by continuing to prosecute the enforcement action Bailey filed in Cole County, Missouri, Circuit Court on March 25, 2024.

2. Issuing any additional Demands or taking any other steps purporting to mandate any action on behalf of Plaintiffs (including Media Matters's officers, employees, and agents) in furtherance of any investigation of Media Matters.

Dated: April 25, 2024

Respectfully submitted,
*/s/ Aria C. Branch*

**ELIAS LAW GROUP LLP**
Aria C. Branch (DC 1014541)
Christopher D. Dodge (DC 90011587)
Elena A. Rodriguez Armenta (DC 90018798)
Samuel T. Ward-Packard (DC 90005484)
250 Massachusetts Ave. NW, Suite 400
Washington, DC 20001
T: (202) 968-4652
abranch@elias.law
cdodge@elias.law
erodriguezarmenta@elias.law
swardpackard@elias.law

Abha Khanna*
1700 Seventh Ave. Suite 2100
Seattle, WA 98101
T: (206) 656-0177
akhanna@elias.law

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (DC 420440)
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Email: tboutrous@gibsondunn.com

Amer S. Ahmed (DC 500630)
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com

*Admitted *pro hac vice*

*Counsel for Plaintiffs Media Matters for America and Eric Hananoki*

App.221

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on the Defendant in accordance with Federal Rule of Civil Procedure 5(a).

*/s/ Aria C. Branch*
Aria C. Branch

App.222

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-147 |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| ANDREW BAILEY, in his official capacity as Attorney General of the State of Missouri, | |
| Defendants. | |

**SECOND SUPPLEMENTAL DECLARATION OF ERIC HANANOKI
IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AGAINST BAILEY**

I, Eric Hananoki, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I previously submitted a declaration in this lawsuit on January 18, 2024, as well as a supplemental declaration on February 1, 2024. I incorporate those declarations by reference here and file this new declaration to address the impact that Missouri Attorney General Bailey's recent actions have had on my work and reporting.

3.      Since I submitted my two earlier declarations, Attorney General Bailey has acted on his earlier public threats against Media Matters by issuing a civil investigative demand (the "Demand") seeking documents—including those involving my research and reporting—and a lawsuit to enforce that demand (the "Petition") in Missouri.

1

4.      The fears and concerns I expressed in my previous declarations due to Attorney General Paxton's actions have now been compounded by the actions of Attorney General Bailey, which I also consider to be nothing more than bad faith retaliation against my reporting.

5.      Before his most recent actions, Bailey made a number of derogatory and defamatory statements about Media Matters and my reporting. For example, Bailey labeled Media Matters "radicals" and "progressive tyrants" seeking to "wipe out free speech." Bailey then made similarly outrageous claims in a number of media appearances. For example, Bailey appeared on the show "Cancel This!" and stated that "Media Matters is built on lies . . . It's a radical, progressive, tyrannical advocacy group masquerading as a news outlet."[1] He accused Media Matters of "market manipulation and bullying [] the advertisers on X[,]" and described Media Matters as a weapon of "the enemy."[2] Bailey also appeared on the channel Newsmax and claimed without any basis that Media Matters had to "dismantle and deconstruct" the "safeguards" that X had in place in order to conduct a "manipulation of the algorithms[.]"[3] Bailey then did not refute host Rob Schmitt when he responded that "these people are evil" and "these people should be deported for this."[4] Bailey publicly confirmed that his office has "coordinated with Texas," and was "in talks with other states as well" as part of the "new front in the war, in the fight for free

---

[1] Cancel This!, *It's A Color-Coded Christmas Party for This Boston Mayor + Andrew Bailey & Nelson McIlveen LIVE!*, YouTube at 1:41:27–1:43:05 (Dec. 14, 2023), https://www.youtube.com/watch?v=xDFXO1MjIME.

[2] *Id.*

[3] Rob Schmitt Tonight, Newsmax at 40:54–42:00 (Dec. 12, 2023), https://www.newsmaxtv.com/Shows/Rob-Schmitt-Tonight/vid/52639c50-996a-11ee-a4f2-5b4ee1ed8474.

[4] *Id.*

App.225

speech."[5]

6.      Attorney General Bailey's repeated, virulent public attacks on Media Matters and on my reporting—including his statements that he was coordinating with the retaliatory investigation of Attorney General Paxton—gave me serious concerns and contributed to the feelings of fear in my earlier declarations.

7.      Attorney General Bailey has now acted upon his earlier disparagement of my reporting. On March 25, 2024, Attorney General Bailey formally issued his Demand, which I have since reviewed. The Demand identifies me by name and asks for all documents "related to" my November 16 article, or "events described in the article," which would encompass communications and documents that I used as I researched and drafted my article—materials that are fundamental to my work as a journalist. So far as I can tell, complying with the Demand would require me to turn over effectively the same set of documents demanded by Paxton's earlier civil investigative demand.

8.      On the same day he issued the Demand, Attorney General Bailey also filed his Petition to enforce that Demand in a state court in Jefferson City, Missouri. That suit is highly distressing to me, and I am troubled by the prospect that access to my private research and communications will be decided by a court in a place with which I have absolutely no connection. As I previously explained, my work on the November 16 article occurred exclusively in Maryland. I have never traveled to Missouri for work, and to the best of my knowledge none of my work on the November 16 article, or any related article, involved any interaction with the state of Missouri.

---

[5] Tim Jones & Chris Arps Show, *MO A.G. Andrew Bailey: Missouri Doesn't Have Sanctuary Cities*, NewsTalkSTL at 5:32–58 (Dec. 12, 2023), https://omny.fm/shows/newstalk-stl/mo-a-g-andrew-bailey-missouri-doesnt-have-sanctuar.

9.      I believe that Attorney General Bailey's demand for my documents—like Attorney General Paxton's earlier demand—is in response to Musk's highly publicized call for retaliation against Media Matters. Attorney General Bailey himself said he and Musk have "been in touch over the past few months on a variety of different topics."[6] Shortly before issuing his Demand, Attorney General Bailey had what he described as a "great discussion with" Musk in a public "X Space."[7] Attorney General Bailey has relentlessly and publicly condemned Media Matters and my reporting, has claimed that he is working with Attorney General Paxton, and has shown no basis for his investigation. In my view, he is harassing and retaliating against Media Matters and myself in an effort to silence Media Matters's reporting (and my reporting specifically) about extremist content on X and to attract attention and praise from his conservative followers on platforms like X.

10.      Attorney General Bailey's Demand, Petition, and his aggressive public statements about Media Matters and my reporting, have had an extremely negative effect on my work and on me personally. The fear of harassment, threats, and legal retaliation that I described in my prior declarations continues with, and is now compounded by, the recent actions taken by Attorney General Bailey. While the Court's recent ruling helped resolve some of my concerns about Attorney General Paxton's investigation, Attorney General Bailey appears to now be retaliating against me in an even more aggressive manner.

11.      I continue to limit my communications and collaboration with other journalists, and I continue to be impacted in my ability to communicate with my editor, Ben Dimiero, from fear

---

[6] Pete Mundo Morning Show, *Andrew Bailey - Missouri Attorney General | 3-19-24*, YouTube at 1:36-1:41, (Mar. 19, 2024) https://www.youtube.com/watch?v=jb1ARx28tvQ&t=86s.

[7]      @AGAndrewBailey,      X.com      (Mar.   19,      2023,      9 :49      AM      ET), https://twitter.com/AndrewBaileyMO/status/1770085152699424772.

4

that our discussions will have to be turned over to state law enforcement officials, like Bailey, who are retaliating against my reporting.

12.     I also continue to curtail my investigative reporting and to self-censor in researching and drafting new articles. Since my last declaration, I have continued to generate articles and reporting ideas about Musk's ownership of X but have been unable to pursue them due to the various investigations into my work. I continue to produce reporting output far below my usual pace as a result of the retaliation I am facing from officials like Bailey.

13.     For example, NBC News released a report on April 16, 2024, which found that at least "150 paid 'Premium' subscriber X accounts and thousands of unpaid accounts have posted or amplified pro-Nazi content on X in recent months, often in apparent violation of X's rules[.]" NBC News found "ads running on 74 of the 150 premium accounts, either on their profile pages or in the replies below their posts." The NBC News report cited my earlier reporting about extremism on X—the very reporting that has led to the retaliation against me by state officials like Bailey.[8]

14.     The NBC News report bolstered the findings I presented in my own related articles, and in ordinary circumstances I would have followed up on the NBC News report and its findings in my own writing. However, I did not follow up with any new articles in response to the NBC News report—despite generating story ideas as a result of it—due to my fear of further legal retaliation and public threats from officials like Bailey. This chill on my reporting will continue so long as state officials' investigations and demands for my private documents and communications remain unchecked.

---

[8] David Ingram, *Verified pro-Nazi X accounts flourish under Elon Musk*, NBC News (Apr. 16, 2024),   https://www.nbcnews.com/tech/social-media/x-twitter-elon-musk-nazi-extremist-white-nationalist-accounts-rcna145020.

App.228

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: ___4/25/2024_____

_____          _____

Eric Hananoki

App.229

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas,<br><br>ANDREW BAILEY, in his official capacity as Attorney General of the State of Missouri,<br><br>        Defendants. | Civil Action No. 24-cv-147 |

**SUPPLEMENTAL DECLARATION OF CYNTHIA PADERA
IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AGAINST BAILEY**

I, Cynthia Padera, declare as follows:

1.        I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.        I am the Chief Operating Officer of Media Matters for America ("Media Matters").

3.        I live in, and work from, the District of Columbia.

4.        I previously submitted a declaration in this lawsuit on January 18, 2024. I incorporate that declaration by reference here and file this new declaration to address Missouri Attorney General Bailey's recent actions directed towards Media Matters, and specifically to describe Media Matters's lack of connection to the state of Missouri.

5.        On March 25, 2024, Attorney General Bailey issued a civil investigative demand (the "Demand") that is very similar to the civil investigative demand issued by Texas Attorney General Paxton. Attorney General Bailey's Demand commands Media Matters to produce a wide

1

array of documents, including documents and communications about our general operations, Eric Hananoki's November 16 article, and communications with companies which currently or previously advertised on the X platform.

6.     That same day, on March 25, without allowing Media Matters time to respond to the Demand, Attorney General Bailey filed a petition (the "Petition") to enforce the Demand against Media Matters in Missouri state court—despite the fact that the organization has no relevant connection to Missouri. This was a full week before Media Matters received the Demand via U.S. mail in Washington, D.C., on April 1.

7.     Media Matters first learned about the existence of the Demand, as well as Bailey's lawsuit, from a reporter who reached out to Media Matters for comment about Bailey's Demand and lawsuit early on the morning of March 25. Only hours later did Attorney General Bailey then issue a press release describing the lawsuit he had filed against Media Matters. At no time did Attorney General Bailey or his office reach out to Media Matters, or our outside counsel, to inform us about the Demand or lawsuit.

8.     Several days later, on March 28, 2024, I personally accepted service of the Petition from a process server hired by Attorney General Bailey. The Petition was served on me in the lobby at Media Matters's Washington D.C. headquarters. This occurred several days before we received the actual Demand through the postal service.

9.     Media Matters's leadership views the investigation and lawsuit of Attorney General Bailey—just like the actions of Attorney General Paxton—as a direct response to Mr. Musk's criticism of Media Matters. Attorney General Bailey's actions appear to be another attempt by a state attorney general to punish Media Matters for its journalism and to support Mr. Musk and his efforts to retaliate against news coverage he does not like. In fact, Attorney General Bailey interviewed Mr. Musk on March 18, during which Musk made thinly veiled references to his

App.232

dispute with Media Matters by discussing advertisers "freak[ing] out if some activist organizations get some article written about how they're advertising next to content that's bad[.]"  Musk claimed that this was a "major suppression of free speech" "that should be dealt with," and suggested that there had been possible legal violations—to which Bailey agreed, calling the situation a "possible antitrust issue" involving "market manipulation."[1]

10.     Executive leadership has been concerned about Attorney General Bailey's highly public attacks against Media Matters and Mr. Hananoki's reporting since December 11, 2023, when Bailey sent a "Notice of Pending Investigation" demanding that Media Matters preserve documents related to a forthcoming investigation by his office.  Bailey announced this "Notice" through a press release in which he condemned Media Matters, including by calling Media Matters a group of "progressive tyrants."

11.     Attorney General Bailey's investigation and lawsuit have compounded the harm already caused by Attorney General Paxton's investigation. The actions of these two Attorneys General have damaged morale at Media Matters, where many of our employees continue to be fearful of being the subject of legal proceedings and exposing themselves to the threats of powerful government officials.

12.     Attorney General Bailey's actions have reinforced the culture of fear within Media Matters that I described in my prior declaration, further chilling employees' willingness to speak, research, or report on topics related to the subjects of the investigations and the Petition.

13.     Media Matters's ability to collaborate with other groups continues to be impaired, as groups that previously worked with Media Matters continue to carefully consider sharing sensitive documents and communications with us while we are subject to investigation. There is

---

[1] @AGAndrewBailey, *The Battle for Free Speech*, X.com, at 28:30–31:24 (Mar. 18, 2023, 8:02 PM), https://twitter.com/AGAndrewBailey/status/1769877183562944637.

App.233

understandable concern that communications with Media Matters could expose other organizations, their members, or their employees to the kinds of legal proceedings we are now facing.

14.     The organization's other collaborative efforts continue to be kept at a standstill due to the retaliatory investigations we are facing. Media Matters previously refrained from actively participating in coalitions focused on issues of hate speech on X while Attorney General Paxton's demand was pending—that participation now faces the added roadblock of Attorney General Bailey's Demand and Petition. External affairs will continue to avoid sharing research regarding X and its content moderation policies with longstanding partners for fear of further retaliation.

15.     Given this latest round of legal retaliation from Attorney General Bailey, Media Matters's senior leaders and I continue to devote significantly more of our time than usual to dealing with investigations and lawsuits, rather than our ordinary job responsibilities. These acts of retaliation by Attorney General Bailey have further harmed the organization's ability to produce reporting and journalism on political extremism in the United States media and has hindered our work across the board.

16.     Media Matters's leadership, officers, and staff are now once more concerned and fearful about having to protect their constitutional rights in yet another place where they do not live or work, against another partisan state attorney general. As I explain below, the organization has no relevant connection to Missouri whatsoever, never mind to Cole County, Missouri, where Attorney General Bailey has sued.

17.     As I stated previously, Media Matters is incorporated under the laws of the District of Columbia and is registered to conduct business in the District of Columbia. Our sole physical office space is located within the District of Columbia and the majority of employees work from the Washington, DC metropolitan area.

App.234

18.     Media Matters does not have an office, workspace, or any other physical presence in Missouri.

19.     Media Matters is not registered to conduct business in Missouri.

20.     Media Matters is not registered as a charity organization in Missouri.  The Missouri Attorney General's office exempted Media Matters from registering as a charitable organization in Missouri in 2007.

21.     Media Matters does not have a registered agent in Missouri.

22.     No Media Matters employee currently works from Missouri or is presently intending to do so. To the best of my knowledge, Media Matters has never had any staff based in Missouri at any point in its existence.

23.     Media Matters does not buy or sell any goods in Missouri; does not offer any goods for sale in Missouri; and does not advertise any goods or merchandise for sale in Missouri. As a non-profit media organization, we do not offer goods for sale anywhere in the United States.

24.     Media Matters does not conduct any fundraising campaigns specifically targeting Missouri.

25.     Neither do any of Media Matters's email-based fundraising campaigns specifically target Missouri.

26.     Given Attorney General Bailey's references to "war" on Media Matters and his encouragement for others to join him, his actions have felt and continue to feel like an existential threat to our organization.[2]

---

[2] Tim Jones & Chris Arps Show, *MO A.G. Andrew Bailey: Missouri Doesn't Have Sanctuary Cities*, NewsTalkSTL, at 5:32–58 (Dec. 12, 2023), https://omny.fm/shows/newstalk-stl/mo-a-g-andrew-bailey-missouri-doesnt-have-sanctuar.

App.235

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 4/25/2024 _____

_____

Cynthia Padera

App.236

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, *et al.*, | |
| Plaintiffs, | Civil Action No. 24-cv-147 |
| v. | |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| ANDREW BAILEY, in his official capacity as Attorney General of the State of Missouri, | |
| Defendants. | |

**SUPPLEMENTAL DECLARATION OF BENJAMIN DIMIERO
IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AGAINST BAILEY**

I, Benjamin Dimiero, declare as follows:

1.      I am over the age of 18, am competent to testify, and have personal knowledge of the facts and information set forth in this declaration.

2.      I am the Editor-in-Chief of Media Matters for America ("Media Matters"). I live and work in the District of Columbia.

3.      I previously submitted a declaration in this lawsuit on January 18, 2024, where I described the chilling effect that Attorney General Ken Paxton's investigation has had on my work as Editor-in-Chief, as well as my collaboration and communication with our Senior Investigative Reporter, Eric Hananoki. I also described the impact that Paxton's conduct had on the operation of our newsroom more broadly. I incorporate that declaration by reference here, and separately address the impact that the recent actions of Missouri Attorney General Bailey have had on my

1

work and Media Matters's newsroom.

4.      Since the time of my prior declaration, Missouri Attorney General Bailey issued his own civil investigative demand (the "Demand") against Media Matters, and immediately filed a lawsuit to enforce (the "Petition") the Demand in Missouri state court.

5.      My prior declaration described the negative impact that Attorney General Paxton's actions had on the morale of my editorial team, and how it dramatically changed and stifled our editorial process. Attorney General Bailey's actions are now contributing to and compounding that negative impact and disruption, particularly in the wake of this Court's pause on Paxton's investigation.

6.      Because of Bailey's actions, our editorial processes continue to be impacted by concern over what we are actually able to research and report on while avoiding exposing ourselves to further retaliation. There is a persisting sense on our editorial team and in our organization that we must proceed extremely cautiously with our journalism or else face further legal retaliation that threatens our ability to operate.

7.      This has proved extremely inhibiting to our editorial operations. Routine articles continue to receive greater internal scrutiny from myself, our broader editorial team, and Media Matters's leadership, which has slowed our output and hampered our ability to promptly publish coverage of emerging stories and topics. Our journalists, including Mr. Hananoki, continue to self-censor due to fear and concern about whether covering certain topics will lead to backlash, and perhaps even imperil the organization's future operations.

8.      Attorney General Bailey's Demand and Petition—and the very real possibility that officials from other states could join his efforts—have justifiably heightened this sense of uncertainty.

9.      Attorney General Bailey's repeated public attacks against Media Matters have also exacerbated the concerns that Media Matters's reporters have about legal backlash to their reporting. The actions of Attorney General Bailey have worsened the culture of fear at our organization that I described in my earlier declaration. This fear continues to distract us from our work reporting on important issues like political extremism in the media, and will continue to do so if officials like Bailey are allowed to carry on their efforts to punish reporting that they dislike.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on: _____
4/25/2024


_____
Benjamin Dimiero

3

App.240

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA,
ERIC HANANOKI,

                    Plaintiffs,

          v.                                       No. 24-cv-147

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,

ANDREW BAILEY, in his official capacity as
Attorney General of the State of Missouri

                    Defendants.

## DECLARATION OF ASSISTANT ATTORNEY GENERAL
## STEVEN REED

I, Steven Reed, declare as follow:

1.      My name is Steven Reed and I am a lawyer duly licensed and in good standing in

the State of Missouri. I am over the age of 21 and fully competent to make this declaration. I make

this declaration based on my personal knowledge.

2.      I am the Chief Counsel for the Consumer Protection Section of the Missouri

Attorney General's Office and am one of the attorneys responsible for the State of Missouri's

investigation into consumer protection violations by Media Matters for America (Media Matters).

3.      The Consumer Protection Section is responsible for administering and enforcing

Chapter 407, the Missouri Merchandising Practices Act, of the Missouri Revised Statutes

(RSMo.).

4.      The Consumer Protection Section of the Missouri Attorney General's Office issues

dozens of Civil Investigative Demands (CID's) under Section 407.040 RSMo. every year in an

1

effort to investigate the "act, use or employment by any person of deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce *or the solicitation of any funds for any charitable purpose*…." Section 407.010 RSMo. (emphasis added).

5.     Under Section 407.040, RSMo., the Missouri Attorney General, on behalf of the State of Missouri, may issue a CID "when it appears to the attorney general that a person has engaged in or is engaging in any method, act, use practice or solicitation declared to be unlawful by this chapter or when he believes it to be in the public interest that an investigation should be made to ascertain whether a person in fact has engaged in or is engaging in any such method, act, use, practice or solicitation …."

6.     In November 2023, the Missouri Attorney General's Office became aware of potential violations of the Missouri Merchandising Practices Act by Media Matters, an organization that purports to solicit funds for charitable purposes, and began to look into the matter.

7.     The Missouri Attorney General's Office discovered that Media Matters not only distributes its newsletter in Missouri, but engages in internet and email solicitations, phone solicitations, and in-person solicitations for fundraising–listing Missouri in its public financial disclosures as a state in which it "is registered or licensed to solicit contributions or has been notified it is exempt from registration." Indeed, Media Matters has specifically communicated with the Missouri Attorney General's Office to seek an exemption from registration for its fundraising in Missouri. *See* Exhibit 1.

8.     The Missouri Attorney General's Office further discovered that Media Matters was credibly accused of defaming the social media platform X (formerly Twitter) by falsely

representing that X routinely populates advertisements for brands like Apple, IBM, and Xfinity next to extremist, fringe content.

9.     The Missouri Attorney General's Office learned that, according to credible allegations, Media Matters had "knowingly and maliciously manufactured side-by-side images depicting advertisers' posts on X Corp.'s social media platform beside Neo-Nazi and white-nationalist fringe content and then portrayed these manufactured images as if they were what typical X users experience on the platform."  Complaint, *X Corp. v. Media Matters for America*, No. 4:23-cv-1175, ECF 1 ¶ 1 (N.D. Tex. Nov. 20, 2023). Media Matters did this by "manipulat[ing] the algorithms … to bypass safeguards."  *Id.* ¶¶ 7–8. According to credible allegations, while Media Matters insisted that paid advertisements regularly "appeared alongside the fringe content," in fact that was true "for only one viewer (out of more than 500 million) on all of X: *Media Matters*." *Id.* ¶ 13 (emphasis in original). Yet, according to reports and allegations, Media Matters' false "reporting" had the desired effect: advertisers withdrew from X in droves.

10.    In confirmation of these allegations involving Media Matters, the Missouri Attorney General's Office has since learned from DoubleVerify, an organization "which provides brand-safety measurement ratings for digital platforms to major advertisers," that allegations that X was regularly populating advertisements next to fringe content is false. DoubleVerify stated that X's "Brand Safety Rates" were nearly perfect—99.99%—during the very time when Media Matters accused X of regularly posting brand advertisements next to fringe content. *See* Exhibit 2 (Todd Spangler, DoubleVerify Apologizes for Misreporting X/Twitter's Brand-Safety Rates for More Than Four Months, Variety (Apr. 15, 2024)).

11.    Having identified potential violations of the Missouri Merchandising Practices Act, the Missouri Attorney General's Office determined to further investigate the matter. The Missouri

Attorney General's Office did not simply file a complaint against Media Matters for violations of the Missouri Merchandising Practices Act; instead, the Missouri Attorney General's Office determined to gather more information by issuing a CID to Media Matters. This is something routinely done by the Missouri Attorney General's Office.

12.     On March 25, 2024, the Office of the Missouri Attorney General, through the Consumer Protection Section that I lead as Chief Counsel, sent by certified mail, Civil Investigative Demand No. 24-10 to Media Matters, a true and accurate copy of which is attached as Exhibit 3 (CID No. 24-10). *See* Exhibit 4 (Certified mail cards and receipts).

13.     Pursuant to section 407.040, the CID identifies the statute of the suspected violation and the general subject matter of the investigation. Specifically, the CID requests information relevant to whether Media Matters has engaged in or is engaging in any merchandising practices declared to be unlawful by section 407.020 with regard to Media Matters' fraudulent manipulation of data on X.com.

14.     The Missouri Attorney General's Office had also learned that Media Matters would refuse, and had refused, to comply with any investigative demand, including CID No. 24-10, as it had with similar investigative demands. Accordingly, Missouri determined it would seek enforcement of its CID sent to Media Matters in Missouri state court as authorized by Missouri law. *See* Section 407.090, RSMo.

15.     As anticipated, Media Matters refused, and continues to refuse, to comply with CID No. 24-10, and has provided no information or materials to the State of Missouri for its investigation under the Missouri Merchandising Practices Act.

16.     After the CID to Media Matters was served, the State of Missouri filed its Petition for Order to Enforce Civil Investigative Demand. *See State of Missouri, ex rel. Andrew Bailey,*

*Attorney General v. Media Matters for America*, Case No. 24AC-CC02291 (Circuit Court of Cole County, Missouri). I am a signatory to that Petition.

17.     Media Matters appeared in the Missouri state court proceeding after service of the Petition and filed a motion for change of judge.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 8, 2024                                    /s/ Steven Reed
                                                      Steven Reed, Chief Counsel
                                                      Consumer Protection Section
                                                      Missouri Attorney General's Office

5

App.245

# Exhibit 1



## ATTORNEY GENERAL OF MISSOURI

### JEFFERSON CITY

65102

JAY NIXON
ATTORNEY GENERAL

P.O. BOX 899
(573) 751-3321

July 12, 2007

Copilevitz & Canter, LLC
Attention: Megan B. Allen
310 W. 20th Street, Suite 300
Kansas City, MO 64108

RE: Charitable Organization & Solicitation Law, 407.450 -- 407.478 RSMo, 2000
Registration and Exemption for **Media Matters for America**
Registration No .**CO-181-07**

Dear Ms. Allen:

Attorney General Jeremiah W. (Jay) Nixon has asked me to respond to your recent letter regarding the above.

Based on the facts submitted to our office, it appears that your organization is exempt from registration under the Charitable Organizations & Solicitations Law, Sections 407.450 to 407.478 RSMo 2000

The initial registration statement and letter noting your statement of exemption has been retained for our files. **In addition**, we invite your organization to be included on the Missouri Attorney General's Office charity web page. The web page will offer a profile of each organization, including a description of its charitable purpose, contact information and basic financial information about the organization with a focus on the program-spending ration. Consumers will be able to easily access information that will assist in evaluating solicitations and choosing wisely when responding to charitable appeals.

To be included on the Attorney Generals charity web page please complete the enclosed forms which certify the accuracy of the information provided. Please mail your information to:

Missouri Attorney General's Office
Attn: Judy Murray
P.O. Box 899
Jefferson City, MO 65102-0899

App.247

Thank you for your continued cooperation.  If you have further questions please contact the undersigned or visit us at www.ago.mo.gov.

Very truly yours,

JEREMIAH W. (JAY) NIXON
Attorney General

Rhonda Johnson
Registration Specialist
Consumer Protection Division

Enclosure

# Exhibit 2

**Better quotes, more news, smarter tools. Welcome to the future of finance.**   **Discover What's New**   ✕

*VARIETY*

# DoubleVerify Apologizes for Misreporting X/Twitter's Brand-Safety Rates for More Than Four Months

**Todd Spangler**
Mon, Apr 15, 2024 • 4 min read

 



DoubleVerify, which provides brand-safety measurement ratings for digital platforms to major advertisers, incorrectly displayed X's Brand Safety Rate — a measure of how frequently ads appeared adjacent to content that met advertiser-approved criteria — on the DoubleVerify dashboard for nearly five months.

From Oct. 24, 2023, to March 14, 2024, DoubleVerify's dashboard provided the wrong data for X to advertisers. In some cases, the measurement firm showed scores as low as 70%, whereas X's Brand Safety Rates were in fact 99.99%. DoubleVerify CEO Mark Mark Zagorski, in a message to customers April 12, apologized for the error and said the company's dashboard now correctly shows X's brand-safety rates.

**More from Variety**

- Elon Musk's X Loses Lawsuit Against Research Group That Reported Rise in Hate Speech, Racist Content on Social Network

- Don Lemon Says Elon Musk Canceled His X Talk Show Deal Shortly After Interview: The Tech Billionaire 'Is Mad at Me'

- Elon Musk Posts Crying-Laughing Emoji in Response to $128 Million Lawsuit by Fired Twitter Executives

"We apologize for any confusion this may have caused to X and to our customers in the course of reviewing your campaign performance on X," Zagorski wrote in the message to customers. "DV remains committed to maintaining the highest standards of accuracy and transparency in our data."

It's unclear how the error occurred. Reps for X and DoubleVerify said the companies are continuing to investigate the issue. DoubleVerify is "conducting a thorough review of our processes and systems to ensure this issue does not occur in the future," according to Zagorski.

"X remains dedicated to ensuring a safe and transparent platform for our valued advertisers and users," the X Business account posted on Friday. "We are deeply troubled by this gross misrepresentation of our Brand Safety performance and have taken immediate action to rectify the situation with DoubleVerify."

Elon Musk, the tech billionaire who owns X, wrote in a post April 12, "Thank you DoubleVerify for correcting your mistake regarding brand safety on this platform. When measured accurately, brand safety on 𝕏 is extremely good."

DoubleVerify's reporting error caused dozens of large brands to pull back advertising spending and stop campaigns on X, according to the social-media company. For example, the DoubleVerify dashboard said that a Molson Coors campaign delivered poorly with a brand-suitability rate in the mid-90s — when it was actually 99.99%. Account teams at Publicis Spark, which manages campaigns for such brands as Campbell's and Conagra, became aware of the erroneous DoubleVerify metric and then said they were hesitant to partner with X, according to Joe Benarroch, X's head of business operations. (A spokesman for Campbell's said that its brands have not advertised on X or Twitter since 2020; that decision was tied to consumer behavior and performance and wasn't related at all to any brand-safety issues.)

Monique Pintarelli, head of Americas for X, in remarks delivered Monday to the Mobile Marketing Association's Board of Global Advertisers, noted that the social network's tools for sensitivity settings and keyword adjacencies — and its partnerships with Integral Ad Science (IAS) and DoubleVerify to allow for third-party verification — were not available prior to Musk's acquisition of Twitter.

Pintarelli also noted that the DoubleVerify reporting error affected only X. She asked advertisers to "please connect with your agencies and measurement partners to ensure you have the most accurate information."

"We are proud of the work we are doing, to ensure our customers have the tools needed to ensure brand safety across our platform," Pintarelli said. "We are now at or above industry standards, in all metrics and capabilities."

X/Twitter and Musk have aggressively pushed back against claims that the social network is unsafe for brand advertising. Last November, X sued liberal watchdog group Media Matters, alleging the group "knowingly and maliciously manufactured" research that showed neo-Nazi and white-nationalist posts on X next to ads for Apple, Bravo, IBM, Oracle and Comcast's Xfinity. Following

the Media Matters report and Musk's seeming endorsement of an anti-Semitic conspiracy theory, several large advertisers including Disney said they were halting their spending on X — either because of the Media Matters reports, Musk's post or a combination of both. Last month, Missouri Attorney General Andrew Bailey filed a lawsuit against Media Matters seeking to force the nonprofit to turn over documents related to the AG's investigation "into its fraudulent business practices," citing X's allegations that Media Matters "deceitfully manipulated X's algorithm to place advertisers' content next to contrived controversial posts." In a statement, Media Matters president Angelo Carusone said: "Far from the free-speech advocate he claims to be, Elon Musk has actually intensified his efforts to undermine free speech by enlisting Republican Attorneys General across the country to initiate meritless, expensive, and harassing investigations against Media Matters in an attempt to punish critics. This [Missouri] investigation is the latest in a transparent endeavor to squelch the First Amendment rights of researchers and reporters; it will have a chilling effect on news reporters."

Read Zagorski's message to DoubleVerify customers about the reporting error for X's Brand Safety Rates:

yahoo!finance   Search for news, symbols or companies   News   Finance   Sports   More   Sign in

My Portfolio   News   Markets   Sectors   Screeners   Personal Finance   Videos   Back to classic

resulted in displaying an incorrect, lower rate. Specifically, DoubleVerify's dashboard incorrectly mirrored the Brand Suitability Rate for your campaign onto the Brand Safety Rate in the summary graphic in Pinnacle. The underlying data available in DV Pinnacle was accurate; only the graphical visualization was not representative of the Brand Safety Rate. This display error occurred over four and a half months from October 24, 2023 to March 14th, 2024, when it was corrected by DV. All current and retroactive Brand Safety data for X is now correctly represented in Pinnacle. The display error was not present in any other area in the UI, including the Incident Reporting and the Rollover Data Detail.

**Based on DoubleVerify's metrics, X's Brand Safety Rate across all campaigns we measured exceeded 99.99% from October 2023 to the present. This means that X's Brand Safety Rate exceeds global benchmarks for brand safety, based on DV's global industry data.**

DoubleVerify takes measurement accuracy and reporting seriously. We take full responsibility for the inaccurate visual representation of X's Brand Safety Rate within our dashboard that displayed an inaccurate and lower Brand Safety Rate.

We apologize for any confusion this may have caused to X and to our customers in the course of reviewing your campaign performance on X. DV remains committed to maintaining the highest standards of accuracy and transparency in our data.

DoubleVerify is working closely with X to ensure that all future reports reflect the accurate Brand Safety performance of campaigns run on X's platform. We also are conducting a thorough review of our processes and systems to ensure this issue does not occur in the future.

Should you wish to have a direct conversation with X regarding your reporting, we would be happy to relay your contact information to your X account lead and facilitate a meeting. Our team at DoubleVerify remains committed to maintaining trust and confidence in our platform, and would welcome a direct follow up with you should you wish to discuss further.

Best regards,

Mark Zagorski
CEO
DoubleVerify

**Best of Variety**

- New Movies Out Now in Theaters: What to See This Week

- From 'The Sympathizer' to 'Three-Body Problem': The Best Book-to-Screen Adaptations to Read This Year

- What's Coming to Disney+ in April 2024

App.252

# Exhibit 3



ATTORNEY GENERAL OF MISSOURI

ANDREW BAILEY
ATTORNEY GENERAL

JEFFERSON CITY

65102

P.O. Box 899
(573) 751-3321

*In the Matter of:*

**Media Matters for America**

**CID NO. 24-10**
**Date:** March 25, 2024

## INVESTIGATIVE DEMAND

**THE ATTORNEY GENERAL TO:**

**Served:** *U.S. Postal Service*
*Certified Mail*

**Media Matters for America**
**PO Box 44811**
**Washington, DC 20026**

The Attorney General of the State of Missouri believes it to be in the public interest that an investigation be made to ascertain whether **Media Matters for America (Subject)** has engaged in or is engaging in practices declared unlawful by § 407.020, RSMo.

The investigation will inquire into the activities of **Subject** in connection with the solicitation of funds for a charitable purpose, or the sale or advertisement of merchandise, §§ 407.020, 407.453, RSMo.

The Attorney General has reason to believe that the **Subject** has used deception, fraud, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of material fact in connection with the soliciting of funds for a charitable purpose or the sale or advertisement of merchandise in or from the State of Missouri, § 407.020, RSMo. Independently, the Attorney General also believes it to be in the public interest to investigate whether such acts have occurred.

The Attorney General believes you have information, documentary material or physical evidence relevant to the above-mentioned conduct.

App.254

## <u>DEFINITIONS</u>

As used in this Demand, the following terms have the meanings described below:

**"Communication"** means any expression, statement, conveyance, or dissemination of any words, thoughts, statements, ideas, or information regardless of form, format, or kind.  "Communication" includes but is not limited to oral or written communications of any kind, such as telephone conversations, discussions, meetings, notes, letters, agreements, emails or other electronic communications, facsimiles, and other forms of written or oral exchange that are recorded in any way, including video recordings, audio recordings, written notes, or otherwise.  Any "Communication" that also falls within the definition of "Document" shall constitute both a Document and a Communication for purposes of this civil investigative demand.

**"Document"** means all written, printed, typed, and recorded matter of every kind and description, originals and copies, and all attachments and appendices thereto.  Without limiting the foregoing, "documents" include all agreements, contracts, correspondence and other communications including notes, memoranda and marginal notations, records, reports, books, manuals, instructions, statistical data and data compilations, drafts, charts, graphs and tables, bills, statements and invoices, advertising, surveys, transcripts, microfilm and microfiche, electronic records that can be reproduced in paper form, recordings, film, tapes, photographs, electronic mail and Web pages, and all other computer-generated, computer-stored, or electronically-stored matter, however and by whomever produced, prepared, reproduced, disseminated, or made.

**"Identify"**, when used with respect to a **person or entity**, means information sufficient to allow employees of the Attorney General to ascertain the name, address, telephone number, and if not a natural person, the contact person of the entity or facility to be identified, as well as the relationship of that person or entity to you.

**"Identifying"**, when used with respect to a **fact or event**, means information sufficient to allow employees of the Attorney General to ascertain the fact or event with reasonable particularity, and to identify each person believed to have knowledge with respect to the fact or event and each document that refers or relates to the fact or event.

**"Relating to"**, "**related to**", "**relate to**" means to be relevant in any way to the subject matter in question, including without limitation all information that directly or indirectly contains, records, reflects, summarizes, evaluates, refers to, is pertinent to, indicates, comments upon, or discusses the subject matter; or that states the background of, or was the basis for, or that records, evaluates, comments, was referred to, relied upon, utilized, generated, transmitted, or received in arriving at any conclusion, opinion, estimate, position, decision, belief, policy, practice, course of business, course of conduct, procedure, or assertion concerning the subject matter.

**"You"**, including your, means Media Matters for America, subsidiaries, partnerships, or any other entities related to Media Matters for America.

<u>DEMAND FOR INFORMATION</u>

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material and information that may be in your possession, custody or control, and permit the inspection and copying thereof:

1. A list or information identifying any and all donations of funds from donors located in the state of Missouri from January 01, 2023 through March 25, 2024.

   The list of donations should include, but is not limited to:
   - Identity of each individual or organization who donated funds;
   - Address of each individual or organization who donated funds;
   - Total amount spent per donation;
   - Date and time of each donation;
   - Payment method for each donation;
   - Identity of financial institution where funds were sent;
   - Contracts and/or agreements governing or related to each donation;

   For each Demand for Information, you shall type the Demand and type your corresponding response. If you do not know the answer to a Demand for Information, you shall identify in your response the individual or business entity that has the answer to the Demand for Information. The document on

3

which you type each Demand and your corresponding response shall be executed by you before a Notary Public.

## DEMAND FOR DOCUMENTS

Demand is hereby made upon you, under the authority granted by Section 407.040, RSMo, to produce in person or via mail to Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102 by April 15, 2024, the following documentary material that may be in your possession, custody or control, and permit the inspection and copying thereof:

2.  All promotional or marketing information provided by you from January 1, 2023 to March 25, 2024 to any individual or organization for the purpose of soliciting donations.

3.  All documents or communications showing how solicited donations were used.

4.  All communications or materials relating to any policy, strategy or operation related to generating stories or content intended to cancel, deplatform, demonetize, or otherwise interfere with businesses located in Missouri, or utilized by Missouri residents.

5.  All communications, internal and external, regarding your strategy to pressure advertisers into pulling advertisements from the social media platform, X (formerly Twitter).

6.  Documents sufficient to identify your employee organizational chart.

7.  Documents sufficient to identify all your operational expenses in the state of Missouri.

8.  All documents discussing Elon Musk's purchase of X (formerly Twitter).

9.  All documents related to the article, or to the events described in the article, by Eric Hananoki entitled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM,Oracle, and Xfinity next to pro-Nazi content."

App.257

10.     All documents sufficient to identify X accounts owned, controlled, or authorized by you used to obtain the images in the article referenced in paragraph 9.

11.     All documents sufficient to identify all X accounts followed by the X accounts identified in response to paragraph 10.

12.     All communications with Apple, International Business Machine Corporation, Bravo Television Network, NBCUniversal, Oracle Corporation, Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, or Sony Group Corporation from November 1, 2023, to March 25, 2024.

## NOTICE OF DEMAND FOR RETENTION OF RECORDS

You are hereby notified that all records, including communications, documents and things, relating to the above requests and the matters that are the subject of these requests for information are to be preserved during the pendency of this investigation.  This includes, but is not limited to, all related customer records, including recordings made of customers, all related correspondence and other communications with third parties, all related documents and things received from third parties, and all internal documents and things.

## COMPLIANCE

You may comply with this Investigative Demand by producing copies of the requested documents and information by regular mail or overnight delivery to **Michelle Starke, P.O. Box 899, Jefferson City, Missouri 65102.** The requested copies of documents and information should be received by the Office of the Attorney General **by 10:00 a.m. (Central) on April 15, 2024** and be accompanied by the attached Business Records Affidavit and Certification of Compliance.

You are advised that the Attorney General will not grant an extension of time or modification of the terms of the Demand except for good cause pursuant to the terms of Section 407.070, RSMo.  Your prompt response and provision of the requested information is requested.

App.258

Your attention is respectfully called to the provisions of Section 407.080, RSMo, which makes certain acts done with the intent to avoid, evade or prevent compliance in whole or in part with any Investigative Demand served hereunder a Class A misdemeanor, which is punishable by a fine not to exceed $1,000.00 for individuals and $5,000.00 for corporations, or by imprisonment for a term of not more than one year, or both a fine and imprisonment.

Please direct all questions regarding this Investigative Demand to Jeremiah Morgan at 573-751-1800 or by e-mail to: Jeremiah.Morgan@ago.mo.gov.

Respectfully Submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, #50387
Deputy Attorney General – Civil Litigation
Missouri Attorney General's Office
Post Office Box 899
Jefferson City, MO 65102
Tel: (573) 751-8870; Fax: (573) 751-0774
Jeremiah.Morgan@ago.mo.gov

App.259

STATE OF _____     )
                                  ) SS.
COUNTY OF _____      )

## **BUSINESS RECORDS AFFIDAVIT AND CERTIFICATE OF COMPLIANCE**

Before me, the undersigned authority, personally appeared _____, who, being by me duly sworn, deposed as follows:

My name is _____, I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of _____. Attached hereto are _____ pages of records from _____. These _____ pages of records are kept by _____ in the regular course of business, and it was the regular course of business of_____ for an employee or representative of_____ with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, opinion or diagnosis. The records attached hereto are the original or exact duplicate of the original.

I further certify that all documents and information required by Civil Investigative Demand No. 24-10 which is in the possession, custody, control, or knowledge of, _____ has been submitted to the Missouri Attorney General as directed herein.

_____
            Affiant

Sworn to before me this ____ day of_____, 2024.

_____
Notary Public
Commission Expires:

7

App.260

# Exhibit 4

USPS TRACKING #

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

9590 9402 6353 0296 0682 26

**United States**
**Postal Service**

• Sender: Please print your name, address, and ZIP+4® in this box•

Allison Whitmer
Office of the Missouri Attorney General
815 Olive Street, Suite 200
St. Louis, MO 63101

CID 24-10. Media Matters for America

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Media Matters for America
P.O Box 44811
Washington, DC 20026

9590 9402 6353 0296 0682 26

2. Article Number (Transfer from service label)

7017 0660 0000 6553 8055

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☐ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2020 PSN 7530-02-000-9053   Domestic Return Receipt

---

**CERTIFIED MAIL**
PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7017 0660 0000 6553 8055

**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee
$

Extra Services & Fees (check box, add fee as appropriate)
☐ Return Receipt (hardcopy)   $
☐ Return Receipt (electronic)   $
☐ Certified Mail Restricted Delivery   $
☐ Adult Signature Required   $
☐ Adult Signature Restricted Delivery   $

Postage
$

Postmark
Here

To
Media Matters for America
P.O Box 44811
Washington, DC 20026

Instructions

App.262



**U.S. Postal Service™**
**CERTIFIED MAIL® RECEIPT**
*Domestic Mail Only*

For delivery information, visit our website at *www.usps.com®*.

OFFICIAL USE

Certified Mail Fee

$

Extra Services & Fees *(check box, add fee as appropriate)*
☐ Return Receipt (hardcopy)        $
☐ Return Receipt (electronic)      $
☐ Certified Mail Restricted Delivery  $
☐ Adult Signature Required         $
☐ Adult Signature Restricted Delivery $

MAR 25 2024          Postmark
                     Here

Postage
$

Total

Media Matters for America
P.O Box 44811
Washington, DC 20026

7017 0660 0000 6553 8055

Instructions

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

MEDIA MATTERS FOR AMERICA,
ERIC HANANOKI,

              Plaintiffs,

      v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,

ANDREW BAILEY, in his official capacity as
Attorney General of the State of Missouri

              Defendants.

No. 24-cv-147
***Oral Hearing Requested***

**MISSOURI ATTORNEY GENERAL ANDREW BAILEY'S**
**MOTION TO DISMISS**

       Defendant Andrew Bailey, in his official capacity as Attorney General of the State of

Missouri, respectfully moves under Fed. R. Civ. P. 12(b) to dismiss Plaintiffs' Supplemental

Complaint (ECF 46).  Specifically, the Supplemental Complaint against Attorney General Bailey

should be dismissed for the reasons set forth in his Opposition to Temporary Restraining Order

and Preliminary Injunction filed simultaneously herewith and incorporated herein, including

*Younger* abstention, the lack of subject-matter jurisdiction, and the lack of personal jurisdiction.

*See* ECF 56.

1

App.264

Date: May 8, 2024                                    Respectfully submitted,

                                                     ANDREW BAILEY
                                                     Attorney General of Missouri

                                                     /s/ Joshua M. Divine
                                                     JOSHUA M. DIVINE, #69875MO
                                                     Solicitor General

                                                     JEREMIAH J. MORGAN, #50387MO
                                                     Deputy Attorney General – Civil

                                                     OFFICE OF THE ATTORNEY GENERAL
                                                     Supreme Court Building
                                                     207 West High Street
                                                     P.O. Box 899
                                                     Jefferson City, Missouri 65102
                                                     Tel. (573) 751-1800
                                                     Fax (573) 751-0774
                                                     josh.divine@ago.mo.gov
                                                     jeremiah.morgan@ago.mo.gov

                                                     *Counsel for Defendant Missouri Attorney General*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document contains one page, exclusive of matters designated for omission, and satisfies the typesetting requirements.

                                                     /s/ Joshua M. Divine
                                                     Counsel for Missouri Attorney General

## CERTIFICATE OF SERVICE

I certify that on May 8, 2024, a true and accurate copy of the foregoing document was electronically filed through the Court's CM/ECF System and that a copy of the foregoing will be sent via email to all parties by operation of the Court's electronic filing system, all consistent with Federal Rule of Civil Procedure 5(b).

                                                     /s/ Joshua M. Divine
                                                     Counsel for Missouri Attorney General

App.265

# EXHIBIT A

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

IN THE CIRCUIT COURT OF COLE COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| STATE OF MISSOURI, ex rel. ANDREW BAILEY, ATTORNEY GENERAL, | ) ) ) ) | |
| Petitioner, | ) ) | Case No. 24AC-CC02291 |
| v. | ) ) | |
| MEDIA MATTERS FOR AMERICA, | ) ) | |
| Respondent. | ) | |

## AMENDED PETITION FOR ORDER TO ENFORCE CIVIL INVESTIGATIVE DEMAND

The State of Missouri, by and through Attorney General Andrew Bailey, petitions the Court pursuant to Missouri Revised Statutes section 407.090, to enforce its Civil Investigative Demand directed to Media Matters for America (hereinafter "Media Matters") and to impose a $1,000 civil penalty—and upon information and belief states in support as follows:[1]

### INTRODUCTION

Media Matters, a self-styled not-for-profit "progressive research and information center," envisions itself monitoring, analyzing, and correcting "conservative misinformation" in the U.S. media. In fact, this description falls far short of reality for this political activist organization. Instead, rather than

---

[1] All statutory citations are to RSMo 2016 unless otherwise noted.

1

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

passively "monitoring," Media Matters has used fraud to solicit donations from Missourians in order to trick advertisers into removing their advertisements from X, formerly Twitter, one of the last platforms dedicated to free speech in America.

Media Matters has pursued an activist agenda in its attempt to destroy X, because they cannot control it. And because they cannot control it, or the free speech platform it provides to Missourians to express their own viewpoints in the public square, the radical "progressives" at Media Matters have resorted to fraud to, as Benjamin Franklin once said, mark X "for the odium of the public, as an enemy to the liberty of the press." Missourians will not be manipulated by "progressive" activists masquerading as news outlets, and they will not be defrauded in the process.

Based on serious allegations of false and deceptive behavior, the Attorney General's Office has issued a Civil Investigative Demand ("CID"), as authorized by Missouri Law, to Media Matters to investigate possible violations of the Missouri Merchandising Practices Act. Because Media Matters has refused such efforts in other states, made clear that it will refuse any such efforts, and has in fact refused such efforts, the Attorney General seeks an order from the Court, pursuant to section 407.090, compelling Media Matters to comply with the CID within 20 days and to impose a $1,000 penalty for violating the MMPA.

App.268

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

**PARTIES**

1.      Andrew Bailey is the Attorney General of the State of Missouri and files this petition in his official capacity pursuant to chapter 407 and section 27.060 of the Missouri Revised Statutes, as well as the authority granted to the Attorney General at common law.

2.      Respondent Media Matters is incorporated under the laws of, and has its principal place of business in the District of Columbia, and engages in media activity as well as fundraising throughout the United States, including in Missouri. Specifically, Media Matters engages in internet and email solicitations, phone solicitations, and in-person solicitations for fundraising– listing Missouri in its public financial disclosures as a state in which it "is registered or licensed to solicit contributions or has been notified it is exempt from registration."

**JURISDICTION**

3.      This Court has subject matter and personal jurisdiction over this action under the Missouri Constitution Article. V, § 14 and section 506.500.

**VENUE**

4.      This Court has authority over this action pursuant to section 407.090, which allows the Attorney General to file in the trial court of general jurisdiction of a county or judicial district in which such person resides, is found, or transacts business, and serve upon such person a petition for an order

3

App.269

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

of such court for the enforcement of such CID.

5.     Media Matters transacts business in this county.

**MISSOURI MERCHANDISING PRACTICES ACT**

6.     Section 407.020 of the Missouri Merchandising Practices Act

("MMPA") provides in pertinent part:

> The act, use or employment by any person of any
> deception, fraud, false pretense, false promise,
> misrepresentation, unfair practice or the
> concealment, suppression, or omission of any
> material fact in connection with the sale or
> advertisement of any merchandise in trade or
> commerce or the solicitation of any funds for any
> charitable purpose, as defined in section 407.453, in
> or from the state of Missouri, is declared to be an
> unlawful practice… Any act, use or employment
> declared unlawful by this subsection violates this
> subsection whether committed before, during or after
> the sale, advertisement, or solicitation.

7.     The words in the statute are "unrestricted, all-encompassing and

exceedingly broad." *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237,

240 (Mo. banc 2001). "[T]he literal words cover every practice imaginable and

every unfairness to whatever degree." *Id*.

8.     "Person" is defined as "any natural person or his legal

representative, partnership, firm, for-profit or not-for-profit corporation,

whether domestic or foreign, company, foundation, trust, business entity or

association, and any agent, employee, salesman, partner, officer, director,

member, stockholder, associate, trustee or cestui que trust thereof."

4

App.270

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

§ 407.010(5).

9.    "Merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, or services." § 407.010(4).

10.    "Trade" or "commerce" is defined as the "advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated. The terms 'trade' and 'commerce' include any trade or commerce directly or indirectly affecting the people of this state." § 407.010(7).

11.    Respondent Media Matters has engaged in trade or commerce within the meaning of section 407.010.

12.    Pursuant to section 407.145, the Attorney General has promulgated rules explaining and defining terms in sections 407.010-407.145 of the Merchandising Practices Act. The rules relevant to the Merchandising Practices Act allegations herein include the provisions of 15 CSR 60.

13.    Section 407.040 provides in pertinent part:

> When it appears to the attorney general that a person has engaged in or is engaging in any method, act, use, practice or solicitation declared to be unlawful by this chapter or when he believes it to be in the public interest that an investigation should be made to ascertain whether a person in fact has engaged in or is engaging in any such method, act, use, practice or solicitation, he may execute in writing and cause to be served upon any person who is believed to have information, documentary material, or

5

App.271

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

physical evidence relevant to the alleged or suspected violation, a civil investigative demand requiring such person to appear and testify, or to produce relevant documentary material or physical evidence or examination, at such reasonable time and place as may be stated in the civil investigative demand, concerning the advertisement, sale or offering for sale of any goods or services or the conduct of any trade or commerce or the conduct of any solicitation that is the subject matter of the investigation. Service of any civil investigative demand, notice, or subpoena may be made by any person authorized by law to serve process or by any duly authorized employee of the attorney general.

14. Section 407.070 provides in pertinent part:

At any time before the return date specified in a civil investigative demand issued under section 407.040, or within twenty days after the civil investigative demand has been served, whichever period is shorter, a petition to extend the return date for, or to modify or set aside the civil investigative demand, stating good cause, may be filed in the circuit court of the county where the parties reside or in the circuit court of Cole County.

## ALLEGATIONS OF FACT

15. Media Matters is credibly accused of defaming the social media platform X (formerly Twitter) by falsely representing that X routinely populates advertisements for brands like Apple, IBM, and Xfinity next to extremist, fringe content.

16. According to a lawsuit filed by X, Media Matters' statements were entirely and maliciously false. "Media Matters knowingly and maliciously manufactured side-by-side images depicting advertisers' posts on X Corp.'s

6

App.272

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

social media platform beside Neo-Nazi and white-nationalist fringe content and then portrayed these manufactured images as if they were what typical X users experience on the platform." Complaint, *X Corp. v. Media Matters for America*, No. 4:23-cv-1175, ECF 1 ¶ 1 (N.D. Tex. Nov. 20, 2023). Media Matters did this by "manipulat[ing] the algorithms … to bypass safeguards." *Id.* ¶¶ 7–8. While Media Matters insisted that paid advertisements regularly "appeared alongside the fringe content," in fact that was true "for *only one* viewer (out of more than 500 million) on all of X: *Media Matters*." *Id.* ¶ 13 (emphasis in original). Yet Media Matters' false "reporting" had the desired effect: advertisers withdrew from X in droves.

17.    The brand-safety organization DoubleVerify recently debunked Media Matters' assertion, confirming that when Media Matters alleged that X was regularly populating advertisements next to fringe content, that allegation was false. The organization, "which provides brand-safety measurement ratings for digital platforms to major advertisers," recently stated that X's "Brand Safety Rates" were nearly perfect—99.99%—during the very time when Media Matters accused X of regularly posting brand advertisements next to fringe content. Todd Spangler, *DoubleVerify Apologizes for Misreporting*

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

*X/Twitter's Brand-Safety Rates for More Than Four Months*, Variety (Apr. 15, 2024).[2]

18.     Similarly, the federal district court overseeing the X lawsuit against Media Matters recently previewed that the court believes X's lawsuit should proceed toward trial. In rejecting Media Matters' request to stay discovery, the court held that, on a preliminary view, "it appears that Plaintiff [X Corp.] sufficiently pleads facts supporting its claims." *X Corp.*, Order denying motion to stay discovery, ECF 54 at 8.[3] The court further noted that Media Matters' argument on the merits was the "weakest" argument it had presented. *Id.*

19.     Because of this background, plus other information known to the Attorney General's Office, the Attorney General grew concerned about the representations that Media Matters provides to Missourians as it solicits donations and whether those representations are unlawfully deceptive.

20.     So the State of Missouri, through the Attorney General, launched an investigation into whether Media Matters violated Missouri law when soliciting donations from Missourians.

21.     Pursuant to that investigation, on March 25, 2024, the Office of the Missouri Attorney General served upon Media Matters, through its

---

[2] https://variety.com/2024/digital/news/x-twitter-brand-saftey-rate-doubleverify-apology-1235971603/
[3] https://storage.courtlistener.com/recap/gov.uscourts.txnd.383454/gov.uscourts.txnd.383454.54.0.pdf

App.274

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

Registered Agent, Angelo Carusone, 800 Maine Avenue SW, Suite 500, Washington DC, 20024, Civil Investigative Demand Number ("Investigative Demand") CID No. 24-10. A true and accurate copy of the Investigative Demand is attached hereto as Exhibit 1 and incorporated herein. A true and accurate copy of proof of service is attached hereto as Exhibit 2 and incorporated herein.

22.    Pursuant to section 407.040, Investigative Demand No. CID No. 24-10 identified the statute of the suspected violation and the general subject matter of the investigation.

23.    Specifically, Investigative Demand CID No. 24-10 requests information relevant to whether Media Matters has engaged in or is engaging in any merchandising practices declared to be unlawful by section 407.020 with regard to Media Matters' fraudulent manipulation of data on X.com (formerly known as Twitter).

24.    The return date to produce all requested documentation and information and submit the Certification of Compliance to the Attorney General's Office is no later than 10:00 a.m. April 15, 2024.

25.    Even before April 15, Media Matters expressed its intent not to comply with CIDs like this one.

26.    For example, the State of Texas served on Media Matters a virtually identical civil investigative demand in December of 2023, which

App.275

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

Media Matters refused to comply with and instead filed a lawsuit to block compliance and disclosure of information and materials. *See* Exhibit 3 (Texas CID); Exhibit 4 (Media Matters complaint); *see generally Media Matters for America, et al. v. Paxton*, 1:24-cv-00147-APM (United States District Court for the District of Columbia).

27.    As of the filing of this amended petition, more than a month has passed since the due date, and Media Matters has continued to refuse to comply.

28.    Defendant did not enter an appearance or request court relief from the CID before April 15.

**COUNT I-REQUEST FOR ORDER ENFORCING INVESTIGATIVE DEMAND**

29.    Petitioner incorporates all of the allegations contained in Paragraphs 1 through 20 above.

30.    The Attorney General has reason to believe that Media Matters has engaged in methods, acts, uses, or practices that violate chapter 407, and that it is in the public's interest that an investigation should be made. *See* § 407.040.1.

31.    Investigative Demand CID No. 24-10 meets all of the statutory requirements of section 407.040.2.

32.    The CID does not run afoul of the statutory prohibitions of section 407.040.3, RSMo, or of the Missouri or U.S. Constitutions.

10

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

33.   Media Matters has failed or will fail to comply with the Investigative Demand CID No. 24-10, as it has expressed that it will not comply with similar investigative demands.

34.   Media Matters has in fact failed to comply with the CID, but in any event, this action was timely when originally filed because the MMPA expressly authorizes the Attorney General to bring a lawsuit even before a completed violation of the MMPA has occurred. § 407.100, RSMo (authorizing the Attorney General to sue "[w]henever it appears to the attorney general that a person has engaged in, is engaging in, *or is about to engage in* any … act … declared to be unlawful by [the MMPA]") (emphasis added).

35.   Accordingly, Petitioner is entitled to an order pursuant to section 407.090 requiring Media Matters to produce responses to Investigative Demand CID No. 24-10.

#### COUNT II-REQUEST FOR CIVIL PENALTY

36.   Failure to comply with a CID is a violation of the MMPA: "A person upon whom a civil investigative demand is served pursuant to the provisions of section 407.040 *shall comply* with the terms thereof unless otherwise provided by an order of a court." § 407.080, RSMo (emphasis added).

37.   The MMPA authorizes a court to "award to the state a civil penalty of not more than one thousand dollars per violation" whenever "a person has

App.277

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

engaged in, is engaging in, or is about to engage in any … act… declared to be unlawful by [the MMPA]." § 407.100, RSMo.

38.    Media Matters has failed to comply with the CID by failing to "comply with the terms" of the CID, such as the April 15 deadline, while simultaneously failing to seek relief from a court before that deadline. § 407.080, RSMo.

39.    This Court is thus authorized to impose a $1,000 penalty for that violation.

WHEREFORE, Petitioner State of Missouri ex rel. Attorney General Andrew Bailey, prays this Court for an Order enforcing the Civil Investigative Demand, ordering Media Matters to produce complete responses to Civil Investigative Demand No. 24-10 within twenty (20) days of the entry of its Order, ordering Media Matters to pay to the State a $1,000 civil penalty, and ordering any other relief that the Court finds is warranted.

Respectfully submitted,

**ANDREW BAILEY**
Attorney General

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan, MO 50387
Deputy Attorney General – Civil
Jeremiah.Morgan@ago.mo.gov
Steven Reed, MO 40616
Chief Counsel – Consumer Protection
Steven.Reed@ago.mo.gov
Kathryn Monroe, MO 76022

12

App.278

Electronically Filed - COLE CIRCUIT - May 24, 2024 - 02:00 PM

Assistant Attorney General
P.O. Box 899
Jefferson City, MO 65102
(573) 751-1800; Fax: (573) 751-0774

ATTORNEYS FOR PETITIONER

## CERTIFICATE OF SERVICE

I certify that a true copy of the State's Amended Petition was served on

May 24, 2024, pursuant to the Court's automatic notification system.

*/s/ Jeremiah J. Morgan*
Jeremiah J. Morgan

App.279

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, ERIC HANANOKI, | |
| Plaintiffs, | |
| v. | No. 24-cv-147 |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| ANDREW BAILEY, in his official capacity as Attorney General of the State of Missouri | |
| Defendants. | |

**SECOND DECLARATION OF ASSISTANT ATTORNEY GENERAL STEVEN REED**

I, Steven Reed, declare as follow:

1.      My name is Steven Reed and I am a lawyer duly licensed and in good standing in the State of Missouri.  I am over the age of 21 and fully competent to make this declaration. I make this declaration based on my personal knowledge.

2.      I am the Chief Counsel for the Consumer Protection Section of the Missouri Attorney General's Office and am one of the attorneys responsible for the State of Missouri's investigation into consumer protection violations by Media Matters for America (Media Matters).

3.      The Consumer Protection Section is responsible for administering and enforcing Chapter 407, the Missouri Merchandising Practices Act, of the Missouri Revised Statutes (RSMo.).

4.      To protect the integrity of investigations as they progress, the Missouri Attorney General's Office as a general policy does not disclose or publicly discuss information about

1

investigations under the MMPA—including documents and information that the Office collects. However, in rare instances, protecting the integrity of an investigation requires a very limited disclosure of information.  This is one of those rare cases given Media Matters' decision to press incorrect allegations in an attempt to obtain an order to forcefully halt an investigation.

5.      During the investigation into Media Matters, the Attorney General's Office has come into possession of internal Media Matters documents that are expressly marked not for circulation and which reveal plans by the organization to use solicited funds for activities contrary to those publicly disclosed to its Missouri donors.

6.      Publicly, Media Matters solicits donations by asserting on its website that it "posts rapid-response items as well as longer research and analytic reports documenting conservative misinformation throughout the media" and "works daily to notify activists, journalists, pundits, and the general public about instances of misinformation."

7.      But the confidential, internal descriptions of Media Matters' operations suggest a different picture.

8.      These materials explain that high-level officials within Media Matters use the organization and its funds not just to issue reports about perceived misinformation, but to actively interfere with and neutralize the operational infrastructure of certain "target" companies.

9.      For example, these documents reveal that Media Matters has entered into partnerships with Facebook and Google—competitors of X—and has developed strategic plans to interfere with the infrastructure systems used by "target" companies to display advertisements.

10.     These materials are in tension with the organization's public comments and solicitations to Missourians and suggest that Media Matters is likely using solicited donations for activities in conflict with the explicit purposes disclosed to donors.

App.282

11.    These documents are especially noteworthy in light of credible allegations that Media Matters' assertions about advertisements on X—assertions that successfully drove advertisers from the platform—were knowingly false.

12.    These materials lend credence to allegations that Media Matters may be violating the Missouri Merchandising Practices Act, and underscore the need for obtaining further documents identified in Civil Investigative Demand No. 24-10.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: June 4, 2024                       */s/ Steven Reed*
                                             Steven Reed, Chief Counsel
                                             Consumer Protection Section
                                             Missouri Attorney General's Office

App.283

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

MEDIA MATTERS FOR AMERICA,
ERIC HANANOKI,

              Plaintiffs,

      v.

WARREN KENNETH PAXTON JR., in his
official capacity as Attorney General of the
State of Texas,

ANDREW BAILEY, in his official capacity as
Attorney General of the State of Missouri

            Defendants.

No. 24-cv-147

## RESPONSE TO NOTICE OF SUPPLEMENTAL AUTHORITY

For several reasons, the Supreme Court's recent decision in *Gonzalez v. Trevino*, No. 22-1025, 2024 WL 3056010 (per curiam), does not help Media Matters.

First, that case involved a "narrow exception" to the *Nieves* rule that Media Matters has never invoked before this Court. As *Gonzalez* reaffirmed, *Nieves v. Bartlett*, 587 U. S. 391 (2019), holds that the presumption of prosecutorial good faith means a person challenging governmental action "must plead and prove the absence of probable cause." ECF 67-1 at 1. *Nieves* and *Gonzalez* recognize a "narrow exception to that rule" where a person produces "objective evidence" that government action has been taken against the plaintiff but "had never been" taken against "similarly situated individuals not engaged in the same sort of protected speech." *Id.* at 2, 4. The problem for Media Matters is it has never tried to plead or prove this exception. Indeed, its filings barely mention *Nieves* at all—likely because the presumption of good faith stated in *Nieves* is

App.284

difficult for Media Matters to deal with.  Any reliance on this exception recognized in *Nieves* is waived.

Second, unable to rely on the actual opinion in *Gonzalez*, Media Matters resorts to relying on a dissenting opinion from the Fifth Circuit in the underlying case.  But the Supreme Court's short *Gonzalez* opinion never mentions, much less endorses, that dissent.

Third, Media Matters tries to assert that the presumption of good faith should not apply in the civil context.  This new argument of course makes no sense.  The Constitution affords *greater* protection to criminal defendants, not less.  To hold that the presumption of good faith only applies in the criminal but not civil context would be at odds with centuries of law.  Media Matters also ignores that *Nieves* never says anything limiting the presumption of good faith to the criminal context.  Indeed, just last month the Supreme Court expressly said that the presumption of good faith applies in the context of redistricting (which obviously is not criminal)—even going so far as to say that a presumption of good faith "directs district courts to draw the inference that cuts in the [government's] favor when confronted with evidence that could plausibly support multiple conclusions."  *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1235–36 (2024). Media Matters ignores this.

Date: June 26, 2024

Respectfully submitted,

ANDREW BAILEY
Attorney General of Missouri

/s/ *Joshua M. Divine*
JOSHUA M. DIVINE, #69875MO
Solicitor General

JEREMIAH J. MORGAN, #50387MO
Deputy Attorney General – Civil
REED C. DEMPSEY, #1697941DC
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-1800
Fax (573) 751-0774
josh.divine@ago.mo.gov
jeremiah.morgan@ago.mo.gov

*Counsel for Defendant Missouri Attorney General*

App.286

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing document contains 2 pages, exclusive of matters designated for omission, and satisfies the typesetting requirements.

/s/ *Joshua M. Divine*
Counsel for Missouri Attorney General


**CERTIFICATE OF SERVICE**

I certify that on June 26, 2024, a true and accurate copy of the foregoing document was electronically filed through the Court's CM/ECF System and that a copy of the foregoing will be sent via email to all parties by operation of the Court's electronic filing system, all consistent with Federal Rule of Civil Procedure 5(b).

/s/ *Joshua M. Divine*
Counsel for Missouri Attorney General

App.287

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MEDIA MATTERS FOR AMERICA, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil No. 24-cv-147 (APM)** |
| ) | |
| **ANDREW BAILEY,** ) | |
| *Attorney General of the State of Missouri*, **et al.** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## PRELIMINARY INJUNCTION ORDER

On April 25, 2024, Plaintiffs Media Matters for America ("Media Matters") and Eric Hananoki filed a motion for preliminary injunctive relief against Defendant Andrew Bailey, the Attorney General for the State of Missouri, ECF No. 49. After considering the parties' arguments and the evidence submitted, and for the reasons stated in the forthcoming Memorandum Opinion, the court grants the motion and enters the following Preliminary Injunction Order. It is hereby:

**ORDERED** that Andrew Bailey, Attorney General of the State of Missouri, together with his agents and employees within the Office of the Attorney General (collectively "Defendant Bailey"), is enjoined from enforcing the Civil Investigative Demand (CID) issued on March 25, 2024, and prosecuting the Petition filed in the Cole County, Missouri Circuit Court against Media Matters on the same day; and, it is further

**ORDERED** that Defendant Bailey is enjoined from issuing any additional CIDs, filing or amending Petitions, or taking steps purporting to mandate any action on behalf of Plaintiffs

App.288

(including Media Matters' officers, employees and agents) in furtherance of the investigation of Media Matters announced by Defendant Bailey on December 11, 2023.

   This order shall remain in effect until a final judgment is entered in this matter, unless this Order is earlier dissolved by this court or by an appellate court.


Dated:  August 22, 2024

            Amit P. Mehta
          United States District Court Judge

App.289

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil No. 24-cv-147 (APM) |
| | ) |
| ANDREW BAILEY, | ) |
| *Attorney General of the State of Missouri*, et al. | ) |
| | ) |
| Defendants. | ) |

<u>**MEMORANDUM OPINION**</u>

**I.**

On November 16, 2023, Plaintiff Media Matters for America, Inc., a District of Columbia-based media company, published an article authored by Plaintiff Eric Hananoki reporting that advertisements for several major corporations were appearing next to extremist content on X.com ("November 16 Article"). Defendant Texas Attorney General Ken Paxton served a Civil Investigative Demand ("Texas CID") on Media Matters shortly thereafter, seeking a host of records concerning Media Matters' reporting and operations. Plaintiffs filed suit against Defendant Paxton in January 2024, asserting a Section 1983 claim for retaliation in violation of the First Amendment and seeking to enjoin enforcement of the Texas CID. The court granted Plaintiffs' motion for a preliminary injunction on April 12, 2024, finding that Plaintiffs were likely to succeed in establishing jurisdiction over Paxton and on the merits of their claim. *Media Matters for Am. v. Paxton*, No. 24-cv-147 (APM), 2024 WL 1773197, at *5–14, *20 (D.D.C. Apr. 12, 2024).

Meanwhile, on March 25, 2024, Defendant Andrew Bailey, the Attorney General for the State of Missouri, served his own Civil Investigative Demand ("Missouri CID") on Media Matters with a return date of April 15, 2024.  Suppl. Compl., ECF No. 46, ¶¶ 16–18, 22 [hereinafter Suppl. Compl.].  The Missouri CID sought nearly the same records as the Texas CID.  *Id.* ¶ 17; Suppl. Compl., Ex. 5, ECF No. 46-3 [hereinafter Pls.' Ex. 5], at 4–5.  On the same day Defendant Bailey served the CID, he preemptively filed an enforcement petition in Missouri state court, claiming that an immediate enforcement action was needed because Media Matters had resisted the Texas CID.  Suppl. Compl., Ex. 6, ECF No. 46-4 [hereinafter Pls.' Ex. 6], at 7–8.

Shortly thereafter, Plaintiffs filed a motion to supplement their complaint to add Attorney General Bailey as a defendant to this action, which the court granted on April 24, 2024.  Order, ECF No. 44.  Plaintiffs then moved for an order enjoining enforcement of the Missouri CID, asserting, among other things, that Defendant Bailey had retaliated against them for protected speech in violation of the First Amendment and Section 1983.  Pls.' Mot. for TRO & Prelim. Inj., ECF No. 49 [hereinafter Pls.' Mot.].[1]  Defendant Bailey opposed the motion for injunctive relief, Def.'s Opp'n, ECF No. 56 [hereinafter Def.'s Opp'n], and moved to dismiss the case, Def's Mot. to Dismiss, ECF No. 57 [hereinafter Def.'s Mot.].

For the reasons explained below, the court grants Plaintiffs' Motion for a Preliminary Injunction and denies Defendant's Motion to Dismiss.

## II.

The court begins with the factual and procedural background of Plaintiffs' claims specific to Defendant Bailey.

---

[1] Plaintiffs also argue that the intrusiveness of the Missouri CID violates the First and Fourth Amendments, and that compelled disclosure would violate District of Columbia and Maryland shield laws.  Pls.' Mem. in Supp. of Pls.'s Mot., ECF No. 49-1 [hereinafter Pls.' Mem.], at 32–36.  The court does not reach these claims.

Three days after Media Matters published the November 16 Article, a former senior aide to President Donald Trump, Stephen Miller, sent a tweet implicitly calling upon "conservative" state attorneys general to investigate Media Matters' reporting on X.  Within hours, Defendant Bailey responded that "[his] team is looking into the matter."  Suppl. Compl. ¶ 10; *see* Br. of Appellees, *Media Matters of Am. v. Paxton*, No. 24-7059 (D.C. Cir. July 10, 2024), at 9.

Weeks later, Defendant Bailey issued a "Notice of Pending Investigation" to Media Matters.  Sent to a generic email address, the Notice directed Media Matters to "<u>preserve all records that may relate to</u> your alleged effort to engage in coordinated, inauthentic behavior on social media platforms in order to generate false statements that were used to solicit contributions under false pretenses."  Suppl. Compl., Ex. 3, ECF No. 46-1, at 2.  On the same day, Defendant Bailey issued a press release, stating that he had put Media Matters on "notice that his office has launched an investigation into its allegedly fraudulent solicitation of donations from Missourians amidst its efforts to target X[.]" Suppl. Compl., Ex. 4, ECF No. 46-2 [hereinafter Pls.' Ex. 4], at 4.  According to the press release, Defendant had "reason to believe Media Matters used fraud to solicit donations from Missourians in order to trick advertisers into pulling out of X[.]" *Id.*  Defendant described Media Matters as "radicals," and said he would fight "to ensure progressive tyrants masquerading as news outlets cannot manipulate the marketplace in order to wipe out free speech." *Id.*

On March 25, 2024, Defendant Bailey mailed the Missouri CID to Media Matters.  The accompanying letter expressed Defendant's belief that Media Matters had "engaged in or is engaging in practices declared unlawful by § 407.020" of the Missouri Merchandising Practices Act (MMPA).  Pls.' Ex. 5 at 1.  The Missouri CID requested various categories of internal documents, including donor records, internal correspondence, and journalistic source material. *Id.* at 3–5.  As to donor records, Defendant Bailey sought "a list or information identifying any and

3

all donations of funds from donors located in the state of Missouri from January 01, 2023, through

March 25, 2024," including the:

- Identity of each individual or organization that donated funds;

- Address of each individual or organization that donated funds;

- Total amount spent per donation;

- Date and time of each donation;

- Payment method for each donation;

- Identity of financial institution where funds were sent; and,

- Contracts and/or agreements governing or related to each donation.

*Id.* at 3.  The demand also sought the following records relating to Media Matters' general and

Missouri-specific operations:

- "All promotional or marketing information provided by you from January 1, 2023, to March 25, 2024 to any individual or organization for the purpose of soliciting donations."

- "All documents or communications showing how solicited donations were used."

- "All communications or materials relating to any policy, strategy, or operation related to generating stories or content intended to cancel, deplatform, demonetize, or otherwise interfere with businesses located in Missouri, or utilized by Missouri residents."

- "Documents sufficient to identify your employee organizational chart."

- "Documents sufficient to identify all your operational expenses in the state of Missouri."

*Id.* at 4.  Finally, the Missouri CID made a broad demand for records relating to Media Matters'

reporting on X and X's owner, Elon Musk:

- "All communications, internal and external, regarding [Media Matters'] strategy to pressure advertisers into pulling advertisements from the social media platform, X (formerly Twitter). "

4

- "All documents discussing Elon Musk's purchase of X (formerly Twitter)."

- "All documents related to the article, or to the events described in the article, by Eric Hananoki entitled 'As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content.'"

- "All documents sufficient to identify X accounts owned, controlled, or authorized by [Media Matters] used to obtain the images in the article [by Eric Hananoki]."

- "All documents sufficient to identify all X accounts followed by the X accounts identified in response to [the immediately preceding request]. "

- "All communications with Apple, International Business Machine Corporation, Bravo Television Network, NBCUniversal, Oracle Corporation, Comcast Corporation, Lions Gate Entertainment Corporation, Warner Bros Discovery Inc., Paramount Pictures Corporation, or Sony Group Corporation from November 1, 2023, to March 25, 2024."

*Id.* at 4–5.  Media Matters received the Missouri CID on April 1, 2024.  Pls.' Mot., Ex. 2, Suppl. Decl. of Cynthia Padera in Supp. of Pls.' Mot., ECF No. 49-3 [hereinafter Suppl. Padera Decl.] ¶ 6.

The same day that Defendant Bailey issued the CID, he filed a petition in Missouri state court to enforce it under MMPA § 407.090 ("Petition").  *See generally* Pls.' Ex. 6.  That provision grants the Attorney General the power to "request [a] court order to produce evidentiary material . . . [w]henever any person fails to comply with any civil investigative demand duly served upon him[.]" Mo. Rev. Stat. § 407.090.  The Petition accused Media Matters of "us[ing] fraud to solicit donations from Missourians in order to trick advertisers into removing their advertisements from X, formerly Twitter, one of the last platforms dedicated to free speech in America."  Pls.' Ex. 6 at 2.  The Petition referred to Media Matters as "radical 'progressives,'" and stated that "Missourians will not be manipulated by 'progressive' activists masquerading as news outlets, and they will not be defrauded in the process."  *Id.*  Perhaps to explain why he filed suit before Media Matters even had received the Missouri CID, Defendant Bailey alleged that "Media Matters has expressed its

intent not to comply with CIDs like this one" and cited Plaintiffs' suit against Defendant Paxton as an example. *Id.* ¶¶ 19–20.

Three days later, on March 28, 2024, Defendant Bailey dispatched a process server to personally deliver the Petition to Media Matters at its office in Washington, D.C.  Suppl. Padera Decl. ¶¶ 6, 8.  Media Matters had not yet received the Missouri CID by mail.  *Id.*

On April 15, 2024, the CID's return date, Media Matters served written objections to the demand and requested that Defendant Bailey withdraw the CID and Petition, noting this court's entry of the injunction against Defendant Paxton.  Suppl. Compl., Ex. 8, ECF No. 46-6 [hereinafter Pls.' Ex. 8].  On April 19, 2024, one day after Plaintiffs sought leave to add Defendant Bailey to this action, Defendant served Media Matters with a Request for Production.  Pls.' Mot., Ex. 3, ECF No. 49-4.  The records requested are nearly identical to those sought by the Missouri CID. *See id.* ¶¶ 1–12.

Plaintiffs then moved to enjoin enforcement of the CID in this court.  Pls.' Mot.  That motion became ripe on May 20, 2024.  Pls.' Reply in Supp. of Pls.' Mot., ECF No. 60 [hereinafter Pls.' Reply].  Four days later, on May 24, 2024, Defendant Bailey amended the Petition, which the court will discuss in greater detail below.  Def.'s Reply in Supp. of His Mot. to Dismiss, ECF No. 63 [hereinafter Def.'s Reply], Ex. A, ECF No. 63-1 [hereinafter Def.'s Ex. A].

The court heard argument on the parties' motions on June 6, 2024.

### III.

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks and citations omitted).  A court may grant the "extraordinary remedy . . . [only] upon a clear

App.295

showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

The preliminary injunction factors are well established. A plaintiff must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Id.* at 20 (citations omitted). As part of the first factor, a plaintiff must establish a likelihood of success in establishing personal jurisdiction over the defendant, if challenged. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913–14 (D.C. Cir. 2015).

Courts in this jurisdiction evaluate the four injunction factors on a "sliding scale"—if a "movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (citation omitted). The Supreme Court's decision in *Winter*, however, sparked disagreement over whether the "sliding scale" framework continues to apply, or whether a movant must make a positive showing on all four factors. *See Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that the D.C. Circuit "has not yet decided whether *Winter* . . . is properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").

Here, application of the sliding scale makes no difference because the court finds that Plaintiffs have met their burden even under a more stringent application of the traditional four-factor test.

## IV.

The court first addresses Defendant Bailey's threshold challenges to the justiciability of Plaintiffs' claims: (1) abstention from the exercise of jurisdiction; (2) lack of personal jurisdiction;

and (3) the adequacy of a state-court remedy and ripeness.  The court will then turn to Plaintiffs' likelihood of success on the merits and the remaining preliminary injunction factors.

### A.    *Younger* Abstention

The court begins with abstention.  Defendant Bailey contends that, because of the pending Missouri state-court enforcement action, the court should abstain from exercising jurisdiction under *Younger v. Harris*, 401 U.S. 37 (1971).  Def.'s Opp'n at 10–15.  The court declines to do so.

A court need not abstain under *Younger* "simply because a pending state-court proceeding involves the same subject matter."  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (citation omitted).  The general rule is that "federal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not 'refus[e] to decide a case in deference to the States.'"  *Id.* (alteration in original) (quoting *New Orleans Pub. Serv. Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989) (*NOPSI*)).  Abstention under *Younger* is thus limited to "only exceptional circumstances."  *NOPSI*, 491 U.S. at 368.

The Supreme Court has identified three such "exceptional" circumstances: "'state criminal prosecutions,' 'civil enforcement proceedings,' and 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'"  *Sprint*, 571 U.S. at 73 (quoting *NOPSI*, 491 U.S. at 367–68).  The first category is inapplicable here. Defendant Bailey relies on the second and third.

*Civil Enforcement Actions.*  The Court's decisions applying *Younger* to instances of civil enforcement "have generally concerned state proceedings 'akin to criminal prosecution' in 'important respects.'"  *Id.* at 79 (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)). "Such enforcement actions are characteristically initiated to sanction the federal plaintiff . . . for

some wrongful act." *Id.* (citation omitted).  Specifically, a "state actor is routinely a party to such proceedings and often initiates the action[,]" and "[i]nvestigations are commonly involved, often culminating in the filing of a formal complaint or charges." *Id.* (citations omitted).  Lower courts have considered, as an additional factor gleaned from pre-*Sprint* caselaw, "whether the State could have alternatively sought to enforce a parallel criminal statute." *Smith & Wesson Brands, Inc. v. Att'y Gen. of N.J.*, 27 F.4th 886, 891 (3d Cir. 2022) (quoting *ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 138 (3d Cir. 2014)).

The Third Circuit's application of these factors in *Smith & Wesson* is instructive here.  In that case, the New Jersey Attorney General was investigating Smith & Wesson for possible violations of the New Jersey Consumer Fraud Act, and he issued a subpoena to the company for records. *Id.* at 889.  Instead of producing documents, Smith & Wesson filed a Section 1983 action in federal court, alleging that the subpoena violated, among other things, the First Amendment. *Id.* Thereafter, the Attorney General filed an action in New Jersey state court seeking to enforce the subpoena. *Id.* at 890.  The state trial court ordered the company to produce records and, after unsuccessful appeals to stay the order, Smith & Wesson did so, subject to an agreement that the Attorney General would return the records if the subpoena were determined to be unlawful. *Id.* The trial court dismissed the case, deciding *Younger* required it to abstain from exercising jurisdiction. *Id.* at 888.

The Third Circuit reversed. *Id.* at 895–96.  In so ruling, the court first found that the state proceedings, although initiated by a state actor, were not "akin to [a] criminal prosecution." *Id.* at 892 (quoting *Sprint*, 571 U.S. at 79).  It distinguished the subpoena enforcement action "from those [cases] where more robust preliminary investigation led to the filing of administrative complaints," and "in those cases, the investigation and the charges concerned the same conduct." *Id.* at 891–92

9

(citations omitted).  The court also explained that the subpoena enforcement action "did not punish wrongdoing."  *Id.* at 892.  "[T]he Attorney General did not allege that Smith & Wesson violated any substantive legal duty," only a "procedural rule related to the production of documents."  *Id.* Moreover, the court said that the company "did nothing wrong," because it had "petitioned a federal court to adjudicate its rights and obligations," instead of producing records. *Id.* at 892–93. There also was no criminal analog to the subpoena enforcement action.  *Id.* at 893.  For these reasons, the court concluded, "[a] subpoena enforcement action that requires the production of documents is not retributive in nature or imposed to punish . . . some wrongful act."  *Id.* (internal quotation marks omitted) (citing *TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230, 236–37 (3d Cir. 2022)).

The parallels between this case and *Smith & Wesson* are obvious.  The Missouri state-court action, although filed by a state actor, involved no preliminary investigation and alleged only a violation of a procedural rule governing the production of records, not a substantive legal duty. Nor did the action seek to punish wrongdoing.  In fact, when Defendant filed the Petition, the Missouri CID was still in the mail.  Media Matters had done nothing wrong; there was nothing to punish.  The same is true today, even after the deadline for production has passed.  Just like Smith & Wesson, Plaintiffs have exercised their right to bring suit in federal court to "adjudicate [their] rights and obligations."  *Id.* at 892.

There is more.  In the Missouri action, Defendant Bailey filed an amended Petition asking the court to impose a civil penalty of up to $1,000 for Media Matters' failure to timely produce records.  Def.'s Ex. A.  This demand for a civil penalty does not make the state proceedings "akin to a criminal prosecution in important respects."  *Sprint*, 571 U.S. at 79 (internal quotation marks and citation omitted).  For one, the court is skeptical that the MMPA's civil penalty provision even

10

applies.  That provision applies to a generic violation of the MMPA.  Mo. Rev. Stat. § 407.100(6).

Elsewhere, the MMPA establishes a particularized process and penalty for "any person that fails

to comply with any civil investigative demand."  *Id.* § 407.090.  That process requires the Attorney

General to first move for an order of enforcement, and only if the person disobeys a final order to

compel are they subject to the sanction of contempt.  *Id.*  This CID-specific provision is likely to

control in the Petition enforcement action, not the general $1,000 civil penalty provision.  *See State

ex rel. Taylor v. Russell*, 449 S.W.3d 380, 382 (Mo. 2014) (en banc) ("[W]here one statute deals

with the subject in general terms and the other deals in a specific way, to the extent they conflict,

the specific statute prevails over the general statute." (internal quotation marks and citation

omitted)).  And because the civil contempt penalty is not "self-executing"—that is, "a court will

impose [a penalty] only after the subpoenaed party violates a court order"—the enforcement action

does not itself seek to sanction wrongful conduct.  *Smith & Wesson*, 27 F.4th at 893; Mo. Stat.

§ 407.090 ("Any disobedience of any final order entered under this section by any court shall be

punished as a contempt thereof.").

But even if the civil penalty were available, *Younger* abstention still would not be

appropriate.  The civil proceeding must "bear a close relationship to proceedings criminal in

nature."  *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

The Missouri state-court action was not the culmination of an investigation into alleged

wrongdoing; Defendant was "just at the investigation stage," Hr'g Tr., ECF No. 66, at 54:12-13.

*See Sprint*, 571 U.S. at 78–79.  In that sense, the Missouri enforcement action is more like a civil

contempt proceeding than a criminal prosecution.

*Judicial Orders.*  The third and final "exceptional" category warranting *Younger* abstention

is "civil proceedings involving certain orders that are uniquely in furtherance of the state courts'

ability to perform their judicial functions." *NOPSI*, 491 U.S. at 368.  Such orders include civil

contempt orders and the requirement of posting bond pending appeal.  *Id*. (citing *Juidice v. Vail*,

430 U.S 327 (1977) (abstaining when state court sought to enforce court-sanctioned orders after

federal plaintiffs had failed to comply), and *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987)

(abstaining when state court sought to enforce its procedure for enforcing a jury verdict)).

Those types of orders are not at issue here.  *Smith & Wesson* once more is illustrative.

There, the Third Circuit held that abstention was improper on this third ground, even though the

New Jersey state-court proceedings were near completion.  *See* 27 F.4th at 893–95.  The trial court

had compelled production under pain of penalties, the state appeals courts had refused to stay the

trial court's order, and Smith & Wesson had conditionally produced records to comply with that

order.  *Id*. at 889–890.  Here, in sharp contrast, the Missouri state court "has neither issued orders

enforcing [the CID] nor made contempt findings."  *TitleMax*, 2 F.4th at 237.  In fact, those

proceedings have barely gotten off the ground.  *See* Joint Notice of Assignment of Missouri Judge,

ECF No. 69.

Defendant's position seems to be that anytime a state attorney general seeks to enforce a

demand for records in state court, the third category is implicated.  But that position contravenes

precedent.  It ignores "the virtually unflagging obligation of the federal courts to exercise the

jurisdiction given them," and that "[a]bstention from the exercise of federal jurisdiction is the

exception, not the rule."  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800,

813, 817 (1976).  The mere prospect of a state court's issuance of a coercive order is not enough

to abstain under *Younger*.  *See also Smith & Wesson*, 27 F.4th at 895 (rejecting the reasoning that

the mere threat of contempt in a pending civil proceeding requires abstention because "the contempt power is generally available to enforce court orders").[2]

In sum, "[b]ecause this case presents none of the circumstances the [Supreme] Court has ranked as 'exceptional,' the general rule governs: 'The pendency of an action in a state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" *Sprint*, 571 U.S. at 73 (quoting *Colo. River*, 424 U.S. at 817 (cleaned up)).  Accordingly, the court declines to abstain under *Younger*.[3]

### B.    Personal Jurisdiction

Next, Defendant Bailey asserts that this court lacks personal jurisdiction over him.  He claims that no provision of the D.C. long-arm statute applies, and that the exercise of personal jurisdiction would violate the Due Process Clause.  Def.'s Opp'n at 23–28.[4]  Defendant Paxton made these same arguments, and the court rejected them.  *Media Matters*, 2024 WL 1773197, at *9–13.  The court does so again.  Both the transacting business prong, D.C. Code § 13-423(a)(1), and the tortious conduct prong, § 13-423(a)(3), confer long-arm jurisdiction that is consistent with due process.

*First*, the "transacting business" prong of the long-arm statute, D.C. Code § 13-423(a)(1), which is co-extensive with the Due Process Clause, applies to Defendant Bailey's conduct for the same reasons that it applied to Defendant Paxton's.  *Media Matters*, 2024 WL 1773197, at *9–12.  There is one immaterial factual difference.  Whereas Defendant Paxton hired a process server to hand-deliver the Texas CID in the District and never moved to enforce it, *id.* at 10, Defendant

---

[2] For these reasons, the court respectfully disagrees with the decision to abstain made by the Eastern District of Missouri in *Backpage.com, LLC v. Hawley*, No. 4:17-cv-1951 (PLC), 2017 WL 5726868 (E.D. Mo. Nov. 28, 2017).
[3] In light of this conclusion, the court need not reach Plaintiffs' arguments that abstaining under *Younger* would be inappropriate because (1) this court reached a merits determination as to Defendant Paxton before Defendant Bailey filed the Missouri state-court action and (2) Defendant Bailey filed the Petition in bad faith.  Pls.' Reply at 11–18.
[4] The court finds that Defendant Bailey is a "person" for the purposes of the D.C. long-arm statute for the reasons stated in its earlier decision.  *See Media Matters*, 2024 WL 1773197, at *5–8.

Bailey hired and directed an agent to physically serve the enforcement Petition on Media Matters in the District, even before the CID reached it by mail, Suppl. Padera Decl. ¶¶ 6, 8. Defendant Bailey's contracting with an agent to cause personal service of alleged retaliatory process established the requisite minimum contacts with the District. *See Media Matters*, 2024 WL 1773197, at *10–11.

Like Defendant Paxton, Defendant Bailey argues that because the hiring of a process server is not "some type of commercial or business-related activity directed at District residents," subsection (a)(1) does not apply. Def.'s Opp'n at 24–25 (quoting *Holder v. Haarman & Reimer Corp.*, 779 A.2d 264, 270–71 (D.C. 2001)). Defendant's insistence that "transacting business" requires something resembling profit-driven conduct within the District is not supported by caselaw. The D.C. Court of Appeals has said that "[i]t is now well-settled that the 'transacting any business' provision embraces those contractual activities of a nonresident defendant which cause a consequence here." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (citation omitted). Defendant Bailey does not deny that he engaged in "contractual activities" by hiring a process server. Nor does he dispute that the personal service caused a consequence here. That is enough to constitute "transacting business" in the District.

The cases Defendant cites, *Forras v. Rauf*, 812 F.3d 1102 (D.C. Cir. 2016), and the D.C. Court of Appeals's decision in *Holder*, do not require a different conclusion. Defendant reads these cases as requiring contacts under subsection (a)(1) to be "commercial or business-related activities." Def.'s Reply at 16 (citing *Holder*, 779 A.2d at 270–71). Defendant quotes from *Forras*: "The plain text of subsection (a)(1), however, focuses on where the defendant undertook the *challenged (business) actions*." *Id.* (quoting *Forras*, 812 F.3d at 1106) (emphasis added by Defendant). That quoted portion, however, merely makes the point that the subsection (a)(1)

14

inquiry focuses on where the challenged activity took place; it does not address the scope of what constitutes "transacting business."  812 F.3d at 1106.  And, although *Holder* refers to "commercial or business-related activity," the court did not purport to narrow *Mouzavires* and, in fact, affirmatively cited to it.  779 A.2d at 269–70.  Nor does Defendant explain why the quoted snippets from *Forras* or *Holder* must be understood to exclude the hiring of a process server from the "business-related activity" of a state attorney general.[5]

*Second*, Plaintiffs have also established personal jurisdiction under § 13-423(a)(3) because they allege that tortious conduct—service of the Petition—occurred in the District and caused Plaintiffs harm here.  *See Media Matters*, 2024 WL 1773197, at *13.  "Defendant's service of process, through an agent, was an act in the District of Columbia that injured Plaintiffs' constitutionally protected interests."  *Id.*  Specifically, Plaintiffs have averred that Defendant Bailey's service of the Petition had chilling effects in the District.  Suppl. Padera Decl. ¶¶ 8, 11–17.  Exercising jurisdiction over Defendant Bailey for such conduct does not offend due process. *See Media Matters*, 2024 WL 1773197, at *13 (citing *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 48 (D.C. Cir. 2020)).

Defendant claims he engaged in no tortious conduct in the District.  Def.'s Opp'n at 25. He points out that he *mailed* the Missouri CID, and D.C. courts consistently have held that a mailing into the District is not enough to satisfy subsection (a)(3).  *Id.* at 27.  That is true.  But Plaintiffs rely not on the mailing of the CID, but on Defendant's personal service of the Petition at Media Matters' office in the District.  Pls.' Mem. at 22; Suppl. Padera Decl. ¶ 8.  Defendant says

---

[5] In his reply brief, Defendant Bailey argues that Plaintiffs have not alleged the elements of an "abuse of process" claim.  Def.'s Reply at 17.  In their briefing, Plaintiffs cited cases addressing that tort for the proposition that hiring a process server creates sufficient contacts to satisfy the Due Process Clause.  Pls.' Mem. at 19–20.  But just because Plaintiffs analogized their First Amendment retaliation claim to an abuse of process tort for jurisdictional purposes does not mean that they were required to plausibly plead that tort claim on the merits.

15

that the service was "merely the statutorily-authorized process provided for seeking enforcement because of Media Matters' refusal to respond to a request for information."  Def.'s Opp'n at 25.  But that is inaccurate.  Media Matters had not yet "refused" to respond when Defendant served the Petition.  Because the CID had not yet arrived by mail, Defendant's in-forum activity occurred before Media Matters even had the opportunity to refuse.  Also, Defendant cites no case supporting the proposition that following an outside forum's procedure for personal service cannot constitute in-forum tortious conduct where, as here, such process was used to retaliate against a D.C. resident for their protected First Amendment activities.

*Finally*, Defendant Bailey warns of the repercussions of exercising jurisdiction in this case.  "[N]o State," he contends, "could investigate a company that engages in business in that State— but is headquartered in another—without exposing itself to a retaliatory suit like the one Media Matters brought here."  Def.'s Reply at 18.  That is an exaggeration.  Just because a business is headquartered elsewhere does not necessarily mean that proper service cannot be executed within the state if, for instance, the business has an agent or presence there.  Additionally, Defendant makes no effort to demonstrate how many states require personal service to initiate the kind of civil enforcement action at issue here.  It may be that other state laws permit service of such a suit by mail on an out-of-state person, an act that would not satisfy either subsection (a)(1) or (a)(3).  Finally, not every effort by an attorney general to enforce a demand for documents against an out-of-state entity will give rise to a federal claim under Section 1983.  This is the unusual case where the target actually has marshalled the evidence to bring and prove such a claim.

### C.   Alternative Remedy at Law & Ripeness

Defendant Bailey makes two additional threshold arguments.  First, he contends that Plaintiffs cannot seek injunctive relief in federal court because they have an adequate remedy at

16

law—namely, litigating their objections in Missouri state court.  Def.'s Opp'n at 29–31.  Second, he contends that they "cannot establish ripeness."  *Id.* at 31.  Neither argument succeeds.

With respect to the assertion that Plaintiffs can seek redress in the Missouri state-court action, Defendant overlooks settled law.  The Supreme Court has held that "[w]hen federal claims are premised on 42 U.S.C. § 1983 . . . we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights."  *Steffel v. Thompson*, 415 U.S. 452, 472–73 (1974); *see Haywood v. Drown*, 556 U.S. 729, 766 (2009) (Thomas, J., dissenting) (noting that "§ 1983 plaintiffs do not have to exhaust state-court remedies before proceeding in federal court"); *Bd. of Regents of Univ. of State of N.Y. v. Tomanio*, 446 U.S. 478, 491 (1980) ("This Court has not interpreted § 1983 to require a litigant to pursue state judicial remedies prior to commencing an action under this section."); *Dist. Props. Assocs. v. District of Columbia*, 743 F.2d 21, 27 (D.C. Cir. 1984) (observing that "there is no requirement that plaintiffs in Section 1983 cases exhaust state remedies before bringing their suits in federal court").  Thus, Plaintiffs are not required to show that the Missouri state proceedings would provide an inadequate remedy at law.  And even if adequate, Plaintiffs are not required to litigate their constitutional challenge in Missouri state court.

*Reisman v. Caplin*, 375 U.S. 440 (1964), does not compel a different result.  *Reisman* did not involve a Section 1983 claim and, as the court previously explained, unlike in *Reisman* where the plaintiffs had not suffered any injury, this case "involves the First Amendment, under which a chilling effect on speech can itself be the harm."  *Media Matters*, 2024 WL 1773197, at *15 (quoting *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1178 (9th Cir. 2022)).  Defendant suggests the court was wrong in distinguishing *Reisman* on this ground because, by seeking only injunctive

relief, Plaintiffs are not trying to rectify a past injury, but instead prevent future harm, which Plaintiffs can do in state court.  Def.'s Opp'n at 30–31.  But the same was true in *Twitter*, *see* 56 F.4th at 1172, 1177 (noting that Twitter sought only injunctive and declaratory relief in federal court, and it "could have challenged the CID in Texas state court"), and the Ninth Circuit there did not hold that *Reisman* compelled Twitter to raise its objections first in state court, *see id.* at 1178–79.  Moreover, regardless of what avenues for relief were available to Twitter, as discussed, Defendant seeks to impose a state-court exhaustion requirement where there is none.

Defendant's ripeness argument fares no better.  He contends that *Twitter* stands for the proposition "that where a recipient of a CID 'can raise its First Amendment defense' in state court, then a federal challenge is not ripe."  Def.'s Opp'n at 31 (quoting *Twitter*, 56 F.4th at 1177).  But *Twitter* says no such thing.  The court there held that "Twitter's allegations are not enough to establish constitutional standing and ripeness because Twitter fails to allege any chilling effect on its speech or any other legally cognizable injury."  *Twitter*, 56 F.4th at 1175.  Nowhere did the court say that the availability of a legal remedy in state court made Twitter's claims not ripe.  Here, Plaintiffs' retaliation claim is plainly ripe as they have come forward with evidence of harm: Defendant's actions chilled their protected expression.  Pls.' Mot., Ex. 1, Second Suppl. Decl. of Eric Hananoki in Supp. of Pls.' Mot., ECF No. 49-2, ¶¶ 10–14 [hereinafter Third Hananoki Decl.]; Pls.' Mot., Ex. 4, Suppl. Decl. of Benjamin Dimiero in Supp. of Pls.' Mot., ECF No. 49-5, ¶¶ 5–6 [hereinafter Second Dimiero Decl.]; *see Twitter*, 56 F.4th at 1174 ("In the First Amendment context, 'the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression.'" (quoting *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021)).

### D.    Likelihood of Success on the First Amendment Retaliation Claim

The court now arrives at the merits.  To prevail on their First Amendment retaliation claim, a plaintiff must show "(1) [they] engaged in conduct protected under the First Amendment; (2) the defendant took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against [them]."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016) (citation omitted).  Unlike Defendant Paxton, who offered little push back on the merits, Defendant Bailey contests the latter two elements and raises a belated challenge as to the first.  The court considers each element in turn.

### 1.    Protected Speech

"The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by [the Supreme Court's] decisions."  *N.Y. Times v. Sullivan*, 376 U.S. 254, 269 (1971).  "Speech on matters of public concern is at the heart of the First Amendment's protection."  *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011) (cleaned up).

In his opposition brief and motion, Defendant did not challenge that Media Matters' reporting is heartland First Amendment protected expression.  Def.'s Opp'n at 32–34; Def.'s Mot. at 1.  In fact, at oral argument, he acknowledged that Media Matters is a "media company" and that "core First Amendment protections would apply to [it]."  Hr'g Tr. at 56:12-18, 56:23–57:1.

But in his reply brief, for the first time, Defendant raises the possibility that Media Matters' reporting is not protected expression.  In a section addressing the causation element, he argues, "if in fact Media Matters defamed X by knowingly posting false information, then its activity was not protected by the First Amendment, and so no 'retaliation' is even possible."  Def.'s Reply at 22

App.308

(citation omitted).  This argument comes too late, so the court treats it as forfeited.  *Rollins Env't Servs. Inc. v. EPA*, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991).

Even if preserved, on the present record, Plaintiffs have likely shown that their reporting was not defamatory and therefore was protected speech under *New York Times v. Sullivan*.  Hr'g Tr. at 75:22-23 ("We absolutely stand by the defense that everything in Media Matters['] reporting was accurate.").  Hananoki has averred in these proceedings that his "November 16 article contains screenshots of X feeds, which include at least nine organic posts from X users and six advertisements from major corporate entities."  Pls.' Mot. for TRO & Prelim. Inj., ECF No. 4, Decl. of Eric Hananoki in Supp. of Pls.' Mot., ECF No. 4-3, ¶ 15 [hereinafter Hananoki Decl.].  In its public response to Hananoki's article, X did not deny that advertising in fact had appeared next to the extremist posts on the day in question.  X stated that it had served "**less than 50 total ad impressions**" next to the "organic content featured in the *Media Matters* article" (a mere fraction of the 5.5 billion ad impressions served that day), and it conceded that Hananoki and one other person had seen advertisements of two of the brands identified in the article next to the extremist content.  *See* Compl., ECF No. 1, ¶ 44 [hereinafter Compl.]; Elon Musk (@elonmusk), X.COM (Nov. 18, 2023, 2:01 AM), https://perma.cc/X4HN-PLJ4.  X called these "contrived experiences," but did not deny the basic premise of the article: that X's platform was delivering ads of major brands next to extremist content.  Many other media outlets, as recently as April 2024, have published similar findings.  Compl. ¶ 34; Third Hananoki Decl. ¶¶ 13–14.  These other stories corroborate Hananoki's reporting and Plaintiffs' belief in its accuracy.

The only contrary evidence that Defendant offers are (1) the purportedly "credible" allegations made by X in the suit it filed against Media Matters, and (2) a statement from the online brand safety organization, DoubleVerify, published on April 15, 2024, weeks *after* Defendant

Bailey issued the Missouri CID and filed the Petition.  Def.'s Opp'n, Decl. of Assistant Att'y Gen. Steven Reed, ECF No. 56-1, ¶ 10 [hereinafter Reed Decl.].  According to DoubleVerify, X's Brand Safety Rate—"a measure of how frequently ads appeared adjacent to content that met advertiser-approved criteria"—was 99.9% from October 24, 2023, to March 14, 2024.  *See* Def.'s Opp'n, Ex. 2, Todd Spangler, *DoubleVerify Apologizes for Misreporting X/Twitter's Brand-Safety Rates for More Than Four Months*, VARIETY (Apr. 15, 2024), https://perma.cc/YQ5L-9DKV.  But this limited evidence—lawsuit allegations not independently confirmed and an article that is not specific to Media Matters' reporting—does not provide reason to suspect that Hananoki's story on X was false or that Plaintiffs acted with actual malice.  Defendant's evidence thus does not undermine the likelihood of Plaintiffs proving their reporting was protected by the First Amendment.

### 2.    *Chilled Expression*

Next, the court holds that Plaintiffs have demonstrated a likelihood of success on element two—that Defendant engaged in "retaliatory action[s] sufficient to deter a person of ordinary firmness in [Plaintiffs'] position from speaking again[.]"  *Aref*, 833 F.3d at 258.

The court already has held that Defendant Paxton's announcement of an investigation and issuance of a CID demanding records relating to Media Matters' organization, funding, and journalism would sufficiently deter a news organization or journalist "of ordinary firmness" from speaking again about X-related matters.  *Media Matters*, 2024 WL 1773197, at *18 (explaining why Defendant Paxton's actions satisfied the second element and describing chilling effects of the Texas CID).  Defendant Bailey has gone one step further.  He has filed suit not only to enforce the Missouri CID, but he has asked a state court to sanction Media Matters with a civil penalty.  Such action chills speech.  *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) (observing that

"even minor punishments can chill protected speech"); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (recognizing that "that a threat of criminal or civil sanctions after publication 'chills' speech").

Further, Plaintiffs' "actual response" demonstrates the chilling effects of Defendant Bailey's conduct.  *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 500 (4th Cir. 2005).  Plaintiff Hananoki avers that the CID and Petition, as well as Defendant Bailey's public attacks, "have had an extremely negative effect on my work and on me personally." Third Hananoki Decl. ¶ 10.  He continues to limit his communications with other journalists and his editor, and self-censors research and writing on X.  *Id.* ¶ 12.  Hananoki's editor, Benjamin Dimiero, confirms that Hananoki and other Media Matters' journalists have self-censored out of fear that "certain topics will lead to backlash, and perhaps even imperil the organization's future operations."  Second Dimiero Decl. ¶ 7.  He also attests that Defendant's actions have adversely impacted Media Matters' editorial process, resulting in slowed output and hampering efforts to issue timely reporting.  *Id.*  "[E]xtreme[] caution[]" remains pervasive within the organization.  *Id.* ¶ 6; *see also* Suppl. Padera Decl. ¶¶ 12 (describing "chilling [of] employees' willingness to speak, research, or report on topics related to the subjects of the investigations and the Petition"), 13–14 (describing impaired collaboration with other groups).

Defendant does not dispute that Plaintiffs' actions would objectively "deter a [journalist or media organization] of ordinary firmness in plaintiff's position from speaking again."  *See Media Matters*, 2024 WL 1773197, at *18 (cleaned up).  Instead, he questions whether Media Matters' expression has in fact been chilled.  Def.'s Opp'n at 33–34.  He cites one story by Media Matters published post-March 25, 2024, that is critical of him and at least 20 articles about Elon Musk that ran after the November 16 Article.  *Id.*  But as did Defendant Paxton, Defendant Bailey "asks too

22

App.311

much of Plaintiffs.  They need not show that the government action led them to stop speaking altogether, only that it would be likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Media Matters*, 2024 WL 1773197, at *19 (quoting *Edgar*, 2 F.4th at 310) (internal quotation marks omitted).  Thus, the fact that Media Matters has continued to publish some related stories—although none specifically identified about extremist content or advertising on X—does not mean Plaintiffs' expression has not been sufficiently chilled.

At oral argument, Defendant also suggested that Media Matters' proof of direct harm from his actions, as distinct from Elon Musk's or Defendant Paxton's, is lacking.  Hr'g Tr. at 69:11-19.  But Defendant enjoys no safe harbor from the fact that X first filed suit against Media Matters or that Defendant Paxton was first to issue a CID.  Concurrent causes can be the source of tortious injury.  *See* RESTATEMENT (SECOND) OF TORTS § 879 (AM. L. INST. 1979) (establishing liability for concurring or consecutive independent acts).   Further, Defendant Bailey has admitted to coordinating with Defendant Paxton from the outset, Third Hananoki Decl. ¶ 5; pg. 29 *infra*, so he cannot distance himself from the harm caused by Defendant Paxton's earlier actions, RESTATEMENT (SECOND) OF TORTS § 876 cmt. a. ("Whenever two or more persons commit tortious acts in concert, each becomes subject to liability for the acts of the others, as well as for his own acts.").

### 3.   Causation

Defendant Bailey devotes most of his attention to the third element: the causal link between Media Matters' protected speech and his issuance of the CID and filing of the Petition.  He argues that the retaliatory criminal arrest standard established in *Nieves v. Bartlett*, 587 U.S. 391 (2019), applies to Plaintiffs' First Amendment claim.  Def.'s Opp'n at 32–33.  According to Defendant, because Media Matters has not established that his office lacked probable cause to initiate the

investigation, Plaintiffs cannot prove causation as a matter of law.  *Id.*  The court will first address why that standard has no applicability in this context and then turn to Plaintiffs' proof of a but-for causal link between Media Matters' reporting and Defendant Bailey's actions.

a.      The *Nieves* Causation Standard

In *Nieves*, the Supreme Court held that, as a general rule, in cases alleging retaliatory arrest based on expression, the plaintiff must establish not only retaliatory motive and injury, but also "plead and prove the absence of probable cause for the arrest."  587 U.S. at 402.  The Court reasoned that a more stringent standard is required because, in such cases, "[t]he causal inquiry is complex because protected speech is often a 'wholly legitimate consideration' for officers when deciding whether to make an arrest."  *Id.* at 401 (citation omitted).  It also explained that, in those cases, "it is particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal conduct."  *Id.* at 402.  The absence or presence of probable cause, the Court continued, is a useful proxy because such evidence "will be available in virtually every retaliatory arrest case."  *Id.* at 401 (quoting *Reichle v. Howards*, 566 U.S. 658, 668 (2012)).  Finally, the court analogized to retaliatory prosecution cases, where the same no-probable-cause rule applies.  *Id.* at 399–402 (citing *Hartman v. Moore*, 547 U.S. 250 (2006)).  In those cases, the presumption of prosecutorial regularity and the usual involvement of multiple government actors justified the higher standard.  *See id.* at 402.

The court is not convinced that *Nieves* applies here.  Defendant cites no case in which a court has applied *Nieves* in the civil context.  To the contrary, courts have declined to extend *Nieves* beyond the retaliatory arrest setting.  *See, e.g.*, *Welch v. Dempsey*, 51 F.4th 809, 812–13 (8th Cir. 2022) (declining to extend the no-probable-cause requirement outside of the context of Fourth Amendment seizure); *Sabatini v. Cal. Bd. of Registered Nursing*, No. 18-cv-2036 (AJB) (AGS),

24

2019 WL 6782946, at *7 (S.D. Cal. Dec. 12, 2019), *aff'd*, 849 F. App'x 634 (9th Cir. 2021) ("[G]iven the narrow scope of the *Nieves* case, the Court chooses not to disturb the well-settled Ninth Circuit authority applying the 'but-for' test to determine causation for ADA retaliation claims."); *Bello-Reyes v. Gaynor*, 985 F.3d 696, 698, 700–01 (9th Cir. 2021) (determining that *Nieves* does not control in the context of ICE bond revocation).  Justice Alito, concurring in the recent *Gonzalez v. Trevino* decision, explained that courts "ordinarily analyze First Amendment retaliation claims under" *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), and then proceeded to distinguish "retaliatory-arrest and retaliatory-prosecution claims."  144 S. Ct. 1663, 1670 (2024) (Alito, J., concurring).

That distinction makes sense, as the rationales for the no-probable-cause rule are ill-fitting in the civil investigative setting.  In the arrest context, "[o]fficers frequently must make 'split-second'" probable cause judgments and thus rely on protected speech to obtain "vital information" about a suspect, such as whether they are willing to cooperate or rather present a threat.  *Nieves*, 587 U.S. at 401.  But protected speech, and particularly reporting on a matter of public concern, is not "often a 'wholly legitimate consideration,'" *id.*, for attorneys general making civil enforcement decisions.

Moreover, the problem of proving causation is not as prevalent here.  As one court has opined, where "the sole basis for probable cause [to arrest] [is] speech," "there is good reason to believe that" the *Nieves* standard does not apply.  *Novak v. City of Parma*, 932 F.3d 421, 431 (6th Cir. 2019).  In such cases, "the causal connection is not so tenuous." *Id.*  That rationale applies here, too, where a media organization's protected journalism is what motivated a law enforcement inquiry.

Additionally, the difficulty in proof that arises when "the official with the malicious motive does not carry out the retaliatory action himself" is less of a concern. *Nieves*, 587 U.S. at 400. Here, for instance, the official who authorized the records demand and is alleged to have the malicious motive is one and the same. And, although the presumption of prosecutorial regularity arguably favors a strict *Nieves*-like standard, the case for adopting one is undercut by the fact that the issuance of a CID cannot be measured against a recognized evidentiary standard like probable cause. This case makes that point. Defendant Bailey issued the Missouri CID pursuant to MMPA § 407.040, which authorizes the issuance of a CID "[w]hen it appears to the attorney general that a person has engaged in or is engaging in" a violation of the consumer protection law or "when [the attorney general] believes it to be in the public interest that an investigation should be made to ascertain whether a person in fact has engaged in or is engaging in" a violation. One person's "appearance" or "belief" of a possible violation as a predicate to issue a CID is a far cry from a "probable cause" inquiry that "speaks to the objective reasonableness of an arrest." *Nieves*, 587 U.S. at 402.

*Nieves* also does not require strict proof of no probable cause in every retaliatory arrest case. The Court carved out an exception "for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves*, 587 U.S. at 406. Retaliatory arrest plaintiffs can "present[] objective evidence that [they were] arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been," *id.* at 407, or "that no one has ever been arrested for engaging in a certain kind of conduct— especially when the criminal prohibition is longstanding and the conduct at issue is not novel[.]" *Gonzalez*, 144 S. Ct. at 1667.

App.315

The *Nieves* exception likely would apply in this instance.  Plaintiffs have shown that many other news outlets published similar stories about advertising appearing next to antisemitic and extremist posts on X, yet none received a CID from Defendant Bailey.  Compl. ¶ 34 (e.g., *Washington Post*, *Business Insider*, *Kansas City Star*) (links to articles verified by court); Third Hananoki Decl. ¶ 13 (NBC News).  But only one drew the condemnation of former Trump aide, Stephen Miller.  *See* Compl. ¶ 46.  It is no coincidence that both Defendants Paxton and Bailey announced investigations of Media Matters shortly after Miller implicitly called on "conservative state Attorneys General[s]" to do so.  *See* Compl. ¶¶ 46–47.

What's more, Defendant Bailey has conceded that it is rare, if not unprecedented, for a Missouri Attorney General to investigate a media organization for the content of its journalism.  *See* Hr'g Tr. at 52:24–53:22.  At oral argument, Defendant Bailey was able to identify CIDs issued to Backpage.com and Google.  *Id.* at 53:6-8.  Neither are news organizations.  *Cf. Ballentine v. Tucker*, 28 F.4th 54, 62 (9th Cir. 2022) ("There is no evidence that anyone besides the Plaintiffs has been arrested for chalking on the sidewalk.").  The facts on the present record place this case within the *Nieves* exception.

b.   <u>But-For Cause</u>

For their part, Plaintiffs contend that *Mt. Healthy* provides the proper causation standard here.  Hr'g Tr. at 20:10-16.  That case demands but-for proof to sustain a retaliation claim.  *See Lozman v. Riviera Beach*, 585 U.S. 87, 96 (2018); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[W]e have held that retaliation is subject to recovery as the but-for cause of official action offending the Constitution.").

In the typical retaliation case, there is both protected speech and unprotected conduct (e.g., poor job performance).  Those cases raise a "thorny causation issue" that requires the "factfinder

to "disentangle" whether the defendant acted because of what the plaintiff said or what they did. *See Novak*, 932 F.3d at 431.  Here, speech is the sole basis for the retaliatory action.  So, the court must determine whether there is a causal link between Plaintiffs' reporting on X and the adverse actions taken by Defendant Bailey.  *See Nieves*, 587 U.S. at 398–99.  For three reasons, the court concludes that Plaintiffs are likely to succeed in proving this element.

*First*, Defendant's public statements are direct evidence of retaliatory intent. Two days after Media Matters published the November 16 Article, Musk posted a tweet threatening "a thermonuclear lawsuit against Media Matters" for its "fraudulent attack on our company," accusing Media Matters of manipulating X's algorithm to artificially force placement of the ads next to extremist content. *See* Compl. ¶¶ 44–45; Elon Musk (@elonmusk), X.COM (Nov. 18, 2023, 2:01 AM), https://perma.cc/X4HN-PLJ4.  In response, Stephen Miller tweeted, "Fraud is both a civil and criminal violation.  There are 2 dozen+ *conservative* state Attorneys General."  *See id.* ¶ 46; Stephen Miller (@StephenM), X.COM (Nov. 19, 2023, 11:48 AM, https://perma.cc/9E6L-FJGY (emphasis added).  Only hours later, Defendant Bailey took up Miller's call, responding "[m]y team is looking into this matter," even when there was no apparent connection to Missouri. *See id.* ¶ 47; Andrew Bailey (@AGAndrewBailey), X.COM (Nov. 19, 2023, 4:46 PM), https://perma.cc/J463-656K.  Defendant's investigation thus began with a political bent.

From that point forward, Defendant consistently characterized Media Matters in ideological terms.  When publicly announcing his issuance of the document preservation notice, Defendant referred to Plaintiffs as "radicals" and called them "progressive tyrants masquerading as [a] news outlet[]."  Pls.' Ex. 4 at 4.  He also claimed Media Matters had acted to "wipe out free speech."  *Id.*  Months later, when simultaneously issuing the CID and filing the Petition, in a press release he called Media Matters a "political activist organization" and "'progressive' activists

masquerading as [a] news outlet[]," which had "pursued an activist agenda in its attempt to destroy X." Suppl. Compl., Ex. 7, ECF No. 46-5, at 3. These statements are at odds with Defendant's concession in these proceedings that Media Matters is a "media company" that is "absolutely" entitled to "core" First Amendment protections. Hr'g Tr. at 56:13-15, 56:23–57:1.

Then, on June 3, 2024, Defendant Bailey said out loud the true purpose of his investigation. During an online interview with Donald Trump Jr., Defendant Bailey was asked "what's the end game" of his investigation of Media Matters. Defendant Bailey responded: "It's a new front in the war against the First Amendment . . . We've seen a direct assault by the deep state and President Biden's Administration." He accused Media Matters of "rigging the system to take down X." He continued:

> They don't want us to have a medium of communication and they will bend and break the rules through any means necessary . . . My office was one of the first in the nation joined by my colleague Ken Paxton in Texas to file an investigation, launch an investigation, into Media Matters . . . We're not going to let them destroy free speech in America[.]

Revealingly, Defendant Bailey expressly tied the investigation to the upcoming election: "This is absolutely a new front in the fight for the war for free speech. This investigation is really critical and again especially *as we move into an election cycle in 2024*."[6]  (Emphasis added.)  Finally, on June 5, 2024, Defendant Bailey once again reiterated on a podcast that Media Matters is a "radical progressive advocacy group masquerading as a 501(c)(3) . . . when in reality what they really want to do is want to silence conservative voices."[7]

---

[6] Triggered, *The Left Wants to Scare US into Submission - Don't Let Them Win, Live with Kash Patel, Jack Posobiec & Missouri AG Andrew Bailey*, at 1:29:50–1:34:00 (June 5, 2024), https://rumble.com/v4zcxit-the-left-wants-to-scare-us-into-submission-dont-let-them-win-live.html.
[7] Human Events Daily with Jack Posobiec, *Did Joe Biden Break Election Law, FBI Knew Laptop Was Real All Along*, at 33:01–35:16 (June 5, 2024), https://www.iheart.com/podcast/269-human-events-daily-with-ja-86752325/episode/did-joe-biden-break-election-law-183021850/.

Although tough talk is not foreign to the law enforcement arena, such overt political messaging is atypical.  A reasonable factfinder is likely to interpret Defendants' words as targeting Media Matters not for legitimate law enforcement purposes but instead for its protected First Amendment activities.

*Second*, there is evidence from which a neutral factfinder likely would find that Defendant Bailey's proffered nonretaliatory explanation for the investigation of Media Matters is pretext. *Boquist v. Courtney*, 32 F.4th 764, 777 (9th Cir. 2022) ("In assessing whether this causal element is met, courts have also given weight to circumstantial evidence such as a proximity in time between the protected speech and the adverse action, the defendant's expression of opposition to the protected speech, and evidence that the defendant proffered false or pretextual explanations for the adverse action").  In his public announcement, Defendant stated that his investigation of Media Matters related to "its allegedly fraudulent solicitation of donations from Missourians amidst its efforts to target X[.]"  Pls.' Ex. 4 at 4.  In the Petition, he said that his investigation centered on Media Matters' "use of fraud to solicit donations from Missourians in order to trick advertisers into removing their advertising from X . . . one of the last platforms dedicated to free speech in America," in violation of Section 407.020 of the MMPA.  Pls.' Ex. 6 at 2.  The evidence that these explanations are a pretext for retaliation is strong.

According to a declaration submitted by Missouri Assistant Attorney General Steven Reed, in November 2023, the Attorney General "discovered that Media Matters was credibly accused of defaming the social media platform X . . . by falsely representing that X routinely populates advertisements for brands like Apple, IBM, and Xfinity next to extremist, fringe content."  Reed Decl. ¶ 8.  Those "credible allegations," according to Reed, were based on a lawsuit filed by X against Media Matters in the Northern District of Texas, challenging the truthfulness of its

reporting.  *Id.* ¶ 9.  Reed does not say that his office independently sought to substantiate these allegations.  Rather, he points to an article published by an online brand safety organization, DoubleVerify, on April 15, 2024, weeks *after* Defendant Bailey issued the Missouri CID and filed the Petition.  *Id.* ¶ 10.  According to that article, X's Brand Safety Rate—"a measure of how frequently ads appeared adjacent to content that met advertiser-approved criteria"—was 99.9% from October 24, 2023, to March 14, 2024.  Spangler, *supra*.  This evidence, according to Reed, was indicative of "potential violations of the Missouri Merchandising Practices Act."  Reed Decl. ¶ 11.

But that logic is difficult to follow.  Even accepting this as evidence that Media Matters' reporting about X was misleading if not defamatory, Reed nowhere explains how the publication constitutes "fraud to solicit donations from Missourians."  Pls.' Ex. 6 at 2.  He never identifies what suspected fraudulent statements or omissions Media Matters made to Missourians for the purpose of soliciting donations.  If he means to say that Media Matters' defamatory *reporting* itself is the fraud, he nowhere links that content to Media Matters' fundraising efforts.  He does not claim, for example, that Media Matters used its reporting on X to solicit donations.  In fact, the webpage on which the November 16 Article appeared made no express fundraising appeal. Nor did it include a donation link.[8]  Defamation is not fraud.  It is thus likely that the false reporting-as-fraudulent fundraising justification for the investigation is pretext for retaliation.

Defendant submitted a second declaration from Reed with his reply brief that sought to bolster the bona fides of his investigation.  Def.'s Reply, Second Decl. of Steven Reed,

---

[8] *See* Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, MEDIA MATTERS (November 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle (last visited August 21, 2024).  Media Matters' website does contain a link through which readers can donate, but that link appears on a dropdown menu.  It is not specific to any publication, let alone the one at issue.

ECF No. 63-2 [hereinafter Second Reed Decl.].  In that declaration, Reed averred for the first time that the Attorney General's Office "has come into possession of internal Media Matters documents that are expressly marked not for circulation and which reveal plans by the organization to use solicited funds for activities contrary to those publicly disclosed to its Missouri donors."  *Id.* ¶ 5. The court has reviewed the documents.  *See* Minute Order, June 7, 2024.  It is perplexed by Reed's representations.

The records are internal strategic action plans that identify Media Matters as one of multiple organizations aligned to resist President Trump.  Media Matters, the strategy materials say, plans to "disarm[] right-wing misinformation," "lead[] the fight against the next generation of conservative misinformation," coordinate opposition research, push news stories and research, and fight for ethical standards in government.  Pls.' Resp. to the Court's June 7 Minute Orders, ECF No. 65 [hereinafter Pls.' Resp.], Ex. A, ECF No. 65-1 [hereinafter Pls.' Ex. A], at 1, 7–8.  The documents appear to be published around *2016*, seven years before Hananoki's reporting on X, a fact Defendant Bailey appeared to confirm on a podcast.[9]  One of the documents has been publicly available on the internet since 2017.  Pls.' Resp. at 1.

According to Reed, the materials are at odds with Media Matters' public representations about its operations.  He says that Media Matters uses funds "not just to issue reports about perceived misinformation, but to actively interfere with and neutralize the operational infrastructure of certain 'target' companies."  Second Reed Decl. ¶ 8.  Reed continues, "these documents reveal that Media Matters has entered into partnerships with Facebook and Google— competitors of X—and has developed strategic plans to interfere with the infrastructure systems used by 'target' companies to display advertisements."  *Id.* ¶ 9.  Reed apparently is referring to

---

[9] Posobiec, *supra* note 7.

that portion of the strategy document that states, "[k]ey right-wing targets will see their influence diminish as a result of our work," and Media Matters will work with "[i]nternet and social media platforms, like Google and Facebook," "to stem the flow of damaging fake news on its platform's pages.  Google will cut off these pages' accompanying sites' access to revenue by pulling their access to Google's ad platform."  Pls.' Ex. A at 12–13.  "These materials," Reed states, "are in tension with the organization's public comments and solicitations to Missourians and suggest that Media Matters is likely using solicited donations for activities in conflict with the explicit purposes disclosed to donors."  Second Reed Decl. ¶ 10.

The court does not understand how a publicly available document written in 2016, years before Elon Musk acquired X, is proof that Media Matters "used fraud to solicit donations from Missourians in order to trick advertisers into removing their advertisements from X" in 2023.  Pls.' Ex. 6 at 2.  The "targets" referenced in 2016 document were small "alt-right" online publications that Media Matters believed pushed "fake news," not large social media platforms like then-Twitter, now X, that host content created by others.  And, the way Media Matters would accomplish its objective, according to the 2016 document, was by working *with* large social media companies like Google and Facebook, not against one like X, then-Twitter.  *See* Pls.' Ex. A at 12–13.

What's more, Defendant's declaration is incomplete.  Reed accurately quotes from a portion of Media Matters' website to claim that it misrepresented its mission to donors.  Second Reed Decl. ¶ 6.  The website does say that Media Matters "posts rapid-response items as well as longer research and analytic reports documenting conservative misinformation throughout the media" and "works daily to notify activists, journalists, pundits, and the general public about instances of misinformation."  *About Us*, MEDIA MATTERS, https://www.mediamatters.org/about-

33

us (last visited August 21, 2024) (emphasis added).   But Reed omits a key statement: that Media Matters' work includes "providing [activists, journalists, pundits, and the general public] with the resources to rebut false claims and *to take direct action against offending media institutions*."   *Id.* Defendant's selective quotation of Media Matters' website undermines the credibility of his representations.   Alongside his overselling of a years-old, publicly available document, it is proof of pretext.

*Third*, a reasonable factfinder is likely to view Defendant Bailey's unorthodox approach to enforcing the CID as further proof of retaliatory intent.   *See Vill. of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) ("The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes."). Defendant Bailey mailed the Missouri CID on the same day that he filed an enforcement action in Missouri state court.   Suppl. Compl. ¶ 24.   According to the Petition, the reason Defendant filed it *before* Media Matters even received the CID was that Media Matters "has failed or *will fail* to comply with" it.   Pls.' Ex. 6 ¶ 25 (emphasis added).   Defendant's assertion that Media Matters "will fail" to comply was based on its earlier lawful filing of this suit against Defendant Paxton. *Id.* ¶¶ 19–20.   But MMPA § 407.090, which Defendant cites as the source of his authority to enforce the CID, does not authorize filing suit in anticipation of noncompliance.   It provides that the Attorney General may request a court order "[w]henever a person fails to comply with any civil investigative demand[.]"   Mo. Rev. Stat. § 407.090.   Media Matters, of course, had not yet "fail[ed]" to comply with the Missouri CID as of March 25, 2024, because the CID was still en

34

route.  *See* Suppl. Compl. ¶ 23.  Defendant's filing of a preemptive suit not authorized by Missouri law is evidence of retaliatory intent.[10]

Defendant's strategic amendment of the Petition supplies even more proof of pretext.  The added request for a civil penalty was an effort to buttress the case for abstention and to avoid the force of *Smith & Wesson*.  That motive is clear from a timeline of the federal and Missouri proceedings.  Recall, the return date for the Missouri CID was April 15, 2024.  Plaintiffs responded with a letter on that date objecting fully to the records demands.  Pls.' Ex. 8.  Three days later, Plaintiffs moved to supplement the complaint in this case to add claims against Defendant Bailey.  Pls.' Rule 15(d) Mot. to Suppl. the Compl., ECF No. 39.  The court granted that motion on April 24, 2024.  Order, ECF No. 4.  The next day, Plaintiffs moved to enjoin the Missouri CID.  Pls.' Mot.  On May 8, 2024, Defendant Bailey both opposed the motion for preliminary injunction and filed a motion to dismiss.  Def.'s Opp'n; Def.'s Mot.  Both filings invoked *Younger* abstention.  On May 20, 2024, Plaintiffs filed their combined reply and opposition brief, citing *Smith & Wesson* for the first time.

Then, Defendant Bailey sought to tilt the playing field in his favor.  On May 24, 2024, *before* filing his reply in support of his motion to dismiss, Defendant returned to Missouri state court to amend his Petition.  He added a second count, "Request for Civil Penalty," which sought a $1,000 civil penalty for Media Matters' failure to produce records by the April 15 deadline, which had passed *40 days* earlier.  Def.'s Ex. A at 11.  Based on his reformulated Petition, Defendant argued to this court: Media Matters' assertion that the Petition does not seek to punish

---

[10] At oral argument, Defendant asserted that he moved preemptively in state court under the authority of § 407.100 of the MMPA, which permits the Attorney General to file for injunctive relief "before a completed violation of the" MMPA.  Hr'g Tr. at 36:7-11.  But nowhere does the Petition cite to § 407.100.  To the contrary, it expressly seeks "an order from the Court, pursuant to Section *407.090*, compelling Media Matters to comply with the CID within 20 days."  Pls.' Ex. 6 at 2–3 (emphasis added).

wrongdoing "is easily dispensed with" because the "operative complaint seeks a $1,000 civil penalty" and for that reason *Smith & Wesson* is "starkly different." Def.'s Reply at 2–3.  He also asserted that, regardless of the civil penalty request, Plaintiffs' failure to timely respond to the Missouri CID was itself a violation of Missouri law, making the enforcement action one seeking to sanction an "unlawful act." *Id.* at 3.

From this timeline, it is apparent that Defendant Bailey amended the Petition to request the $1,000 civil penalty to distinguish this case from *Smith & Wesson*.  After all, Defendant waited 40 days after April 15 to seek the civil penalty, and he did so only after Plaintiffs cited to a case that is nearly on all fours with this one.  Defendant offers no reason for this sequencing of events other than the one drawn by the court.  It is yet more proof that retaliation for protected expression was likely his true motive for investigating Media Matters.

\*     \*     \*

The court does not discard lightly the presumption of regularity generally afforded to prosecutorial decision-making.  *Cf. Hartman v. Moore*, 547 U.S. 250, 263 (2006) (discussing the presumption of regularity in the context of a criminal charging decision).  "But it falls on the judiciary to ensure that the First Amendment is not reduced to a parchment promise." *Gonzales v. Trevino*, 60 F.4th 906, 907 (5th Cir. 2023) (Ho, J., dissenting from denial of rehearing en banc).  And "the most heinous act in which a democratic government can engage is to use its law enforcement machinery for political ends." *Id.* (quoting Laurence H. Silberman, *Hoover's Institution*, WALL ST. J., July 20, 2005) (alteration omitted).  That apparently is what has occurred here.

App.325

On this record, the court finds that Plaintiffs are likely to succeed in proving a but-for causal linkage between their protected First Amendment activities, Defendant's decision to issue and enforce the Missouri CID, and Plaintiffs' chilled expression.

### E.   Irreparable Harm, Balance of the Equities, and the Public Interest

The court summarily addresses the final three injunction factors, as the same reasons for granting the injunction against Defendant Paxton apply equally here.   Plaintiffs will suffer irreparable harm in the absence of relief because the "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Media Matters*, 2024 WL 1773197, at *19 (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016)) (internal quotation marks omitted).   Defendant Bailey contends that Media Matters suffers no injury because it will not have to hand over documents until it has a full and fair opportunity to contest the CID in Missouri state court.   Def.'s Opp'n at 37.   That argument elides the ongoing chilling effects Plaintiffs have endured and would continue to endure from a continuation of the state-court proceedings.   Also, Defendant Bailey offers the self-inflicted harm argument as Defendant Paxton, Def.'s Opp'n at 38, to no avail.   *Media Matters*, 2024 WL 1773197, at *19.

The balance of equities and the public interest favor Plaintiffs as well.   *Media Matters*, 2024 WL 1773197, at *20.   Specifically, Missouri's interest in enforcing its consumer protection laws must give way when a state actor uses them to retaliate against a media organization for protected speech, *see supra* Section IV.F.

### V.

In conclusion, the court finds that Plaintiffs have demonstrated a likelihood of success on the merits, including personal jurisdiction over Defendant; they would be irreparably harmed absent an injunction; and the equities favor the requested relief.   Accordingly, the court grants

App.326

Plaintiffs' Motion for Preliminary Injunction, ECF No. 49.  For the same reasons, the court denies

Defendant's Motion to Dismiss, ECF No. 57.[11]   A separate, appealable order entering the

injunction preceded this opinion, ECF No. 70.


Dated:  August 23, 2024

_____
Amit P. Mehta
United States District Court Judge

---

[11] Given the posture of this case, the court does not address Defendant's arguments for dismissal of Plaintiffs' other claims.  Defendant may renew these arguments at later stages of this proceeding.  *See supra* n.1.

App.327

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, ERIC HANANOKI, | |
| Plaintiffs, | |
| v. | Civil Action No. 24-cv-00147-APM |
| WARREN KENNETH PAXTON JR., in his official capacity as Attorney General of the State of Texas, | |
| ANDREW BAILEY, in his official capacity as Attorney General of the State of Missouri | |
| Defendants. | |

---

**DEFENDANT ANDREW BAILEY'S NOTICE OF APPEAL**

---

Pursuant to 28 U.S.C. § 1292(a)(1) and Rules 3(a)(1) and 4(a)(1)(A) of the Federal Rules of Appellate Procedures, notice is hereby given that Defendant Andrew Bailey, in his official capacity as Attorney General of the State of Missouri, appeals to the United States Court of Appeals for the District of Columbia Circuit from the Preliminary Injunction Order, ECF 70, dated August 22, 2024, and accompanying Memorandum Order, ECF 71, dated August 23, 2024, which granted Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction Against Bailey, ECF 49, and thus, is immediately appealable under 28 U.S.C. § 1292(a)(1).  Defendant also hereby appeals from all subsidiary rulings incorporated in the Memorandum Opinion and Order.

A copy of the Memorandum Opinion and Order is attached hereto as Exhibit 1.

App.328

Date: September 20, 2024                    Respectfully submitted,

                                            ANDREW BAILEY
                                            Attorney General of Missouri

                                            /s/ *Joshua M. Divine*
                                            JOSHUA M. DIVINE, #69875MO
                                            Solicitor General

                                            JEREMIAH J. MORGAN, #50387MO
                                            Deputy Attorney General – Civil
                                            REED C. DEMPSEY, #1697941DC
                                            Deputy Solicitor General

                                            OFFICE OF THE ATTORNEY GENERAL
                                            Supreme Court Building
                                            207 West High Street
                                            P.O. Box 899
                                            Jefferson City, Missouri 65102
                                            Tel. (573) 751-1800
                                            Fax (573) 751-0774
                                            josh.divine@ago.mo.gov
                                            jeremiah.morgan@ago.mo.gov

                                            *Counsel for Defendant Missouri Attorney General*

2

App.329

**CERTIFICATE OF SERVICE**

I certify that on September 20, 2024, a true and accurate copy of the foregoing document was electronically filed through the Court's CM/ECF System and that a copy of the foregoing will be sent via email to all parties by operation of the Court's electronic filing system, all consistent with Federal Rule of Civil Procedure 5(b).

/s/ *Joshua M. Divine*
Counsel for Missouri Attorney General

App.330